**No. 24-4100**

_____

**In the United States Court of Appeals for the Tenth Circuit**

_____

NetChoice, LLC,

*Plaintiff/Appellee,*

v.

Derek Brown, Utah Attorney General, and Katherine Hass, Director, Utah Division of Consumer Protection, Utah Department of Commerce,

*Defendants/Appellants.*

_____

On appeal from an order granting a preliminary injunction
U.S. District Court, District of Utah, Honorable Robert J. Shelby,
No. 2:23-cv-00911-RJS-CMR

_____

**Principal Brief of Appellants**

_____

Stanford E. Purser
Utah Solicitor General
Erin T. Middleton
Deputy Solicitor General
David Wolf
Lance Sorenson
Assistant Attorneys General
Utah Attorney General's Office
P.O. Box 140858
Salt Lake City, UT 84114
(801) 366-0533
*Counsel for Derek Brown and
Katherine Hass*

**Oral Argument Requested**

# Table of Contents

Table of Authorities.................................................................................v

Statement of Related Cases .................................................................1

Jurisdictional Statement.......................................................................1

Introduction...........................................................................................2

Statement of the Issues........................................................................4

Statement of the Case...........................................................................5

I.   Statement of Facts..........................................................................5

    A.   Social media companies' constant access to children...................5

    B.   Social media's harmful effects on children..................................6

    C.   The battle for user attention and data ......................................10

    D.   The Act .......................................................................................13

II.  Procedural History ........................................................................14

Summary of Argument.........................................................................16

Argument..............................................................................................19

I.   The district court erred by holding NetChoice is substantially
    likely to succeed on the merits. ....................................................21

    A.   The central coverage definition is content-neutral. ..................22

        1.   The central coverage definition is content-neutral. ............24

        2.   The "interact socially" requirement is not
            content-based. .......................................................................28

        3.   This case is more like *Reagan* than *Reed*. ............................30

4. The central coverage definition does not restrict NetChoice's members' ability to collage user generated speech. ...................................................................... 32

B. The Act survives intermediate scrutiny. ..................................... 39

1. The Act serves the State's substantial and important interests. ............................................................................. 40

a. The State has a substantial interest in protecting children's mental health. ............................................. 42

b. The district court's decision doesn't mean the State's substantial interest in protecting children's mental health fails intermediate scrutiny ................................................... 44

c. The State has a substantial interest in protecting minors' privacy. ...................................... 51

2. The Act is narrowly tailored to serve the State's interests. ............................................................ 54

a. The Act serves the State's interests in a direct and effective way. ....................................... 54

b. The Act need not be the least restrictive means. ......... 56

c. The Act is not overinclusive. ........................................ 58

d. The Act does not fail intermediate scrutiny for being underinclusive ............................................... 61

3. The Act leaves open ample channels of communication. ..... 64

II. The district court erred by finding the remaining preliminary injunction factors favored NetChoice ........................................... 67

Conclusion .................................................................................... 69

Statement of Oral Argument ............................................................ 69

Certificate of Compliance ..........................................................70

CM/ECF Certification .............................................................71

Certificate of Service ..............................................................72

**Addenda**

Addendum A—Utah Minor Protection in Social Media Act

Addendum B—Memorandum Decision & Order Granting
　　　　　Preliminary Injunction

# Table of Authorities

## Cases

*Abilene Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson Cnty., Kan.*,
492 F.3d 1164 (10th Cir. 2007) ........................................................... 41

*Am. Broad. Cos. v. Aereo, Inc.*,
573 U.S. 431 (2014) ................................................................................ 36

*Am. Target Advertising, Inc. v. Giani*,
199 F.3d 1241 (10th Cir. 2000) ..................................... 22, 23, 39, 40

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ................................................................................ 21

*Ashcroft v. Am. Civil Liberties Union*
542 U.S. 656 (2004) ................................................................................ 60

*Brewer v. City of Albuquerque*,
18 F.4th 1205 (10th Cir. 2021) .................................................. 20, 57

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ...................................................................... 44, 53

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022) ................................................. 22, 23, 25, 32, 38

*City of Los Angeles v. Alameda Books, Inc.*,
535 U.S. 425 (2002) ................................................................ 41, 44, 46

*City of Renton v. Playtime Theaters, Inc.*,
475 U.S. 41 (1986) ........................................................................ 23, 41

*Countryman v. Farmers Ins. Exch.*,
545 F. App'x 762 (10th Cir. 2013) ..................................................... 48

*Courthouse News Serv. v. New Mexico Admin. Office of Courts*,
53 F.4th 1245 (10th Cir. 2022) ........................................................... 20

*Eccles v. Peoples Bank of Lakewood Vill., Cal.*,
  333 U.S. 426 (1948) .............................................................. 19

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975) ................................................... 53, 61, 66

*Evans v. Sandy City*,
  944 F.3d 847 (10th Cir. 2019) ...................................... 58, 64

*Fish v. Kobach*,
  840 F.3d 710 (10th Cir. 2016) ............................................ 69

*Frazier v. Winn*,
  535 F.3d 1279, (11th Cir. 2008) ........................................ 53

*Golan v. Holder*,
  609 F.3d 1076 (10th Cir. 2010) ............................... 40, 41, 54

*Harmon v. City of Norman, Oklahoma*,
  981 F.3d 1141 (10th Cir. 2020) .......................................... 40

*Heideman v. S. Salt Lake City*,
  348 F.3d 1182 (10th Cir. 2003) ............................... 19, 20, 46

*Hodgson v. Minnesota*,
  497 U.S. 417 (1990) ............................................................ 52

*In re Taylor*,
  899 F.3d 1126 (10th Cir. 2018) .......................................... 20

*Leonard v. HGM Park Manor of Salina, LLC*,
  No. CV 22-2267-KHV, 2023 WL 8452140
  (D. Kan. Dec. 6, 2023) (unpublished) ................................ 48

*Maryland v. King*,
  567 U.S. 1301 (2012) .................................................... 19, 68

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ............................................................ 19

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ....................... 17, 21, 33, 34, 35, 36, 37, 38, 58, 59

*N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*,
854 F.3d 1236 (10th Cir. 2017) .......................................... 68

*NetChoice v. Bonta*,
-- F. Supp. 3d ---, 2024 WL 5264045 (2024) ................................... 37, 38

*NetChoice, LLC v. Fitch*,
738 F. Supp. 3d 753 (S.D. Miss. 2024) ................................. 30

*NetChoice, LLC v. Yost*,
716 F. Supp. 3d 539 (S.D. Ohio 2024) ................................. 53

*New York v. Ferber*,
458 U.S. 747 (1982) ............................................... 42

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................... 68

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
734 F.3d 406 (5th Cir. 2013) ............................................. 68

*Pryor v. Sch. Dist. No.*,
*1*, 99 F.4th 1243 (10th Cir. 2024) ....................................... 67

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) ............................................ 22, 23, 30, 31

*Reno v. ACLU*,
521 U.S. 844 (1997) ............................................... 60

*Roper v. Simmons*,
543 U.S. 551 (2005) ............................................... 12

*StreetMediaGroup, LLC v. Stockinger*,
79 F.4th 1243 (10th Cir. 2023) ......................................... 22

*Television v. F.C.C.*,
(en banc), 58 F.3d 654 (D.C. Cir. 1995) ................................... 42

*Territory of Alaska v. American Can Co.*,
358 U.S. 224 (1959) ............................................... 48

*TikTok Inc. v. Garland*,
  604 U.S. ---, 145 S. Ct. 57 (2025)..........22, 27, 51, 54, 56, 57, 58, 61, 62

*TikTok, Inc. v. Trump*,
  490 F.Supp.3d 73 (D.C. 2020) ............................................................. 11

*Turner Broad. Sys., Inc. v. F.C.C.*,
  512 U.S. 622 (1994) (*Turner I*) ...................23, 26, 27, 28, 44, 48, 56, 57

*Turner Broad. Sys., Inc. v. F.C.C.*,
  520 U.S. 180 (1997) (*Turner II*)......................................... 41, 44, 45, 46

*Univ. of Texas v. Camenish*,
  451 U.S. 390 (1981) ............................................................................ 46

*VoteAmerica v. Schwab*,
  121 F.4th 822 (10th Cir. 2024)............................................................ 39

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ......................................................... 23, 25, 40, 54

*Williams-Yulee v. Florida Bar*,
  575 U.S. 433 (2015) ............................................................................ 62

## Statutes

28 U.S.C. § 1292 ................................................................................... 1

28 U.S.C. § 1331 ................................................................................... 1

Utah Code § 13-71-101 .......................................................................... 1

Utah Code § 13-71-101(1)..................................................... 10, 11, 13, 14

Utah Code § 13-71-101(11)................................................................... 65

Utah Code § 13-71-101(13)............................................................. 24, 29

Utah Code § 13-71-101(14)............................................................. 24, 29

Utah Code § 13-71-101(14)(a)(i) ......................................................... 33

Utah Code § 13-71-101(15)................................................................... 10

Utah Code § 13-71-102 ........................................................ 13, 42, 47, 48

Utah Code § 13-71-102(2)................................................................55

Utah Code § 13-71-102(3)................................................................55

Utah Code § 13-71-102(3),...............................................................57

Utah Code § 13-71-102(6)................................................................55

Utah Code § 13-71-102(7)................................................................57

Utah Code § 13-71-202 ...............................................................63, 66

**Rules**

Fed. R. App. P. 32(a)(5) .................................................................70

Fed. R. App. P. 32(a)(6) .................................................................70

Fed. R. App. P. 32(a)(7)(B) .............................................................70

Fed. R. App. P. 32(B) ....................................................................70

Fed. R. App. P. 43(c)(2)...................................................................1

Fed. R. Evid. 201 .........................................................................50

Fed. R. Evid. 201(b) ......................................................................48

Fed. R. Evid. 201(c) ......................................................................48

Fed. R. Evid. 201(d) ......................................................................48

**Other Authorities**

Ayelet Gordon-Tapiero and Yotam Kaplan, *Unjust Enrichment by Algorithm*, 92 Geo. Wash. L. Rev. 305 (2024)..................................10

Kaveh Waddell, *Your Data is Forever*, The Atlantic, June 2, 2016 ..................................................................12

*Constant Companion: A week in the life of a young
person's smartphone use*, *Common Sense Media* (Sept. 26, 2023) ........7

Elizabeth Chuck, *Major psychology group says infite scrolling,
other social media features are 'particularly risky'
to youth mental health,* NBC News (April 15,
2024)……………………………………………………………….…11

G. Wells, J. Horwitz, and D. Seetharaman, *Facebook Knows
Instagram is Toxic for Teen Girls, Company Documents Show*,
Wall Street Journal (Sept. 14, 2021) ....................................................8

Greg Lukianoff  and Jonathan Haidt, *The Coddling of the American
Mind: How Good Intentions and Bad Ideas Are Setting Up a
Generation for Failure,*
Penguin Press (New York, 2018) ............................................................2

Jonathan Haidt, The Anxious Generation: How the Great
Rewiring of Childhood is Causing an Epidemic of
Mental Illness, (2024) ............................................................ 11, 61, 63

Josh Obear, *Note: Move Last and Take Things,*
2018 Colum. Bus. Law Rev. 994 ............................................................10

*Merriam-Webster.com*, *Social*, def. 3,
https://www.merriam-
webster.com/dictionary/social..............................................................28

Mark D. Griffiths, *Adolescent social networking: How do social media
operators facilitate habitual use?,*
Education and Health, Vol. 36 (2018)................................................12

S.B. 194, *Social Media Regulation Amendments*, Utah Senate Bus. and
Lab. Comm. Meeting,
2024 Gen. Leg. Sess, Feb. 15, 2024........................ 10, 11, 12, 49, 50, 51

## Statement of Related Cases

There are no prior or related appeals.

## Jurisdictional Statement

NetChoice, LLC filed a complaint against the Utah Attorney General[1] and Katherine Hass, the director of the Utah Division of Consumer Protection (collectively, the State), claiming the Utah Minor Protection in Social Media Act (the Act), Utah Code 13-71-101 to -401, is unconstitutional under the First Amendment. App.1:14-61.[2] The district court had jurisdiction. 28 U.S.C. § 1331.

The district court granted NetChoice's motion for preliminary injunction on September 10, 2024. App.5:926-64. The State filed a notice of appeal on October 10, 2024. App.5:965. This Court has jurisdiction over appeals from orders granting preliminary injunctions 28 U.S.C. § 1292.

---

[1] This litigation was filed against then Utah Attorney General Sean D. Reyes. Derek Brown became the Utah Attorney General in January 2025, so he has been substituted as a party. Fed. R. App. P. 43(c)(2).
[2] Appendix (App.) citations appear as volume:page, for example volume 1 page 14 is App.1:14.

## Introduction

The first president of Facebook once described the thought process behind building social media sites:

> [It] was all about: How do we consume as much of your time and conscious attention as possible? . . . [W]e need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post . . . . And that's going to get you to contribute more content . . . . It's a social-validation feedback loop . . . exploiting a vulnerability in human psychology.

He concluded: "God only knows what it's doing to our children's brains."[3]

We now know what excessive social media use does to children's brains. It has caused an alarming spike in adverse mental health outcomes among teenagers. It increases youth susceptibility to depression, anxiety, self-harm, and suicide.

Despite this, social media companies have laced their products with highly addictive elements that act like nicotine in tobacco or the design features of casinos, meant to keep gamblers at the slots and tables as long as possible. These addictive elements have nothing to do

---

[3] Greg Lukianoff and Jonathan Haidt, *The Coddling of the American Mind: How Good Intentions and Bad Ideas Are Setting Up a Generation for Failure* 147 (2018).

with the underlying content and everything to do with trapping youth in an endless loop, where their eyeballs are constantly drawn to social media, so the social media companies can profit from the data.

These addictive elements work. The average teenager spends five hours per day on social media. Nearly a third of 13- to 18-year-olds say they are on social media constantly. Even the most conscientious parents are losing the battle to maintain effective parental controls. For all these reasons, the former U.S. Surgeon General warned, "We must . . . urgently take action" to protect children from these harms.

Utah heeded this warning. It adopted the Act to implement safeguards for minor accounts. Social media companies must disable certain addictive product features and set child-protective default privacy settings absent parental consent.

The problem is the Act cannot currently protect minors because the district court enjoined it. NetChoice asserted it violated the First Amendment rights of its members, some of the world's largest social media companies. Although the Act doesn't make any distinctions based on message or content, the court still held the Act's very attempt to define and regulate "social media companies" was content-based and

therefore applied strict scrutiny. That was wrong. The Act's definition of "social media company" is content-neutral, so the district court should have applied (at most) intermediate scrutiny. This Court should reverse and vacate the district court's injunction so the Act can once again serve the Utah Legislature's compelling interest in protecting the State's children.

## Statement of the Issues

Whether the district court erred by holding NetChoice was substantially likely to succeed on the merits of its facial claim that the Act's central coverage definition—defining social media companies and social media services—is content-based, thus subjecting the Act to strict scrutiny, even though the definition does not disfavor any content.

This issue was preserved. App.2:249-85.

Whether the district court abused its discretion when it found the remaining preliminary injunction factors weighed in NetChoice's favor.

This issue was preserved. App.2:286-87.

## Statement of the Case

### I.    Statement of Facts

#### A.    Social media companies' constant access to children

Internet connectivity arrived in two waves. App.2:306. First, the 1990s saw an increase in the paired technologies of personal computers and internet access, both of which could be found in most homes by 2001. *Id.* The second wave was the rapid increase in the paired technologies of social media and smartphones, beginning around 2007 and reaching most homes by 2012 or 2013. App.2:307.

By 2024, forty-three percent of 8- to 12-year-olds and ninety-five percent of 13- to 17-year-olds in the U.S. had smartphones. *Id.* The average teenager spends five hours *per day* on social media, far more than they spend on other activities, including homework, sports, reading, or other hobbies. App.2:307-08. Studies demonstrate the number of teenagers on social media and how long they spend on social media increased dramatically between 2010 and 2015. App.2:308. In 2009, about 50% of American high school seniors were using social media every day. *Id.* In 2011, about 75% of American high school seniors were using social media every day. *Id.* By 2015, 15% of American high school girls were using social media for more than forty

hours per week. *Id.* For 13- to 18-year-olds, 95% use social media, and more than 33% of them say they are using it almost constantly. *Id.*

## B.    Social media's harmful effects on children

There has been a drastic increase in teen mental illness since 2010. App.2:309. Rates of major depressive disorders have more than doubled since 2010. *Id.* Major depression has increased 161% for boys and 145% for girls. *Id.* By 2021, about a third of American girls reported experiencing major depression. *Id.* Hospital admissions for teenagers who have intentionally harmed themselves have increased sharply since about 2010. *Id.* Suicide rates among 10- to 14- year-old girls in the U.S. have doubled since 2010. App.2:310.

This collapse in teen mental health coincides with a time when most Americans owned a smartphone and more than 70% of high school students used social media daily. *Id.* Correlational studies have consistently shown a link between heavy social media use and mood disorders. *Id.* Social media use among adolescents is correlated to cyberbullying-related depression, body image and eating disorders, poor sleep, online harassment, low self-esteem, and higher depressive symptoms. *Id.* Additionally, social media-induced fear of missing out, or

"the pervasive apprehension that others might be having rewarding experiences from which one is absent," has been associated with depression, anxiety, and neuroticism. App.2:313, 343.

Newer research demonstrates causation, not just correlation. Excessive and problematic social media use, such as compulsive or uncontrollable use, has been linked to sleep problems, attention problems, and feelings of exclusion among adolescents. App.2:312. A systematic review of fifty-five studies found a consistent relationship between social media use and poor sleep quality, reduced sleep duration, sleep difficulties, and depression among youth. *Id.* Social media, more than TV or gaming, is linked to shorter sleep, more mid-sleep awakenings, and longer time to fall asleep. *Id.;* App.2:313.[4] Poor sleep, in turn, has been linked to altered neurological development in adolescent brains, depressive symptoms, and suicidal thoughts and behaviors. App.2:312. Even *social media companies* have internal research establishing the causal link between their product and poor

---

[4] *See* also *Constant Companion: A week in the life of a young person's smartphone use*, *Common Sense Media* (Sept. 26, 2023) (stating more than half of teens use phones overnight, primarily for YouTube), https://www.commonsensemedia.org/research/constant-companion-a-week-in-the-life-of-a-young-persons-smartphone-use.

mental health, with Facebook finding it makes "body issues worse for 1 in 3 teen girls." App.2:314.[5]

Studies also show the more time teens spend on social media per day beyond one or two hours, the more depressed they are. App.2:310. A 2023 Gallup study found 37% of adolescents who spend more than three hours per day on social media report poor mental health, compared with 23% who spend less than three hours per day. App.2:311. These studies are consistent with a 2022 meta-analysis finding a strong connection between social media use and depression/anxiety. *Id.* It found there is a 13% increase in depression for each additional hour spent on social media per day. *Id.* A longitudinal cohort study of U.S. adolescents aged 12 to 15 found that adolescents who spent more than three hours per day on social media faced double the risk of experiencing poor mental health outcomes including symptoms of depression and anxiety. *Id.*

Conversely, there are experimental studies showing cutting back or giving up social media causes better mental health. App.2:314.

---

[5] *See also* G. Wells, J. Horwitz, and D. Seetharaman, *Facebook Knows Instagram is Toxic for Teen Girls, Company Documents Show*, Wall Street Journal (Sept. 14, 2021).

Limits on social media use have resulted in mental health benefits for young adults and adults. App.2:314-15. A randomized controlled trial in college-aged youth found limiting social media use to thirty minutes daily over three weeks led to significant improvements in depression severity. *Id.* Other studies show improvement in mental health outcomes when social media is restricted. *Id.* For example, one researcher paid people to try to get off social media, and he reported reduced social media use increased general happiness. App.2:315. A random assignment experiment found reducing social media use to one hour a day improved youths' confidence in their appearance. *Id.* Another experiment randomly assigned college students to engage in common activities. *Id.* Walking and studying increased positive mood, while using social media decreased positive mood. *Id.*

### C.    The battle for user attention and data

Social media companies are "attention brokers."[6] They generally offer their products for free in exchange for user[7] time and data.[8] The companies then sell advertising space to marketers who covet such space and the attendant user data so they can target advertisements to specific audiences.[9]

Social media companies are thus financially incentivized to keep eyeballs on screens. The amount of data they can acquire about users and their networks is linked to revenue.[10] Social media companies are financially incentivized to target adolescents because once an individual

---

[6] Josh Obear, *Note: Move Last and Take Things,* 2018 Colum. Bus. Law R. 994, 1007.

[7] Unless otherwise noted, the State uses the term "user" to include those defined as "users" and as "account holders." Utah Code § 13-71-101(1),(15).

[8] Ayelet Gordon-Tapiero & Yotam Kaplan, *Unjust Enrichment by Algorithm*, 92 Geo. Wash. Law Rev. 305, 314, 317-18 (2024).

[9] *Id.*; *see also* Ober, *supra* n.6*,* at 1030 ("Facebook also provided advertisers with a startling amount of customizability in selecting their target demographic – today, advertisers can select up to ninety-eight personal data points such as location, age, generation, gender [etc.]")

[10] *S.B. 194, Social Media Regulation Amendments*, Utah Senate Bus. and Lab. Comm. Meeting, 2024 Gen. Leg. Sess, Feb. 15, 2024, Testimony of Serge Jorgensen, Partner, Sylint Group, Min. 17:04, *at* https://le.utah.gov/av/committeeArchive.jsp?timelineID=250130. Mr. Jorgensen explained social media companies are financially incentivized to collect data from users and that usage is linked to revenue.

registers for a social media platform and becomes addicted to it, they

are less likely to switch platforms.[11] But once lost, users are unlikely to

return.[12]

Like casinos designed to keep gamblers at the tables, social media

sites have added features that foster addiction,[13] regardless of the

content viewed. Among these design elements are infinite scroll (by

which content loads continuously so a user never sees a page break in

their social media feed), autoplay features (through which the next

video automatically begins playing without any user activity), and push

notifications (which "ping" users regarding any number of activities

happening on their social media feeds, even when the user is not on the

_____

[11] *Jorgensen Testimony, supra n.*10.

[12] *See TikTok, Inc. v. Trump*, 490 F.Supp.3d 73, 84 (D.C. 2020) ("The nature of social media is . . such that users are unlikely to return to platforms they have abandoned[.]").

[13] *See* Jonathan Haidt, *The Anxious Generation: How the Great Rewiring of Childhood is Causing an Epidemic of Mental Illness* 130 (2024); Elizabeth Chuck, *Major psychology group says infinite scrolling, other social media features are 'particularly risky' to youth mental health*, NBC News (Apr. 15, 2024) https://www.nbcnews.com/news/us-news/psychology-group-says-infinite-scrolling-social-media-features-are-par-rcna147876.

application or website). App.2.341. These features are meant to grab attention and keep users coming back. *Id.*[14]

This battle for user attention and data has heightened ramifications when youth are involved. Adolescents often do not understand or appreciate the risks of providing information about themselves or their families to social media companies and other users.[15] They may not understand personal data becomes everlasting once given to a social media company or another user.[16] Social media companies can spread an individual child's worst moments—whatever they may be—around the world instantly, never to be deleted, impacting their peer relationships and future educational and job

---

[14] *See also* Mark D. Griffiths, *Adolescent social networking: How do social media operators facilitate habitual use?,* Education and Health, Vol. 36, No. 3, at 67-78 (2018) (describing how push notifications and promises of social rewards keep users coming back to social media platforms); *see also* Elizabeth Chuck, *supra* n.13.

[15] *See* Jorgensen Testimony, *supra* n.10; *see also Roper v. Simmons,* 543 U.S. 551, 569 (2005) (distinguishing between juvenile offenders because "scientific and sociological studies" confirm a "lack of maturity and underdeveloped sense of responsibility" in youth "often result[s] in impetuous and ill-considered actions and decisions").

[16] *Cf.* Kaveh Waddell, *Your Data is Forever*, The Atlantic, June 2, 2016. https://www.theatlantic.com/technology/archive/2016/06/your-data-is-forever/485219/ (explaining permanence of personal information on the internet).

opportunities.[17] And the user data may be used in the future in ways we do not yet understand.

### D.    The Act

Recognizing these perils, the Utah legislature passed the Act to serve its compelling interest in protecting its children's mental health and privacy. Utah Code § 13-71-102. To that end, the Act adopts limited requirements for how "social media companies" operate their "social media services." The district court referred to the definitions of social media company and social media service as the "central coverage definition." App.5:943.

The Act first requires "social media companies" to adopt an age assurance system on their social media services so they can identify accounts held by Utah users under the age of eighteen (minor accounts). *Id.* § 13-71-201(1).

The Act then adopts restrictions for those minor accounts. It requires social media companies to disable the addictive features of autoplay, infinite scroll, and push notifications for all minor accounts. *Id.* §§ 13-71-101(11), -202(5). It also requires social media companies to

---

[17] Jorgensen Testimony, *supra* n.10.

13

set default privacy settings on their social media services to prioritize maximum privacy for minor accounts. *Id.* § 13-71-202(1). These settings include limiting the visibility of and access to the minor account holder to "connected accounts," which are defined as accounts "directly connected to" the minor account holder's account or to an account "directly connected to the minor account holder's account." *Id.* §§ 13-71-101(3), -202. More colloquially, default visibility is limited to "friends" or "friends of a friend." These default privacy settings must remain in place unless a parent consents to change them. *Id.* § 13-71-204(1)-(3).

The Act instructs the director of Utah's Division of Consumer Protection to enforce the Act, and authorizes the Utah Attorney General to advise her. *Id.* §§ 13-71-301(1), (2). It was set to go into effect in October 2024.

## II.   Procedural History

NetChoice is a nonprofit trade association for internet companies. App.5:928. Its members include many prominent social media companies, like Meta (Facebook and Instagram), YouTube, and Snap, Inc. *Id.*

NetChoice filed its first amended complaint against the Attorney General and Director Hass and moved for a preliminary injunction. App.5:936. NetChoice alleged the Act was facially unconstitutional under the First and Fourteenth Amendments because it impermissibly regulated the speech of NetChoice's members and of its members' users. App.5:936-37.

NetChoice argued it was substantially likely to succeed on the merits because the Act's central coverage definition was content-based thus subjecting the entire Act to strict scrutiny. App.1:96-100. NetChoice also raised other challenges, including that the Act's requirements that social media companies disable user engagement features and limit the visibility of minor accounts were unconstitutional. App.1:106-17.

The State opposed the preliminary injunction on the ground, among others, that NetChoice was not substantially likely to succeed on the merits. App.2:249-86. It showed the Act is content-neutral because it does not target any content or message but only imposes time, place, and manner-like restrictions. App.2:249-62. The State thus showed the court should apply intermediate scrutiny. App.2.260-63. Relying on the

evidence discussed above, the State showed the Act survived

intermediate or strict scrutiny because it was narrowly tailored to serve

the State's compelling interests in protecting children from the privacy

and mental health harms linked to social media. App.2:261-70.

Even though the Act does not regulate any ideas, the court held

NetChoice was substantially likely to succeed on the merits because the

Act's central coverage definition was content-based. App.5:941-46. The

Court then held NetChoice was substantially likely to succeed on its

argument that the entire Act failed strict scrutiny. App.5:947-57. The

court also held the remaining preliminary injunction factors favored

NetChoice. App.5:957-59. The district court enjoined enforcement of the

Act, App.5:963, and the State appealed, App.5:965.

## Summary of Argument

This appeal asks this Court to reverse the district court's holding

that the central coverage definition is content-based and vacate the

injunction.

The central coverage definition is content-neutral. To be content-

neutral, a law may require some evaluation of the speech, but may not

discriminate based on the topic or idea expressed. That is true of the

central coverage definition. It applies to websites or applications that have certain structural characteristics, no matter the content.

Despite that, the district court determined the central coverage definition was content-based because it applies to websites that allow users to "interact socially." That was wrong. The "interact socially" requirement does not target any type of content. It refers only to a feature that allows users to interact and that, when combined with the other definitional requirements, creates a platform that puts minors at increased risk regardless of the subject or purpose of communications.

The district court also incorrectly held the central coverage definition is content-based because NetChoice's members collage distinct compilations of user speech. That holding is based on a misapplication of *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), which addressed only whether social media companies could be compelled to include messages violating their content moderation policies. *Moody* does not suggest the very attempt to regulate social media companies is content-based.

Because the central coverage definition is content-neutral, the district court erred when it applied strict scrutiny. This Court should

17

remand so it can apply intermediate scrutiny. A law survives intermediate scrutiny if it is narrowly tailored to serve a substantial and important interest. The Act passes that test. The State has an important and substantial interest in protecting its children's privacy and mental health. The Act is narrowly tailored to serve that interest because it only requires social media companies to disable the addictive user engagement features for minors and get parental permission to change privacy settings. Notably, minors can still have social media accounts and post about whatever they want. NetChoice's members also are free to convey any ideas or viewpoints.

Because the Act is content-neutral and would survive intermediate scrutiny, the district court erred by finding NetChoice was substantially likely to succeed on the merits. It also erred by finding NetChoice prevailed under the remaining preliminary injunction factors. Because the Act survives intermediate scrutiny, it is the State, not NetChoice, that has suffered irreparable injury by having its law enjoined. So too, the balance of harms and public interest in protecting children weigh in the State's favor. This Court should reverse.

# Argument

The district court erred by granting NetChoice's motion to preliminarily enjoin enforcement of the Act. A preliminary injunction is an "extraordinary" action. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Fed. Practice & Procedure § 2948, pp. 129-130 (2d. ed. 1995)). "[E]specially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." *Eccles v. Peoples Bank of Lakewood Vill., Cal*., 333 U.S. 426, 431 (1948). This is because "any time a State is enjoined . . . from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (internal citation omitted).

The moving party thus bears the heavy burden of establishing its right to relief is "clear and unequivocal." *Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1188 (10th Cir. 2003). It must show: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury; (3) the threatened injury outweighs whatever

damage an injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest. *Id.* at 1188.

This Court reviews a district court's preliminary injunction decision for abuse of discretion. *Courthouse News Serv. v. New Mexico Admin. Office of Courts*, 53 F.4th 1245, 1254 (10th Cir. 2022). A court abuses its discretion if it "rests on an erroneous legal conclusion or lacks a rational basis in the record." *Id.* Factual findings are thus generally reviewed for clear error and legal conclusions, like statutory interpretations, are reviewed de novo. *Id.* at 1255; *see also In re Taylor*, 899 F.3d 1126, 1129 (10th Cir. 2018) (statutory interpretation is a question of law). The Court also reviews de novo the factual and legal conclusions underlying First Amendment issues. *See Brewer v. City of Albuquerque*, 18 F.4th 1205, 1216 (10th Cir. 2021).

The district court erred when it enjoined the enforcement of the Act. Its determination that NetChoice is substantially likely to succeed on the merits of its facial challenge is based on the incorrect legal conclusion that the Act is content-based and subject to strict scrutiny. The district court also abused its discretion when it determined the remaining factors favored the injunction.

20

I.    **The district court erred by holding NetChoice is substantially likely to succeed on the merits.**

The district court erred when it held NetChoice is substantially likely to succeed on its claim that the Act is facially unconstitutional. Facial challenges are "disfavored." *Moody*, 603 U.S. at 723. They often rest on speculation about the "law's coverage and its future enforcement." *Id.* at 723. They thus "threaten to short circuit the democratic process" by preventing the states from enforcing their laws in constitutional ways. *Id.* So even in the First Amendment context, facial challenges are—and should be—"hard to win." *Id.* A plaintiff cannot succeed on a facial challenge under the First Amendment unless it shows a "substantial number of the laws' applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (quoting *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)).

The district court incorrectly held that NetChoice had met this burden because the Act's central coverage definition was content-based and the Act did not pass strict scrutiny. App.5:942-43. The district court was wrong. The Act's central coverage definition is content-neutral, so the court should have applied intermediate scrutiny to the Act

21

### A.    The central coverage definition is content-neutral.

The first step in a First Amendment challenge is to determine whether the law is content-based. *Am. Target Advertising, Inc. v. Giani*, 199 F.3d 1241, 1247 (10th Cir. 2000). A content-based law is subject to strict scrutiny, *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 164 (2015), while a content-neutral law is subject to intermediate scrutiny, *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1252 (10th Cir. 2023). The reason for the lower scrutiny is that content-neutral regulations "pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *TikTok Inc. v. Garland*, 604 U.S. ---, 145 S. Ct. 57, 67 (2025).

A law is content-based on its face if it "target[s] speech based on its communicative intent." *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022). The "principal inquiry" is whether the government adopted the law "because of disagreement with the message it conveys." *American Target*, 199 F.3d at 1247.

On the other hand, a law is content-neutral when it is "agnostic as to content." *Reagan*, 596 U.S. at 69. Laws that "confer benefits or impose burdens on speech without reference to the ideas or views

expressed are in most instances content neutral." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994) ("*Turner I*"). A law is content-neutral even if it "require[s] some evaluation of the speech," so long as it does not discriminate "based on the topic discussed or the idea or message expressed." *Reagan*, 596 U.S. at 72, 73-74 (quoting *Reed*, 576 U.S. at 171). For example, time, place, and manner laws are content-neutral so long as they are "justified without reference to the content of the unregulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791-92 (1989) (citation and internal quotation marks omitted). So too, regulations designed not to suppress a message but to control "the 'secondary' effects of speech, will generally be deemed to be content neutral," *Am. Target*, 199 F.3d at 1247 (quoting *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 47-48 (1986)).

Deciding whether a law is content-based is "not always a simple task." *Turner I*, 512 U.S. at 642. Nor does a determination that a law is facially content-neutral necessarily end the inquiry. *Reagan*, 596 U.S. at 76. A facially content-neutral law may still be content-based if there is evidence the law's purpose was to regulate speech because the government disagrees with the message. *Id*.

The central coverage definition is content-neutral on its face. It is merely a time, place and manner restriction on websites that have certain structural characteristics—regardless of the message, speaker or viewpoint. The district court erred when it held otherwise.

### 1. The central coverage definition is content-neutral.

The Act's central coverage definition defines a social media company as an entity that owns or operates a social media service, which in turn is defined as a website or application that (i) displays content primarily generated by account holders; (ii) permits an individual to register as an account holder and create a profile visible to others; (iii) connects account holders "to allow users to interact socially with each other" within the application; (iv) makes available to each account holder a list or lists of other account holders with whom they share a connection; and (v) allows account holders to post content viewable by other users. Utah Code §§ 13-71-101(13) & (14). All five structural attributes must exist for a service to be subject to the Act's enforcement.

This definition is content-neutral. The Act treats all companies that operate social media services the same, regardless of whether those

social media services have a topical focus or promote (or disfavor) particular content. And the Act does not regulate the type of content social media companies—or their users—can display. It is wholly "agnostic as to content." *Reagan*, 596 U.S. at 69.

Rather than policing content, the central coverage definition regulates websites and applications with certain structural attributes. Determinations about whether the Act applies can be made based on how a website or application works, absent any judgment about the message conveyed.

Because the application of the Act's central coverage definition does not depend on the underlying message, the Act functions more like a content-neutral time, place, and manner restriction. And those regulations have long been subject to intermediate scrutiny so long as they don't attempt to disfavor certain messages. *See, e.g., Reagan*, 596 U.S. at 71 (concluding law distinguishing between signs based on their location in relation to the services being advertised was "similar to ordinary time, place, or manner restrictions" and was thus content-neutral); *Ward*, 491 U.S. at 792-93 (holding ordinance requiring park

25

performers to use the city's sound equipment was content-neutral because it applied regardless of message).

Beyond time, place, and manner standards, the Supreme Court has recognized structural regulations can be content-neutral. In *Turner I*, for example, the Court reviewed a law that applied only to cable television carriers and required them to carry some local broadcast stations. 512 U.S. at 630. The Court held this law was content-neutral on its face because it applied to all cable operators of a certain size, regardless of their programming. *Id.* at 644-45. Here, the central coverage definition is content-neutral because it applies to all social media services, regardless of messaging. The district court erred when it held otherwise.

*Turner I* also recognized regulating cable television's unique structures was a content-neutral purpose. It held the regulations were "justified by special characteristics" of that medium and the particular risk those characteristics posed to the viability of the nation's broadcast

system. *Turner I*, 512 U.S. at 652, 661-62.[18] In so holding, the Court

specifically rejected the argument that the regulation was content-

based just because it "applie[d] to one medium (or a subset thereof) but

not others." *Id.* at 660; *see also id.* at 652 (stating must-carry provisions

were based on unfair competition by "cable systems" and not

disfavoring ideas); *see also TikTok*, 145 S. Ct. at 68 (recognizing strict

scrutiny is unwarranted "when the differential treatment is justified by

some special characteristic" of the speaker or media being regulated)

(quoting *Turner I,* 512 U.S. at 659)).

Like *Turner I*, the central coverage definition regulates websites

and applications based on their structural characteristics. That

structure sets social media services apart from other websites because it

creates the fully immersive, interactive experience that has been

uniquely tied to the youth mental health crisis. But the regulation of

websites that meet the criteria of a social media service is fully agnostic

---

[18] The district court said *Turner I's* analysis was inapplicable because that law was content-neutral on its face, so the court considered the purpose of the law. App.5:947 n.112. That distinction is irrelevant because the Act is facially content-neutral. Besides, *Turner I* recognized regulating the structural characteristics was content-neutral. That is no less true when the regulation of structural characteristics is facially apparent.

to content. It applies the same, no matter what users view or talk about. Accordingly, the Act's regulation of social media—and not other internet media—is facially content neutral.

### 2.     The "interact socially" requirement is not content-based.

Although the Act doesn't disfavor speech on any topic, subject, or viewpoint, the district court still held it was content-based because of the definition's requirement that the social media service "allow users to interact socially" with each other within the application or website. App.5:945. This, the court held, was content-based because it divides the world between social platforms and platforms for "news, sports, commerce, [and] online video games." *Id.*

The court's holding misunderstood the "interact socially" requirement which, like the other definitional characteristics, is based on identifying structural criteria, regardless of content. "Social" interaction merely describes human beings interacting together as part of an online "society." *See* Merriam-Webster.com, *social* meaning 3, "of or relating to human *society*, the interaction of the individual and the group, or the welfare of human beings as members of *society*," available at https://www.merriam-webster.com/dictionary/social (emphasis

added). It describes whether and how a platform allows users to connect—not any reason for, or topic of, the interaction. The basis for social interaction could be many different topics—selling a bicycle or discussing the news or networking for a job—the Act does not distinguish between those many purposes or require them to be for a social, rather than some other, objective.

But while the Act includes social interactions as one of the required features of a social media service, it does not divide the internet between social interactions and other websites. App.5:945n.105. There are many websites not covered by the Act that might also allow social interaction. Internet users can, for example, interact in the comments section of a variety of websites, including those about news and sports. Yet those social interactions do not trigger the Act unless the site with the comment section also satisfies the other requirements of the central coverage definition. Utah Code § 13-71-101(13), (14). The question, then, is whether a website is structured, regardless of content or purpose, to allow users to interact *in addition* to meeting the other requirements of section 13-71-101(14). And that is a question of structure, not content.

29

To support its holding, the court noted the Act does not apply to platforms for "news, sports, commerce, and online video games." App.5.945. In support, it cited a case about Mississippi's social media law, which explicitly exempts those sites from coverage. *Id.* (citing *NetChoice, LLC v. Fitch,* 738 F. Supp. 3d 753, 770 (S.D. Miss. 2024)). But Utah's law makes no such exceptions. All those topics may be freely discussed on a social media service under the Act, and a site's focus on that content would not exempt it from the Act. So too, any news, sports, commerce, or video game website would become subject to the Act's reach if it met all the requirements of the central coverage definition. The Act is entirely about the structure a platform adopts—not the content.

### 3.    This case is more like *Reagan* than *Reed*.

Because the central coverage definition doesn't single out speech based on content, the district court erred when it held this case was more like *Reed* than *Reagan*. App.5:944-45. In *Reed*, a law prohibited the display of outdoor signs without a permit, but then exempted ideological signs, political signs, and temporary directional signs (as well as twenty other categories), which were each subject to different

rules. *Reed*, 576 U.S. at 159. The Court held the law was content-based because the restrictions "depend[ed] entirely on the communicative content of the sign" and specific subject matters were singled out for different treatment. *Id.* at 164, 169.

Unlike *Reed,* the Act's coverage of websites or applications that allow users to "interact socially" is not like the discrimination between political, ideological, and event-related speech in *Reed*. The central coverage definition does not distinguish between topics or subject matters. It merely identifies a feature enabled on certain platforms that, when combined with the other definitional requirements, determines whether the platform is subject to certain time, place, and manner restrictions designed to protect minors' privacy and mental health.

Contrary to what the district court said, this case is more like *Reagan.* That decision held an ordinance distinguishing between on- and off-premises signs was content-neutral—even though the signs had to be read to determine whether they were on or off-premises—because the law did not single out any topic or subject for differential treatment.

596 U.S. at 71. The review of the signs merely helped determine which content-neutral requirements applied. *Id.*

So too here. The Act does "not single out any topic or subject matter for differential treatment." *Id.* at 71. While the State needs to know certain information—like whether a platform primarily displays account holder content, allows users to interact, and provides account holders with a list of other accounts that "share[] a connection within the system"—it need not review the content of any interactions. It only needs that information to determine whether the Act's restrictions for minor accounts apply. The Act thus does not substitute a "'function or purpose' proxy" for an obvious subject matter distinction. App.5:944 (citing *Reagan*, 596 U.S. at 74). The social interaction component of the central coverage definition does not target speech on any subject matter. Despite what the district court said, it only "inform[s] the application of otherwise content-neutral restrictions." App.5:946.

### 4. The central coverage definition does not restrict NetChoice's members' ability to collage user generated speech.

The district court also held the central coverage definition is content-based because it "restricts social media companies' ability to

collage user-generated speech into their own 'distinctive compilation[s] of expression.'" App.5:946 (citing *Moody*, 603 U.S. at 716-17). That, too, was error.

The central coverage definition merely identifies who is subject to the Act. To fall within the central coverage definition, a website or application must "display[] content that is primarily generated by account holders and not by the social media company." Utah Code § 13-71-101(14)(a)(i). But while that requirement acknowledges social media companies display account holder information, nothing in it limits how they select, arrange, or display that information or what message they may convey. The definition allows social media companies to collage user speech into whatever distinct compilation they wish.

The district court's holding about compilations of speech appears to conflate NetChoice's challenge to the central coverage definition with its challenge to other provisions of the Act. Below, NetChoice argued its ability to collage user speech was threatened by the Act's requirements that social media companies disable user engagement features and limit the display of information about minor users without parental consent. App.1:111-12; 4:812. But the district court never reached whether those

individual provisions were content-based, nor did it analyze them under the exacting standard *Moody* requires for facial challenges. 603 U.S. at 724-25 (stating that, in facial challenges, a court must assess the challenged provision's scope and then determine which of its applications violate the First Amendment and "measure them against the rest"). This Court should not do so now.

Equally unsound is the district court's suggestion that the Act's central coverage definition must be content-based because decisions social media companies make about operating or constructing their platforms must be speech. App.5:942,946. The district court wrongly noted the State had conceded this fact. App.5:942n.21. Actually, the State conceded only that social media sites contain speech and the Act is subject to heightened scrutiny for that reason. App.2:238. But the State did not concede that every operational decision or every *compilation* of user speech (as opposed to the underlying speech itself) is also the social media company's expression. Indeed, the State's supplemental briefing argued NetChoice had not shown what expressive activities each provision of the Act impacted. App.4:873-75, 877. To be sure, the First Amendment doesn't go on leave when social

media companies are involved. *Moody*, 603 U.S. at 719. But neither

does it mean any attempt to regulate them is content-based.

The district court's conclusion that the Act is content-based

because social media companies compile user speech is based on a

misapplication of *Moody*. That case addressed laws that restricted

whether and how a social media platform could use its content

moderation standards to disfavor, hide, or add warning labels to certain

posts. 603 U.S. at 717-18, 720-21. The Court ultimately did not decide

whether those speech compulsions were constitutional, instead

remanding the matters so the lower courts could perform an

appropriate facial examination. *Id.* at 726. In so doing, the Court opined

that the First Amendment offers protection when "an entity engaging in

expressive activity, including compiling and curating others' speech, is

directed to accommodate messages it would prefer to exclude." *Id.* at

731.

The Court, however, limited its decision to those content

moderation functions, noting it was not addressing "feeds whose

algorithms respond solely to how users act online—giving them content

they appear to want, without any regard to independent content

standards." *Id.* at 736 n.5. The Court also acknowledged an entity

engaged in expressive activity "when performing one function," such as

content moderation, "may not be [engaging in expressive activity] when

carrying out another." 603 U.S. at 732 n.4.

That view was shared by the justices who concurred in the

decision. Justice Barrett, who provided the necessary fifth vote for the

majority, cautioned the First Amendment implications "might be

different" for "a platform's algorithm[] that just presents automatically

to each user whatever the algorithm thinks the user will like." *Id.* at

746 (Barrett, J. concurring). And while Justice Alito concurred that

social media companies get First Amendment protection when they

curate user speech to express the social media companies' own ideas, he

observed that may not be the case when they act as "dumb pipes that

merely emit what they are fed," and "communicate no message of their

own." *Id.* at 782-83 (Alito, J. concurring) (quoting *Am. Broad. Cos. v.

Aereo, Inc.*, 573 U.S. 431, 458 (2014) (Scalia, J., dissenting)).

The district court's decision captures none of the nuance of *Moody*,

instead taking language specifically discussing content moderation—a

feature not at issue here—and applying it to all social media

compilations of user posts. *Moody* does not stand for the principle that all compiled social media feeds are expressive, nor that any attempt to regulate a website or platform simply because it may compile user information is content-based. *See NetChoice v. Bonta*, -- F. Supp. 3d ---, 2024 WL 5264045, at *9-10 (2024) (explaining *Moody* did not resolve whether personalized social media feeds were expressive). The Act itself and its central coverage definition are nothing like the laws addressed in *Moody* that would have compelled platforms to display posts containing topics, ideas, or viewpoints they disfavored.

Compounding the court's error, the record does not contain enough evidence about the compilations NetChoice's members display across their platforms to their millions of users—evidence necessary to determine how much the compilations are expressive feeds that feature the member's editorial decision-making versus algorithmic feeds designed only to capture user attention without any intentional (or even non-machine generated) message or expression.[19] Given NetChoice's

---

[19] NetChoice submitted limited information about its members' compilations. App.1:152-55,174-75,206. Much of that evidence was about content moderation standards. It did not provide sufficient information to determine the extent to which the compilations are merely algorithmic responses unrelated to message.

decision to bring a facial challenge, that lack of evidence alone should have been enough to reject any argument the Act is content-based merely because social media companies collage user speech. *Moody*, 603 U.S. at 725 (noting facial challenge requires asking whether there is an intrusion on protected editorial expression "as to every covered platform or function").

But even assuming all user speech compilations are expressive, that still does not mean the central coverage definition is content-based. After all, a law is not necessarily content-based just because it will affect how content is displayed. *See, e.g.*, *Reagan*, 596 U.S. at 72 (law prohibiting digitization of off-premises signs was content-neutral). A law is instead content-based when it *discriminates* against content by treating messages, viewpoints, or topics differently. *Id.; Bonta*, 2024 WL 5264045, at *13. For reasons already discussed, the central coverage definition does not do that.

*     *     *

In sum, the central coverage definition is content-neutral.[20] It does not disfavor any speech based on its content, but only regulates social media services based on the structural attributes of those sites that pose unique risks to Utah's youth.

## B. The Act survives intermediate scrutiny.

Because the district court determined the central coverage definition is content-based, it applied strict scrutiny to the entire Act and held NetChoice was substantially likely to succeed on its claims the Act would not survive it.[21] App.5:947. That was wrong. The district court should have applied intermediate scrutiny.[22] *Am. Target*, 199 F.3d at 1247. This Court should remand so the district court can do so in the first instance. *See VoteAmerica v. Schwab*, 121 F.4th 822, 852 (10th Cir.

---

[20] Because the district court determined the central coverage definition was content-based, it did not consider whether the specific provisions challenged by NetChoice are content-neutral. The State thus does not address those arguments.

[21] For purposes of this interlocutory appeal, the State does not challenge the court's findings that NetChoice has a substantial likelihood of success on its claims that the Act fails strict scrutiny. The State reserves the right to argue the Act survives strict scrutiny after discovery at a trial on the merits.

[22] The State argued below that intermediate scrutiny applied to everything but the age assurance provision, which is subject to rational basis review. App.2:264-66. The district court did not address the age assurance requirement, so the State does not raise it here.

2024) (holding court erred by finding the law was content-based and remanding for further findings, including application of intermediate scrutiny).

Even so, if this Court decides to consider intermediate scrutiny, the Act satisfies it. Because burdens at the preliminary injunction phase track the burdens at trial, the State must show the Act satisfies intermediate scrutiny. *See Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1147 (10th Cir. 2020). A law passes intermediate scrutiny if it serves a substantial government interest and is narrowly drawn to serve that interest. *Am. Target*, 199 F.3d at 1247. A law must also leave "open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791 (internal quotation marks omitted). The State has shown the Act meets those requirements.

### 1. The Act serves the State's substantial and important interests.

To survive intermediate scrutiny, a law must "be directed at an important or substantial governmental interest unrelated to the suppression of free expression." *Golan v. Holder*, 609 F.3d 1076, 1084 (10th Cir. 2010). Courts examine whether the law was "designed to address a real harm, and whether [it] will alleviate [that harm] in a

40

material way." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195

(1997) ("*Turner II*").

Courts give "substantial deference" to legislative judgments when

conducting this inquiry, recognizing legislatures are better equipped to

evaluate data and make predictive judgments. *Golan*, 609 F.3d at 1084-

85 (citing *Turner II,* 520 U.S. at 195). The court's "sole obligation" is to

ensure the legislature has "drawn reasonable inferences based on

substantial evidence." *Id.* (internal quotation marks omitted).

Under the substantial evidence standard, lawmakers may rely on

"any evidence that is 'reasonably believed to be relevant' for

demonstrating a connection between speech and a substantial,

independent government interest." *City of Los Angeles v. Alameda

Books, Inc.*, 535 U.S. 425, 438 (2002) (plurality opinion) (quoting

*Renton*, 475 U.S. at 51-52). Such evidence can include "anecdotal

evidence, statistical data, prior cases, and their common sense." *Abilene

Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson Cnty., Kan.*, 492 F.3d

1164, 1174 (10th Cir. 2007). The evidence need only "fairly support" the

government's rationale. *Alameda Books*, 535 U.S. at 438.

Here, the State made a reasonable legislative conclusion supported by substantial evidence when it determined the Act was necessary to protect its substantial interest in the well-being and privacy of its children.

### a. The State has a substantial interest in protecting children's mental health.

States have a substantial interest in protecting the mental well-being of children. *See, e.g., New York v. Ferber*, 458 U.S. 747, 756 (1982) ("It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling." (internal quotation marks omitted)); *Action for Child. Television v. F.C.C.* (en banc), 58 F.3d 654, 661-663 (D.C. Cir. 1995) (finding state had compelling interest in protecting children from exposure to indecent broadcasts).

The State passed the Act to protect that substantial interest. Utah Code § 13-71-102. As noted in Dr. Twenge's declaration and the Surgeon General's Advisory, there is a youth mental health crisis. App.2:309-14,338-43; *Supra* 6-9. Rates of major depressive orders have more than doubled, hospital admissions for teenagers who engage in self-harm

42

have dramatically increased, and suicide rates for 10 to 14 year old girls have doubled. App.2:309-10.

Substantial evidence connects those harms to social media use. Studies have consistently shown a link between heavy social media use and mood disorders. App.2:310,338-39. Social media use among adolescents is also correlated to poor sleep, attention problems, online harassment, low self-esteem, and higher depressive symptoms, among other concerns. *Id.*; *see supra* 6-9.

Substantial evidence also supports the State's judgment that the Act would alleviate these harms. Studies show mental health improved when users spent less time on social media. App.2:314-15,339. The former Surgeon General recently warned there are "ample indicators that social media can . . . have a profound risk of harm to the mental health and well-being of children and adolescents" and urged states to take action to protect minors' well-being. App.2:336,347.

The State thus had substantial evidence to fairly support its findings that social media is negatively harming its youth and that limiting social media would help protect the mental health of its youth. That is all intermediate scrutiny requires.

**b.    The district court's decision doesn't mean the State's substantial interest in protecting children's mental health fails intermediate scrutiny.**

The district court held the State's evidence did not satisfy strict scrutiny's compelling interest requirement because it did not establish a "clear, causal relationship between minors' social media use and negative mental health impacts." App.5:949. Even if such a causal link were required for strict scrutiny, *see Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799-800 (2011), it is not required under the more deferential intermediate scrutiny standard. Intermediate scrutiny does not require the State to "prove that its theory" is correct. *See Alameda Books*, 535 U.S. at 437. Indeed, "[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of [those] events based on deductions and inferences for which complete empirical support may be unavailable." *Turner I*, 512 U.S. at 665 (plurality opinion). The ultimate question, then, is not whether the enacting body "was correct," but rather "whether the legislative conclusion was reasonable and supported by substantial evidence." *Turner II*, 520 U.S. at 211 (internal quotation marks omitted). The State's evidence here

easily satisfies that standard. *Supra* 5-13. As shown below, the district court's analysis of the State's evidence doesn't show otherwise.

> i.    *The Surgeon General's Advisory*

First, the district court criticized the State's reliance on the Surgeon General's Advisory because, while sounding the alarm on the harms of social media, the Advisory also noted social media can benefit some youth. App.5:949-50. But the "possibility of drawing two inconsistent conclusions from the evidence" doesn't prevent a legislative decision from surviving intermediate scrutiny. *Turner II*, 520 U.S. at 211. While the Advisory acknowledges potential benefits, it was issued as a warning about the harms. App.2:338-43. That is why it ends with a call to action, recommending policymakers "limit[] the use of features that attempt to maximize time, attention, and engagement," and require "a higher standard of data privacy for children." App.2:347. That Advisory supports the Act's limited measures, which still allow minors to use social media in the ways the Surgeon General said may be beneficial, App.2:338, but with the additional privacy protections and without exposure to the addictive features used to keep eyes on screens.

45

### ii.    Dr. Twenge's Declaration

Second, the district court found Dr. Twenge's declaration was insufficient to prove social media caused poor mental health. App.5:950-51. But it did not dispute that the studies cited in that declaration established a correlative relationship between social media use and negative mental health impacts across genders. *Id.* That correlative relationship is enough for intermediate scrutiny. *See Alameda Books*, 535 U.S. at 437 (intermediate scrutiny doesn't require empirical proof).

The district court also erred by finding Dr. Twenge's declaration insufficient because she relied on studies that were not before the court. App.5:950. Preliminary injunctions are "restricted proceeding[s], often conducted under pressured time constraints, on limited evidence and briefing schedules." *Heideman*, 348 F.3d at 1188. Courts may rely on less formal or complete evidence then they could at a trial on the merits, as the rules of evidence don't apply, *id.*, and a party is "not required to prove [its] case in full." *Univ. of Texas v. Camenish*, 451 U.S. 390, 395 (1981).

That was precisely the case below. The omission of the reports Dr. Twenge relied on at the preliminary injunction phase should not bar the

application of intermediate scrutiny. The State could have provided those reports upon request, and it could provide them on remand. Even without them, Dr. Twenge's declaration provides substantial evidence supporting the State's decision to regulate social media companies to protect its children.

### *iii.    Legislative Findings*

Third, the district court said in dicta the State did not provide any of the evidence Utah's legislature considered in passing the Act even though courts "usually consider such evidence" in deciding whether a law advances a substantial government interest under intermediate scrutiny. App.5:949n.126. And the court suggested the State did not satisfy "this reduced burden," apparently due to the alleged lack of legislative evidence. *Id.* That too is wrong.

The State referred the court to, and the court cited, the legislative findings outlining the State's compelling interests in protecting minors' well-being and privacy. App.2:246; App.5:949n.124; Utah Code § 13-71-102. Those findings documented that social media use has been linked to poor mental health in minors, certain addictive features contribute to its excessive use, and social media companies' collection of minors' data

47

has exposed them to privacy related harms that they do not fully

comprehend. *Id.* § 13-71-102. The findings may lack the full details that

were in Dr. Twenge's declaration and the Surgeon General's Advisory,

but lawmakers need not "make a record of the type that an

administrative agency or court does to accommodate judicial review."

*Turner I*, 512 U.S. at 666 (plurality opinion).

What's more, a court can take judicial notice "on its own" of

undisputed facts that can be accurately and readily determined from

reliable sources at any stage of the proceedings. Fed. R. Evid. 201(b), (c),

(d). That includes legislative history. *See, e.g., Territory of Alaska v.*

*American Can Co.*, 358 U.S. 224, 226-27 (1959); *Countryman v. Farmers*

*Ins. Exch.*, 545 F. App'x 762, 765 n.2 (10th Cir. 2013) (unpublished)

(taking judicial notice of legislative history on appeal to supplement the

record); *Leonard v. HGM Park Manor of Salina, LLC*, No. CV 22-2267-

KHV, 2023 WL 8452140, at *4 (D. Kan. Dec. 6, 2023) (unpublished)

(noting courts "often take judicial notice of certain public records,

including legislative committee reports").

Here, the district court—and anyone else—had ready access to a

publicly available hearing before the Utah Senate Business and Labor

Committee in which it heard testimony showing the need for the Act.[23]

That testimony bolsters the statutory findings:[24]

- Zach Rausch,[25] Associate Research Scientist at New York University, testified the research "strongly suggests" there is a "direct relationship" between social media and poor adolescent mental health, particularly for girls. He testified about the unique harm social media companies pose to adolescents because teens are more impulsive, less able to regulate their emotions, and highly sensitive to social rewards and social belonging. He said push notifications, infinite scroll, and autoplay contributed to these negative outcomes.

- Jonathan Rothwell, Ph.D.,[26] Research and Principal Economist with Gallup, stated teens spend more time on social media than they spend doing anything else and that studies showed a correlation between poor mental health and social media use. He, too, noted infinite scroll, push notifications, and social rewards contribute to excessive use.

---

[23] At the bottom of section 102 on the legislature's website, it says "Enacted by Chapter 206, 2024 General Session." https://le.utah.gov/xcode/Title13/Chapter71/13-71-S102.html?v=C13-71-S102_2024100120240501. Clicking on the hyperlink embedded in the "206" takes the public directly to S.B. 194, Social Media Regulation Amendments. https://le.utah.gov/~2024/bills/static/SB0194.html. Directly under the bill's title are three banners, including one that says "Hearings/Debate." *Id.* Clicking on that option takes the public to a page with links to all the committee hearings and floor debates discussing the bill. https://le.utah.gov/~2024/bills/static/SB0194.html.
[24] *S.B. 194, Social Media Regulation Amendments,* Senate Bus. and Lab. Comm. Meeting, 2024 General Sess., Feb. 15, 2024, https://le.utah.gov/av/committeeArchive.jsp?timelineID=250130.
[25] Mr. Rausch's testimony begins at minute 7:00.
[26] Dr. Rothwell's testimony begins at minute 26:35.

- The former U.S. Surgeon General[27] recorded a message consistent with his Advisory.

- A teen[28] testified about her experience with social media addiction, causing her to become anxious, depressed and suicidal.

This testimony reinforces the evidence in the declaration of Dr. Twenge and the Surgeon General Advisory. Granted, the district court concluded the State's proffered evidence did not show a compelling interest for strict scrutiny purposes. App.5:948-51. Even if that were true, it was a mistake for the district court to then suggest in dicta, in a footnote, that the State also failed to show a substantial interest under intermediate scrutiny because the court didn't have any evidence of what the Utah Legislature considered in passing the Act. App.5:949n.126. The court had both (1) the evidence the State provided showing the serious problems the Act addressed along with the legislative findings, and (2) easy and public access to the evidence presented at the legislative hearings, of which the court could take judicial notice, Fed. R. Evid. 201, supporting the legislature's findings.

---

[27] Video testimony begins at Min. 58:15.
[28] Testimony of Liddy Johnson, Min. 38:50.

50

### c.    The State has a substantial interest in protecting minors' privacy.

The Act would pass intermediate scrutiny based on the State's interest in protecting minors' mental health alone, but the State also has a substantial interest in protecting the privacy of its youth's data. *See TikTok*, 145 S. Ct. at 69 (recognizing government interest in protecting citizens' data from being exploited by China). As in *TikTok*, social media services "collect[] extensive personal information from and about [their] users." *Id.*; *see supra* 10-12. Adults weigh the risks and rewards of providing personal information to social media companies, but children and teens often do not fully understand those risks.[29] The disclosure of minors' information may affect not only children's peer relationships but also their future educational or job opportunities.[30] And those are only some of the potential negative consequences that come from the permanence of the personal data disclosed.[31]

---

[29] Jorgensen Testimony, *supra* n.10. Mr. Jorgensen described the demand for user data among social media firms and that minors are willing to disclose a lot of information for a perceived reward from social media.

[30] *Id.*

[31] *Id.*

51

The district court did not see the State's interest in protecting privacy as compelling because, it said, the Act intrudes on minors' First Amendment rights to the content they create. App.5:951. But the fact that minors have free speech rights doesn't eliminate the State's interest in protecting them from harm by regulating how social media companies use and display their information. *See Hodgson v. Minnesota*, 497 U.S. 417, 444 (1990) (recognizing states have "a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely."). Whether the Act reaches too far in regulating those rights may raise questions about tailoring, App.5:949n.169, but it does not minimize the importance of protecting children's data.

Still, the Act does not intrude on minors' First Amendment rights. Minors can have a social media account without parental consent and can post anything they like. They can connect with any other account they choose. The Act also does not require social media companies to hide any information from them based on subject, ideas, or viewpoint.

The Act only asks them to get parental consent before advertisers and other strangers across the worldwide web have access to their data.

That makes this case different from the cases cited by the district court, App.5:951n.135, where the government barred minors from creating social media accounts at all without parental consent, *see NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 547, 558 (S.D. Ohio 2024), or where the government passed laws to shield minors from content deemed harmful. *See Brown*, 564 U.S. at 799 (violent video games); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211 (1975) (nudity at drive-in theaters). Unlike in those cases, the State's interest here is not keeping minors away from certain content. It is about shielding minors' personal information and supporting parents in their efforts to protect data about their families from being permanently disclosed to the internet. *Cf. Frazier v. Winn*, 535 F.3d 1279, 1285 (11th Cir. 2008) (per curiam) (rejecting facial challenge to law excusing students from reciting pledge only with parental consent because "protecting the rights of parents on some educational issues" justifies some restriction of students' speech).

### 2.    The Act is narrowly tailored to serve the State's interests.

The Act survives intermediate scrutiny because it is narrowly tailored to serve those substantial and important interests. Content-neutral laws don't "pose the same inherent dangers to free expression," so the State "has a degree of latitude in choosing how to further its asserted interest." *Golan*, 609 F.3d at 1090. Narrow tailoring is satisfied if the government's substantial interest "would be achieved less effectively" without the law and the law does not "burden substantially more speech than is necessary" to further that interest. *TikTok*, 145 S. Ct. at 70 (quoting *Ward*, 491 U.S. at 799). The law must serve the government's interest in "a direct and effective way." *Id.*

Here, the Act directly and effectively serves the State's interest. The district court's consideration of possible less restrictive alternatives doesn't suggest otherwise. Nor does the district court's overinclusiveness or underinclusiveness analysis.

### a. The Act serves the State's interests in a direct and effective way.

The Act directly and effectively furthers the State's interest in protecting minors' privacy and mental health. Following the Surgeon General's recommendation, App.2:347, it limits the use of the addictive

features on the products (social media services) causing the mental

health crisis. So too, the default privacy and parental control settings

allow youth to share their personal information with the wider world

(unconnected accounts) under the guiding hand of a parent who is

better equipped to assess the risk and has their interests at heart,

rather than a behemoth social media data mining company, who

doesn't.

The Act also does not burden substantially more speech than

necessary to effectively serve those interests. The legislature

determined, based on the evidence, that minors were exposed to privacy

and mental health harms by social media services because those

services entice minors with endless content, addictive features, and

promises of social validation so they can mine and profit from their

data. Utah Code § 13-71-102(2), (3), (6); *supra* 5-13, 49-50.

The way the Act regulates those social media services doesn't

burden substantially more speech than necessary. Minors can still have

social media accounts (even without parental consent), and NetChoice's

members can compile feeds however they like. The Act only requires the

social media services to determine whether the account holder is a

minor, and if so, to set default privacy settings absent parental consent and to disable the addictive features used to draw users in and keep their eyes tied to the screen. Those requirements strike an appropriate balance between imposing some burdens on social media companies and protecting the mental well-being and privacy of the minors who use those products.

The district court concluded the State's evidence did not show that removing the "nicotine-like" addictive features would reduce the time spent on social media, improve mental health, or decrease privacy risks. App.5:953-54. But even assuming the evidence was insufficient for strict scrutiny, it was enough for intermediate scrutiny where courts "accord substantial deference to the predictive judgments" of lawmakers. *TikTok*, 145 S. Ct. at 69-70 (quoting *Turner I*, 512 U.S. at 665 (plurality opinion)). The State made such a predictive judgment here.

> **b.    The Act need not be the least restrictive means.**

The district court rejected the State's tailoring arguments because it did not believe the State adopted the least restrictive means. App.5:952-53. Unlike strict scrutiny, however, intermediate scrutiny does not demand that the law "be the least speech-restrictive means of

advancing" the State's interests. *See TikTok,* 145 S. Ct. at 70 (quoting *Turner I*, 512 U.S. at 662). Neither does it require the State to try less restrictive alternatives first. *Brewer*, 18 F.4th at 1254.

Contrary to what the district court said, the State did not have to try to promote parental controls first. App.5:952-53. To be sure, lawmakers often should consider whether some less restrictive means have "already proven effective." *TikTok*, 145 S. Ct. at 71; *see also Brewer*, 18 F.4th at 1255 (intermediate scrutiny means the government should ordinarily give "serious consideration" to less restrictive means). But the State did that here. It considered parental controls but found them to be inadequate. Utah Code § 13-71-102(3), (7). Even when parents want to adopt them, children find ways around them, trapping parents in an exhausting battle to keep up. App.2:326-27. Instructions about how to circumvent those controls are readily available on the internet. App.2:327. And while it's possible teens may still circumvent the Act's age and parental control restrictions, the State could reasonably determine its goals of protecting children would be more effectively achieved by requiring the very companies that profit from children's data and employ addictive features to help parents in that

57

battle. As the Surgeon General acknowledged, "the entire burden of mitigating the risk of harm of social media cannot be placed on the shoulders of children and their parents." App.2:345.

The district court may disagree with the State's determination, but that is not the test. *TikTok*, 145 S. Ct. at 71. The State made reasonable findings that are supported by substantial evidence for a legislative determination. That is all that is required.

### c.     The Act is not overinclusive.

The district court also found the Act was overinclusive because it regulates platforms, like Dreamwidth, even though they may not promote themselves to minors, have many minor users, or use addictive features. App.5:956. Not so. Intermediate scrutiny doesn't require "perfect tailoring." *Evans v. Sandy City*, 944 F.3d 847, 857 (10th Cir. 2019). Nor does evidence about a single site show the Act's unconstitutional applications outweigh the law's plainly legitimate sweep, which is the standard for deciding that a law is facially unconstitutional. *Moody*, 603 U.S. at 723-24. Still more, the Act's scope does not burden substantially more speech than necessary. The restrictions on using the addictive features would not burden a service

that does not actually use those features. Still more, the State's interest in protecting minors' privacy extends to any social media services with their data, no matter the total number of minor accounts.[32] Limiting the Act's scope to social media services with a significant number of minor accounts would not effectively serve the State's interest.

The district court also speculated, in dicta, that the Act "appears" to be overinclusive because the age assurance provision burdens adult users. App.5:956. Adult account holders will, of course, be subject to the age assurance provision. But the Act's age assurance requirements can be satisfied with "minimal" burden on most users. App.2:319-29. To satisfy the Act, age assurance generally would only need to be performed once, could be performed online in "less than a minute," and need not require the account holder to provide private or sensitive information. *Id.*

Below, NetChoice cited *Ashcroft v. ACLU* for the argument that governments can't require social media companies to assure their users are over a certain age. App.1:112-13. *Ashcroft* said no such thing. It held

---

[32] Indeed, Mr. Jorgensen noted smaller services may be more incentivized to monetize user data. *Supra* n.12.

only that a district court did not abuse its discretion when it determined, in 1999, that the government had failed to show the age verification scheme was the least restrictive means to protect children from pornography. 542 U.S. 656, 665-67 (2004). Yet *Ashcroft* wisely noted that technology may change and specifically encouraged the consideration of new evidence about available technologies on remand. *See Ashcroft*, 542 U.S. at 671.

Technology has certainly changed. Gone are the days when the internet was not as invasive as radio or television because internet communications "do not invade an individual's home or appear on one's computer screen unbidden." *Reno v. ACLU*, 521 U.S. 844, 854 (1997). Given the nature of social media and the new ease of age assurance, the Act's age assurance provisions do not substantially burden adult speech and survive narrow tailoring under intermediate scrutiny.

In that same footnote, the district court also speculated that the Act's "restrictions on minors' ability to connect with those outside their immediate networks" impermissibly burdens minors' speech. App.5:956n.169. But the Act doesn't prohibit minors from connecting with anyone, with or without parental consent. The restriction here

merely enables parents to exercise their parental authority to keep

their children safe from having anything they post viewed by those

outside their networks.[33] It was not designed to "protect the youth from

ideas or images" the State deemed unsuitable for them. App.5:956n.169

(quoting *Erznoznik*, 422 U.S. at 212-14).

### d.     The Act does not fail intermediate scrutiny for being underinclusive.

The district court also found the Act is underinclusive because

minors can still spend unlimited time on social media and non-social

media companies can continue to use addictive features like push

notifications, autoplay, and infinite scroll. App. 5:954-55.

Those concerns don't show the Act is inappropriately tailored

under intermediate scrutiny. Underinclusiveness may be relevant to

whether a law is "actually pursuing" a government interest or is just

interested in disfavoring a message, speaker, or viewpoint. *See TikTok*,

145 S. Ct. at 70. Still, the "First Amendment imposes no freestanding

underinclusiveness limitation, and the [State] need not address all

---

[33] There is evidence the virtual world, especially social media, is riskier to children than the real world. *See* Haidt, *Anxious Generation* 67-68, *supra* n.13, at 166-67.

61

aspects of a problem in one fell swoop." *Id.* (internal citations omitted).

The Supreme Court has "accordingly upheld laws—even under strict

scrutiny—that conceivably could have restricted even greater amounts

of speech in service of their state interest." *Williams-Yulee v. Florida*

*Bar*, 575 U.S. 433, 449 (2015) (upholding law prohibiting judicial

candidates from soliciting campaign donations even though law did not

ban candidate from sending personal thank you notes or candidate's

campaign from soliciting donations).

   Here, the State narrowly tailored the Act to mitigate the harms of

social media. It did not attempt to regulate a broader swath of the

internet, even if other websites may also share some of the

characteristics of the central coverage definition or also use push

notifications, infinite scroll, or autoplay. That is because the evidence

did not show other websites like Netflix, ESPN, or Bing caused the

same mental health concerns. But there is substantial evidence linking

social media services and their use of addictive features to mental

health problems. *Supra* at 6-9. That evidence extends beyond Dr.

Twenge's statement that "social media, more than TV or gaming, is

linked to poor sleep." App.5:955n.162. It also includes the Surgeon

General's Advisory that, among other concerns, "social media-induced fear of missing out, or 'the pervasive apprehension that others might be having rewarding experiences from which one is absent' has been associated with depression, anxiety, and neuroticism." App.2:342.[34] Disabling those addictive features gives children the chance to take a break from social media. App.2:258.

Narrow tailoring also did not require the State to set express time limits on social media use. Policymaking frequently requires legislators to make predictive judgments and draw distinctions based on those judgments. Here, it concluded the harms would be mitigated by requiring the sites to add supervisory tools to enable optional time limits, default privacy settings overcome only with parental controls, and strict limitation of product features driving addiction. Utah Code §§ 13-71-202, -203(2). Its failure to impose more limits does not mean the law is a cover to disfavor a message or viewpoint.

---

[34] *See also* Haidt, *The Anxious Generation*, *supra* n.13, at 308 n.24, ("[S]ocial media's unique elements such as social validation, frequent reinforcement for behaviors, public displays of followers and likes, and profiles of relatable peers slightly older than the user make it an even more potent force [than streaming platforms like Netflix and Hulu]").

### 3.    The Act leaves open ample channels of communication.

The Act also leaves open ample channels of communication. The First Amendment "does not guarantee the right to employ every conceivable method of communication at all times and in all places." *Evans,* 944 F.3d at 860. To survive intermediate scrutiny, a law must merely leave open ample channels of communication. *Id.* The important question is whether a speaker remains "ab[le] to reach his or her target audience." *Id.*

The answer here is NetChoice's members remain free to reach their target audience. Social media platforms are not barred from opening accounts for minors, advertising to them, or conveying any ideas or viewpoints to them. The Act merely requires social media companies to take additional steps to protect the child's information from exploitation.

The provisions limiting addictive engagement features also don't prevent social media companies from reaching minor users. Social media companies can still use alerts to notify minors about their accounts; they must just wait to do it until the minor opens the application rather than reaching out to distract the minor when the

application is closed. *See* Utah Code § 13-71-101(11). The Act's infinite

scroll and autoplay limitations similarly leave adequate channels open.

NetChoice's members can still display whatever videos they wish in

whatever order they wish; the minor must simply push "play" to view it.

So too with infinite scroll. The Act leaves the amount of content to load

on a page completely up to each social media platform. NetChoice's

members can display as much content as they wish; the prohibition on

seamless pagination and autoplay for teenagers only helps separate

content, not limit its size, giving teenagers a break from constant

bombardment. And social media companies, of course, remain free to

communicate with their adult users however they like, including by

using push notifications, infinite scroll, and autoplay.

For similar reasons, the Act leaves open ample channels of

communication for social media users. Again, the Act does not bar any

users—including minors—from social media. Minor users may share

any message they wish. They may search to see any content on any

topic or viewpoint that is publicly available on the platform, even

without autoplay or infinite scrolling features. And while the Act directs

that minors' account profiles may only be displayed to other connected

accounts unless their parent consents, the Act doesn't prevent minors from connecting with anyone (even without parental consent), including other minors if they have that minor's account profile. To be sure, a minor using social media lacks access to the same visibility features as an adult user under the Act (absent parental consent). Utah Code § 13-71-202. But that was precisely the point. The First Amendment rights of minors are not co-extensive with those of adults. A state may permissibly determine that, at least in some precisely delineated areas, "a child . . . is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Erznoznik*, 422 U.S. at 214 n.11 (internal citations omitted).

\*    \*    \*

In sum, the district court's strict scrutiny findings do not mean the Act would not survive intermediate scrutiny. And it easily survives that level of scrutiny. There is a close fit between the Act's means and the State's compelling interest in protecting children, the Act does not burden substantially more speech than necessary, and the Act leaves open ample communication channels for NetChoice's members and their users.

**II.    The district court erred by finding the remaining preliminary injunction factors favored NetChoice.**

The district court also wrongly concluded that NetChoice had established the remaining three preliminary injunction factors: it will suffer irreparable injury absent an injunction; its harm without the injunction outweighs the State's harm with the injunction; and the injunction is not adverse to the public interest. *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1250 (10th Cir. 2024). The court based its findings almost entirely on the premise that NetChoice was substantially likely to prevail on the merits. App.5:959 (stating constitutional violations constitute irreparable harm and "it follows that the balance of equities and the public interest lean in NetChoice's favor").

But as explained above, the district court applied the wrong level of scrutiny to the Act in concluding NetChoice was substantially likely to succeed on the merits. Under the correct intermediate scrutiny standard, NetChoice will not prevail on its claims. And the district court's reason for finding NetChoice satisfies the remaining three factors falls apart.

Starting from the correct premise that the Act is substantially likely to withstand intermediate scrutiny, NetChoice can't satisfy all

67

three of the remaining factors. NetChoice no longer has a constitutional injury, and its alleged irreparable economic harms—potential fines incurred from noncompliance with a constitutional statute—do not outweigh the State's harms. *See, e.g., Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (internal quotation marks omitted)); *N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1254-55 (10th Cir. 2017) (same); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws.").

That also means the injunction is adverse to the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting balancing of harms and public interest "merge when the Government is the opposing party"). Plus, the State has an undeniable and compelling interest in protecting minors from the documented ills discussed above. The Act does that in reasonable ways. The public interest is, and will be

68

harmed, by a continued injunction against the Act's enforcement. *See, e.g., Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016) ("[D]emocratically elected representatives . . . are in a better position than" courts "to determine the public interest[;] . . . [t]he courts' peculiar function is to say what the law is, not to second-guess democratic determinations of the public interest." (internal quotation marks omitted)).

## Conclusion

Based on the above, the Court should reverse the district court's order granting a preliminary injunction.

## Statement of Oral Argument

Oral argument will help the Court resolve the issue of first impression presented in this appeal.

Respectfully submitted,

/s/ Erin T. Middleton
Erin T. Middleton
Deputy Solicitor General
*Counsel for Derek Brown and*
*Katherine Hass*

## Certificate of Compliance

1.      This brief complies with the type volume limitation of Fed.

R. App. P. 32(a)(7)(B) and Local Rule 32(B) because it contains 12,985

words, excluding those parts of the brief exempted by the Rule.

2.      This brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been

prepared in a proportionally spaced typeface using Microsoft Word in

Century Schoolbook 14-point font.

<u>/s/ Erin T. Middleton</u>
Erin T. Middleton
Deputy Solicitor General
*Counsel for Derek Brown and*
*Katherine Hass*

**CM/ECF Certification**

Pursuant to Section II(J) of the Court's CM/ECF User's Manual, the undersigned certifies that:

1.    All required privacy redactions have been made.

2.    Any hard copies of the foregoing brief required to be submitted to the clerk's office are exact copies of the brief as filed via ECF; and

3.    The brief filed via ECF was scanned for viruses with the most recent version of Microsoft Defender Antivirus, and, according to the program, is free of viruses.

/s/ Erin T. Middleton
Erin T. Middleton
Deputy Solicitor General
*Counsel for Derek Brown and*
*Katherine Hass*

## Certificate of Service

I certify that on 27th day of February 2025, I electronically filed a copy of the foregoing brief using the Court's CM/ECF system, and all parties will be served through that system.

/s/ Erin T. Middleton
Erin T. Middleton
Deputy Solicitor General
*Counsel for Derek Brown and Katherine Hass*

# Addendum A

**Enrolled Copy**                                                    **S.B. 194**

1    ## SOCIAL MEDIA REGULATION AMENDMENTS

### 2024 GENERAL SESSION

### STATE OF UTAH

**Chief Sponsor: Michael K. McKell**

House Sponsor: Jordan D. Teuscher

2    ────────────────────────────────────

3    **LONG TITLE**

4    **General Description:**

5         This bill enacts provisions related to age assurance and protecting minors in the Utah Minor

6    Protection in Social Media Act (Act).

7    **Highlighted Provisions:**

8         This bill:

9    ‣ defines terms;

10   ‣ requires social media companies to verify a new account holder's age using an approved

11   system;

12   ‣ requires a social media service to:

13        • enable maximum default privacy settings on a Utah minor account holder's account;

14        • provide supervisory tools and verifiable parental consent mechanisms on a Utah

15   minor account holder's account; and

16        • provide confidentiality protections for minors' data;

17   ‣ establishes the Division of Consumer Protection's enforcement powers relating to the

18   Act;

19   ‣ provides compliance safe harbors when social media companies implement approved

20   systems for age assurance and verifiable parental consent; and

21   ‣ contains a severability clause.

22   **Money Appropriated in this Bill:**

23        None

24   **Other Special Clauses:**

25        This bill provides a special effective date.

26        This bill provides a coordination clause.

27   **Utah Code Sections Affected:**

28   AMENDS:

29   **13-2-1 (Effective 05/02/24)**, as last amended by Laws of Utah 2023, Chapters 31, 36, 377,

30   458, 477, 498, 509, and 536

31   ENACTS:

32   **13-71-101 (Effective 10/01/24)**, as Utah Code Annotated 1953

33   **13-71-102 (Effective 10/01/24)**, as Utah Code Annotated 1953

34   **13-71-201 (Effective 10/01/24)**, as Utah Code Annotated 1953

35   **13-71-202 (Effective 10/01/24)**, as Utah Code Annotated 1953

36   **13-71-203 (Effective 10/01/24)**, as Utah Code Annotated 1953

37   **13-71-204 (Effective 10/01/24)**, as Utah Code Annotated 1953

38   **13-71-301 (Effective 10/01/24)**, as Utah Code Annotated 1953

39   **13-71-302 (Effective 10/01/24)**, as Utah Code Annotated 1953

40   **13-71-401 (Effective 10/01/24)**, as Utah Code Annotated 1953

41   **Utah Code Sections affected by Coordination Clause:**

42   **78B-3-1101**, as Utah Code Annotated 1953

43

44   *Be it enacted by the Legislature of the state of Utah:*

45       Section 1. Section **13-2-1** is amended to read:

46       **13-2-1 (Effective 05/02/24). Consumer protection division established --**

47   **Functions.**

48   (1)  There is established within the Department of Commerce the Division of Consumer

49      Protection.

50   (2)  The division shall administer and enforce the following:

51      (a)  Chapter 10a, Music Licensing Practices Act;

52      (b)  Chapter 11, Utah Consumer Sales Practices Act;

53      (c)  Chapter 15, Business Opportunity Disclosure Act;

54      (d)  Chapter 20, New Motor Vehicle Warranties Act;

55      (e)  Chapter 21, Credit Services Organizations Act;

56      (f)  Chapter 22, Charitable Solicitations Act;

57      (g)  Chapter 23, Health Spa Services Protection Act;

58      (h)  Chapter 25a, Telephone and Facsimile Solicitation Act;

59      (i)  Chapter 26, Telephone Fraud Prevention Act;

60      (j)  Chapter 28, Prize Notices Regulation Act;

61      (k)  Chapter 32a, Pawnshop, Secondhand Merchandise, and Catalytic Converter

| 62 | Transaction Information Act; |
|---|---|
| 63 | (l)  Chapter 34, Utah Postsecondary School and State Authorization Act; |
| 64 | (m)  Chapter 41, Price Controls During Emergencies Act; |
| 65 | (n)  Chapter 42, Uniform Debt-Management Services Act; |
| 66 | (o)  Chapter 49, Immigration Consultants Registration Act; |
| 67 | (p)  Chapter 51, Transportation Network Company Registration Act; |
| 68 | (q)  Chapter 52, Residential Solar Energy Disclosure Act; |
| 69 | (r)  Chapter 53, Residential, Vocational and Life Skills Program Act; |
| 70 | (s)  Chapter 54, Ticket Website Sales Act; |
| 71 | (t)  Chapter 56, Ticket Transferability Act; |
| 72 | (u)  Chapter 57, Maintenance Funding Practices Act; |
| 73 | (v)  Chapter 61, Utah Consumer Privacy Act; |
| 74 | (w)  Chapter 63, Utah Social Media Regulation Act; |
| 75 | (x)  Chapter 64, Vehicle Value Protection Agreement Act; |
| 76 | (y)  Chapter 65, Utah Commercial Email Act; |
| 77 | (z)  Chapter 67, Online Dating Safety Act; [and] |
| 78 | (aa)  Chapter 68, Lawyer Referral Consultants Registration Act[-] ; and |
| 79 | (bb)  Chapter 71, Utah Minor Protection in Social Media Act. |
| 80 | Section 2.  Section **13-71-101** is enacted to read: |

81

**CHAPTER 71. UTAH MINOR PROTECTION IN SOCIAL MEDIA ACT**

82

**Part 1. General Provisions**

83    **13-71-101**  (Effective 10/01/24). Definitions.

| 84 | (1)  "Account holder" means a person who has, creates, or opens an account or profile to use |
| 85 | a social media service. |
| 86 | (2)  "Age assurance system" means measures reasonably calculated to enable a social media |
| 87 | company to identify whether a current or prospective Utah account holder is a minor |
| 88 | with an accuracy rate of at least 95%. |
| 89 | (3)  "Connected account" means an account on the social media service that is directly |
| 90 | connected to: |
| 91 | (a)  the minor account holder's account; or |
| 92 | (b)  an account that is directly connected to an account directly connected to the minor |
| 93 | account holder's account. |
| 94 | (4)  "Content" means any information, visual depictions, tools, features, links, software, or |

95    other materials that appear on or are available or enabled through a social media service.

96    (5)  "Directly connected" means an account on the social media service that is connected to

97    another account by:

98    (a)  sending a request to connect to another account holder and having the request to

99    connect accepted by the other account holder; or

100    (b)  receiving a request to connect from another account holder and accepting the request

101    to connect.

102    (6)  "Director" means the director of the division.

103    (7)  "Division" means the Division of Consumer Protection created in Section 13-2-1.

104    (8)  "Minor" means an individual under 18 years old that:

105    (a)  has not been emancipated as that term is defined in Section 80-7-102; or

106    (b)  has not been married.

107    (9)  "Parent" includes a legal guardian.

108    (10)  (a)  "Personal information" means information that is linked or can be reasonably

109    linked to an identified individual or an identifiable individual.

110    (b)  "Personal information" includes a person's:

111    (i)  first and last name;

112    (ii)  date of birth;

113    (iii)  home or physical address, including street name and city;

114    (iv)  screen or user name that reveals an individual's email address, first name, or last

115    name;

116    (v)  telephone number;

117    (vi)  Social Security number;

118    (vii)  photograph, video, or audio file containing a person's image or voice;

119    (viii)  geolocation information sufficient to identify street name and city; and

120    (ix)  any other identifier that a person may use to contact a specific individual.

121    (11)  "Push notification" means an automatic electronic message displayed on an account

122    holder's device, when the user interface for the social media service is not actively open

123    or visible on the device, that prompts the account holder to repeatedly check and engage

124    with the social media service.

125    (12)  "Resident" means the same as that term is defined in Section 53-3-102.

126    (13)  "Social media company" means an entity that owns or operates a social media service.

127    (14)  (a)  "Social media service" means a public website or application that:

128    (i)  displays content that is primarily generated by account holders and not by the

129       social media company;

130     (ii)  permits an individual to register as an account holder and create a profile that is

131        made visible to the general public or a set of other users defined by the account

132        holder;

133     (iii)  connects account holders to allow users to interact socially with each other

134        within the website or application;

135     (iv)  makes available to each account holder a list or lists of other account holders

136        with whom the account holder shares a connection within the system; and

137     (v)  allows account holders to post content viewable by other users.

138   (b)  "Social media service" does not include:

139     (i)  email;

140     (ii)  cloud storage; or

141     (iii)  document viewing, sharing, or collaboration services.

142 (15)  "User" means an individual who accesses or uses a social media service.

143 (16)  (a)  "Utah account holder" means a person who is a Utah resident and an account

144   holder.

145   (b)  "Utah account holder" includes a Utah minor account holder.

146 (17)  "Utah minor account holder" means a Utah account holder who is a minor.

147 (18)  "Verifiable parental consent" means authorization from a parent for a social media

148   service to collect, use, and disclose personal information of a Utah minor account

149   holder, that complies with the following verifiability requirements:

150   (a)  the social media service shall provide advance notice to the parent describing

151     information practices related to the minor account holder's personal information; and

152   (b)  the social media service shall receive confirmation that the parent received the notice

153     described in Subsection (18)(a).

154    Section 3. Section **13-71-102** is enacted to read:

155   **13-71-102 (Effective 10/01/24). Legislative findings.**

156    The Legislature finds that:

157 (1)  the state has a compelling interest in safeguarding the well-being and privacy of minors

158   in the state;

159 (2)  the proliferation of social media services has led to the widespread collection and

160   utilization of personal information, exposing minors to potential privacy and identity

161   related harms;

162 (3)  the addictive design features of certain social media services contribute to excessive use

163    of a social media service by minors, impacting sleep patterns, academic performance,
164    and overall health;
165    (4)    social media services are designed without sufficient tools to allow adequate parental
166    oversight, exposing minors to risks that could be mitigated with proper parental
167    involvement and control;
168    (5)    the state has enacted safeguards around products and activities that pose risks to minors,
169    including regulations on motor vehicles, medications, and products and services targeted
170    to children;
171    (6)    prolonged and unregulated social media use has been linked to adverse effects on the
172    mental health of minors, including increased rates of anxiety, depression, and social
173    isolation;
174    (7)    existing measures employed by social media companies to protect minors have proven
175    insufficient; and
176    (8)    the state should ensure that minors' personal data is given special protection, as minors
177    may have less awareness of the risks, consequences, and safeguards related to a social
178    media company's processing of minors' personal data.
179        Section 4.  Section **13-71-201** is enacted to read:

## Part 2. General Requirements

181    **13-71-201**  (Effective 10/01/24). Age assurance required.
182    (1)    A social media company shall implement an age assurance system to determine whether
183    a current or prospective Utah account holder on the social media company's social media
184    service is a minor.
185    (2)    A Utah account holder that the social media company identifies as a minor through the
186    use of an age assurance system is subject to the requirements in Sections 13-71-202 and
187    13-71-203.
188    (3)    A social media company shall:
189    (a)    implement a review process allowing account holders to appeal the account holder's
190    age designation by submitting documentary evidence to establish the account holder's
191    age range; and
192    (b)    review evidence submitted by the account holder and make a determination within
193    30 days of submission of the evidence.
194    (4)    A social media company shall segregate any personal information gathered specifically
195    within the age assurance system and shall not use the personal information for any other

196     purposes except for the purposes listed in Subsections 13-71-204(4)(a) through (f).

197          Section 5.  Section **13-71-202** is enacted to read:

198          **13-71-202  (Effective 10/01/24). Requirements for Utah minor account holders.**

199          A social media company shall, for Utah minor account holders on the social media

200     service:

201     (1)  set default privacy settings to prioritize maximum privacy, including settings that:

202          (a)  restrict the visibility of a Utah minor account holder's account to only connected

203               accounts;

204          (b)  limit the Utah minor account holder's ability to share content to only connected

205               accounts;

206          (c)  restrict any data collection and sale of data from a Utah minor account holder's

207               account that is not required for core functioning of the social media service;

208          (d)  disable search engine indexing of Utah minor account holder profiles;

209          (e)  restrict a Utah minor account holder's direct messaging capabilities to only allow

210               direct messaging to connected accounts; and

211          (f)  allow a Utah minor account holder to download a file with all information associated

212               with the Utah minor account holder's account;

213     (2)  implement and maintain reasonable security measures, including data encryption, to

214     protect the confidentiality, security, and integrity of personal information collected from

215     a Utah minor account holder;

216     (3)  provide an easily accessible and understandable notice that:

217          (a)  describes any information the social media company collects from a Utah minor

218               account holder; and

219          (b)  explains how the information may be used or disclosed;

220     (4)  upon request of a Utah minor account holder:

221          (a)  delete the personal information of the Utah minor account holder, unless the

222               information is required to be retained under Section 13-61-203, or a different

223               provision of state or federal law; and

224          (b)  remove any information or material the Utah minor account holder made publicly

225               available through the social media service; and

226     (5)  disable the following features that prolong user engagement:

227          (a)  autoplay functions that continuously play content without user interaction;

228          (b)  scroll or pagination that loads additional content as long as the user continues

229               scrolling; and

230      (c) push notifications prompting repeated user engagement.

231        Section 6. Section **13-71-203** is enacted to read:

232      **13-71-203  (Effective 10/01/24). Supervisory tools.**

233 (1) A social media company shall offer supervisory tools for a Utah minor account holder

234      that the Utah minor account holder may decide to activate.

235 (2) The supervisory tools described in Subsection (1) shall include capabilities for an

236      individual selected by the Utah minor account holder to:

237      (a) set time limits for the Utah minor account holder's daily social media service usage

238          across devices;

239      (b) schedule mandatory breaks for the Utah minor account holder during selected days

240          and times across devices;

241      (c) view:

242          (i) data detailing the Utah minor account holder's total and average daily time spent

243             on the social media service across devices;

244          (ii) a list of connected accounts;

245          (iii) a list of accounts blocked by the Utah minor account holder;

246          (iv) the Utah minor account holder's:

247             (A) privacy settings;

248             (B) content sensitivity settings; and

249             (C) direct messaging settings and permissions; and

250      (d) receive notifications when the Utah minor account holder changes an account setting

251          described in this Subsection (2).

252        Section 7. Section **13-71-204** is enacted to read:

253      **13-71-204  (Effective 10/01/24). Parental consent -- Data privacy for Utah minor**

254 **accounts.**

255 (1) A social media company may not allow a Utah minor account holder to change the

256      default data privacy setting described in Subsection 13-71-202(1) without first obtaining

257      verifiable parental consent.

258 (2) A social media company's terms of service related to a Utah minor account holder shall

259      be presumed to include an assurance of confidentiality for the Utah minor account

260      holder's personal information.

261 (3) The presumption of confidentiality in Subsection (2) may be overcome if the social

262      media company obtains verifiable parental consent.

263 (4) The presumption of confidentiality in Subsection (2) does not apply to a social media

264    company's internal use or external sharing of a Utah minor account holder's personal
265    information if the use or sharing is necessary to:
266    (a)  maintain or analyze functioning of the social media service;
267    (b)  enable network communications;
268    (c)  personalize the user's experience based on the user's age and location;
269    (d)  display a username chosen by the Utah minor account holder;
270    (e)  obtain age assurance information as required under Section 13-71-201; or
271    (f)  comply with the requirements of this chapter or other federal or state laws.
272        Section 8.  Section **13-71-301** is enacted to read:

### Part 3. Division Enforcement Powers

274    **13-71-301**  (Effective 10/01/24). Enforcement powers.
275    (1)  The division shall administer and enforce the provisions of Part 2, General
276    Requirements, in accordance with Chapter 2, Division of Consumer Protection.
277    (2)  The attorney general, upon request, shall give legal advice to, and act as counsel for, the
278    division in the exercise of the division's responsibilities under this part.
279    (3)  (a)  In addition to the division's enforcement powers under Chapter 2, Division of
280    Consumer Protection:
281        (i)  the division director may impose an administrative fine of up to $2,500 for each
282            violation of this chapter; and
283        (ii)  the division may bring an action in court to enforce a provision of this chapter.
284    (b)  In a court action by the division to enforce a provision of this chapter, the court may:
285        (i)  declare that the act or practice violates a provision of this chapter;
286        (ii)  enjoin actions that violate this chapter;
287        (iii)  order disgorgement of any money received in violation of this chapter;
288        (iv)  order payment of disgorged money to an injured purchaser or consumer;
289        (v)  impose a civil penalty of up to $2,500 for each violation of this chapter;
290        (vi)  award actual damages to an injured purchaser or consumer; and
291        (vii)  award any other relief that the court deems reasonable and necessary.
292    (c)  If a court grants judgment or injunctive relief to the division, the court shall award
293    the division:
294        (i)  reasonable attorney fees;
295        (ii)  court costs; and
296        (iii)  investigative fees.

297  (4) (a) A person who violates an administrative or court order issued for a violation of
298      this chapter is subject to a civil penalty of no more than $5,000 for each violation.
299      (b) A civil penalty authorized under this section may be imposed in any civil action
300          brought by the division, or by the attorney general on behalf of the division.
301  (5) All money received for the payment of a fine or civil penalty imposed under this section
302      shall be deposited into the Consumer Protection Education and Training Fund
303      established in Section 13-2-8.
304      Section 9.  Section **13-71-302** is enacted to read:
305      **13-71-302  (Effective 10/01/24). Age assurance and verifiable parental consent**
306  **safe harbor.**
307  (1) In accordance with Title 63G, Chapter 3, Utah Administrative Rulemaking Act, the
308      division shall make rules:
309      (a) to establish processes and means by which a social media company may:
310          (i) assure whether an account holder is a minor in accordance with Section 13-71-201;
311              and
312          (ii) obtain verifiable parental consent in accordance with Section 13-71-203; and
313      (b) to establish criteria a social media company may use to determine whether the social
314          media company's age assurance system is 95% accurate.
315  (2) A social media company is not subject to an enforcement action for a violation of
316      Section 13-71-201 if the social media company implements and maintains an age
317      assurance system that complies with rules made by the division as described in
318      Subsection (1)(a)(i).
319  (3) A social media company is considered to have obtained verifiable parental consent if
320      the social media company obtains parental consent through a mechanism that complies
321      with the rules made by the division as described in Subsection (1)(a)(ii).
322      Section 10.  Section **13-71-401** is enacted to read:
323                          **Part 4. Severability**
324      **13-71-401  (Effective 10/01/24). Severability.**
325  (1) If any provision of this chapter or the application of any provision to any person or
326      circumstance is held invalid by a final decision of a court of competent jurisdiction, the
327      remainder of this chapter shall be given effect without the invalid provision or
328      application.
329  (2) The provisions of this chapter are severable.

Appellate Case: 24-4100    Document: 28    Date Filed: 02/27/2025    Page: 94

330    (3) Nothing in this chapter shall displace any other available remedies or rights authorized

331        under the laws of this state or the United States.

332        Section 11. **Effective date.**

333        This bill takes effect on October 1, 2024.

334        Section 12. **Coordinating S.B. 194 with H.B. 464.**

335        If S.B. 194, Social Media Regulation Amendments, and H.B. 464, Social Media

336    Amendments, both pass and become law, the Legislature intends that, on October 1,

337    2024:

338        (1) Subsection 78B-3-1101(1) enacted in H.B. 464 be amended to read:

339        "(1) "Account holder" means the same as that term is defined in Section 13-71-101.";

340        (2) Subsection 78B-3-1101(4) enacted in H.B. 464 be amended to read:

341        "(4) "Content" means the same as that term is defined in Section 13-71-101.";

342        (3) Subsection 78B-3-1101(8) enacted in H.B. 464 be amended to read:

343        "(8) "Minor" means the same as that term is defined in Section 13-71-101."; and

344        (4) Subsections 78B-3-1101(12) through (16) enacted in H.B. 464 be amended to

345    read:

346        "(12) "Social media company" means the same as that term is defined in Section

347    13-71-101.

348        (13) "Social media service" means the same as that term is defined in Section

349    13-71-101.

350        (14) "User" means the same as that term is defined in Section 13-71-101.

351        (15) "Utah account holder" means the same as that term is defined in Section

352    13-71-101.

353        (16) "Utah minor account holder" means the same as that term is defined in Section

354    13-71-101.".

Addendum B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NETCHOICE, LLC, <br><br> Plaintiff, <br><br> v. <br><br> SEAN D. REYES, in his official capacity as Attorney General of Utah; and KATHERINE HASS, in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case Nos. 2:23-cv-00911-RJS-CMR and 2:24-cv-00031-RJS-CMR <br><br> Chief Judge Robert J. Shelby <br><br> Magistrate Judge Cecilia M. Romero |
| HANNAH PAISLEY ZOULEK, a Utah resident; JESSICA CHRISTENSEN, a Utah resident; LU ANN COOPER, a Utah resident; M.C., a Utah resident, by and through her parent, LU ANN COOPER; VAL SNOW, a Utah resident; and UTAH YOUTH ENVIRONMENTAL SOLUTIONS, a Utah association, <br><br> Plaintiffs, <br><br> v. <br><br> KATHERINE HASS, in her official capacity as Director of the Utah Division of Consumer Protection; SEAN REYES, in his official capacity as Utah Attorney General, <br><br> Defendants. | |

Earlier this year, the State of Utah enacted the Utah Minor Protection in Social Media Act.[1]  The Act, which takes effect on October 1, 2024, seeks to protect young Utahans' mental

---

[1] Utah Code §§ 13-71-101 to 401.

health and personal privacy by requiring social media platforms to verify users' ages and impose special restrictions on minors' accounts.

Now before the court are two cases challenging the Act, alleging it violates the rights to free expression and due process under the First and Fourteenth Amendments of the United States Constitution. The first is brought by Plaintiff NetChoice, LLC. NetChoice is a trade association comprised of internet companies, including household names such as Google, Meta, Snap, and X. The second is brought by Plaintiffs Hannah Paisley Zoulek, Jessica Christensen, Lu Ann Cooper, M.C., Val Snow, and Utah Youth Environmental Solutions. The Zoulek Plaintiffs are minors, adults, and a youth-led organization who use social media platforms to learn, express themselves, and interact with others. Both NetChoice and the Zoulek Plaintiffs seek orders enjoining Defendants Sean D. Reyes and Katherine Hass from enforcing the Act while the court resolves the parties' constitutional challenges.[2]

As explained below, the court finds NetChoice is substantially likely to succeed on its claim the Act violates the First Amendment and grants its request for a preliminary injunction. The court recognizes the State's earnest desire to protect young people from the novel challenges associated with social media use. But owing to the First Amendment's paramount place in our democratic system, even well-intentioned legislation that regulates speech based on content must satisfy a tremendously high level of constitutional scrutiny. And on the record before the court, Defendants have yet to show the Act does.

---

[2] Dkt. 52 (case no. 2:23-cv-00911), *Plaintiff's Motion for Preliminary Injunction* (*NetChoice Motion*); Dkt. 37 (case no. 2:24-cv-00031), *Motion for Preliminary Injunction and Memorandum of Law in Support* (*Zoulek Motion*). In subsequent citations to the respective dockets, the court will note "NetChoice" or "Zoulek" in a parenthetical following the docket number.

Throughout this Memorandum Decision and Order, the court will refer to Plaintiff NetChoice, LLC as "NetChoice." The court will refer to Plaintiffs Hannah Paisley Zoulek, Jessica Christensen, Lu Ann Cooper, M.C., Val Snow, and Utah Youth Environmental Solutions, collectively, as "the Zoulek Plaintiffs." The court will refer to NetChoice and the Zoulek Plaintiffs, collectively, as "Plaintiffs."

Separately, the court finds the Zoulek Plaintiffs have not sufficiently alleged their standing to challenge the Act's constitutionality and denies their request for a preliminary injunction. The court dismisses the Zoulek Plaintiffs' claims without prejudice and invites them to move for leave to file an amended complaint if they wish to do so.

## BACKGROUND

### I.   The Parties

#### A.  NetChoice

NetChoice is a nonprofit trade association for internet companies.[3] It seeks to "promote online commerce and speech," "increase consumer access and options via the [i]nternet," and "minimiz[e] the burdens that would prevent businesses from making the [i]nternet more accessible and useful."[4] NetChoice members include many prominent internet companies: Dreamwidth; Google, which owns and operates YouTube; Meta, which owns and operates Facebook and Instagram; Nextdoor; Pinterest; Snap Inc., which owns and operates Snapchat; and X.[5]

According to NetChoice, each of these companies operate websites and applications that publish, disseminate, create, or distribute protected speech "by displaying text, audio, images, or video to users—including user-generated content."[6] And through NetChoice member sites, users "gain access to information and communicate with one another about it on any subject that might come to mind."[7]

---

[3] Dkt. 51 (NetChoice), *Plaintiff's First Amended Complaint* (*NetChoice FAC*) ¶ 8.

[4] *Id.*

[5] *Id.* ¶ 11.  The Act does not regulate all NetChoice members.  *Id.*  For clarity, however, this Order refers to the subset of NetChoice members subject to the Act as "members."

[6] *NetChoice Motion* at 5 (internal quotations and citations omitted).

[7] *NetChoice FAC* ¶ 19.

**B.  The Zoulek Plaintiffs**

The Zoulek Plaintiffs are Utah residents and a Utah-based association who use social media to "communicate, express themselves, associate with peers, and learn."[8]  They contend the Act would restrict their ability "to communicate and access information."[9]

Hannah Paisley Zoulek is a soon-to-be college student who uses social media for educational purposes and to connect with communities of users expressing themselves through creative writing.[10]  Jessica Christensen is a prominent advocate for former members of polygamous groups who herself escaped a polygamous family at age fifteen.[11]  Minors and adults who have left or are seeking help in leaving abusive homes frequently contact her through social media.[12]  Lu Ann Cooper is the co-founder and president of Hope After Polygamy, which provides support to individuals, including minors, who are in or have left polygamist communities.[13]  Hope After Polygamy maintains several social media accounts to educate the public about its services and communicate with minors seeking help.[14]  M.C. is Cooper's daughter and a high school student who uses social media to connect with friends, explore creative interests, and obtain information about a range of topics.[15]  Val Snow is a YouTuber who makes videos about mental health, resilience, and LGBTQ-related issues.[16]  Both minors

---

[8] Dkt. 36 (Zoulek), *First Amended Complaint for Declaratory and Injunctive Relief* (*Zoulek FAC*) ¶ 5.

[9] *Id.*

[10] *Id.* ¶ 7.

[11] *Id.* ¶ 8.

[12] *Id.*

[13] *Id.* ¶ 9.

[14] *Id.*

[15] *Id.* ¶ 10.

[16] *Id.* ¶ 11.

and adults watch his content and contact him through the channel for support.[17]  And Utah Youth

Environmental Solutions (UYES) is a "youth-led grassroots organization that seeks to educate

young people in Utah regarding climate change and environmental issues."[18]  It uses social

media to advertise opportunities for involvement, promote other resources and information, and

communicate with minors interested in the organization.[19]

### C.  Defendants

Defendants are Katherine Hass and Sean Reyes, both sued in their official capacity.[20]

Hass is Director of the Division of Consumer Protection of the Utah Department of Commerce

(the Division).[21]  The Act grants enforcement authority to the Division and its Director.[22]  Reyes

is the Attorney General of Utah.[23]  He has authority to "give legal advice to, and act as counsel

for, the [D]ivision in the exercise of the [D]ivision's responsibilities."[24]

## II.  The Act

In March 2024, the State enacted the Utah Minor Protection in Social Media Act.[25]

Scheduled to take effect on October 1, 2024, the Act partially replaces Utah's Social Media

Regulation Act of 2023, which the State repealed after NetChoice and the Zoulek Plaintiffs filed

separate cases challenging its constitutionality.[26]  The Act purports to advance Utah's

---

[17] *Id.*

[18] *Id.* ¶ 12.

[19] *Id.*

[20] *NetChoice FAC* ¶¶ 14–15; *Zoulek FAC* ¶¶ 13–14.

[21] *NetChoice FAC* ¶ 15; *Zoulek FAC* ¶ 13.

[22] *NetChoice FAC* ¶ 15 (citing Utah Code § 13-71-301); *Zoulek FAC* ¶ 13 (citing Utah Code § 13-71-301).

[23] *NetChoice FAC* ¶ 14; *Zoulek FAC* ¶ 14.

[24] *NetChoice FAC* ¶ 14 (quoting Utah Code § 13-71-301(4)(b)); *Zoulek FAC* ¶ 14.

[25] *NetChoice FAC* ¶¶ 38–39; *Zoulek FAC* ¶ 43.

[26] *NetChoice FAC* ¶¶ 38–39; *Zoulek FAC* ¶ 42.

"compelling interest in safeguarding the well-being and privacy of [Utah] minors" who use

social media services.[27]

### A.  Central Coverage Definition

The Act regulates "[s]ocial media compan[ies],"[28] defined as "entit[ies] that own[] or

operate[] a social media service."[29]  A "social media service" is, in turn, defined as "a public

website or application" that:

(i)    displays content that is primarily generated by account holders and not by the social media company;

(ii)   permits an individual to register as an account holder and create a profile that is made visible to the general public or a set of other users defined by the account holder;

(iii)  connects account holders to allow users to interact socially with each other within the website or application;

(iv)   makes available to each account holder a list or lists of other account holders

---

[27] Utah Code § 13‑71‑102(1).  The Act contains various legislative findings related to this "compelling interest." Those findings state:

-  the proliferation of social media services has led to the widespread collection and utilization of personal information, exposing minors to potential privacy and identity related harms;

-  the addictive design features of certain social media services contribute to excessive use of a social media service by minors, impacting sleep patterns, academic performance, and overall health;

-  social media services are designed without sufficient tools to allow adequate parental oversight, exposing minors to risks that could be mitigated with proper parental involvement and control;

-  the state has enacted safeguards around products and activities that pose risks to minors, including regulations on motor vehicles, medications, and products and services targeted to children;

-  prolonged and unregulated social media use has been linked to adverse effects on the mental health of minors, including increased rates of anxiety, depression, and social isolation;

-  existing measures employed by social media companies to protect minors have proven insufficient; and

-  the state should ensure that minors' personal data is given special protection, as minors may have less awareness of the risks, consequences, and safeguards related to a social media company's processing of minors' personal data.

[28] Utah Code §§ 13‑71‑201 to 204, 302.

[29] Id. § 13‑71‑101(13).

with whom the account holder shares a connection within the system; and

(v)    allows account holders to post content viewable by other users.[30]

The Act expressly excludes from the "social media service" definition "email[,]" "cloud

storage[,]" and "document viewing, sharing, or collaboration services."[31]

### B. The Act's Requirements

The Act's requirements are readily divided in two parts.  First, the Act requires social

media companies to  "implement an age assurance system to determine whether a current or

prospective Utah account holder . . . is a minor."[32]  The system must be "reasonably calculated to

enable a social media company to identify whether a current or prospective Utah account holder

is a minor with an accuracy rate of at least 95%."[33]  And in conjunction with this requirement,

social media companies must "implement a review process allowing account holders to appeal

the account holder's age designation by submitting documentary evidence to establish the

account holder's age range."[34]  The company must "review evidence submitted by the account

holder and make a determination within 30 days of submission of the evidence."[35]

Second, the Act subjects social media companies to special rules with respect to Utah

minors' accounts.  Relevant to this case, the Act requires social media companies to "set default

privacy settings to prioritize maximum privacy, including settings" that:

(a)    restrict  the  visibility  of  a  Utah  minor  account  holder's  account  to  only

---

[30] *Id.* § 13-71-101(14)(a).

[31] *Id.* § 13-71-101(14)(b).

[32] *Id.* § 13-71-201(1).  The Act defines a minor as "an individual under 18 years old" that "has not been emancipated" or "married."  *Id.* § 13-71-101(8).

[33] *Id.* § 13-71-101(2).

[34] *Id.* § 13-71-201(3)(a).

[35] *Id.* § 13-71-201(3)(b).

          connected accounts;[36]

(b)     limit the Utah minor account holder's ability to share content to only connected accounts;

(c)     restrict any data collection and sale of data from a Utah minor account holder's account that is not required for core functioning of the social media service;[37]

(d)     disable search engine indexing of Utah minor account holder profiles;

(e)     restrict a Utah minor account holder's direct messaging capabilities to only allow direct messaging to connected accounts; and

(f)     allow a Utah minor account holder to download a file with all information associated with the Utah minor account holder's account[.][38]

These default privacy setting may not be changed without a social media company "first obtaining verifiable parental consent."[39]

The Act also requires social media companies to "disable" certain "features that prolong user engagement" on Utah minors' accounts.[40] These features include "autoplay functions that continuously play content without user interaction[,]" "scroll or pagination that loads additional

---

[36] The Act defines a connected account as "an account on the social media service that is directly connected to: (a) the minor account holder's account; or (b) an account that is directly connected to an account directly connected to the minor account holder's account." *Id.* § 13-71-101(3). Directly connected "means an account on the social media service that is connected to another account by (a) sending a request to connect to another account holder and having the request to connect accepted by the other account holder; or (b) receiving a request to connect from another account holder and accepting the request to connect." *Id.* § 13-71-101(5).

[37] The Act does not define what falls within the scope of "required for core functioning of the social media service."

[38] *Id.* § 13-71-202(1).

[39] *Id.* § 13-71-204(1). Verifiable parental consent "means authorization from a parent for a social media service to collect, use, and disclose personal information of a Utah minor account holder, that complies with" certain "verifiability requirements." *Id.* § 13-71-101(18). To comply, the social media service must "provide advance notice to the parent describing information practices related to the minor account holder's personal information" and "receive confirmation that the parent received the notice . . . ." *Id.* § 13-71-101(18)(a), (b).

[40] *Id.* § 13-71-202(5).

content as long as the user continues scrolling[,]"[41] and "push notifications prompting repeated user engagement."[42]

Finally, the Act states a covered social media company's "terms of service related to a Utah minor account holder shall be presumed to include an assurance of confidentiality for the Utah minor account holder's personal information."[43]  This presumption "may be overcome if the social media company obtains verifiable parental consent."[44]  And the presumption of confidentiality "does not apply to a social media company's internal use or external sharing of a Utah minor account holder's personal information if the use or sharing is necessary" to:

(a)     maintain or analyze functioning of the social media service;

(b)     enable network communications;

(c)     personalize the user's experience based on the user's age and location;

(d)     display a username chosen by the Utah minor account holder;

(e)     obtain age assurance information as required under [Utah Code] Section 13-71-201; or

(f)     comply with the requirements of this chapter or other federal or state laws.[45]

## C.  Enforcement

The Act grants the Division enforcement authority and authorizes the Attorney General to "give legal advice to, and act as counsel for the [D]ivision in the exercise of [its] [enforcement]

---

[41] The court will follow the parties in referring to this feature as seamless pagination.

[42] *Id.* § 13-71-202(5)(a)-(c).  Apart from "push notifications," the Act does not further define these features.  A push notification is "an automatic electronic message displayed on an account holder's device, when the user interface for the social media service is not actively open or visible on the device, that prompts the account holder to repeatedly check and engage with the social media service."  *Id.* § 13-71-101(11).

[43] *Id.* § 13-71-204(2).

[44] *Id.* § 13-71-204(3).

[45] *Id.* § 13-71-204(4).

responsibilities."[46]  Specifically, the Division Director "may impose an administrative fine of up to $2,500 for each violation" of the Act,[47]  and the Division "may bring an action in court to enforce a provision" of the Act.[48]  For actions brought in court, the court may:

(i)      declare that the act or practice violates a provision of [the Act];

(ii)     enjoin actions that violate [the Act];

(iii)    order disgorgement of any money received in violation of [the Act];

(iv)    order payment of disgorged money to an injured purchaser or consumer;

(v)     impose a civil penalty of up to $2,500 for each violation of [the Act];

(vi)    award actual damages to an injured purchaser or consumer; and

(vii)   award any other relief that the court deems reasonable and necessary.[49]

"If a court grants judgment or injunctive relief to the [D]ivision," the Act further provides "the court shall award the [D]ivision" its "reasonable attorney fees[,]" "court costs[,]" and "investigative fees."[50]

The Act provides a "safe harbor" for social media companies who implement "age assurance" and "verifiable parental consent" mechanisms that comport with rules promulgated by the Division.[51]  The safe harbor provides that a social media company "is not subject to an enforcement action for a violation of Section 13-71-201 [the age assurance requirement] if the

---

[46] *Id.* § 13-71-301(1), 301(2).

[47] *Id.* § 13-71-301(3)(a)(i).

[48] *Id.* § 13-71-301(3)(a)(ii).  The Act authorizes both the Division and the "attorney general on behalf of the [D]ivision" to seek civil penalties in a civil action.  *Id.* § 13-71-301(4)(b).

[49] *Id.* § 13-71-301(3)(b).

[50] *Id.* § 13-71-301(3)(c).  The Act also subjects "[a] person who violates an administrative or court order issued for a violation of [the Act] . . . to a civil penalty of no more than $5,000 for each violation."  *Id.* § 13-71-301(4)(a).

[51] *Id.* § 13-71-302.  At oral argument, Defendants indicated the Division will not publish these rules until after the Act takes effect on October 1, 2024.

social media company implements and maintains an age assurance system that complies with rules made by the [D]ivision."[52]  And the same provision assures that "[a] social media company is considered to have obtained verifiable parental consent if the social media company obtains parental consent through a mechanism that complies with . . . rules made by the [D]ivision."[53]

## III.    Procedural History

NetChoice and the Zoulek Plaintiffs initiated their respective cases in December 2023 and January 2024, challenging the constitutionality of the then-existing Utah Social Media Regulation Act of 2023.[54]  Shortly thereafter, however, the court stayed both cases pending the completion of the 2024 Utah legislative session.[55]  During the session, the Utah Legislature repealed the 2023 law and partially replaced it with the Act.[56]  The parties in both cases agreed to file amended complaints drawn to the Act.[57]

On May 3, 2024, NetChoice filed its First Amended Complaint and the present Motion for Preliminary Injunction.[58]  The Zoulek Plaintiffs followed suit on May 31, 2024.[59]  Both Plaintiffs broadly challenge the constitutionality of the Act, arguing it violates the First Amendment and the Due Process Clause of the Fourteenth Amendment by impermissibly

---

[52] *Id.* § 13-71-302(2).

[53] *Id.* § 13-71-302(3).

[54] Dkt. 1 (NetChoice), *NetChoice's Initial Complaint for Declaratory and Injunctive Relief*; Dkt. 2 (Zoulek) *Zoulek's Initial Complaint for Declaratory and Injunctive Relief*.

[55] Dkt. 41 (NetChoice), *Docket Text Order* (striking the briefing schedule for NetChoice's Motion for Preliminary Injunction and directing the parties to propose an updated schedule following the legislative session); Dkt. 27 (Zoulek), *Order Granting Stipulation and Joint Motion to Stay Pending the Completion of the 2024 Utah General Legislative Session*.

[56] *NetChoice FAC* ¶ 38; *Zoulek FAC* ¶¶ 42–43.

[57] Dkt. 45 (NetChoice), *Docket Text Order* (establishing new briefing schedule); Dkt. 31 (Zoulek), *Docket Text Order* (same).

[58] *See generally NetChoice FAC*; *NetChoice Motion*.

[59] *See generally Zoulek FAC*; *Zoulek Motion*.

regulating the protected speech of social media companies and their users.[60]  Each Plaintiff also

asserts provisions of the Act are preempted by Section 230 of the Communications Decency Act

(CDA), 47 U.S.C. § 230,[61] and the Zoulek Plaintiffs assert the Act violates the Commerce

Clause.[62]  Both Plaintiffs aver these issues satisfy their burden to obtain a preliminary injunction

and ask the court to enjoin Defendants from enforcing the Act before it takes effect on October 1,

2024.[63]

    Defendants oppose both Motions for Preliminary Injunction on the grounds that Plaintiffs

fail to meet their burden "of establishing a clear and unequivocal right" to injunctive relief.[64]  To

that end, Defendants primarily contend Plaintiffs "cannot . . . demonstrate that [they are] likely to

succeed on the merits" because "the Act is a reasonable and constitutional regulation that is

appropriately tailored to the State's important and compelling interests."[65]

    After Plaintiffs filed their Motions for Preliminary Injunctions, Defendants separately

moved to dismiss certain claims in each case.  In the NetChoice case, Defendants moved to

dismiss NetChoice's Section 230 preemption claim,[66] and in the Zoulek case, Defendants moved

to dismiss the Zoulek Plaintiffs' Section 230 preemption and Commerce Clause claims.[67]  On

July 22, 2024, the court issued a Memorandum Decision and Order granting Defendants' Motion

---

[60] *NetChoice Motion* at 1–5; *Zoulek Motion* at 1–2.  *See also NetChoice FAC* ¶¶ 1–7; *Zoulek FAC* ¶¶ 1–6.

[61] *NetChoice FAC* ¶ 5; *Zoulek FAC* ¶ 6.  *See also NetChoice Motion* at 4.

[62] *Zoulek Motion* at 2; *Zoulek FAC* ¶ 6.

[63] *NetChoice Motion* at 4–5; *Zoulek Motion* at 2.

[64] Dkt. 58 (NetChoice), *Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction* (*NetChoice Opposition*) at 3; Dkt. 52 (Zoulek), *Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction* (*Zoulek Opposition*) at 3.

[65] *NetChoice Opposition* at 2–3; *Zoulek Opposition* at 3.

[66] Dkt. 59 (NetChoice), *Defendants' Motion to Dismiss for Failure to State a Claim and Memorandum in Support*.

[67] Dkt. 51 (Zoulek), *Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Count 3) and Failure to State a Claim (Counts 3 and 4)*.

to Dismiss NetChoice's Section 230 preemption claim for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[68]  Shortly thereafter, the Zoulek Plaintiffs voluntarily dismissed their Section 230 claim.[69]  On August 5, 2024, the court issued a separate Memorandum Decision and Order granting Defendants' Motion to Dismiss the Zoulek Plaintiffs' Commerce Clause claim for lack of standing.[70]

With those claims dismissed, only Plaintiffs' challenges under the First and Fourteenth Amendments remain, and the court considers only those challenges in its analysis of the present Motions.  Those Motions are fully briefed[71] and the court heard oral argument on August 14, 2024.[72]

## ANALYSIS

The court takes up the parties' Motions separately, beginning with NetChoice's Motion and then proceeding to the Zoulek Plaintiffs' Motion.  Although Defendants' do not challenge either Plaintiffs' standing, "[t]he standing requirement is an 'irreducible constitutional minimum' that 'serv[es] to identify those disputes which are appropriately resolved through the judicial

---

[68] Dkt. 78 (NetChoice), *Memorandum Decision and Order Granting Defendants' Motion to Dismiss* (*Section 230 Decision*).

[69] Dkt. 66 (Zoulek), *Plaintiffs' Notice of Voluntary Dismissal of Count IV of the First Amended Complaint*.

[70] Dkt. 67 (Zoulek), *Memorandum Decision and Order Granting Defendants' Motion to Dismiss*.

[71] Dkt. 73 (NetChoice), *Plaintiff's Reply Brief in Support of Motion for Preliminary Injunction* (*NetChoice Reply*); Dkt. 62 (Zoulek), *Plaintiffs' Combined Reply in Support of Motion for Preliminary Injunction and Opposition to Motion to Dismiss*.

At the direction of the court, the parties submitted supplemental briefing concerning the Supreme Court's recent decision in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024).  *See* Dkt. 75 (NetChoice), *Plaintiff's Supplemental Brief on the Supreme Court's Moody Decision* (*NetChoice Supp. Brief*); Dkt. 79 (NetChoice), *Defendants' Supplemental Brief Regarding the Supreme Court's Decision in Moody v. NetChoice*; Dkt. 65 (Zoulek), *Plaintiffs' Response to Order for Supplemental Briefing*; Dkt. 68 (Zoulek), *Defendants' Supplemental Brief Regarding the Supreme Court's Decision in Moody v. NetChoice*.

[72] Dkt. 80 (NetChoice), *Minute Entry*; Dkt. 69 (Zoulek), *Minute Entry*.

process.'"[73]   Accordingly, the court begins its review of each Motion by examining Plaintiffs'

standing.   Concluding NetChoice has standing, the court proceeds to the merits of its Motion and

grants its request for preliminary injunctive relief.   Concluding the Zoulek Plaintiffs lack

standing, the court denies the Zoulek Plaintiffs' Motion and dismisses each of their claims.

## I.   NetChoice's Motion

### A.   NetChoice Has Standing to Assert Harms to the First Amendment Interests of Its Members.

The court begins its analysis of NetChoice's Motion by reviewing whether NetChoice has

standing to raise constitutional challenges against the Act.   "The familiar tripartite test for

standing requires a plaintiff to show (1) it has 'suffered an injury in fact'; (2) the injury is 'fairly

traceable to the challenged action of the defendant'; and (3) it is 'likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision.'"[74]   However, a different

standing test applies to organizations asserting claims on behalf of their members.[75]   Such an

organization must show "(1) at least one of its members would have standing to sue in the

member's own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither

the claim asserted nor the relief requested requires the member to participate in the lawsuit."[76]

---

[73] *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) (second alteration in original); *see also Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)).

[74] *Speech First, Inc.*, 92 F.4th at 949 (quoting *Lujan*, 504 U.S. at 560–61).

[75] *Id.* (citing *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000)).

[76] *Id.*

14

NetChoice, suing on behalf of its members, satisfies these requirements.[77]  First, NetChoice has shown its members have individual standing to sue because they are subject to the Act and will face injury in the form of liability if they violate its operative provisions.[78]  This injury is directly traceable to Defendants, who the Act vests with enforcement authority, and would be redressed by an injunction blocking that authority.  Second, NetChoice has shown the interests it aims to protect are central to its organizational purpose of promoting "online commerce and speech" while "minimizing . . . burdens that . . . prevent businesses from making the Internet more accessible and useful."[79]  Finally, NetChoice has shown its claims do not "require[] the participation of individual members in the lawsuit."[80]  Its claims can be proven without fact-intensive, individualized inquiry and the prospective relief it seeks "will inure to the benefit of those members of the association actually injured."[81]

Thus, the court concludes NetChoice has standing to raise constitutional claims on behalf of its members.[82]

---

[77] Courts considering recent challenges NetChoice has brought against similar state laws have reached the same conclusion.  *See NetChoice, LLC v. Fitch*, No. 1:24-cv-170-HSO-BWR, 2024 WL 3276409, at *5–7 (S.D. Miss. July 1, 2024) (holding NetChoice "has demonstrated its associational standing to bring claims on behalf of its member and its members' Mississippi users"); *NetChoice, LLC v. Yost*, No. 2:24-cv-00047, 2024 WL 555904, at *3–6 (S.D. Ohio Feb. 12, 2024) (finding NetChoice had "standing to bring both its claims on behalf of its member organizations and Ohioan minors"); *NetChoice, LLC v, Griffin*, No. 5:23-cv-05105, 2023 WL 5660155, at *9–12 (W.D. Ark. Aug. 31, 2023) (concluding NetChoice has associational standing to challenge state law on behalf of its members and its members' users).

[78] *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (citing *Craig v. Boren*, 429 U.S. 190, 194 (1976)) (holding a trade group had standing when a challenged law was "aimed directly at [the group's members], who . . . would have to take significant and costly compliance measures or risk criminal prosecution").

[79] *NetChoice FAC* ¶ 8.

[80] *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

[81] *Warth v. Seldin*, 422 U.S. 490, 515 (1975).

[82] NetChoice contends it has standing to sue on behalf of both its members and its members' users.  However, as explained below, the court determines NetChoice is entitled to a preliminary injunction based on the interests of its members alone.  The court need not consider whether NetChoice has standing to advance claims on behalf of its members' users.

**B. NetChoice Is Entitled to a Preliminary Injunction.**

Having reviewed NetChoice's standing, the court turns to NetChoice's Motion for Preliminary Injunction.  To obtain a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, a moving party must establish four elements: "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm . . . the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."[83]  Because preliminary injunctive relief "is an extraordinary remedy" the moving party's "right to relief must be clear and unequivocal."[84]

As described below, NetChoice clears this hurdle.  First, NetChoice has shown it is substantially likely to succeed on the merits of its claim the entire Act violates the United States Constitution.  Specifically, NetChoice has shown it is substantially likely to succeed on its first cause of action—that the entire Act, through the Act's Central Coverage Definition, facially violates the First Amendment.[85]  Second, NetChoice has demonstrated the remaining preliminary injunction factors support its request for relief.

**1. NetChoice is Substantially Likely to Succeed on the Merits of Its Claim the Entire Act, Through the Central Coverage Definition, Violates the First Amendment.**

NetChoice argues the entire Act facially violates the First Amendment because the Act's

---

[83] *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 752 (10th Cir. 2024) (quoting *Gen. Motors Corp. v. Urb. Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007)).

[84] *Id.* (quoting *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005)).

[85] *See NetChoice FAC* ¶¶ 71–96.  Because the court concludes NetChoice has shown it is substantially likely to succeed on this claim, it does not reach NetChoice's remaining First and Fourteenth Amendment claims.  *See NetChoice FAC* ¶¶ 97–151, 160–173, 179–187; *NetChoice Motion* at 24–34, 37–39.  Neither does the court reach NetChoice's Section 230 claims.  *See NetChoice* FAC ¶¶ 152–159, 174–178; *NetChoice Motion* at 35–37.  The court already determined, as a matter of law, that Section 230 does not preempt the Act's prohibitions on the use of autoplay, seamless pagination, and notifications on minors' accounts and dismissed the corresponding claim from NetChoice's FAC.  *See generally Section 230 Decision*.

16

operative provisions each rely on the Central Coverage Definition, and the Central Coverage Definition imposes unjustified, content-based restrictions on social media companies' speech.[86]

NetChoice's argument is persuasive.  As a preliminary matter, there is no dispute the Act *implicates* social media companies' First Amendment rights.[87]  The speech at issue in this case— the speech social media companies engage in when they make decisions about how to construct and operate their platforms—is protected speech.[88]  The Supreme Court has long held that "[a]n entity 'exercis[ing] editorial discretion in the selection and presentation' of content is 'engage[d] in speech activity'" protected by the First Amendment.[89]  And this July, in *Moody v. NetChoice, LLC*, the Court affirmed these First Amendment principles "do not go on leave when social media are involved."[90]  Indeed, the Court reasoned that in "making millions of . . . decisions each day" about "what third-party speech to display and how to display it," social media companies "produce their own distinctive compilations of expression."[91]

Regarding the more pressing question—whether the Act facially *violates* social media companies' First Amendment rights—the probable answer is "yes."  As explained below,

---

[86] *NetChoice Motion* at 16–24; *id.* at 25–26 (quoting *Murphy v. N.C.A.A.*, 584 U.S. 453, 481 (2018)).

[87] Defendants concede this issue, acknowledging "social media platforms contain speech, such that there are First Amendment . . . concerns."  *NetChoice Opposition* at 10.  Relatedly, Defendants concede each challenged provision of the Act, other than the age assurance requirement, is subject to heighted First Amendment scrutiny.  *Id.*

[88] NetChoice argues the Act implicates the First Amendment rights of both its members and its members' users. However, as suggested at n. 82, the court concludes NetChoice is entitled to a preliminary injunction without deciding whether the Act implicates and violates the First Amendment rights of social media users.

[89] *Moody*, 144 S. Ct. at 2402 (quoting *Arkansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)) (second and third alterations in original); *see also Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557, 570 (1995) ("Nor, under our precedent, does First Amendment protection require a speaker to generate, as an original matter, each item featured in the communication.").

[90] *Moody*, 144 S. Ct at 2394.

[91] *Id.* at 2393.  *Cf. Yost*, 2024 WL 555904, at *7 ("[T]he Act does implicate the First Amendment, at least to some degree . . . ."); *Fitch*, 2024 WL 3276409, at *10 ("[T]he [c]ourt is not persuaded that H.B. 1126 merely regulates non-expressive conduct."); *Comput. & Commc'ns Indus. Ass'n et al. v. Paxton*, 2024 WL 4051786, at *10 (W.D. Tex. Aug. 30, 2024) ("The [c]ourt agrees with Plaintiffs that HB 18's threshold coverage definition is a content-based regulation.").

NetChoice has shown it is substantially likely to succeed on its claim the Act has "no constitutionally permissible application"[92] because it imposes content-based restrictions on social media companies' speech, such restrictions require Defendants to show the Act satisfies strict scrutiny, and Defendants have failed to do so.

i. **NetChoice Has Shown the Act Imposes Content-Based Restrictions on Social Media Companies' Speech.**

NetChoice argues the entire Act is facially content based because the Central Coverage Definition draws distinctions between websites that allow users to interact socially and websites that serve another function or purpose, such as those that allow users to shop, read the news, access entertainment, educate themselves, or conduct business.[93] In brief review, the Central Coverage Definition defines a "social media company" as "an entity that owns or operates a social media service," and defines a "social media service" by reference to five characteristics, including "a public website or application" that "allow[s] users to interact socially with each

---

[92] *NetChoice Supp. Brief* at 9; *see also NetChoice Motion* at 15 (quoting *United States v. Stevens*, 559 U.S. 460, 472–73 (2010)).

In *Moody*, the Supreme Court affirmed that a district court evaluating a facial challenge under the First Amendment must consider whether a "substantial number of [a law's] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Moody*, 144 S. Ct. at 2397.  The Court also prescribed a step-by-step framework for courts assessing this question to apply.  *Id.* at 2398.  First, the court directed district courts to assess a challenged law's "scope," considering "[w]hat activities, by what actors," the law "prohibit[s] or otherwise regulate[s]."  *Id.* Second, the Court directed district courts to "decide which of the law['s] applications violate the First Amendment, and . . . measure them against the rest."  *Id.*

With respect to the scope-framing Central Coverage Definition, however, the *Moody* questions are easily answered. There is no dispute about who and what the Act regulates because the parties agree the Act's operative provisions, only apply to "social media companies" providing "social media services" to minors.  *See NetChoice Supp. Brief* at 2–4.  Likewise, there is no dispute "about how the First Amendment applies to *different* websites or regulatory requirements."  *Id.* at 5.  Although the parties offer opposing arguments about whether the Act satisfies heighted First Amendment scrutiny, NetChoice urges the Act is uniformly unconstitutional and Defendants urge the Act is uniformly constitutional.  *See id.* at 9.

[93] *NetChoice Motion* at 16–17 (citing *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163–64 (2015)).

other . . . ."[94]  The court agrees with NetChoice.

While a law "is facially content based . . . if it 'applies to particular speech because of the topic discussed or the idea or message expressed[,]'"[95] not all "facial distinctions . . . are obvious,"[96] and a law "cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result."[97]  Additionally, even "facially content neutral" laws must be considered content based if they "cannot be justified without reference to the content of the regulated speech," or if they "were adopted . . . because of disagreement with the message the speech conveys."[98]

For example, in *Reed v. Town of Gilbert, Arizona*, the Supreme Court held a municipal policy that divided signs into categories based on their "communicative content," such as "political signs" and "temporary directional signs," and regulated each category differently, was facially content based.[99]  The court reasoned that "a speech regulation targeted at a specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter."[100]  But in *City of Austin v. Reagan National Advertising*, the Court held a municipal policy that distinguished between on-premises and off-premises signs (that is, signs advertising products or services located on the site where the sign was installed and signs advertising products or services located somewhere else) was not facially content based.[101]

---

[94] Utah Code §§ 13-71-101(13) – (14).

[95] *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed*, 576 U.S. at 163).

[96] *Reed*, 576 U.S. at 163.

[97] *City of Austin*, 596 U.S. at 74.

[98] *Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (internal quotations and alterations omitted).

[99] *Id.*

[100] *Id.* at 169.

[101] *City of Austin*, 596 U.S. at 66, 68.

Distinguishing *Reed*, the Court explained that although the on-premises/off-premises distinction "required a reader to inquire 'who is the speaker and what is the speaker saying,'" it required that inquiry "only in service of drawing neutral, location-based lines."[102]  This examination was "agnostic as to content," failing to "single out any topic or subject matter for differential treatment."[103]

The Central Coverage Definition, like the sign ordinance at issue in *Reed*, appears to draw facially content-based distinctions between subjects of speech.  Just as the *Reed* ordinance divided the universe of signs into political signs, defined as signs "designed to influence the outcome of an election," and temporary directional signs, defined as "signs directing the public to a church,"[104] the Act's Central Coverage Definition divides the universe of internet platforms into social media services, defined as websites or applications that "allow users to interact socially with each other," and other internet platforms, such as platforms for "news, sports, commerce, [and] online video games."[105]

Defendants respond that the Definition contemplates a social media service's "structure, not subject matter."[106]  However, Defendants' argument emphasizes the elements of the Central Coverage Definition that relate to "registering accounts, connecting accounts, [and] displaying user-generated content" while ignoring the "interact socially" requirement.[107]  And unlike the premises-based distinction at issue in *City of Austin*, the social interaction-based distinction does

---

[102] *Id.* at 68–69.

[103] *Id.* at 69.

[104] *See Reed*, 576 U.S. at 155.

[105] *Fitch*, 2024 WL 3276409, at *9.  Although the Central Coverage Definition doesn't expressly divide the world of internet platforms into social media services, news services, entertainment services, etc., it implicitly does the same by distinguishing between social media services and all other types of internet services.

[106] *NetChoice Opposition* at 22.

[107] *Id.*

not appear designed to inform the application of otherwise content-neutral restrictions.  It is a distinction that singles out social media companies based on the "social" subject matter "of the material [they] disseminate[]."[108]  Or as Defendants put it, companies offering services "where interactive, immersive, social interaction is the whole point."[109]

Defendants also respond that the Central Coverage Definition is content neutral because it does not prevent "minor account holders and other users they connect with [from] discuss[ing] any topic they wish."[110]  But in this respect, Defendants appear to misunderstand the essential nature of NetChoice's position.  The foundation of NetChoice's First Amendment challenge is not that the Central Coverage Definition restricts minor social media users' ability to, for example, share political opinions.  Rather, the focus of NetChoice's challenge is that the Central Coverage Definition restricts social media companies' abilities to collage user-generated speech into their "own distinctive compilation[s] of expression."[111]

Moreover, because NetChoice has shown the Central Coverage Definition facially distinguishes between "social" speech and other forms of speech, it is substantially likely the Definition is content based and the court need not consider whether NetChoice has "point[ed] to

---

[108] *Fitch*, 2024 WL 3276409, at *9; *see also Paxton*, 2024 WL 4051786, at *11 ("If there is a difference between the regulated DSP and unregulated DSP, it is the content of the speech on the site, not the medium through which that speech is presented.").

[109] *NetChoice Opposition* at 25.

[110] *Id.*

[111] *Moody*, 144 S. Ct. at 2393.

any message with which the State has expressed disagreement through enactment of the Act."[112]

Likewise, the court need not consider NetChoice's additional arguments that the Definition is

speaker based or viewpoint based.[113]

### ii.  Defendants Have Not Shown the Act Satisfies Strict Scrutiny.

Accepting that the entire Act, through the Central Coverage Definition, is facially content

based, strict scrutiny applies.[114]  The Act is "presumptively unconstitutional and may be justified

only if the government proves that [it is] narrowly tailored to serve compelling state interests."[115]

Defendants have not met their burden to satisfy this "demanding standard."[116]

---

[112] *NetChoice Opposition* at 21.  *See Reed*, 576 U.S. at 165–166 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993) ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech.")).

Defendants also cite *Turner Broadcasting System v. F.C.C.* in support of their position that the Central Coverage Definition is content-neutral.  *See NetChoice Opposition* at 22.  In *Turner*, the Supreme Court employed a two-part analysis to hold rules requiring cable television systems to carry local broadcast television stations were not content based.  *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 645 (1994) ("Our cases have recognized that even a regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys.").  First, the Court held the rules were not facially content based because they were "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry."  *Id.* at 637–45.  Second, the Court held that content-based purposes did not underlie the facially content neutral rules.  *Id.* at 645–49.  Defendants' argument relies on the second piece of this analysis.  *See NetChoice Opposition* at 22.  But as outlined above, the court need not conduct this analysis because the Central Coverage Definition is facially content based.

[113] *See NetChoice Motion* at 17–18.

[114] *Reed*, 576 U.S. at 164.

[115] *Id.* at 163.

[116] *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (quoting *U.S. v. Playboy Ent. Group*, 529 U.S. 803, 817 (2000)) ("It is rare that a regulation restricting speech because of its content will ever be permissible.").

Recall that it is NetChoice's burden to show it is likely to succeed on the merits of its First Amendment challenge.  *See Leachco, Inc.*, 103 F.4th at 752; *Awad v. Ziriax*, 670 F.3d 1111, 1129 (10th Cir. 2012).  That being so, the "burdens at the preliminary injunction stage track the burdens at trial," and Defendants bear "the burden of proof on the ultimate question of the challenged Act's constitutionality."  *Awad*, 670 F.3d at 1129 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 429 (2006)); *see also Playboy Ent. Group*, 529 U.S. at 818 ("When First Amendment compliance is the point to be proved, the risk of nonpersuasion—operative in all trials—must rest with the Government, not with the citizen.").

### a. Defendants Have Not Shown the Act Serves a Compelling State Interest.

Although the Act's statutory language asserts "the state [of Utah] has a compelling interest in safeguarding the well-being and privacy of minors in the state[,]"[117]  Defendants have not met their burden to articulate a compelling government interest warranting the Act's intrusion on social media companies' First Amendment rights.

To satisfy this exacting standard, Defendants must "specifically identify an 'actual problem' in need of solving."[118]  In *Brown v. Entertainment Merchants Association*, for example, the Supreme Court held California failed to demonstrate a compelling government interest in protecting minors from violent video games because it lacked evidence showing a causal "connection between exposure to violent video games and harmful effects on children."[119]  Reviewing psychological studies California cited in defense of its position, the Court reasoned research "show[ed] at best some correlation between exposure to violent entertainment" and "real-world effects."[120]  This "ambiguous proof" did not establish violent videogames were such a problem that it was appropriate for California to infringe on its citizens' First Amendment rights.[121]  Likewise, the Court rejected the notion that California had a compelling interest in "aiding parental authority."[122]  The Court reasoned the state's assertion ran contrary to the "rule that 'only in relatively narrow and well-defined circumstances may government bar public

---

[117] Utah Code § 13-71-102(1).

[118] *Brown*, 564 U.S. at 799 (quoting *Playboy Ent. Grp.*, 529 U.S. at 822–23); *see also Awad*, 670 F.3d at 1130 ("[O]verly generally statements of abstract principles do not satisfy the government's burden to articulate a compelling interest.").

[119] *Brown*, 564 U.S. at 800.

[120] *Id.*

[121] *Id.* at 799.

[122] *Id.* at 802.

dissemination of protected materials to [minors].'"[123]

Viewing Defendants' argument through a wide lens, the court understands Defendants' position to be that the State has compelling interests in protecting minors from the mental health- and personal privacy-related harms associated with excessive social media use.[124]  But these interests, like California's interests in protecting minors from the harms associated with violent videogames and aiding parental authority, fall short of the First Amendment's demanding standards.

First, though the court is sensitive to the mental health challenges many young people face, Defendants have not provided evidence establishing a clear, causal relationship between minors' social media use and negative mental health impacts.  It may very well be the case, as Defendants allege, that social media use is associated with serious mental health concerns including depression, anxiety, eating disorders, poor sleep, online harassment, low self-esteem, feelings of exclusion, and attention issues.[125]  But the record before the court contains only one report to that effect, and that report—a 2023 United States Surgeon General Advisory titled *Social Media and Youth Mental Health*—offers a much more nuanced view of the link between social media use and negative mental health impacts than that advanced by Defendants.[126]  For

---

[123] *Id.* (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975)) (alteration in original).

[124] Defendants' analysis does not clearly identify what compelling government interest the Act seeks to advance, moving straight from the question of whether the Central Coverage Definition is content based to a discussion of whether the Act is appropriately tailored.  *See NetChoice Opposition* at 27–30.  Thus, the court infers these interests from the Act's factual findings and Defendants' general opposition to NetChoice's Motion.  *See* Utah Code § 13-71-102; *NetChoice Opposition* at 4–5, 12–18, 27–30.

[125] *NetChoice Opposition* at 12–15.

[126] *See* Dkt. 58-4 (NetChoice), *Social Media and Youth Mental Health*.  Nor do Defendants provide any evidence the Utah Legislature considered as it deliberated whether to pass the Act.  Although courts usually consider such evidence in deciding whether a law satisfies intermediate scrutiny—that is, whether a law advances a substantial government interest—it is telling that Defendants do not satisfy this reduced burden.  *See Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195, 198–216 (1997) (finding Congress reasonably relied on "substantial evidence" in concluding a "real threat justified enactment" of a federal law subject to intermediate scrutiny).

example, the Advisory affirms there are "ample indicators that social media can . . . have a profound risk of harm to the mental health and well-being of children and adolescents," while emphasizing "robust independent safety analyses of the impact of social media on youth have not yet been conducted."[127]  Likewise, the Advisory observes there is "broad agreement among the scientific community that social media has the potential to both benefit and harm children and adolescents," depending on "their individual strengths and vulnerabilities, and . . . cultural, historical, and socio-economic factors."[128]  The Advisory suggests social media can benefit minors by "providing positive community and connection with others who share identities, abilities, and interest," "provid[ing] access to important information and creat[ing] a space for self-expression," "promoting help-seeking behaviors[,] and serving as a gateway to initiating mental health care."[129]

The record also contains a Declaration by Dr. Jean Twenge, a psychology professor at San Diego State University, describing various reports linking social media use to negative mental health impacts.[130]  But these reports are not themselves a part of the record, and the court is unable to assess their results or methodologies.  Moreover, a review of Dr. Twenge's Declaration suggests the majority of the reports she cites show only a correlative relationship

---

[127] *Id.* at 4, 11.

[128] *Id.* at 5.

[129] *Id.* at 6.  The Advisory suggests these benefits are especially prominent among minors "who are often marginalized, including racial, ethnic, and sexual and gender minorities."  *Id.*  For example, the Advisory cites evidence that "[s]even out of ten adolescent girls of color report encountering positive or identity-affirming content related to race across social media platforms."  *Id.*

[130] *See* Dkt. 58-2 (NetChoice), *Declaration of Dr. Jean Twenge* ¶¶ 30–53 (*Twenge Declaration*).

between social media use and negative mental health impacts.[131]  Insofar as those reports support

a causal relationship, Dr. Twenge's Declaration suggests the nature of that relationship is limited

to certain populations, such as teen girls, or certain mental health concerns, such as body

image.[132]

Second, Defendants' position that the Act serves to protect uninformed minors from the

"risks involved in providing personal information to social media companies and other users"[133]

ignores the basic First Amendment principle that "minors are entitled to a significant measure of

First Amendment Protection."[134]  The personal information a minor might choose to share on a

social media service—the content they generate—is fundamentally their speech.  And the

Defendants may not justify an intrusion on the First Amendment rights of NetChoice's members

with, what amounts to, an intrusion on the constitutional rights of its members' users.[135]

Third, with respect to both the State's mental health and personal privacy concerns,

Defendants generally argue parents are caught "in a losing battle against social media companies

for the attention and well-being of their own children."[136]  However, Defendants' evidence is far

from clear that "the Act's restrictions meet a substantial need of parents who wish to restrict their

---

[131] *See, e.g.*, *id.* ¶ 31 ("Correlational studies consistently show a link between heavy social media use and mood disorders."); *id.* ¶ 33(e) ("These studies are consistent with a 2022 meta-analysis finding a strong connection between social media use and depression/anxiety."); *id.* ¶ 42 ("A longitudinal prospective study of adolescents without ADHD symptoms found that . . . high-frequency use of digital media . . . was associated with a modest yet statistically significant increased odds of developing ADHD symptoms.").

[132] *See, e.g.*, *id.* ¶ 47 ("Even the *social media companies themselves* have internal research establishing the causal link between their product and poor mental health outcomes for youth, with Facebook finding that 'we make body issues worse for 1 in 3 teen girls.'"); *id.* ¶ 52 ("A random assignment experiment found that reducing social media use to one hour a day improved youths' confidence in their appearance.").

[133] *NetChoice Opposition* at 17.

[134] *Erznoznik*, 422 U.S. at 212–13.

[135] *Yost*, 2024 WL 555904, at *12 ("[L]ike content-based regulations, laws that require parental consent for children to access constitutionally protected, non-obscene content, are subject to strict scrutiny."); *see also Brown*, 564 U.S. at 794–95 (citing *Erznoznik*, 422 U.S. at 213–14).

[136] *NetChoice Opposition* at 35.

children's access to" social media services and "cannot do so" otherwise.[137]  To the contrary,

Defendants' evidence generally indicates "[o]ther methods exist to advance the goal of

protecting children on the internet, including parental controls and web filtering technology."[138]

### b.  Defendants Have Not Shown the Act Is Narrowly Tailored.

Even assuming Defendants have established the State's mental health and personal

privacy concerns are "'actual problem[s] in need of solving,'"[139] the Act fails strict scrutiny

because Defendants have not shown it is "carefully tailored to achieve those ends."[140]  In the

strict scrutiny context, narrow tailoring requires a law to be the "least restrictive means" of

satisfying a government interest.[141]  That is, "the curtailment of free speech must be actually

necessary . . . ."[142]  Additionally, the government may not pursue its interests by means that are

either "seriously underinclusive" or "seriously overinclusive."[143]

To begin, Defendants have not shown the Act is the least restrictive option for the State

to accomplish its goals because they have not shown existing parental controls are an inadequate

---

[137] *Brown*, 564 U.S. at 803.

[138] Dkt. 58-3 (NetChoice), *Declaration of Tony Allen* (*Allen Declaration*) ¶ 37.

The Declaration of Carl Szabo in Support of Plaintiff's Motion for Preliminary Injunction provides a useful explanation of the utility of these alternative methods.  *See* Dkt. 52-1 (NetChoice), *Declaration of Carl Szabo in Support of Plaintiff's Motion for Preliminary Injunction* (*Szabo Declaration*) ¶ 8–9.  Szabo describes the lengths NetChoice's members go to protect children on their social media platforms, as well as the network-, device-, browser-, and app-level restrictions parents may implement to control their children's access to various social media services.  *Id.*

[139] *Brown*, 564 U.S. at 799.

[140] *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989).

[141] *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)).

[142] *Brown*, U.S. 564 at 799; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) ("The dispositive question in this case . . . is whether content discrimination is reasonably necessary to achieve [a defendant's] compelling interests.").

[143] *Brown*, U.S. 564 at 805.

alternative to the Act.[144]  While Defendants present evidence suggesting parental controls are not

in widespread use,[145] their evidence does not establish parental tools are deficient.  It only

demonstrates parents are unaware of parental controls, do not know how to use parental controls,

or simply do not care to use parental controls.[146]  Moreover, Defendants do not indicate the State

has tried, or even considered, promoting "the diverse supervisory technologies that are widely

available" as an alternative to the Act.[147]  The court is not unaware of young people's

technological prowess and potential to circumvent parental controls.[148]  But parents "control[]

whether their minor children have access to Internet-connected devices in the first place,"[149] and

Defendants have not shown minors are so capable of evading parental controls that they are an

insufficient alternative to the State infringing on protected speech.[150]

Defendants also suggest the Act is essential to solving social media-related problems

because social media platforms contain "nicotine-like additives"—namely, seamless pagination,

autoplay, and push notification systems—designed to foster "over-indulgence" and "user

addiction."[151]  But Defendants do not offer any evidence that requiring social media companies

---

[144] *See Ashcroft v. A.C.L.U.*, 542 U.S. 656, 666 (2004) (upholding a district court's decision to issue a preliminary injunction enjoining enforcement of a federal law restricting minors' access to certain internet content when the government failed its burden to show the plaintiffs' proposed alternative—blocking and filtering software—was a less effective solution).

[145] *See, e.g., NetChoice Opposition* at 17 (citing evidence that "just 50 percent of parents use any kind of parental controls," and "just 16% of parents use blocking or filtering controls to restrict their teens use of [their] cell phone").

[146] *Allen Declaration* ¶¶ 38–41.

[147] *NetChoice Motion* at 21.  In any case, the State should be mindful of parents who choose not to use parental controls because they are not concerned about their children's social media use.  "It is cardinal with us that the custody, case, and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."  *Ginsberg v. State of N.Y.*, 390 U.S. 629, 639 (1986) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)).

[148] *Allen Declaration* ¶¶ 39–41.

[149] *Szabo Declaration* ¶ 9.

[150] If minors are capable of circumventing parental controls at all levels, there is reason to believe children could also circumvent the controls the Act requires social media companies to impose.  *See Brown*, 564 U.S. at 802.

[151] *NetChoice Opposition* at 4, 16, 30.

to compel minors to push "play," hit "next," and log in for updates will meaningfully reduce the amount of time they spend on social media platforms.  Nor do Defendants offer any evidence that these specific measures will alter the status quo to such an extent that mental health outcomes will improve and personal privacy risks will decrease.

Next, Defendants have not shown the Act is not seriously "underinclusive when judged against its asserted justification[s]."[152]  *Brown* is illustrative for this purpose where the Supreme Court held California's restrictions on minors' access to violent videogames were underinclusive in so far as they did not restrict minors' access to other media, including "Saturday morning cartoons" or videogames "rated for young children."[153]  The Court reasoned California's failure to regulate cartoons like Bugs Bunny and non-violent videogames like Sonic the Hedgehog was problematic because research showed they produced the same effect in children as violent videogames.[154]  This result "raise[d] serious doubts about whether the government [was] in fact pursing the interest it invoke[d], rather than disfavoring a particular speaker or viewpoint."[155]

Like *Brown*, the Act appears underinclusive when judged against the State's interests in protecting minors from the harms associated with social media use because the Act ultimately preserves minors' ability to spend as much time as they want on social media platforms.  This outcome does not comport with a core underpinning of Defendants' argument—that *excessive* social media use harms minors.[156]  Similarly, the Act preserves minors' access to the addictive features Defendants express particular concern with on all internet platforms other than social

---

[152] *Brown*, 564 U.S. at 802.

[153] *Id.* at 800–02.

[154] *Id.*

[155] *Id.* at 802.

[156] *See NetChoice Opposition* at 4, 13, 23, 58, 60.

media services.[157]  As NetChoice explains, "a teenager can receive notifications about their favorite sports team from ESPN but not from X—even if the notification is word-for-word the same."[158]  They can "seamlessly scroll through image searches on Bing or through college rankings on U.S. News and World Report but cannot use such seamless pagination for searching recipes on Pinterest."[159]  And they "can autoplay videos on Disney+ and Hulu," but not YouTube.[160]

Defendants generally respond to these underinclusivity concerns by suggesting a social media-specific problem arises when social media companies' use "addictive design features" in combination with "user-generated [content] and user-to-user interface."[161]  But Defendants simply do not offer any evidence to support this distinction,[162] and they only compare social media services to "entertainment services."[163]  They do not account for the wider universe of platforms that utilize the features they take issue with, such as news sites and search engines. Accordingly, the Act's regulatory scope "raises seriously doubts" about whether the Act actually advances the State's purported interests.[164]

---

[157] "Essentially all applications, including services like Apple News, Disney+, Duolingo, ESPN, and *The Wall Street Journal*" send users push notifications; "services like Disney+, Hulu, Spotify, and Buzzfeed use autoplay to present content[;]" and "services like U.S. News and World Report College Rankings, *The New York Times*, Bing, and Apple News use seamless pagination to present content[.]"  *Szabo Declaration* ¶¶ 17–19.

[158] *NetChoice FAC* ¶ 94.

[159] *Id.*

[160] *Id.* ¶ 78, 94.

[161] *NetChoice Opposition* at 28.

[162] In support of their position, Defendants cite a paragraph from Dr. Twenge's Declaration stating "[s]ocial media, more than TV or gaming, is linked to shorter sleep, more mid-sleep awakenings, and longer time to fall asleep." *Twenge Declaration* ¶ 39.  *See also Brown*, 564 U.S. at 798 (rejecting the notion that videogames present special First Amendment problems because they are "interactive").

[163] *NetChoice Opposition* at 28.

[164] *Brown*, 564 U.S. at 802; *see also Williams-Yulee v. Florida Bar*, 575 U.S. 433, 448–49 (2015) (explaining underinclusivity "raises a red flag" when it suggests the government is disfavoring a particular speaker or viewpoint, or it "reveal[s] that a law does not actually advance a compelling interest").

Finally, Defendants have not shown the Act is not seriously overinclusive, restricting more constitutionally protected speech than necessary to achieve the State's goals.  Specifically, Defendants have not identified why the Act's scope is not constrained to social media platforms with significant populations of minor users, or social media platforms that use the addictive features fundamental to Defendants' well-being and privacy concerns.[165]  NetChoice member Dreamwidth, "an open source social networking, content management, and personal publishing website," provides a useful illustration of this disconnect.[166]  Although Dreamwidth fits the Central Coverage Definition's concept of a "social media service," Dreamwidth is distinguishable in form and purpose from the likes of traditional social media platforms—say, Facebook and X.[167]  Additionally, Dreamwidth does not actively promote its service to minors and does not use features such as seamless pagination and push notification.[168]

In combination, these shortcomings demonstrate Defendants have not met their burden to show the Act, through the Central Coverage Definition, is narrowly tailored to advance a compelling government interest.[169]  As a result, the court concludes Defendants have not met

---

[165] *NetChoice Motion* at 24; *Szabo Declaration* ¶¶ 10–12.

[166] *See* Dkt. 52-5 (NetChoice), *Declaration of Denise Paolucci in Support of Plaintiff's Motion for Preliminary Injunction* ¶ 1.

[167] *Id.* ¶ 7.

[168] *Id.* ¶¶ 3, 5, 11, 13–14.

[169] The court's focus with respect to under- and over-inclusivity is how the Act, through the Central Coverage Definition, restricts *social media companies'* speech.  However, the Act also appears overinclusive in so far as it affects *users'* speech.  For example, the Act's age assurance provision, which applies to all users, broadly burdens adult users' ability to "access a broad range of protected speech on a broad range of covered websites." *Fitch*, 2024 WL 3276409 at *12.  As another example, the Act's restrictions on minors' ability to connect with those outside their immediate networks broadly burdens minors' ability to share and receive protected speech.  *See Erznoznik*, 422 U.S. at 212–14 (explaining "minors are entitled to a significant measure of First Amendment protection" and "speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the youth from ideas or images a legislative body thinks unsuitable for them").

their "burden of proof on the ultimate question of the . . . Act's constitutionality,"[170] and NetChoice is substantially likely to prevail on the merits of its claim the entire Act, through the Central Coverage Definition, facially violates the First Amendment.[171]

### 2. The Remaining Preliminary Injunction Factors Support NetChoice's Request for Injunctive Relief.

Having determined NetChoice is substantially likely to succeed on the merits of its First Amendment challenge, the court next considers the remaining preliminary injunction factors. "When a movant establishes the first prong of a preliminary injunction based on a First Amendment claim, the remaining prongs generally also weigh in [its] favor."[172]  Such is the case here.

### i. NetChoice Has Shown Its Members Will Suffer Irreparable Injury Absent a Preliminary Injunction.

Under the second preliminary injunction factor, NetChoice must demonstrate it will suffer irreparable injury in the absence of an injunction.  Within the First Amendment context, however, "[t]he Supreme Court has made clear that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"[173]  This principle comports with the wider view that "the infringement of a constitutional right . . . require[s] no

---

[170] *Gonzales*, 546 U.S. at 429.  Notably, this conclusion generally comports with the recent decisions of other district courts applying strict scrutiny to similar laws.  *See, e.g.*, *Fitch*, 2024 WL 3276409, at *14 ("In summary, NetChoice has demonstrated a substantial likelihood of success on its claim that H.B. 1126 is either overinclusive or underinclusive, or both, for achieving the assert governmental interest—protecting minors from predatory behavior online . . . ."); *Yost*, 2024 WL 555904, at *13 ("In other words, the Act is either underinclusive or overinclusive, or both, for all the purported government interests at stake).

[171] Defendants do not specifically dispute NetChoice's argument that if the Central Coverage Definition is unconstitutional, the entire Act, through the Central Coverage Definition, is unconstitutional.

[172] *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1254 (10th Cir. 2024) (citing *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013)).

[173] *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

further showing of irreparable injury."[174]  Separately, courts hold that a plaintiff suffers
irreparable injury when they face "monetary damages that cannot later be recovered for reasons
such as sovereign immunity."[175]

NetChoice has shown its members face irreparable injury absent a preliminary injunction
for both these reasons.  First, as explained above, NetChoice has shown it is substantially likely
to succeed on the merits of its claim the Act, through the Central Coverage Definition, violates
its members' First Amendment rights.  Because even brief First Amendment violations
"unquestionably constitute[] irreparable injury," NetChoice has shown it will suffer irreparable
harm absent a preliminary injunction.[176]  Second, NetChoice members stand to incur substantial
unrecoverable expenses in the form of either civil penalties or compliance costs absent a
preliminary injunction because Defendants, sued in their official capacities as government
employees, are immune from suit for monetary damages.[177]  This harm is particularly concerning
given the high cost of violating the Act—$2,500 per offense—and the State's failure to
promulgate administrative rules enabling social media companies to avail themselves of the
Act's safe harbor provision before it takes effect on October 1, 2024.[178]

---

[174] *Free the Nipple*, 916 F.3d at 805 (citing *Awad*, 670 F.3d at 1131).

[175] *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010) (citing *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994)) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury.").

[176] *Id.*

[177] *NetChoice Motion* at 39–40.

[178] *See* Utah Code § 13-71-302.  Defendants' Opposition asserts that state law does not allow the Division to promulgate these rules until the Act's effective date—October 1, 2024.  *See* Dkt. 58-7 (NetChoice), *Declaration of Katherine Hass* ¶ 5 (citing Utah Code § 13-2-1(2)).  But in discussing this issue at oral argument, Defendants did not recognize the harm this delay poses to social media companies who wish to comply with the Act on day one. Neither did the Defendants suggest the State would make any effort to mitigate this harm, such as delaying enforcement of the law or providing draft rules to NetChoice members or the public.

### ii.   The Balance of Equities and the Public Interest Weigh in Favor of a Preliminary Injunction.

When the government is the opposing party to a lawsuit, the third and fourth preliminary factors "merge."[179]  A moving party must show avoiding the harm a threatened injury poses is consistent with the public interest.  Though, the Tenth Circuit holds "it is always in the public interest to prevent the violation of a party's constitutional rights."[180]

Because NetChoice has shown it is substantially likely the Act violates social media companies' First Amendment rights, it follows that the balance of equities and the public interest lean in NetChoice's favor.  Defendants counter that the public interest favors "protecting children and adolescents from the harmful effects of social media" and preserving the State's ability to "enact and enforce" state laws.[181]  But as discussed above, Defendants have not shown the State's desire to protect minors eclipses the First Amendment.  Indeed, the public interest in protecting constitutional rights is "more profound" than the public interest in carrying out "the will of the voters" through the implementation of state laws.[182]  Accordingly, the court concludes the final two preliminary injunction factors, in combination with the first two factors, support granting NetChoice's request for a preliminary injunction.

### iii.   No Bond is Required.

Rule 65(c) provides a "court may issue a preliminary injunction . . . only if the movant gives a security in an amount that the court considers proper to pay the costs and damages

---

[179] *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)), *abrogated on other grounds by Garland v. Cargill*, 602 U.S. 406 (2024).

[180] *Awad*, 670 F.3d at 1132 (quoting *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).

[181] *NetChoice Opposition* at 58–59.

[182] *Awad*, 670 F.3d at 1132 (citation omitted).

sustained by any party found to have been wrongfully enjoined or restrained."[183]  Although the

parties do not address this issue, the court must.[184]  Trial courts in the Tenth Circuit "have 'wide

discretion under Rule 65(c) in determining whether to require security.'"[185]

Because this preliminary injunction "enforces fundamental constitutional rights against

the government," the court determines "[w]aiving the security requirement best accomplishes the

purposes of Rule 65(c)."[186]  No bond is required.

## II.  The Zoulek Plaintiffs' Motion

The court now turns to the Zoulek Plaintiffs' Motion, which argues, among other things,

that the court should enjoin enforcement of the Act because the Zoulek Plaintiffs are likely to

prevail on the merits of their First Amendment claims.[187]  Although neither party addresses the

Zoulek Plaintiffs' standing to bring these claims, the court begins—and ends—its analysis with

this threshold inquiry.[188]

### A.  The Zoulek Plaintiffs Lack Standing to Challenge the Act Under the First Amendment.

Recall that to establish standing, a plaintiff must show they have suffered an injury in

---

[183] Fed. R. Civ. P. 65(c).

[184] *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (holding that while a district court judge has discretion to "determine a bond is unnecessary to secure a preliminary injunction . . . when a trial court fails to contemplate the imposition of the bond," as required by Rule 65(c), "its order granting a preliminary injunction is unsupportable").

[185] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (quoting *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003)).

[186] *S. Utah Drag Stars v. City of St. George*, 677 F.Supp.3d 1252, 1294 (D. Utah 2023) (quoting *United Utah Party v. Cox*, 268 F.Supp.3d 1227, 1260 (D. Utah 2017)); *Rocky Mountain Gun Owners v. Polis*, 685 F.Supp.3d 1033, 1061 (D. Colo. 2023) ("The Court finds a bond unnecessary as this case seeks to enforce a constitutional right against the government.").

[187] *Zoulek Motion* at 1.  Zoulek also argues they are likely to prevail on their claim under the Commerce Clause.  *Id.* at 2.  However, the court previously dismissed this claim.  *See Memorandum Decision and Order Granting Defendants' Motion to Dismiss*.  Only Zoulek's First Amendment claims remain for consideration.  *See Zoulek FAC* ¶¶ 70–87, 88–90.

[188] *Collins*, 916 F.3d at 1314 (quoting *Arbaugh*, 546 U.S. at 514).

fact, that their injury is fairly traceable to the challenged actions of defendants, and that it is likely, as opposed to merely speculative, that their injury will be redressed by a favorable decision of the court.[189]  This showing is "substantially more difficult to establish" when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*."[190]  Because courts are reluctant to engage in "guesswork as to how independent decisionmakers will exercise their judgment,"[191]  a plaintiff must "adduc[e] facts showing that  . . . third-party choices have been or will be made in such a manner as to . . . permit redressability of injury."[192]

Applying this standard to the present case, the Zoulek Plaintiffs suffer from a redressability problem.  The Act regulates social media companies—not social media users.  And any injuries to the Zoulek Plaintiffs' First Amendment rights would arise as the second-order effects of social media companies' responses to the Act.  Nonetheless, the Zoulek Plaintiffs have not identified how an injunction will ensure redress of their purported injuries.  They have not shown that social media companies—which are free to restrict user access, remove content, and otherwise moderate their platforms as they see fit—will maintain minors' access to their

---

[189] *Speech First*, 92 F.4th at 949 (quoting *Lujan*, 504 U.S. at 560–61).

[190] *State v. United States Env't Prot. Agency*, 989 F.3d 874, 889 (10th Cir. 2021) (quoting *Lujan*, 504 U.S. at 562).

[191] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013).

[192] *State*, 989 F.3d at 889 (quoting *Ctr. for Biological Diversity v. United States Dep't of Interior*, 563 F.3d 446, 478 (D.C. Cir. 2009)) (emphasis in original).

platforms absent an injunction.[193]

At oral argument, the Zoulek Plaintiffs suggested the existence of NetChoice's lawsuit resolved their redressability problem. They identified references to the parallel lawsuit in their Motion and First Amended Complaint and suggested the court could take judicial notice of its existence as evidence social media companies intended to maintain the status quo unless otherwise required to act. However, the Zoulek Plaintiffs did not cite legal authority in support of this contention, and NetChoice's lawsuit offers no clear indication its members will maintain minors' access to their platforms absent an injunction.[194]

Perhaps social media companies would maintain minors' access, recognizing the ways minors use their platforms to communicate and learn. Or perhaps social media companies would see value in the State's mental health and data privacy concerns and voluntarily reduce minors' access. The issue is we do not know. The Zoulek Plaintiffs have not pled facts demonstrating

---

[193] Courts have uniformly held, social media companies are private entities, and the public does not have a First Amendment right to use their platforms. *See, e.g., O'Handley v. Weber*, 62 F.4th 1145, 1155–57 (9th Cir. 2023) (noting that "[a]s a private company, Twitter is not ordinarily subject to the Constitution's constraints" and holding it "did not violate the Constitution" when moderating a user's posts or suspending an account); *Prager Univ. v. Google LLC*, 951 F.3d 991, 996–99 (9th Cir. 2020) (explaining that YouTube may be a "public square on the Internet" but that does not turn it into a state actor or convert the platform to a public forum subject to the First Amendment); *DeLima v. Google, Inc.*, 561 F.Supp. 3d 123, 134–35 (D.N.H. 2021) (dismissing a claim that social media companies' removal of posts and deleting of accounts violated the First Amendment because companies are private entities, not state actors); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F.Supp.3d 1107, 1121–27 (N.D. Cal. 2020) (holding Facebook's removal of a plaintiff's content and profiles did not violate the First Amendment because company was a private actor and social media platforms are not public forums); *Davison v. Facebook, Inc.*, 370 F.Supp.3d 621, 628–29 (E.D. Va. 2019) (dismissing constitutional claims against Facebook because, "as a private entity, [it has] the right to regulate the content of its platforms as it sees fit"); *Nyabwa v. FaceBook*, No. 2:17-cv-24, 2018 WL 585467, at *1 (S.D. Tex. Jan. 26, 2018) (explaining that notwithstanding the Supreme Court's recognition "that social media sites like FaceBook and Twitter have become the equivalent of a public forum for sharing ideas and commentary, the Court did not declare a cause of action against a private entity such as FaceBook for a violation of the free speech rights protected by the First Amendment").

[194] The Zoulek Plaintiffs directed the court to a portion of *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001) describing the standard the court should apply to review a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). However, the case is inapt because it addressed the proper handling of disputed jurisdictional facts. *Id.* The issue here is that the Zoulek Plaintiffs simply fail to plead essential jurisdictional facts. It is also noteworthy that the Circuit was not dealing with a third-party standing issue and made no comments about the heightened bar applied to third-party standing. *See, e.g.*, 1204–05.

social media companies "will likely react in predictable ways" if the court enjoins the Act.[195]

Under these circumstances, the court must conclude the Zoulek Plaintiffs' injuries are not redressable, and the Zoulek Plaintiffs' lack standing to challenge the Act under the First Amendment.

### B. The Court Dismisses Counts I and II of the Zoulek Plaintiffs' First Amended Complaint Without Prejudice.

The effect of the Zoulek Plaintiffs' lack of standing extends beyond their Motion for Preliminary Injunction.  "Because Article III standing is a jurisdictional issue," the court's conclusion that the Zoulek Plaintiffs lack standing means the court does not have subject matter jurisdiction to hear their claims.[196]  And "once a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue."[197]  It "must dismiss the action."[198]  Accordingly, the court dismisses the Zoulek Plaintiffs' First Amendment claims, Counts I and II of their First Amended Complaint, without prejudice.

### CONCLUSION

For the forgoing reasons, NetChoice's Motion is GRANTED.  Defendants, their agents, their employees, and all other persons acting under their direction or control are PRELIMINARILY ENJOINED under Federal Rule of Civil Procedure 65 from enforcing any part of the Utah Minor Protection in Social Media Act, Utah Code §§ 13-71-101 to 401, pending

---

[195] *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (quoting *Dept. of Com. v. New York*, 588 U.S. 752, 768 (2019)).

[196] *Felix v. City of Bloomfield*, 841 F.3d 848, 854 (10th Cir. 2016) (citing *Lujan*, 504 U.S. at 559–60).

[197] *Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238, 1245 (10th Cir. 2005) (quoting *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999)); *see also Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1217 (10th Cir. 2006) (citing *Gold v. Loc. 7 United Food & Com. Workers*, 159 F.3d 1307, 1311 (10th Cir. 1998)) ("[O]nce a court determines it lacks jurisdiction over a claim, it perforce lacks jurisdiction to make any determination of the merits of the underlying claim.").

[198] Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

final disposition of the issues in this case.

The Zoulek Plaintiffs' Motion is DENIED and Counts I and II of the Zoulek Plaintiffs'

First Amended Complaint are dismissed without prejudice.  The Zoulek Plaintiffs may seek

leave to file an amended complaint within thirty (30) days.

SO ORDERED this 10th of September 2024.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge