# In the United States Court of Appeals for the Tenth Circuit

———

NETCHOICE, LLC,

*Plaintiff-Appellee,*

*v.*

DEREK BROWN, UTAH ATTORNEY GENERAL, AND
KATHERINE HASS, DIRECTOR, UTAH DIVISION OF CONSUMER PROTECTION,
UTAH DEPARTMENT OF COMMERCE,

*Defendants-Appellants.*

———

On Appeal from Order Granting Preliminary Injunction
U.S. District Court, District of Utah, Hon. Robert J. Shelby
Case No. 2:23-cv-00911-RJS-CMR

———

**BRIEF OF PLAINTIFF-APPELLEE NETCHOICE**

———

Oral Argument Requested

Scott A. Keller
Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
  Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

*Counsel for Appellee NetChoice*

## FEDERAL RULE OF APPELLATE PROCEDURE 26.1 DISCLOSURE STATEMENT

Plaintiff-Appellee NetChoice, LLC has no parent corporation, and no publicly held corporation owns 10% or more of its stock. These representations are made so that the Judges of this Court may evaluate possible disqualification or recusal.

*/s/ Scott A. Keller*
Scott A. Keller

# TABLE OF CONTENTS

**Page**

Table of Authorities................................................................v

Introduction........................................................................1

Statement of Issues ............................................................3

Statement of the Case.........................................................4

    A.  Background .................................................................4

        1.  NetChoice members' websites disseminate and enable vast amounts of speech protected by the First Amendment. .................................................................4

        2.  Websites choose how to disseminate and display expression and facilitate the expression of their users. .........5

        3.  Parents have many tools to oversee how their children use the internet. ..........................................................7

    B.  Utah's 2024 Minor Protection in Social Media Act ......................8

        1.  Content-based central coverage definition of "social media company." § 13-71-101(13). ...........................................9

        2.  Parental consent to override limitations on the visibility of minors' accounts and expression. §§ 13-71-202(1)(a)-(b), 13-71-204(1). .......................................10

        3.  Prohibition on notifications and certain means of disseminating expression on minors' accounts. § 13-71-202(5)..................................................................11

        4.  Age assurance for all users. § 13-71-201.................................12

        5.  Restrictions on data collection and use. §§ 13-71-202(1)(c), 13-71-204(2)-(4)..........................................13

        6.  Enforcement and penalties. § 13-71-301.................................14

    C.  Procedural history...................................................14

Summary of the Argument ................................................15

Argument............................................................................17

I.    The Act's speech regulations violate the First Amendment............17

    A.    The Act's central "social media company" definition is content-based, triggering strict scrutiny for all the Act's speech regulations..............................................................18

        1.    The Act's coverage definition is content-based by singling out websites that disseminate "social interaction" speech and "lists" of other users.......................18

        2.    Defendants incorrectly argue that the Act's central coverage definition is content-neutral....................................22

    B.    The Act's speech regulations fail both strict and intermediate First Amendment scrutiny. ......................................26

        1.    The State lacks a sufficient governmental interest in the Act's restrictions and burdens on speech.......................27

        2.    The Act is improperly tailored because its scope is simultaneously overinclusive and underinclusive compared to its purported aims...............................................31

    C.    The Act's individual speech restrictions trigger and fail heightened First Amendment scrutiny for independent, additional reasons. ...........................................................37

        1.    The Act's parental-consent requirements for minors to share expression on covered websites violate the First Amendment. §§ 13-71-202(1)(a)-(b), 13-71-204(1). ................37

        2.    The Act's prohibitions on notifications and publishing speech in certain ways to minors fail heightened First Amendment scrutiny. § 13-71-202(5).....................................45

        3.    The Act's "age-assurance" requirement violates the First Amendment under heightened First Amendment scrutiny. § 13-71-201. .........................................47

II.    The district court properly concluded that the Act is facially invalid under the First Amendment. ....................................50

III. The remaining preliminary-injunction factors favor
      NetChoice...................................................................................55

Conclusion.........................................................................................57

Statement Regarding Oral Argument ...............................................58

Certificate of Service .........................................................................59

Certificate of Compliance ..................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abilene Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson Cnty.,*
492 F.3d 1164 (10th Cir. 2007) ........................................................28

*Ackerley Commc'ns of Ma., Inc. v. City of Somerville,*
878 F.2d 513 (1st Cir. 1989) ...........................................................25

*ACLU v. Mukasey,*
534 F.3d 181 (3d Cir. 2008) ............................................................49

*Am. Booksellers Found. v. Dean,*
342 F.3d 96 (2d Cir. 2003) ..............................................................49

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021) .........................................................36, 53, 54

*Aposhian v. Barr,*
958 F.3d 969 (10th Cir. 2020) ........................................................57

*Ashcroft v. ACLU,*
542 U.S. 656 (2004) .........................................2, 16, 37, 48, 49, 50

*Ashcroft v. Free Speech Coal.,*
535 U.S. 234 (2002) .......................................................................47

*Ass'n of Cmty. Org. v. Mun. of Golden,*
744 F.2d 739 (10th Cir. 1984) ........................................................24

*Awad v. Ziriax,*
670 F.3d 1111 (10th Cir. 2012) ............................................28, 56, 57

*Boos v. Barry,*
485 U.S. 312 (1988) .......................................................................26

*Brewer v. City of Albuquerque*,
  18 F.4th 1205 (10th Cir. 2021) ...................................................31, 36

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) ...............2, 16, 27, 28, 31, 34, 36, 38, 39, 40, 42, 43, 44, 48

*Chamber of Com. v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010) ...................................................56

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022) ...............................................................20

*City of L.A. v. Patel*,
  576 U.S. 409 (2015) ..........................................................33, 54

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
  747 F. Supp. 3d 1011 (W.D. Tex. 2024) ................................3, 19, 53

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*,
  447 U.S. 530 (1980) .............................................................26

*Edenfield v. Fane*,
  507 U.S. 761 (1993) .............................................................30

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975) .............................................................38

*Evans v. Sandy City*,
  944 F.3d 847 (10th Cir. 2019) ...................................................40

*FEC v. Cruz*,
  596 U.S. 289 (2022) ..........................................................34, 37

*First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*,
  308 F.3d 1114 (10th Cir. 2002) ..................................................25

*Frazier ex rel. Frazier v. Winn*,
  535 F.3d 1279 (11th Cir. 2008) ..................................................44

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ........................................... 25

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
  515 U.S. 557 (1995) ........................................... 23

*Joseph Burstyn, Inc. v. Wilson,*
  343 U.S. 495 (1952) ............................................. 5

*LKL Assocs., Inc. v. Farley,*
  94 P.3d 279 (Utah 2004) ....................................... 21

*Mahanoy Area Sch. Dist. v. B. L.,*
  594 U.S. 180 (2021) ........................................... 44

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,*
  460 U.S. 575 (1983) ........................................... 31

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ............................ 1, 4, 5, 8-10, 16-17, 24-25, 33, 45, 51-55

*NetChoice v. Bonta,*
  761 F. Supp. 3d 1202 (N.D. Cal. 2024) ........................ 46

*NetChoice, L.L.C. v. Fitch,*
  134 F.4th 799 (5th Cir. 2025) ................................ 53

*NetChoice, LLC v. Bonta,*
  113 F.4th 1101 (9th Cir. 2024) ............................... 44

*NetChoice, LLC v. Bonta,*
  2025 WL 807961 (N.D. Cal. Mar. 13, 2025) ................. 3, 27, 51

*NetChoice, LLC v. Griffin,*
  2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ............... 18, 41, 53

*NetChoice, LLC v. Griffin,*
  2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ......... 3, 7, 19, 39, 48, 50, 53

*NetChoice, LLC v. Yost,*
2025 WL 1137485 (S.D. Ohio Apr. 16, 2025)................................3, 46, 48, 53

*Ohio v. EPA,*
603 U.S. 279 (2024) .........................................................................................56

*Packingham v. North Carolina,*
582 U.S. 98 (2017) ........................1, 2, 4, 5, 9, 15, 21, 27, 31, 37, 40, 48, 51, 52

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
460 U.S. 37 (1983) ......................................................................................24, 25

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ...................................13, 15, 19, 20, 21, 22, 23, 46

*Reno v. ACLU,*
521 U.S. 844 (1997) ........................................2, 16, 24, 26, 48, 49, 50

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020) ...........................................................................................56

*Sable Commc'ns of Cal., Inc. v. FCC,*
492 U.S. 115 (1989) .........................................................................................28

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011) .....................................................................2, 27, 36, 46

*TikTok Inc. v. Garland,*
145 S. Ct. 57 (2025) ...................................................................................33, 34

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994) ...............................................................22, 23, 30, 47

*United States v. Edge Broad. Co.,*
509 U.S. 418 (1993) .........................................................................................32

*United States v. Playboy Ent. Grp., Inc.,*
529 U.S. 803 (2000) ...................................................................................26, 37

*Verlo v. Martinez,*
820 F.3d 1113 (10th Cir. 2016) ....................................................... 55

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) ............................................................... 25, 31

*X Corp. v. Bonta,*
116 F.4th 888 (9th Cir. 2024) .................................................. 52, 53

*Z.J. Gifts D-2, L.L.C. v. City of Aurora,*
136 F.3d 683 (10th Cir. 1998) ........................................................ 26

**Statutes**

Utah Code § 13-61-101, *et seq.* ...................................................... 34

Utah Code § 13-71-101 ............................. 1-3, 9, 10, 12, 15, 17-23, 32, 41, 42, 48

Utah Code § 13-71-201 ............................................. 1, 4, 12, 13, 16, 47

Utah Code § 13-71-202 ........................... 1, 3, 6, 10, 11, 12, 13, 16, 34, 37, 38, 45

Utah Code § 13-71-204 ....................................... 1, 3, 10, 13, 14, 16, 37

Utah Code § 13-71-301 ................................................................ 14, 56

Utah Code § 13-71-302 ...................................................................... 14

**Other Authorities**

Katie Kindelan, *6 Teen Girls Were The Organizers Behind
Nashville's Massive Black Lives Matter Protest*, ABC News
(June 9, 2020), https://perma.cc/E8F4-GFES ................................................ 39

The district court properly held that Utah Senate Bill 194 (2024) ("Act" or "SB194") violates the First Amendment.[1] SB194 uses a content-based "social media company" coverage definition to unconstitutionally restrict speech on certain websites. Three restrictions are particularly relevant here. First, the Act limits the audiences to which minors are allowed to speak on covered social media websites without parental consent. §§ 13-71-202(1)(a)-(b), 13-71-204(1). Second, it restricts how websites display content to minors by prohibiting certain notifications, autoplay, and seamless pagination. § 13-71-202(5). Third, covered websites must implement "age assurance" requirements, requiring all users to prove their age in some way before accessing and engaging in speech on covered websites. § 13-71-201(1).

Consequently, this Act restricts access to "a staggering amount of" protected speech. *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024). Covered websites disseminate "communication of all kinds"—including statements from "elected representatives," "debate[s]" about "religion and politics," "vacation photos," "tips on entrepreneurship," and more. *Packingham v. North Carolina*, 582 U.S. 98, 104-05 (2017). The State lacks "power to prevent children" from participating in this expressive activity "without their

---

[1] This Brief refers to all "website[s]" and "application[s]" as "websites." § 13-71-101(14)(a). Unless otherwise noted, all statutory citations herein refer to the Utah Code.

parents' prior consent." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). And requiring age-verification before disseminating protected speech significantly burdens minors' and adults' access to speech. *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997).

As Defendants therefore rightly "concede," this "Act is subject to heightened scrutiny," and "the State must show the Act satisfies" it. Br.34, 40; *see* App.5:942.[2] The Act cannot meet the First Amendment's demanding standards.

Defendants fundamentally err in arguing that SB194 need only satisfy intermediate scrutiny. The Act's speech regulations all trigger strict scrutiny, because the law's central "[s]ocial media company" coverage definition is content-based. § 13-71-101(13). Specifically, this coverage definition singles out websites based on the content of social interaction speech and whether websites display "lists of other account holders." § 13-71-101(14)(a)(iii)-(iv). Laws imposing content-based burdens must pass strict scrutiny. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).

In any event, Defendants have not met their burden under either strict or intermediate scrutiny. Both standards require "narrow[] tailor[ing]." *Packingham*, 582 U.S. at 105-06. The Act lacks that tailoring. Defendants attempt to justify the Act based on equivocal evidence that cannot support the Act's regulatory scope. SB194 does not regulate many websites across the

---

[2] Appendix citations appear as App.[volume:page].

Internet that use the same means of disseminating speech the Act restricts on covered websites, but it simultaneously burdens many websites that do not use those means at all. That makes these speech regulations both overbroad and underinclusive.

The district court therefore properly enjoined enforcement of SB194's speech restrictions. Supreme Court precedent confirms this holding was correct, and it aligns with judicial decisions nationwide enjoining enforcement of similar online speech restrictions. *NetChoice, LLC v. Yost*, 2025 WL 1137485 (S.D. Ohio Apr. 16, 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ("*Griffin II*"); *NetChoice, LLC v. Bonta*, 2025 WL 807961 (N.D. Cal. Mar. 13, 2025); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) ("*CCIA*").

## STATEMENT OF ISSUES

1. Whether the Act imposes content-based restrictions on speech through its central "[s]ocial media company" definition that singles out "social[]" interaction and websites that display "lists" of friends. §§ 13-71-101(13); 13-71-101(14)(a)(iii)-(iv).

2. Whether the Act's individual speech regulations fail either strict or intermediate First Amendment scrutiny because they are improperly tailored, including the Act's requirements (1) for parental consent before minors can speak beyond state-limited networks, §§ 13-71-202(1)(a)-(b), 13-71-204(1); (2) limiting how websites can display and disseminate speech, § 13-71-

3

202(5); and (3) for websites to engage in "age assurance" before permitting anyone to access and engage in protected speech, § 13-71-201(1).

<h2>STATEMENT OF THE CASE</h2>

### A. Background

### 1. NetChoice members' websites disseminate and enable vast amounts of speech protected by the First Amendment.

NetChoice is a leading Internet trade association. Based on the Act's central "social media service" coverage definition, the Act regulates websites operated by at least the following NetChoice members: (1) Dreamwidth; (2) Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc., which owns and operates Snapchat; (7) X; and (8) YouTube. *E.g.*, App.1:131 ¶ 11 (Szabo Decl.).[3]

The Act regulates members based on a shared set of speech-facilitating functions. These "social media" websites "allow users to upload content . . . to share [it] with others." *Moody*, 603 U.S. at 719. And once a user uploads content, other users "viewing the content can" "react to it, comment on it, or share it themselves." *Id.*; *e.g.,* App.1:173-74 ¶¶ 7-9 (Davis Decl.).

As a result, covered websites "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107. Teens (like adults) use these websites for protected expression, education, civic engagement, App.1:125-26 ¶ 6

---

[3] Reddit joined NetChoice after Defendants appealed.

4

(Szabo Decl.), and plain "entertain[ment]," *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). They engage with news, politics, sports, extracurriculars, educational opportunities, and information about career prospects. *See, e.g.*, App.1:125-26 ¶ 6 (Szabo Decl.); App.1:175-79 ¶¶ 13-21 (Davis Decl.).

That is why covered members are precisely the kinds of "social media" websites that the Supreme Court has held the First Amendment protects people's right to "access," free from governmental restraint. *Packingham*, 582 U.S. at 108.

## 2. Websites choose how to disseminate and display expression and facilitate the expression of their users.

Members choose how to disseminate and display speech to users in ways that accord with their policies. Different members disseminate different content in different ways to serve different users. The Act directly regulates a handful of the protected "editorial" choices that websites make about whether and how to display speech. *Moody*, 603 U.S. at 718.

*Curation.* It would be impossible for any user to find or view even a sliver of the billions of pieces of content on these websites. To help organize and make this content accessible and digestible—and to "engage[] in expression"—websites disseminate speech through feeds or "stream[s] of other users' posts" that are "personalized" to each user. *Id.* at 716, 734; *e.g.*, App.1:174-75 ¶¶ 10-12 (Davis Decl.).

*Dissemination of users' speech.* Like other websites, covered members disseminate user-generated expression—broadly to the public, to registered

users, or a mix of both. App.1:134 ¶ 16.c (Szabo Decl.). Consequently, by default on some members' websites, users' accounts and uploaded content can be visible and accessible to the public. App.1:134 ¶ 16.c (Szabo Decl.). Some members allow users to select who can see their content and account pages. App.1:134 ¶ 16.c (Szabo Decl.); App.1:160, 167 ¶¶ 31-32, 50 (Veitch Decl.).

*Autoplay.* Some members provide "autoplay" features "that continuously play content without user interaction" that users can disable. § 13-71-202(5)(a); App.1:136 ¶ 17.a (Szabo Decl.); App.1:158-59 ¶ 28 (Veitch Decl.). Users may prefer to have a series of music videos autoplay on covered websites, much like music automatically plays on music streaming services like Spotify. App.1:163 ¶ 38 (Veitch Decl.). Autoplay is common among many kinds of other digital services like ESPN.com, Hulu, Disney+, and Buzzfeed. App.1:136 ¶ 17.b (Szabo Decl.).

*Seamless pagination.* Many NetChoice members also use seamless pagination, where content loads frictionlessly and does not require users to click onto more pages to see more content. App.1:136-37 ¶ 18 (Szabo Decl.); App.1:159 ¶ 29 (Veitch Decl.). This too is common, including on services like Apple News and websites like the U.S. News and World Report, *The New York Times*, and Bing. App.1:136-37 ¶ 18 (Szabo Decl.).

*Notifications.* Many covered members allow users to receive notifications. These notifications inform users about when a friend sends a message, recommended content, relevant announcements, activities of their connections, or suspicious account logins—among other things. App.1:137 ¶ 19.a (*Id.*).

Notifications are important ways that websites communicate with users. Members allow users to change what notifications they receive. App.1:137-38 ¶ 19.b (*Id.*); App.1:159 ¶ 30 (Veitch Decl.). And device manufacturers also allow users to control what notifications they see on their devices and when. App.1:138 ¶ 19.c (Szabo Decl.). Notifications are common among nearly all applications, including messaging, Apple News, Disney+, *The Wall Street Journal*, shopping, and banking applications. App.1:138 ¶ 19.d (*Id.*).

### 3. Parents have many tools to oversee how their children use the internet.

"[P]arents may rightly decide to regulate their child's use of social media . . . . And many tools exist to help parents with this endeavor." *Griffin II*, 2025 WL 978607, at *3.

Parents can control what *devices* minors can access—and when. App.1:128-30 ¶ 9 (Szabo Decl.). Not all devices are internet-enabled. App.1:128 ¶ 9 (*Id.*). And devices themselves come with many built-in parental-control options. App.1:129 ¶ 9.b (*Id.*). Those options include the ability to lock or limit apps and features, restrict settings to limit content, limit access to only approved websites, and set overall or time-of-day and usage limits. App.1:129 ¶ 9.b (*Id.*).

Parents also have control over the *networks* that minors use. App.1:128-29 ¶ 9.a (*Id.*). Wireless routers allow parents to manage which network a minor connects to, if any. App.1:128-29 ¶ 9.a (*Id.*). They also allow parents to set up rules defining which internet websites minors can use (and at what

times). App.1:128-29 ¶ 9.a (*Id.*). Many internet service providers offer similar tools. App.1:128 ¶ 9.a (*Id.*).

Parents can also control *software*. App.1:129-30 ¶ 9.c (*Id.*). Many web browsers offer parental controls. App.1:129-30 ¶ 9.c (*Id.*). Third-party parental control software is also available for many devices. App.1:129-30 ¶ 9.c (*Id.*).

Many members have developed their own suite of parental controls and other protections for minors. *E.g.*, App.1:127-28 ¶¶ 8, 9.d (*Id.*); App.1:183-86 ¶¶ 28-34 (Davis Decl.); App.1:147-53 ¶¶ 11-17 (Veitch Decl.); App.1:200 ¶¶ 6-7 (Yadegar Decl.). These controls supplement the resources that members spend crafting and enforcing "content-moderation" policies that aim to prevent harmful or objectionable speech from reaching users. *E.g.*, App.1:127-28 ¶ 8.c (Szabo Decl.); App.1:186-90 ¶¶ 35-43 (Davis Decl.); App.1:152-58 ¶¶ 18-26 (Veitch Decl.). These members' efforts have been successful. *E.g.*, App.1:127-28 ¶ 8.c (Szabo Decl.).

## B.   Utah's 2024 Minor Protection in Social Media Act

The Act's central coverage definitions and its operative requirements target specified "activities" exercised by an identifiable set of "actors." *Moody*, 603 U.S. at 724.

### 1. Content-based central coverage definition of "social media company." § 13-71-101(13).

The Act regulates "social media" websites that "allow users to upload content . . . to share [it] with others." *Id.* at 719. This is consistent with common usage of "social media." *See id.*; *Packingham*, 582 U.S. at 104-05.

Specifically, the Act targets "[s]ocial media compan[ies]" that operate "social media service[s]." § 13-71-101(13). Regulated "service[s]" include any "public website or application that":

> (i) displays content that is primarily generated by account holders and not by the social media company;
> (ii) permits an individual to register as an account holder and create a profile that is made visible to the general public or a set of other users defined by the account holder;
> (iii) connects account holders to allow users to interact socially with each other within the website or application;
> (iv) makes available to each account holder a list or lists of other account holders with whom the account holder shares a connection within the system; and
> (v) allows account holders to post content viewable by other users.

§ 13-71-101(14)(a). The Act expressly excludes from this definition "(i) email; (ii) cloud storage; or (iii) document viewing, sharing, or collaboration services." § 13-71-101(14)(b).

In short, the Act regulates precisely the kinds of "social media" websites that *Packingham* held people have a right to "access." 582 U.S. at 108. Conversely, the Act does *not* regulate the "kinds of" services for which *Moody* questioned whether a different First Amendment analysis might apply (in

addressing the distinct context of *compelled*-speech-dissemination laws). 603 U.S. at 718, 724-25. The Act's exclusion of "[e]mail," § 13-71-101(14)(b)(i), excludes "email," *Moody*, 603 U.S. at 725. The Act's requirements for "visib[ility] to the general public or a set of other users" and "content viewable by other users," § 13-71-101(14)(a)(ii), (v), excludes all manner of services, including "direct messaging" and "ride-sharing service[s]," *Moody*, 603 U.S. at 724-25. And the Act's requirement that services must "allow users to interact *socially*," § 13-71-101(14)(a)(iii) (emphasis added), excludes "payment service[s]," "online marketplace[s]," and "ride-sharing service[s]," *Moody*, 603 U.S. at 725.

### 2. Parental consent to override limitations on the visibility of minors' accounts and expression. §§ 13-71-202(1)(a)-(b), 13-71-204(1).

The Act restricts to whom minors can speak on covered websites, absent parental consent. § 13-71-204(1).

First, covered websites must "restrict the visibility of a Utah minor account holder's *account* to only connected accounts." § 13-71-202(1)(a) (emphasis added). As Defendants put it, this would require parental consent for minors' accounts to be visible beyond connected "friends" or "friends of a friend." Br.14; *see* § 13-71-101(3). Under this provision, minors would not be able to create a page to display recruiting highlights, political activism, or art visible beyond the state-restricted network of users.

Second, covered websites must "limit" a "minor account holder's ability to *share content* to only connected accounts." § 13-71-202(1)(b) (emphasis added). A minor therefore cannot share with the public a link to a fundraiser for extracurriculars, comment on a post about current events, or share a musical performance beyond a government-limited network. These provisions also restrict what speech minors can consume. Without parental consent, a 17-year-old can read adults' commentary on overseas wars, but can only read a fellow 17-year-old's commentary if already "connected" to the other teen.

Compounding the problem, not all members have "connected accounts" as defined by the Act. *See* App.1:166-67 ¶¶ 48-49 (Veitch Decl.); App.1:135 ¶ 16.e (Szabo Decl.). On such websites, minors might not be able to share content or make their views accessible to *anyone* without parental consent.

**3. Prohibition on notifications and certain means of disseminating expression on minors' accounts. § 13-71-202(5).**

The Act regulates how covered websites disseminate and display speech on minors' accounts. Specifically, "for Utah minor account holders," covered websites must "disable the following features":

(a) autoplay functions that continuously play content without user interaction;
(b) scroll or pagination that loads additional content as long as the user continues scrolling; and

(c) push notifications prompting repeated user engagement.

§ 13-71-202(5). None of these provisions is defined, except "[p]ush notifica-tion."[4]

### 4. Age assurance for all users. § 13-71-201.

The Act requires covered websites to "implement an age assurance sys-tem to determine whether a current or prospective Utah account holder . . . is a minor." § 13-71-201(1). "Age assurance system" is defined as "measures reasonably calculated to enable a social media company to identify whether a current or prospective Utah account holder is a minor with an accuracy rate of at least 95%." § 13-71-101(2).

This requirement will result in additional barriers for *all* users to access speech on covered websites. The Act's introductory language describes this provision as requiring covered websites "to *verify* a" user's "age using an approved system." *See* App.1:63 (emphasis added). Especially in light of the Act's requirement for an "accuracy rate of at least 95%," § 13-71-101(2), this provision will require many covered websites to essentially "card" everyone (including adults) that wants to use the website. *E.g.*, App.1:208-9 ¶¶ 8-10 (Paolucci Decl.). Once a user's age has been verified, the user can only

---

[4] An "automatic electronic message displayed on an account holder's device, when the user interface for the social media service is not actively open or visible on the device, that prompts the account holder to repeatedly check and engage with the social media service." § 13-71-101(11).

contest that designation by "submitting documentary evidence" and undergoing a "review process." § 13-71-201(3)(a). Adults unwilling to undergo an "age-assurance" process will be restricted from accessing covered websites. And adults misidentified as minors that are unwilling to go through the statutory appeals process will have all the same restrictions placed on their accounts as minors.

### 5. Restrictions on data collection and use. §§ 13-71-202(1)(c), 13-71-204(2)-(4).

The Act imposes two requirements on covered websites' collection and use of data.[5]

First, covered websites must "restrict any data collection and sale of data from a Utah minor account holder's account that is not required for core functioning of the social media service." § 13-71-202(1)(c).

Second, covered websites' "terms of service related to a Utah minor account holder shall be presumed to include an assurance of confidentiality for the Utah minor account holder's personal information," which "may be overcome" with "verifiable parental consent." § 13-71-204(2)-(3). The Act does not explain what this "assurance" means. Yet the Act's exceptions to this "assurance" suggest that the websites may violate the "assurance" even

---

[5] These provisions are "[g]overnment regulation[s] of speech" because they impose legal duties on websites if they disseminate speech of a certain type. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

through some "internal use[s]" of user data for personalization of content. § 13-71-204(4).

### 6.  Enforcement and penalties. § 13-71-301.

*Enforcement and penalties.* Both Defendants have enforcement responsibility for the Act. § 13-71-301(1)-(2). The Division of Consumer Protection has multiple enforcement tools. First, it "may impose an administrative fine of up to $2,500 for each violation." § 13-71-301(3)(a)(i). Second, it may pursue "court action," where it may seek (1) declaratory and injunctive relief; (2) "disgorgement of any money received in violation" of the Act; (3) civil penalties "of up to $2,500 for each violation"; (4) "actual damages to an injured purchaser or consumer"; and (5) attorney's fees, investigative fees, and court costs. § 13-71-301(3)(b)-(c).

*Safe harbor.* The Act also contains a limited "safe harbor" provision. A covered website is purportedly (1) "not subject to an enforcement action for a violation of" the age-assurance provision "if the social media company implements and maintains an age assurance system that complies with rules made by the division"; and (2) is "considered to have obtained verifiable parental consent if the social media company . . . complies with the rules made by the division." § 13-71-302(2)-(3).

### C.  Procedural history

After NetChoice challenged Utah's 2023 law regulating social media websites, the Utah Legislature in March 2024 repealed and replaced that law

with the Act challenged here. App.1:28-29 ¶¶ 38-39 (Amend. Compl.). NetChoice filed an amended complaint and moved for a preliminary injunction. After full and extensive briefing on that motion, supplemental briefing on the Supreme Court's *Moody* decision, and a hearing, the district court preliminarily enjoined Defendants' enforcement of the Act. App.5:926.

## SUMMARY OF THE ARGUMENT

**I.** NetChoice is likely to succeed on the merits because the Act's speech regulations violate the First Amendment.

**A.** The district court correctly concluded that the Act's central "[s]ocial media company" and "social media service" definitions, § 13-71-101(13)-(14), are content-based, App.5:943-57. Specifically, the Act singles out websites that feature "social interaction" and display "lists" of users' friends. § 13-71-101(13)-(14). SB194 therefore discriminates based on the "subject matter" that websites disseminate—that is, their "content." *Reed*, 576 U.S. at 163. Each of the Act's speech regulations triggers strict scrutiny, because each depends on this coverage definition.

**B.** The Act's speech restrictions do not satisfy even intermediate First Amendment scrutiny—let alone strict scrutiny—because they are not "[1] narrowly tailored [2] to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (cleaned up).

The studies that Defendants cite in attempting to justify the Act's speech regulations neither substantiate the claim that social media websites cause

harm to minors, nor justify the Act's scope. Defendants cite only a handful of equivocal and correlational studies about the purported harms arising from a few websites (and a few, editorial, speech-facilitating functions on those websites). Those studies likewise suggest that minors derive benefit from some covered websites as well. This cannot satisfy heightened First Amendment scrutiny and justify a law that regulates myriad websites—including those without the purportedly harmful functions.

**C.** Multiple individual speech restrictions trigger and fail heightened First Amendment scrutiny for additional, independent reasons.

First, the Act defines to whom minors can speak on covered websites, absent parental consent. §§ 13-71-202(1)(a)-(b), 13-71-204(1). This violates Supreme Court precedent, which holds that the government cannot require minors to obtain their "parents' prior consent" to engage in protected speech. *Brown*, 564 U.S. at 795 n.3.

Second, the Act also expressly forbids several means of disseminating speech on minors' accounts: website notifications "prompting repeated user engagement," autoplay, and seamless pagination. § 13-71-202(5). That contravenes fundamental protections for speech dissemination and editorial discretion. *Moody*, 603 U.S. at 727-28.

Third, the Act impedes *all* users' access to covered websites by requiring websites to implement "age assurance" for "current" and "prospective Utah account holder[s]." § 13-71-201(1). Yet age-verification requirements impermissibly burden access to protected speech. *Ashcroft*, 542 U.S. at 667; *Reno*,

521 U.S. at 881-82. And that is particularly true here, where the covered websites disseminate vast amounts of speech that is protected both as to adults and minors.

**II.** The district court properly concluded that SB194 is facially invalid under the facial-challenge standard reaffirmed in *Moody*. The district court complied with *Moody*'s two-step process for evaluating facial First Amendment challenges. 603 U.S. at 724-25. More generally, the Supreme Court's broad body of facial-challenge precedent also renders the Act's speech regulation facially unconstitutional.

**III.** The remaining preliminary injunction factors strongly favor affirming the preliminary injunction. The loss of First Amendment rights constitutes irreparable harm. So do the massive, unrecoverable compliance costs imposed by the Act. The balance-of-hardships and the public-interest analysis merge in suits against the government, which cannot violate constitutional rights. All these factors favor protecting free speech.

## ARGUMENT

### I. The Act's speech regulations violate the First Amendment.

The Act's speech regulations all violate either strict or intermediate First Amendment scrutiny. The district court properly applied strict scrutiny, because the Act's central "[s]ocial media company" and "social media service" definitions are content-based. § 13-71-101(13)-(14); *see* App.5:943-47. And the

district court correctly held that the Act's speech regulations cannot satisfy strict scrutiny. App.5:947-57.

On appeal, Defendants argue that the district court erred by not applying *intermediate* scrutiny instead. Br.21, 40. Defendants "do not challenge the court's findings that NetChoice has a substantial likelihood of success on its claims that the Act fails strict scrutiny." Br.39 n.21. So if this Court agrees with the district court that the Act imposes content-based regulations triggering strict scrutiny, then Defendants' concession warrants affirmance. Regardless, the Act's speech restrictions cannot satisfy intermediate scrutiny. *E.g.*, *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *15-21 (W.D. Ark. Aug. 31, 2023) ("*Griffin I*").

## A. The Act's central "social media company" definition is content-based, triggering strict scrutiny for all the Act's speech regulations.

### 1. The Act's coverage definition is content-based by singling out websites that disseminate "social interaction" speech and "lists" of other users.

The Act's "social media company" definition is content-based in two separate ways. This coverage definition selects websites for regulation if they (1) disseminate speech allowing users to speak and interact with one another "*socially*"; and (2) display "a list or lists of other account holders." § 13-71-101(14)(a)(iii)-(iv) (emphasis added). This regulates speech based on the "subject matter" covered websites disseminate, so it is based on their

"content." *Reed*, 576 U.S. at 163. Because the Act is "content based on its face," it "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165.

**a.** The Act makes a content-based distinction by restricting access to websites that "allow users to interact *socially*." § 13-71-101(14)(a)(iii) (emphasis added). This definition singles out websites facilitating "social interaction" and user-generated dialogue, while exempting websites focused on other forms of content and communication—like news, sports, professional, and website-generated content. In other words, the Act will restrict speech based on the "topic[s]" that are generally "discussed" on the website. *Reed*, 576 U.S. at 163. "[W]hether any particular [website] falls within the ban is determined by the content of the posts resting inside that" website. *Griffin II*, 2025 WL 978607, at *9 (cleaned up).

As the district court correctly recognized, the Act essentially "divide[s] the world of internet platforms into social media services, news services, entertainment services"—while exempting those news and entertainment services as a practical matter. App.5:945 n.105; App.5:943 (Act exempts services "that allow users to shop, read the news, access entertainment, educate themselves, or conduct business"). The Western District of Texas similarly reached this same conclusion: "The elevation of news, sports, commerce, and provider-generated content over user-generated content is a content-based regulation." *CCIA*, 747 F. Supp. 3d at 1032.

Within the subset of websites regulated based on their social-interaction and user-generated content, it may be true that the Act does not *further* "regulate the type of content social media companies—or their users—can display." Br.25, 29. But the Act's threshold social-interaction distinction is content-based. Analogously, if the government decided to regulate only news television channels such as CNN or Fox News, that would still be a content-based restriction even if those channels could still choose what to air. *Cf.* Br.24.

Defendants argue that this Act does not "*explicitly* exempt[]" services like news and entertainment services. Br.30 (emphasis added). But it does not matter whether the Act draws content-based distinctions through exclusions (as in other States' invalid laws) or through the plain meaning of its social-interaction coverage provisions. Even "subtle" distinctions drawn on content-based grounds are no less content-based than "obvious" distinctions. *Reed*, 576 U.S. at 163. Likewise, governments may not use "function or purpose" as a "proxy" for content. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022). What matters is whether the distinction is based on "the communicative content" of the speech. *Reed*, 576 U.S. at 164. In *Reed*, that included "directional" communication. *Id.* Here, it is "*social*[]" communication. § 13-71-101(14)(a)(iii). So the Act is not "agnostic as to content." *Reagan*, 596 U.S. at 69; *contra* Br.22.

Relatedly, Defendants also ask this Court to necessarily ignore the Act's limitation to "*social* interaction" by interpreting the phrase to include *all*

expression online: "'Social' interaction merely describes human beings interacting together as part of an online 'society.'" Br.28 (citation omitted). If *any* online interaction is a "social" interaction, there was no reason for the Legislature to have added the qualifier "socially." Utah courts "interpret[] statutes to give meaning to all parts." *LKL Assocs., Inc. v. Farley*, 94 P.3d 279, 281 (Utah 2004). And if Defendants were correct, that would only expand the scope of the Act's coverage, requiring more websites to comply with the Act's unconstitutional speech restrictions. As *Packingham* said, it is "enough" to declare a law unconstitutional under the First Amendment "that the law applies . . . to social networking sites." 582 U.S. at 106-07.

**b.** The Act is content-based for an additional, independent reason. This Act covers only those websites that "make[] available to each account holder a list or lists of other account holders with whom the account holder shares a connection." § 13-71-101(14)(a)(iii)(iv). In other words, websites that display lists of other accounts to which users are "connected" (*e.g.*, friends and family) are regulated, but websites that do not display such lists are exempted. This distinction necessarily examines the "content" of the speech displayed on the website. *Reed*, 576 U.S. at 163.

**c.** The Act is also speaker-based, for all of the reasons discussed above and for the additional reason that the Act singles out websites based on whether the speech on it "is primarily generated by account holders." § 13-71-101(14)(a)(iii)-(iv). "[L]aws that single out the press, or certain elements thereof, for special treatment 'pose a particular danger of abuse by the State,'

and so are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640-41 (1994) (citation omitted).

### 2. Defendants incorrectly argue that the Act's central coverage definition is content-neutral.

**a.** Defendants misstate the hallmark of a content-based law, incorrectly asserting that the "'principal inquiry' is whether the government adopted the law 'because of *disagreement with the message it conveys*.'" Br.22 (emphasis added) (citation omitted). The Supreme Court expressly rejected the same argument in *Reed*, because this "conflates two distinct but related limitations" on government power to regulate speech: "content-based regulation[s]" and "discrimination among viewpoints." 576 U.S. at 168-69. Here, the Act is content-based because it is "targeted at specific subject . . . even if it does not discriminate among viewpoints within that subject matter." *Id.* at 169.

Similarly, this Court cannot ignore the Act's facially content-based distinctions because of the government's assertedly "benign *motive* [or] content-neutral *justification*." *Id.* at 165 (emphases added) (cleaned up). When a statute's text is content-based "on its face," the Court does not look to the statute's purpose to override that content-based discrimination. *Id.* (Although a content-based "purpose" can render a facially content-neutral law content-based. *Id.*)

**b.** Governments also cannot purport to regulate the "structure" of speech services by using content-based criteria. Defendants contend that the Act merely "regulates websites and applications with certain structural attributes" rather than content. Br.25. That *may* describe other parts of the Act's coverage definition, such as the requirement to "permit[] an individual to register as an account holder." § 13-71-101(14)(a)(ii). But the Act's coverage still turns on the separate content-based distinctions of "interact socially" or the display of "lists" of friends. § 13-71-101(14)(a)(iii)-(iv). The law's content-based distinctions do not disappear just because it also includes other potentially content-neutral requirements.

Defendants' analogy to *Turner* just illustrates this Act's flaws. Br.26. In *Turner*, "Congress . . . required cable operators to provide carriage to broadcast stations, but [did] not impose[] like burdens on analogous video delivery systems." 512 U.S. at 659. The Supreme Court concluded that this distinction was *not* based on content. *Id.* at 643-44. After concluding that the law was content-neutral, *Turner* held that this must-carry law was one of the rare, permissible speaker-based distinctions "justified by special characteristics of the cable medium: the ['physical'] bottleneck monopoly power exercised by cable operators and the dangers this power poses to the viability of broadcast television." *Id.* at 661. Or as *Moody* just put it, *Turner* depended on "limit[ing] the cable operators' 'monopolistic,' gatekeeping position 'in order to allow for the survival of broadcasters.'" 603 U.S. at 742 n.10 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 577 (1995)). *Turner*

would have come out differently if Congress had privileged broadcast channels dedicated to particular content like news, or if it had only required cable companies that primarily distribute movie channels to carry broadcast channels.

In stark contrast, there are no such "special justifications" here or on the internet, as the Supreme Court subsequently clarified. *See Reno*, 521 U.S. at 868-69. Defendants suggest a different First Amendment analysis should apply because "[t]echnology has certainly changed" since *Reno*. Br.60. But *Moody* rejected this, holding that the "First Amendment . . . does not go on leave when social media are involved." 603 U.S. at 719.

**c.** Nor does the Act impose a mere time, place, or manner restriction. Defendants' contrary arguments (Br.23-25) would require a vast and unwarranted expansion of that doctrine.

Simply calling the Act a "time, place, and manner" restriction does not make the Act content neutral, as Defendants' arguments suggest. Rather, content-neutrality is a necessary threshold requirement for the time-place-and-manner doctrine to even apply in the first place. *E.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Here, the Act's restrictions cannot be "time, place, and manner regulations because they are not content neutral." *Ass'n of Cmty. Org. v. Mun. of Golden*, 744 F.2d 739, 750 (10th Cir. 1984). That is especially true of the doubly content-based notifications ban. *See infra* pp.45-46. Time-place-and-manner restrictions also cannot

be speaker-based, which this Act is. *See, e.g., Perry*, 460 U.S. at 55; *Ackerley Commc'ns of Ma., Inc. v. City of Somerville*, 878 F.2d 513, 520 (1st Cir. 1989).

Even if the Act were both content-neutral and speaker-neutral, the time-place-and-manner doctrine still would not apply. Editorial choices about presenting speech are not the "manner" of speech that the government can regulate under this doctrine. *E.g., Moody*, 603 U.S. at 740. Otherwise, governments would be allowed to regulate how online newspapers, cable news, streaming services, and other private entities publish speech. That would eviscerate protections for editorial discretion, which includes "organizing and presenting" third-party speech in a compilation. *Id.* at 731.

Rather, the "manner" of speech that the government can regulate under this doctrine is largely limited to things like (1) amplification of sound to prevent public disruption; and (2) distance from places that might be disturbed, such as schools. *Ward v. Rock Against Racism*, 491 U.S. 781, 784 (1989) (amplification); *Grayned v. City of Rockford*, 408 U.S. 104, 105 (1972) (law preventing demonstrations within 100 feet of schools). That is why time-place-and-manner restrictions traditionally apply to speech in public places, and especially public forums. *See Ward*, 491 U.S. at 791; *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1132 (10th Cir. 2002). It therefore does not matter that the Act purportedly "leave[s] open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791. The Supreme Court has "consistently rejected the suggestion that a government may justify a content-based prohibition by showing that speakers

have alternative means of expression" available. *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 541 n.10 (1980) (collecting cases).

**d.** Similarly, the well-cabined secondary-effects doctrine does not apply here. *Cf.* Br.23 (suggesting this Act is meant "to control the secondary effects of speech" (cleaned up)).

The "lesser scrutiny afforded regulations targeting the secondary effects of crime or declining property values has no application to [1] content-based regulations [2] targeting the primary effects of protected speech." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815 (2000). For instance, "[l]isteners' reactions to speech are not the type of 'secondary effects'" governments can permissibly regulate. *Boos v. Barry*, 485 U.S. 312, 321 (1988).

More generally, the secondary-effects doctrine applies only to physical "ordinances zoning adult uses" that "burden free speech interests only incidentally"—not laws like this Act that directly target speech. *Z.J. Gifts D-2, L.L.C. v. City of Aurora*, 136 F.3d 683, 686 (10th Cir. 1998). *Reno* held that States cannot "cyberzone" the internet by imposing "restriction[s] on speech." 521 U.S. at 868.

## B. The Act's speech regulations fail both strict and intermediate First Amendment scrutiny.

Because the Act's central coverage definition is content-based, the Act's speech regulations must satisfy strict scrutiny. If "a statute's gateway coverage definition is content-based, the statute as a whole is subject to strict scrutiny because the coverage definition applies in all applications of the

statute." *Bonta*, 2025 WL 807961, at *12. After all, "content-based burdens must satisfy the same rigorous scrutiny as [ ] content-based bans." *Sorrell*, 564 U.S. at 566. But Defendants do not "not challenge the [district] court's findings that NetChoice has a substantial likelihood of success on its claims that the Act fails strict scrutiny." Br.39 n.21. Instead, Defendants argue that the Act satisfies *intermediate* scrutiny. So if this Court agrees with the district court that strict scrutiny applies, then NetChoice necessarily prevails in this appeal.

In any event, the Act's speech regulations also fail intermediate scrutiny. As Defendants concede, if any form of heightened First Amendment scrutiny applies, *Defendants* have the burden to "show the Act satisfies intermediate scrutiny." Br.40. So Defendants must show that the Act is "[1] narrowly tailored [2] to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (cleaned up). The "law must not burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* (cleaned up). Defendants have failed to make the requisite showings.

### 1. The State lacks a sufficient governmental interest in the Act's restrictions and burdens on speech.

Defendants' two asserted governmental interests fail to support the Act.

**a.** Defendants first assert a general interest in protecting children. Br.42. But the Supreme Court has made clear that a general interest in protecting minors "does not include a free-floating power to *restrict the ideas* to which children may be exposed." *Brown*, 564 U.S. at 794 (emphasis added). And

especially in the First Amendment context, "overly general statements of abstract principles do not satisfy the government's burden to articulate a compelling interest." *Awad v. Ziriax*, 670 F.3d 1111, 1130 (10th Cir. 2012). As relevant here, the government's burden instead requires showing "a direct causal link" between social media use and the broad range of websites regulated by the Act here. *Brown*, 564 U.S. at 799.

On appeal, Defendants all but concede that they cannot demonstrate "proof" of such a "causal link" between social media websites and "harm to minors." *Id.* "Nearly all of the research" highlighted in Defendants' brief is "based on correlation, not evidence of causation." *Id.* at 800 (citation omitted); *see* Br.6-7, 49. The district court agreed after an extensive review of the record evidence. *See* App.5:949-51.

Defendants instead argue that they do not need to prove a causal relationship, and that this Court should defer to the Legislature's judgment. But "whatever deference is due" to the Legislature, that does "not foreclose [this Court's] independent judgment." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989); *Abilene Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson Cnty.*, 492 F.3d 1164, 1174 (10th Cir. 2007) (same). Defendants' cited sources are far too equivocal to support the Act's sweeping scope.

The Surgeon General's Advisory, for instance (Br.45), highlights the potential "*benefits* of social media use among children and adolescents"—including facilitating (1) "positive community and connection with others who share identities, abilities and interests"; (2) "access to important

information"; (3) "a space for self-expression"; and (4) the opportunity to "form and maintain friendships online and develop social connections." App.2:338 (emphasis added). "[B]uffering effects against stress that online social support from peers may provide can be especially important for youth who are often marginalized, including racial, ethnic, and sexual and gender minorities." *Id.* These benefits are consistent with evidence presented by NetChoice in this case. *E.g.*, App.1:180-83.

Beyond those benefits, the Surgeon General's Advisory notes that more research is needed before making sweeping conclusions: "robust independent safety analyses on the impact of social media on youth *have not yet been conducted*," "[m]ore research is needed to fully understand the impact of social media," and "[m]ost prior research to *date has been correlational*." App.2:336, 343 (emphases added).

Dr. Jean Twenge's declaration has similar shortcomings. Br.46-47. Many of her conclusions are qualified or limited to correlational studies. *E.g.*, App.2:310 ¶¶ 30-32 ("may be linked"; "[c]orrelation studies"; "long been correlated"). In addition, many of her assertions discuss only a *single* "social media" website. *E.g.*, App.2:311-12, 314-15 ¶¶ 36, 47, 50-51. Such assertions can hardly justify restricting speech on *all* the social media websites regulated by the Act. Her declaration also highlights the difficulty in isolating the purported harms of social media use, because the declaration also discusses the purported effects of general "technology use" and "digital media" consumption. App.2:309-10 ¶¶ 21, 31.

The district court also correctly recognized that Defendants failed to "provide any evidence the Utah Legislature considered as it deliberated whether to pass the Act." App.5:949 n.126; *see Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). And snippets of the legislative record that Defendants provide on appeal likewise fall far short of demonstrating the necessary evidence to justify the Act under heightened scrutiny. Br.47-50. The highlighted testimony in the legislative record does not demonstrate any causal relationship. Br.49 ("strongly suggests"; "showed a correlation"). And it likewise fails to substantiate the Act's overbroad regulatory scope to myriad social media websites. There are nowhere near the kind of "unusually detailed statutory findings" the Supreme Court has required to uphold speech regulations under intermediate scrutiny. *Turner*, 512 U.S. at 646.

At bottom, if Defendants' cited evidence were enough, governments would have vast authority to restrict speech. All governments would need to do is identify a handful of studies and experts purportedly supporting a small fraction of the Act's legislative scope. First Amendment heightened scrutiny demands far more than a minimal battle of the experts.

**b.** Defendants also assert a governmental interest "in protecting minors' privacy" and "their data." Br.59. But what Defendants call "data" and "personal information," Br.53, is just the *speech* that minor users post to the services. Government cannot recharacterize speech as mere "data" in an attempt to restrict speech. Nor can governments circumvent the First Amendment by attempting to restrict other steps in the process of speech creation.

*Brown*, 564 U.S. at 793 n.1 ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference."); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 588 (1983) (taxes on paper and ink used by newspapers).

### 2. The Act is improperly tailored because its scope is simultaneously overinclusive and underinclusive compared to its purported aims.

Under intermediate scrutiny, Defendants have the burden to demonstrate that the Act is "narrowly tailored" and "the law must not burden substantially more speech than is necessary." *Packingham*, 582 U.S. at 106 (cleaned up). The First Amendment "demand[s] a *close fit* between ends and means." *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1221-22 (10th Cir. 2021) (emphasis added) (cleaned up). Here, Defendants have not—and cannot—demonstrate that "close fit."

**a.** The Act is vastly overinclusive and "burden[s] substantially more speech than is necessary." *Packingham*, 582 U.S. at 106; *cf.* Br.58-59. "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799.

The Act regulates far too many websites to remedy the narrow range of harms Defendants have asserted. For instance, Defendants argue that the Act is necessary to address the mental health harms from purportedly "addictive features" of autoplay, seamless pagination, and notifications. Br.54-

55. Yet the Act's "social media service" coverage definition is not limited to only websites that have those features. § 13-71-101(14).

Nor is the Act's scope limited to the handful of websites that Defendants' cited studies identify as potentially harmful. So even if the studies that Defendants cite were sufficient to regulate the few websites identified in those studies (they are not), the cited studies can hardly justify the Act's broad regulation of all manner of websites swept into the law's coverage definition for "social media service[s]." After all, "the validity of [a] regulation depends on the relation it bears to the *overall problem* the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case." *United States v. Edge Broad. Co.*, 509 U.S. 418, 430 (1993) (emphasis added).

NetChoice member Dreamwidth perfectly illustrates these tailoring flaws. Dreamwidth does not use autoplay, seamless pagination, or push notifications. *See* App.5:956. And no study purports to identify harms from minors' use of Dreamwidth. In fact, Dreamwidth has few minor users. App.1:206-07 ¶ 5 (Paolucci Decl.). But the Act regulates Dreamwidth all the same. App.1:207-08 ¶ 7 (*Id.*). That means Dreamwidth must adopt both a parental-consent process for minors seeking to share their creative writing and an age-assurance process for all users. It does not matter that the Act's specific regulations of features like autoplay "would not burden a service that does not actually use" "features" such as autoplay. Br.58. A covered website without autoplay, like Dreamwidth, still must comply with the Act's *other*

restrictions. And the constitutional analysis examines only those "actual applications." *City of L.A. v. Patel*, 576 U.S. 409, 418-19 (2015).

Other websites beyond Dreamwidth face a similar situation. As *Moody* makes clear, the facial First Amendment analysis focuses on whether there are "*kinds of* websites" that might "fall on different sides of the constitutional line," and not specific websites. *Moody*, 603 U.S. at 718, 726. Defendants have not offered any justification to restrict access to college football forums (such as BYU's cougarboard.com), recipe-sharing websites (such as Pepper.com), and myriad other websites where users can engage in, and with, protected speech.

The Act's broad and undifferentiated targeting of speech across countless websites and their users is nothing like the narrow national security issues in *TikTok Inc. v. Garland*, 145 S. Ct. 57 (2025); *cf.* Br.51. That case was expressly limited to a single service posing unique national security concerns from "a *foreign adversary's control* over a communications platform." *TikTok*, 145 S. Ct. at 66 (emphasis added). The Supreme Court thus repeatedly emphasized the narrowness of its *TikTok* holding. *E.g.*, *id.* at 62-63, 66-69. Particularly relevant here, *TikTok*'s tailoring discussion is unique. There, a law regulating only TikTok was properly tailored where the foreign-controlled entity itself was the purported harm. *Id.* at 70-71. The Act here, by contrast, is the kind of "law targeting any other speaker" that *TikTok* concluded "would by necessity entail a distinct inquiry and separate considerations." *Id.* at 69. Unlike the permissible rationale for governmental regulation

in *TikTok*, Defendants here incorrectly assert that the government can regulate websites because of their presentation of content. *See id.* at 73 (Gorsuch, J., concurring) (the Court in *TikTok* "rightly refrain[ed] from endorsing" an "asserted interest in preventing 'the covert manipulation of content,'" *i.e.*, exercise of editorial discretion).

Defendants also mistakenly argue that regulating an overbroad array of websites is necessary to further the government's purported interest in regulating to whom minors can speak. Br.59.[6] Minors have the "right to speak or be spoken to without their parents' consent." *Brown*, 564 U.S. at 795 n.3. If the government could infringe that right by asserting an interest in regulating the audiences to which minors can speak, that would "vitiate the rule that only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to minors." *Id.* at 802 (cleaned up).

**b.** The Act simultaneously is "wildly underinclusive." *Id.* It regulates commonplace editorial judgments used on myriad websites left unregulated by the Act. And it attempts to address purported harms that Defendants'

---

[6] Defendants provide no justification why the purported protection of data minors provide to websites, *e.g.*, § 13-71-202(1), should be limited to covered websites. Utah already has a comprehensive data-privacy regulation law, §§ 13-61-101 to -404, which makes any additional restrictions imposed by this Act an unconstitutional "prophylaxis-upon-prophylaxis approach[]." *FEC v. Cruz*, 596 U.S. 289, 306 (2022) (citation omitted).

own declarants have recognized might arise from internet use in general—beyond covered social media websites. *See supra* p.29. Yet the Act only regulates certain disfavored websites.

Countless non-covered websites used by minors disseminate speech in ways the Act restricts for only covered websites:

(1) essentially all websites with user-generated content allow users to communicate with people outside of their social networks, App.1:134 ¶ 16.b (Szabo Decl.);

(2) many applications send notifications to users, including non-covered services like Apple News, Disney+, ESPN, and *The Wall Street Journal*, App.1:138 ¶ 19.d (*Id.*);

(3) various non-covered services use autoplay to present content, like Disney+, Hulu, Spotify, and Buzzfeed, App.1:136 ¶ 17.b (*Id.*);

(4) many non-covered services use seamless pagination to present content, like U.S. News and World Report College Rankings, *The New York Times*, Bing, and Apple News, App.1:136-37 ¶ 18 (*Id.*); and

(5) essentially all websites collect, process, and share some amount of user data, App.1:141 ¶ 23 (*Id.*).

Defendants' responses to the Act's underinclusiveness raise similar tailoring flaws discussed above. For instance, Defendants claim that "the evidence did not show other websites . . . caused the same mental health concerns." Br.62. That is inaccurate. Some of Defendants' cited evidence is based on general "technology use" and "digital media" use. App.2:309-10 ¶¶ 21, 31 (Twenge Decl.). Put another way, some of the purported harms relied on by Defendants arise from sources left unregulated by the Act.

That leaves Defendants' argument that social media websites are perhaps uniquely responsible for "social media-induced fear of missing out." Br.63. It is unlikely that the government has a sufficient governmental interest in regulating speech that users find engaging. *See, e.g., Sorrell*, 564 U.S. at 577-78 (the First Amendment protects "catchy jingles"); *Brown*, 564 U.S. at 798 (rejecting the argument that "interactive" and immersive video games fall outside the First Amendment's protections). Regardless, Defendants' argument just reinforces the Act's overinclusiveness: There is no record evidence that the Act's speech restrictions and its regulatory scope are properly tailored to address this interest. For example, Defendants have not cited any evidence that autoplay or seamless pagination create a fear of missing out. Nor have Defendants provided evidence that regulated websites like Dreamwidth contribute to this phenomenon.

**c.** Finally, the Act is not the "least restrictive means of achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted). Even under intermediate scrutiny, "[i]f the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *Brewer*, 18 F.4th at 1221 (citation omitted). The Act violates this important precept.

Parents already have many tools—including those offered by "social media companies"—to control whether and how their children use covered websites. *See supra* pp.7-8. It is precisely those kinds of tools that the Supreme Court has repeatedly endorsed as a less-restrictive alternative to

governmental intervention. *E.g.*, *Ashcroft*, 542 U.S. at 667. Utah could give "parents the information needed to engage in active supervision" over their children's internet use. *Playboy*, 529 U.S. at 826. That would require little more than the State itself publicizing the diverse supervisory technologies that are widely available. "It is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Id.* at 824. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* at 815.

## C. The Act's individual speech restrictions trigger and fail heightened First Amendment scrutiny for independent, additional reasons.

In addition to the Act's content-based central coverage definition, the Act's restrictions on "access to social media" prevent the "legitimate exercise of First Amendment rights" and independently trigger heightened First Amendment scrutiny. *Packingham*, 582 U.S. at 108. Whenever governments "restrict" access to speech, "the Government bears the burden of proving the constitutionality of its actions." *Cruz*, 596 U.S. at 305 (citation omitted).

### 1. The Act's parental-consent requirements for minors to share expression on covered websites violate the First Amendment. §§ 13-71-202(1)(a)-(b), 13-71-204(1).

The Act's restrictions on the authorized audiences for minors' speech on covered websites, absent parental consent, violate the First Amendment. §§ 13-71-202(1)(a)-(b), 13-71-204(1). Under these provisions, minors and

covered websites cannot disseminate speech from minors, or the "account[s]" of minors, beyond a circumscribed network of "connec[tions]" without parental consent. § 13-71-202(1)(a)-(b). So Utah would prohibit minors from addressing the broader audiences on covered websites. This unconstitutionally limits aspiring musicians from cultivating an audience, high schoolers from engaging in political organizing, and countless other applications. Defendants' contrary arguments minimize both the Act's effects and the extent of minors' First Amendment rights under binding precedent.

**a.** The district court correctly concluded that "the Act's restrictions on minors' ability to connect with those outside their immediate networks broadly burdens minors' ability to share and receive protected speech." App.5:956 n.169.

The Supreme Court has held that "the state" lacks "power to prevent children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S. at 795 n.3. Minors therefore have a First Amendment "right to speak or be spoken to." *Id.* And "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975).

*Brown* held unconstitutional a California law that required parental consent before minors could buy or rent "violent video games." 564 U.S. at 802. Although *Brown* considered violent video games, the Court recognized that allowing governments to require parental consent before minors can access

or engage in protected speech would have far-reaching consequences: It would allow States to require parental consent for "political rall[ies]" or "religious" services. *Id.* at 795 n.3. *Brown* rejected that view. *Id.* at 802.

Here, minors' First Amendment "right to speak or be spoken to," *id.* at 795 n.3, includes the right to speak to friends, family, *and* to a broader audience on social media without governmental interference. "Minors, who cannot vote for the lawmakers that represent them, can use social media to make their voices heard on issues that affect them, like school shootings and school choice." *Griffin II*, 2025 WL 978607, at *13. Those rights would be severely undermined if minors could be presumptively prohibited from sharing their views beyond Utah's constrained network. Under Utah's approach, a minor would not be able to leave a comment on an un-"connected" public official's social media post about a recent policy proposal. More generally, minors' political advocacy would be limited. *E.g.*, Katie Kindelan, *6 Teen Girls Were The Organizers Behind Nashville's Massive Black Lives Matter Protest*, ABC News (June 9, 2020), https://perma.cc/E8F4-GFES ("A group of six teenage girls who met on Twitter were responsible for a massive protest in Nashville in support of the Black Lives Matter movement that drew thousands of people."). Nor would a minor be allowed to create a page for her art that could be visible beyond the State's constrained network. A high school athlete could not share highlights visible to college recruiters unless those recruiters were within state-limited networks. Of course, people would also not be able to *view* minors' speech unless they are in the minors' networks—including

*other* minors. Defendants acknowledge this is "precisely the point." Br.66. But that candor does not make this speech restriction any more constitutional.

**b.** As a result, these parental-consent provisions fail heightened First Amendment scrutiny for all the reasons discussed above in Part I.B—and for additional reasons.

The State lacks a sufficient governmental interest in preventing minors from speaking without "parent[al] consent." *Brown*, 564 U.S. at 795 n.3. Parents have a wide range of options to monitor and control minors' use of the internet. *See supra* pp.7-8. Whatever "modest gap in concerned parents' control" the available parental tools leave open, if any, filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803. That is because "the government does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* at 803 n.9.

In any event, the parental-consent requirements "burden substantially more speech than is necessary to further the government's legitimate interests." *Packingham*, 582 U.S. at 106 (citation omitted). For minors to engage in *any* speech beyond the State-limited networks, they must secure parental consent. That is a direct limitation on a minor's "ability to reach his or her target audience." *Evans v. Sandy City*, 944 F.3d 847, 860 (10th Cir. 2019); *contra* Br.64. Burdening minors' religious, political, artistic, and plain social speech is far overbroad to address the State's purported concerns about minors disclosing "personal information." Br.53. In addition, not all covered websites

have the bilateral "connect[ions]" contemplated by the Act. *See* § 13-71-101(5)(a). On websites like X and YouTube, therefore, minors may be unable to share their content or account page *at all* without parental consent. *See* App.1:135 ¶ 16.e (Szabo Decl.); App.1:166 ¶ 48 (Veitch Decl.).

The Act also does not account for the difficulty in verifying a parent-child relationship for purposes of processing parental consent. In enjoining a similar parental-consent requirement, *Griffin* credited the *State's* expert testimony that "the biggest challenge you have with parental consent is actually establishing . . . the parental relationship." *Griffin I*, 2023 WL 5660155, at *4 (cleaned up). These difficulties are compounded when, for example, families are nontraditional (like foster families), families have differences in name or address, parents disagree about consent, minors are unsafe at home, or parental rights are terminated. *See* App.1:135 ¶ 16.f (Szabo Decl.); App.1:213-15 ¶¶ 17-19 (Paolucci Decl.); App.1:219-20 ¶ 6 (Rumenap Decl.). Covered websites would "err on the side of caution and require detailed proof of the parental relationship." *Griffin I*, 2023 WL 5660155, at *15. So "parents and guardians who otherwise would have freely given consent to open an account will be dissuaded by the red tape and refuse consent—which will unnecessarily burden minors' access to constitutionally protected speech." *Id.*; *see* App.1:195-96 ¶ 55 (Davis Decl.).

In addition, the parental-consent provisions are vastly underinclusive. If interacting outside the state-limited networks were indeed "dangerous," it undermines the government's interest to allow minors to do so as "long as

one parent . . . says it's OK." *Brown*, 564 U.S. at 802. Furthermore, the parental-consent requirement does nothing to stop minors *without* parental consent from sharing information on other websites (or other media).

These provisions are not properly tailored because different minors may be arbitrarily limited to different audiences for their protected speech based on aspects of their networks over which they have no control. The Act allows minors without parental consent to speak to their friends (over which minor users may have control) *and* friends of friends. § 13-71-101(5)(a). Thus, the full range of a minor's state-permitted audience will be based, in part, on the "friend" network of their friends—over which individual minor users lack control. So similarly situated minors may reach entirely different audiences based on small differences in their networks. For instance, a minor that shares a connection with a family member living outside of Utah may be able to reach a much broader audience than a minor whose entire family is located in Utah. That is not a result that furthers any legitimate governmental interest. Moreover, it is a handicap that no other State imposes on its minors.

**c.** Defendants' counter-arguments fail.

Defendants attempt to justify the Act's parental-consent requirement by saying it "only asks [minors] to get parental consent before advertisers and other strangers across the worldwide web have access to their data." Br.53. But what Defendants call "data" or "personal information" (Br.53) is the very speech content that minors choose to publicly disseminate to others. *See supra* pp.30-31. Minors' ability to speak on topics ranging from art to politics

42

cannot be restricted by pretending their speech is personal information. *See Brown*, 564 U.S. at 795 & n.3. Just as a minor's op-ed in the local paper is not "personal information" that the government can restrict consistent with the First Amendment, the same is true of a minor's social media post about politics.

Then, Defendants contend this parental-consent law is properly tailored because it "enables parents to exercise their parental authority to keep their children safe from having anything they post viewed by those outside their networks." Br.61; *see* Br.55.[7]

But the Supreme Court in *Brown* already rejected this argument. Governmental requirements for parental consent "do not enforce *parental* authority" but rather "impose *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3. Likewise, the Court has also registered "doubts" that the government has *any* interest in "punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech." *Id.* at 802. The proper way to reinforce and aid parental authority is to support the tools that private industry already makes available to parents. The State "could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary

---

[7] Defendants do not explain why allowing minors to speak to both "friends" and "friends of friends"—over which parents have no statutory control— furthers parental oversight.

[tools]"; or by "(2) educating children and parents." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024).

Defendants' distinctions of *Brown* wholly miss the mark. For example, Defendants suggest that *Brown*'s reasoning concerned only content-*based* laws. Br.53. As an initial matter, the Act here *is* content-based. *See supra* Part I.A. Regardless, the parental-consent law in *Brown* would have been *worse* if it applied to *all* video games—rather than just the content-based category of *violent* video games. Nothing *Brown* says about protecting minors' rights to engage in speech without "parents' prior consent" is limited to content-based laws. 564 U.S. at 795 n.3.

Finally, Defendants also erroneously rely (Br.53) on *Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279 (11th Cir. 2008). That is a case, decided before *Brown*, about *student* speech rights. Governments traditionally have greater authority to regulate public-school students' speech "in light of the special characteristics of the *school environment*." *Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 187 (2021) (emphasis added) (citation omitted). Even then, "students do not shed their constitutional rights to freedom of speech or expression." *Id.* at 187 (cleaned up). Regardless, *Frazier*'s reasoning was abrogated by the Supreme Court's decision in *Brown*. 564 U.S at 795 n.3. And this Act does not purport to—nor is it tailored to—regulate minors' speech while in school.

## 2. The Act's prohibitions on notifications and publishing speech in certain ways to minors fail heightened First Amendment scrutiny. § 13-71-202(5).

The Act's prohibitions on autoplay, seamless pagination, and certain notifications on minors' accounts, § 13-71-202(5), violate the First Amendment for reasons independent of the Act's content-based coverage definition.

As Defendants concede (Br.32-38), the First Amendment protects websites' "choices about what third-party speech to display and *how to display it.*" *Moody*, 603 U.S. at 716 (emphasis added). And "editorial discretion in the selection and presentation of content" is "speech activity." *Id.* at 731 (cleaned up). In other words, States cannot "prevent[] [a website] from compiling the third-party speech it wants in the way it wants." *Id.* at 718. "[L]aws curtailing [websites'] editorial choices must meet the First Amendment's requirements." *Id.* at 717.

Yet the Act here would restrict protected editorial activity in multiple ways.[8]

First, the Act prohibits websites from issuing notifications "prompting repeated user engagement"—*i.e.,* from speaking. § 13-71-202(5)(c); *see*

---

[8] These means of disseminating speech *could be* construed as the product of "algorithms." But the choice to send notifications, enable autoplay, or use seamless pagination are all made by humans at the regulated websites. *See* App.1:136-38 ¶¶ 17.a, 18, 19.b (Szabo Decl.); App.1:158-59 ¶¶ 28-29 (Veitch Decl.). Accordingly, these functions do not implicate *Moody*'s reservation of judgment about "algorithms" that "respond *solely* to how users act online." 603 U.S. at 736 n.5 (emphasis added).

*NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1224 (N.D. Cal. 2024) ("[T]here is little question that notifications are expressive."). Assuming that covered websites can divine precisely what notifications "prompt[] repeated user engagement," such a prohibition on websites' own speech violates the First Amendment. Covered websites use notifications to communicate with users. *See* App.1:159 ¶ 30 (Veitch Decl.). So notifications contain everything from protected "[f]acts" to opinions about whether users will find content useful, all of which are protected speech. *Sorrell*, 564 U.S. at 570. Indeed, this prohibition penalizes the "message expressed" that a user may want to read or view content. *Reed*, 576 U.S. at 163. (This is a further reason this provision triggers strict scrutiny as a content-based regulation of speech.)

Second, the Act also prohibits covered websites from disseminating speech using autoplay and seamless pagination on minors' accounts. *See supra* pp.11-12. The Act's prohibition on seamless pagination is akin to telling disfavored newspapers how many columns their pages can include or forbidding disfavored streaming services from encouraging "binge watching" by autoplaying subsequent episodes of a show. Just like *The Salt Lake Tribune* online may choose to format or organize content in a way that makes it easier for readers to navigate and review, covered websites have the right to display content using seamless pagination. *See Yost*, 2025 WL 1137485, at *15 (comparing "social media" to "publishers of opinion work—a newspaper limited to 'Letters to the Editor'"). Similarly, the Act's prohibition on autoplay is akin to barring (disfavored) radio stations from offering unbroken

music "marathons." Governments lack authority to prohibit Disney+ from autoplaying television episodes or Spotify from autoplaying music. The same is true here. From users' perspective, these provisions violate the principle that "the First Amendment bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002).

Accordingly, these provisions fail heightened First Amendment scrutiny for all the reasons discussed above in Part I.B. They also fail heightened scrutiny because the State lacks a sufficient governmental interest in regulating the precise means of how covered websites disseminate protected speech. None of the legislative findings addresses—let alone warrants restricting— notifications, autoplay, or seamless pagination. *See Turner*, 512 U.S. at 646. In addition, governmental regulation is not necessary when unrebutted record evidence demonstrates that users can control whether the services use autoplay or send them notifications at both the device and application level. *See* App.1:136-38 ¶¶ 17.a, 18, 19.b (Szabo Decl.); App.1:150, 158-59, 165 ¶¶ 14.a, 28, 45 (Veitch Decl.).

### 3. The Act's "age-assurance" requirement violates the First Amendment under heightened First Amendment scrutiny. § 13-71-201.

The Act violates the First Amendment by requiring covered websites to engage in "age assurance" to disseminate protected speech. § 13-71-201(1). This provision will require covered websites to collect personal information

or documentation from *all* users—including information about whether minors are married or emancipated, § 13-71-101(8)—to continue offering their services. As a result, this requirement "burdens social media access for all [users]—both adults and minors whose parents would allow them to use social media." *Griffin II*, 2025 WL 978607, at *8; *see* App.1:208-09 ¶¶ 8-10 (Paolucci Decl.). And heightened First Amendment scrutiny applies when governments age-gate protected speech, especially the fully protected speech (as to both minors and adults) disseminated by the covered websites here. *Brown*, 564 U.S. at 795 n.3; *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882; *Yost*, 2025 WL 1137485, at *20.

The district court correctly concluded that "the Act's age assurance provision, which applies to all users, broadly burdens adult users' ability to access a broad range of protected speech on a broad range of covered websites." App.5:956 n.169 (cleaned up). The same is true of minors.

"[I]mposition of an age-verification requirement for account creation is maximally burdensome." *Griffin II*, 2025 WL 978607, at *13. Minors and adults would need to divulge personal information before discussing their faith on a forum dedicated to religion, "petition[ing] their elected representatives" on X, "shar[ing] vacation photos" "with their friends and neighbors" on Facebook, looking for work around the neighborhood on Nextdoor, learning how to solve math problems on YouTube, and otherwise creating or receiving protected speech. *Packingham*, 582 U.S. at 104-05. This restriction on "access to social media," *id.* at 108, is much broader than the age-

verification law that *Ashcroft* held unconstitutional, 542 U.S. at 659. That law regulated "sexually explicit materials." *Id.* But this Act's age-assurance provision restricts access to billions of posts protected for both adults *and* minors.

The First Amendment does not tolerate this burden to access protected speech. The Act's age-verification requirement unlawfully bars access to speech entirely for those unwilling or unable to provide the requisite documentation or information. *E.g., Reno*, 521 U.S. at 856. And even those willing to comply with the requirements must unconstitutionally "forgo the anonymity otherwise available on the internet." *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) (similar).

That is why the Supreme Court has held that requiring adults or minors to provide personal information or documentation—such as "identif[ication]" or "credit card information"—burdens access to speech. *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882. And in the district court, Defendants said that covered websites can comply with the Act's age-assurance requirement by engaging in (1) "age verification" or "age inference," requiring "drivers' licenses, passports, electoral rolls, credit reports, cell phone network records, banking, [] credit card records," or "digital identity"; or (2) "age estimation," which requires users to provide "facial images, voiceprints, or game play." App.2:248 (cleaned up); *see* App.2:320-21 ¶¶ 12-13 (Allen Decl.). So users will need to "produce state-approved documentation to prove their age and/or

submit to biometric age-verification testing" to access protected speech. *Griffin II*, 2025 WL 978607, at *8.

It is therefore unclear how Defendants can maintain that the Act "need not require the account holder to provide private or sensitive information." Br.59. If Defendants mean to suggest that governments can require identification to access protected speech so long as it does not require "private or sensitive information," Supreme Court precedent rejects this. *See Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882. Providing identification or identifying information burdens access to speech. Even if age assurance may be arguably "eas[ier]" now than it was 21 years ago when *Ashcroft* was decided, new methods do not solve the constitutional problem. *Contra* Br.60.

These provisions fail heightened First Amendment scrutiny for all the reasons discussed above in Part I.B. They also fail heightened scrutiny because of the burden they impose on adult users. App.5:956.

## II. The district court properly concluded that the Act is facially invalid under the First Amendment.

The district court properly concluded that "the Act has 'no constitutionally permissible application' because it imposes content-based restrictions on social media companies' speech, such restrictions require Defendants to show the Act satisfies strict scrutiny, and Defendants have failed to do so." App.5:943 & n.92; *see Griffin II*, 2025 WL 978607, at *14. In other words, the Act's speech regulations are not properly tailored or supported by a sufficient governmental interest in any circumstance where they would apply.

*Bonta*, 2025 WL 807961 at \*13 ("*Moody* . . . does not speak to[] a First Amendment facial challenge to a statute's coverage definition that extends to every application.").

**A.** This facial-challenge inquiry "first" asks what "actors" and "activities" the Act regulates. *Moody*, 603 U.S. at 724. Here, the Act targets an identifiable set of "actors" (social media websites) and "activities" (access to those websites and those websites' dissemination of protected speech). *Id.* Defendants do not argue that the Act has a different scope than NetChoice identified.

The "kinds of websites and apps" that the Act regulates are the "kinds of" "social media" websites discussed by the Supreme Court in *Packingham* and *Moody*. *Moody*, 603 U.S. at 718; *see supra* pp.9-10. "[U]sers employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." *Packingham*, 582 U.S. at 105 (cleaned up). So the Court held the First Amendment protects people's right to "access" these websites free from governmental restraint. *Id.* at 108. Otherwise, such restrictions on access would "prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* That is because these "kinds of" websites (1) "allow users to upload content . . . to share with others"; and (2) allow those "viewing the content . . . [to] react to it, comment on it, or share it." *Moody*, 603 U.S. at 716, 719. That is, these websites are uniquely dedicated to allowing and enabling their users to both speak and listen.

If there were any doubt, the Act expressly excludes the kinds of non-social-media services discussed in *Moody*. *See supra* p.10. Accordingly, this case is unlike *Moody*, where it was unclear "what [] the laws have to say," about other "kinds of" services "beyond [] social-media." 603 U.S. at 716, 725. Because the Act targets "social media" websites, this Court "need not speculate" about "hypothetical or imaginary cases." *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (cleaned up).

To the extent that—given the vagueness at the coverage definition's margins—the Act might implicate slightly different "kinds of" websites beyond social media, that is not an impediment to facial relief. *Moody*, 603 U.S. at 718. As *Packingham* said, this Court "need not decide the precise scope of the statute" because "[i]t is enough to assume that the law applies" and restricts access "to social networking sites." 582 U.S. at 106. Laws that restrict access to "commonplace social media websites" and "also to websites as varied as . . . Washingtonpost.com[] and Webmd.com," raise constitutional problems. *Id.*[9] All such websites engage in, and facilitate, protected speech activities. Reading the Act to regulate *more* services where users "speak and listen, and then, after reflection, speak and listen once more," *id.* at 104, would only magnify the Act's constitutional harms.

---

[9] Defendants have never argued the Act applies to such other, non-social media websites.

**B.** "[N]ext," this Court must compare the Act's unconstitutional applications to any constitutional ones, asking whether the former "substantially outweigh" the latter. *Moody*, 603 U.S. at 723-25. That inquiry here is straightforward "from the face of the law": All aspects of the Act's speech regulations, "in every application to a covered social media company, raise the same First Amendment issues." *X*, 116 F.4th at 899.

Defendants do not contend that more factual development is necessary at this preliminary-injunction stage. And other courts have concluded, even at the summary-judgment stage, that no "factual development would help illuminate the scope of users' First Amendment interest in accessing regulated platforms." *Griffin II*, 2025 WL 978607, at *7. Multiple courts have held that NetChoice can raise both the rights of its members *and* those members' users. *E.g.*, *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 807 (5th Cir. 2025); *Yost*, 2025 WL 1137485, at *9-14; *CCIA*, 747 F. Supp. 3d at 1031; *Griffin I*, 2023 WL 5660155, at *11-12.

From users' perspective, there is "no dispute that users engage in protected speech on all the platforms that are arguably within the Act's proscription" and "the Act imposes a platform-wide burden on users' right to engage in that speech," which does not "differ between the platforms." *Griffin II*, 2025 WL 978607, at *7. "By [burdening or] barring access to all content on regulated platforms . . . the Act is unconstitutional in all conceivable applications." *Id.* at *14; *see Yost*, 2025 WL 1137485, at *14 (similar). So, "the pertinent facts . . . are the same across the board." *AFP*, 594 U.S. at 618. In

other words, whenever the Act would operate to burden or bar a user from access to a covered website—*i.e.*, "actual applications" where "the law is a restriction," *Patel*, 576 U.S. at 418-19—the Act it is unconstitutional.

This, too, distinguishes *Moody*, where the Court concluded the parties had not adequately argued about how the First Amendment's protections for editorial discretion might apply to non-social media services. *Moody*, 603 U.S. at 725-26. In *Moody*, therefore, the "pertinent facts" concerning whether and how the First Amendment applied *might* not have "been the same." *AFP*, 594 U.S. at 618. But here, cases like *Packingham* and *Brown* hold that governments cannot restrict access to protected speech without satisfying heightened First Amendment scrutiny. *See supra* Parts I.C.1, 3. Relatedly, *Moody* did not hold that every regulation of online speech requires intensive investigation of editorial discretion.

Accordingly, this Court does not need to inquire into the precise editorial discretion of every covered website, as Amici States claim. *See* States' Amicus Br.13-15. Whatever differences might exist among regulated websites' editorial discretion, those differences are not "pertinent facts" about whether the First Amendment applies. *AFP*, 594 U.S. at 618. This is a case that primarily concerns restrictions on access to protected speech (through parental consent and age-verification) and specific restrictions on the display of protected content that do not raise concerns as to the appropriateness of a facial challenge. Accordingly, this case can be resolved the same way that a long line of First Amendment cases have been resolved: declaring the Act's

speech restrictions to be facially unconstitutional. Under Amici's theory, however, governments could ban social media altogether and then make websites prove that their editorial discretion is sufficiently expressive. And some companies, like Dreamwidth, Amici say are not "engaged in [their] own expression." States' Amicus Br.14. Ostensibly, that would allow the government to ban Dreamwidth consistent with the First Amendment. The Constitution and the First Amendment facial-challenge analysis allow no such thing.

And even if there were a handful of regulated websites that disseminate speech that the State can lawfully regulate in some fashion, such websites' existence does not defeat facial relief. That is why the First Amendment's "less demanding" facial-challenge analysis asks whether a "law's unconstitutional applications *substantially outweigh* its constitutional ones." *Moody*, 603 U.S. at 723-24 (emphasis added). The State cannot impose overbroad restrictions failing heightened First Amendment scrutiny and point to scattered, potentially constitutional applications to defeat relief.

## III. The remaining preliminary-injunction factors favor NetChoice.

When evaluating a preliminary injunction "[i]n the First Amendment context, the likelihood of success on the merits will often be the determinative factor." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (cleaned up). The other factors here also overwhelmingly favor NetChoice.

NetChoice, its members, and covered websites' users would face irreparable injury absent a preliminary injunction.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). Preventing First Amendment harms is so important that "most courts hold that no further showing of irreparable injury is necessary." *Awad*, 670 F.3d at 1131 (citation omitted).

The constitutional harms are especially severe in light of the Act's penalties. Under the Act, covered websites face $2,500 in civil penalties for every "violation" of the Act. § 13-71-301(3)(a)(i), (b)(v). Without the injunction, members would be forced to choose between complying—sacrificing First Amendment freedoms—or risk incurring substantial penalties. *See Chamber of Com. v. Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010) ("[b]oth compliance and non-compliance" with law would "injure" plaintiff's "members").

In addition to First Amendment harms, lifting the injunction would require covered websites to begin incurring unrecoverable compliance costs. *See Ohio v. EPA*, 603 U.S. 279, 292 (2024). Attempting to comply with the Act would be time-consuming, burdensome, and expensive. App.1:162-64, 167, 169-70 ¶¶ 35, 41, 49, 53, 55 (Veitch Decl.); App.1:196-97 ¶ 58 (Davis Decl.); App.1:202-03 ¶ 9 (Yadegar Decl.). Some members may lack the resources to fully comply at all. App.1:208, 212-16 ¶¶ 8, 16-21 (Paolucci Decl.).

The remaining two factors "merge" when "the government is the opposing party." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132 (citation omitted). Like their peers across the country, minors in Utah can speak freely on social media services without, for instance, governmental demands for parental consent. And all Utah residents can access social media websites without undergoing age assurance. App.1:180-83 ¶¶ 23-27 (Davis Decl.); App.1:164-65, 167, 169 ¶¶ 42, 45, 50, 54 (Veitch Decl.). The Act's speech restrictions should therefore remain preliminary enjoined.

## Conclusion

The Court should affirm the district court's judgment.

Date: May 27, 2025

Respectfully submitted,

*/s/ Scott A. Keller*
Scott A. Keller
Steven P. Lehotsky
Jeremy Evan Maltz
Lehotsky Keller Cohn LLP
200 Massachusetts Avenue, NW,
  Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

*Counsel for Appellee NetChoice*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellee NetChoice agrees with Defendants-Appellants that this case—and the important constitutional questions it presents—would benefit from oral argument.

## CERTIFICATE OF SERVICE

On May 27, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Tenth Circuit CM/ECF User's Manual Sec. II.L; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Scott A. Keller*

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,999 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Scott A. Keller*