No. 24-4100

---

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

NETCHOICE, LLC,
*Plaintiff-Appellee*,

*v.*

DEREK E. BROWN, UTAH ATTORNEY GENERAL, AND
KATHERINE HASS, DIRECTOR, UTAH DIVISION OF CONSUMER
PROTECTION, UTAH DEPARTMENT OF COMMERCE,
*Defendant-Appellants*.

**On Appeal from Order Granting Preliminary Injunction**
**U.S. District Court, District of Utah, Hon. Robert J. Shelby**
Case No. 2:23-cv-00911-RJS-CMR

**BRIEF OF *AMICI CURIAE* WIKIMEDIA FOUNDATION,**
**ORGANIZATION FOR TRANSFORMATIVE WORKS,**
**CHAMBER OF PROGRESS, AND ENGINE ADVOCACY**
**IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

Wendy Chu

Harvard Cyberlaw Clinic

1557 Massachusetts Avenue, 4th Floor
Cambridge, MA 02138

(617) 495-0575
wchu@law.harvard.edu


*Counsel for Amici Curiae*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF INTEREST ............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................4

ARGUMENT ........................................................................6

   I.   The Act's Unconstitutionally Vague and Overbroad Definition of "Social Media Service" Risks Sweeping in Mission-Driven Entities.................................6

      A.   The Court Should Hold that the Act is Unconstitutionally Vague ..............6

      B.   The Court Should Find that the Act is Unconstitutionally Overbroad ........9

      C.   Upholding the Act Sets a Dangerous Precedent that Mission-Driven Platforms Will Struggle to Comply With ..........................................11

   II.   The Court Should Hold That the Act Violates Covered Entities' First Amendment Right to Exercise Editorial Freedom .................................14

      A.   The First Amendment Protects Online Platforms' Editorial Freedom ......14

      B.   The Act Infringes Upon Covered Entities' Editorial Freedom..................16

CONCLUSION ....................................................................19

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ............................................................................9

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ..........................................................................10

*Hill v. Colorado*,
530 U.S. 703 (2000) ............................................................................6

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Bos.*,
515 U.S. 557 (1995) ............................................................... 14, 15, 16

*Mia. Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo*,
418 U.S. 241 (1974) ............................................................... 14, 15, 17

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......................................................................5, 10

*Pac. Gas & Elec. Co. v. Pub. Utils. Com.*,
475 U.S. 1 (1986) ..............................................................................14

*Turner Broad. Sys. v. FCC*,
509 U.S. 952 (1993) ..........................................................................14

*U.S. v. Hansen*,
599 U.S. 762 (2023) ..........................................................................10

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) ............................................................................8

*Virginia v. Hicks*,
539 U.S. 113 (2003) ............................................................................9

*Wyo. Gun Owners v. Gray*,
83 F.4th 1224 (10th Cir. 2023).........................................................6, 7

**Statutes**

Utah Code Ann. § 13-71 ............................................................4

Utah Code Ann. § 13-71-101 .....................................................5

Utah Code Ann. § 13-71-101(14)(a)...........................................6

Utah Code Ann. § 13-71-101(2) ...............................................12

Utah Code Ann. § 13-71-101(3) ...............................................16

Utah Code Ann. § 13-71-101(4) ...............................................16

Utah Code Ann. § 13-71-102...................................................4, 8

Utah Code Ann. § 13-71-202(1)(a)-(b)....................................5, 16

Utah Code Ann. § 13-71-401 ....................................................5

**Other Authorities**

*#StartupsEverywhere Profile: Roydon Jeffrey, Co-Founder & CEO, ListedB*,
    Engine, https://www.engine.is/news/startupseverywhere-brooklyn-ny-listedb
    (last visited June 2, 2025) ...................................................7

*About*, Scratch, https://scratch.mit.edu/about (last visited Apr. 20, 2025) ....... 12, 17

*Age Verification Bill Tracker*, FSC Action Center,
    https://action.freespeechcoalition.com/age-verification-bills/ (last visited Apr.
    14, 2025)..........................................................................11

Amy Beth Hanson, *Federal judge temporarily blocks Utah social media law aimed
    at protecting children*, AP News, Sep. 11, 2024, https://apnews.com/article/utah-
    tiktok-social-media-youth-b678ed7c9bcc1ea0b72f8b320b5f26fa .......................4

Betsy Rosenblatt & Rebecca Tushnet, *Transformative Works: Young Women's
    Voices on Fandom and Fair Use, in* eGirls, eCitizens: Putting Technology,
    Theory and Policy into Dialogue with Girls' and Young Women's Voices (Jane
    Bailey & Valerie Steeves eds., 2015).....................................................14

Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, *NetChoice, LLC v. Reyes*, No. 2:23-cv-00911 (D. Utah 2024). ..........8

*Help:Editing*, Wikipedia, https://en.wikipedia.org/wiki/Help:Editing (last visited Apr. 18, 2025)......................................................................................2

Memorandum Decision and Order, *NetChoice, LLC v. Reyes*, No. 2:23-cv-00911-RJS-CMR, slip op. at 2 (D. Utah Sept. 10, 2024). .................................................6

*Monthly Overview*, Wikimedia Statistics, https://stats.wikimedia.org/#/en.wikipedia.org (last visited May 27, 2025)....1, 12

*More Than Just A Number: How Determining User Age Impacts Startups*, Engine, https://static1.squarespace.com/static/571681753c44d835a440c8b5/t/66ad1ff867 b7114cc6f16b00/1722621944736/More+Than+Just+A+Number+-+Updated+August+2024.pdf (Feb. 2024) ..........................................................13

*Our Work*, Wikimedia Foundation, https://wikimediafoundation.org/our-work/ (last visited Apr. 18, 2025). ...................................................................................1

*Pricing*, AgeChecker, https://agechecker.net/pricing (last visited Apr. 14, 2025)..13

*Pricing*, IDWise, https://www.idwise.com/pricing (last visited Apr. 14, 2025).....13

Rebecca W. Black, *Access and Affiliation: The Literacy and Composition Practices of English Language Learners in an Online Fanfiction Community*, 49 J. Adolescent & Adult Literacy 118 (2005) ..........................................................18

Rebecca W. Black, *Language, Culture, and Identity in Online Fanfiction*, 3 E-Learning and Digital Media 170-84 (2003) ..........................................................18

SB194 Social Media Regulation Amendments, McKell: Utah Senate 2024 General Session - Day 36 (2024) https://le.utah.gov/av/floorArchive.jsp?markerID=126605. ..................................8

*What are Khan Academy's community guidelines?,* Khan Academy, https://support.khanacademy.org/hc/en-us/articles/115002941867-What-are-Khan-Academy-s-Community-Guidelines (last visited Apr. 20, 2025) ..............17

*Wikimedia Foundation Privacy Policy*, Wikimedia Foundation, https://foundation.wikimedia.org/wiki/Policy:Privacy_policy (last visited Apr. 18, 2025). .................................................................................................................2

*Wikimedia Projects*, Wikimedia Foundation, https://wikimediafoundation.org/our-work/wikimedia-projects/#a4-guides (last visited Apr. 18, 2025)........................1

*Wikipedia: Largest Encyclopedia*, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:Largest_encyclopedia (last visited Apr. 14, 2025)...............................................................................................14

*Wikipedia:About*, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:About (last visited Apr. 18, 2025)...........................................................................1

*Wikipedia:Talk Page Guidelines*, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:Talk_page_guidelines (last visited Apr. 20, 2025)..............................................................................18

World Econ. F., *Internet Fragmentation: An Overview*, 33-35, https://www3.weforum.org/docs/WEF_FII_Internet_Fragmentation_An_Overview_2016.pdf (Jan. 2016)..........................................................19

**Rules**

Federal Rule of Appellate Procedure 26.1 ...............................................1

## STATEMENT OF INTEREST[1]

Wikimedia is a non-profit charitable foundation based in San Francisco, California on a mission to "keep knowledge free."[2] It accomplishes that goal through advocacy work and by hosting thirteen free-knowledge platforms known as the Wikimedia Projects.[3] Wikipedia, Wikimedia's most well-known platform, serves as a free online encyclopedia that allows users to write and edit content collaboratively.[4] The Wikimedia Projects host factual and educational content that is created, edited, and moderated by over 275,000 volunteer contributors per month worldwide.[5] The English Wikipedia alone had more than 11,000,000,000 page views in April 2025.[6] To provide free and accurate information to such a wide audience, the Wikipedia project relies on the assistance of volunteers who work

---

[1] Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici* Wikimedia Foundation, the Organization for Transformative Works, Chamber of Progress, and Engine Advocacy do not have parent corporations, and no publicly held corporation owns ten percent or more of any of *amici's* stock.

[2] *Our Work*, Wikimedia Foundation, https://wikimediafoundation.org/our-work (last visited Apr. 18, 2025).

[3] The Wikimedia Projects include Wikipedia, Wikibooks, Wiktionary, Wikiquote, Wikimedia Commons, Wikisource, Wikiversity, Wikispecies, Wikidata, Wikifunctions, MediaWiki, Wikivoyage, and Wikinews. *See Wikimedia Projects*, Wikimedia Foundation, https://wikimediafoundation.org/our-work/wikimedia-projects/#a4-guides (last visited Apr. 18, 2025).

[4] *Wikipedia:About*, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:About (last visited Apr. 18, 2025).

[5] As of January 2025.

[6] *Monthly Overview*, Wikimedia Statistics, https://stats.wikimedia.org/#/en.wikipedia.org (last visited May 27, 2025).

collaboratively. As an invaluable part of the fabric of Wikipedia, volunteer editors determine whether a topic is notable enough to deserve its own page, confirm that content remains accurate, and ensure that pages are notable, neutral, and cited by reliable sources.[7] Wikimedia protects the privacy of its contributors through an extensive privacy policy and an editorial process that allows users to maintain a degree of anonymity regardless of whether they register an account.[8]

The Organization for Transformative Works ("OTW") is a non-profit established to protect and defend fans and fanworks from commercial exploitation and legal challenge. Its members make and share works commenting on and transforming existing works—from reworking a film from the perspective of the villain to using storytelling to explore racial and gender dynamics in media. The Archive of Our Own ("AO3"), OTW's free, volunteer-operated website, has over 8 million registered users and hosts over 15 million unique works. The OTW's users often seek anonymity to write about sensitive topics. Despite the fact that it is one of the top-visited sites in the U.S., and a Library of Congress heritage site, AO3 operates on a budget of well under $500,000 annually and the OTW has no paid

---

[7] *See Help:Editing*, Wikipedia, https://en.wikipedia.org/wiki/Help:Editing (last visited Apr. 18, 2025).

[8] *Wikimedia Foundation Privacy Policy*, Wikimedia Foundation, https://foundation.wikimedia.org/wiki/Policy:Privacy_policy (last visited Apr. 18, 2025).

employees, only volunteers. The OTW minimizes the collection of data as the best way to protect user privacy.

Chamber of Progress is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress seeks to protect Internet freedom and free speech, promote innovation and economic growth, and empower technology customers and users. In keeping with that mission, Chamber of Progress believes that allowing a diverse range of websites and philosophies to flourish will benefit everyone—consumers, store owners, and application developers. Chamber of Progress's work is supported by its corporate partners, but its partners do not sit on its board of directors and do not have a vote on, or veto over, its positions. Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree.

Engine Advocacy ("Engine") is a non-profit technology policy, research, and advocacy organization dedicated to bridging the gap between startups and policymakers. Engine works with government officials and a community of thousands of high-technology, growth-oriented startups across the nation to support innovation and entrepreneurship through research, policy analysis, and advocacy. Engine's community of startups across the country includes small- and

medium-sized companies that host user-generated content, engage in a variety of content moderation, and appeal to a wide range of users.

*Amici* are concerned that the Utah Minor Protection in Social Media Act ("Act"), Utah Code § 13-71 threatens platforms' ability to distribute free knowledge. The vague language of the Act threatens to sweep these platforms into its ambit, which may pose a threat to their editorial models and mission-driven foci, including the ability to share free knowledge with the world. In the interest of promoting access to community and free knowledge, *amici* urge the Court to affirm the district court's argument.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Act was passed to protect minors from the "addictive design features of certain social media services"[9] and stop social media platforms from "continu[ing] to prioritize their profits over our children's wellbeing."[10] Unfortunately, the language of the Act goes much further than simply protecting youth from the risks posed by these types of for-profit social media sites. The Act's vague, overly broad definition of "social media service" risks sweeping mission-driven services into the Act as covered entities.

---

[9] *See* Utah Code Ann. § 13-71-102.

[10] Amy Beth Hanson, *Federal judge temporarily blocks Utah social media law aimed at protecting children*, AP News, Sep. 11, 2024, https://apnews.com/article/utah-tiktok-social-media-youth-b678ed7c9bcc1ea0b72f8b320b5f26fa.

The Act imposes stringent requirements on the broad swath of "social media services" that it hopes to control. These requirements include age assurance mandates, privacy conditions, and content restrictions that would be incredibly challenging for mission-driven platforms to implement.[11] Compliance with the Act's age assurance requirements would undoubtedly prove costly for these platforms, and age assurance checks will create a barrier for both minors and adults who attempt to access their services. The Act also encroaches upon platforms' First Amendment rights by requiring a hands-on editorial model to ensure compliance with the Act's stringent content restrictions for minors. The First Amendment protects online platforms' editorial decisions if they serve an expressive purpose. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 731-32 (2024). If read to apply to platforms like Wikipedia and AO3, the Act would require them to take on more active editorial roles[12]—which not only would jeopardize their missions, but which would also degrade the quality of the content on their platforms. Platforms' expressive decision to rely on its expansive community of users and volunteers to edit and curate content ought to be protected.

When the district court granted a preliminary injunction preventing the Act from going into effect, it recognized that "even well-intentioned legislation that

---

[11] *See* Utah Code Ann. § 13-71-101, 401.
[12] *See* Utah Code Ann. § 13-71-202(1)(a)-(b).

regulates speech based on content must satisfy a tremendously high level of constitutional scrutiny."[13] In light of the Act's breadth, vagueness, and violations of platforms' editorial freedom, Utah "ha[s] yet to show that the Act does" satisfy constitutional scrutiny.[14] This Court should affirm the district court's judgment.

## ARGUMENT

**I.    The Act's Unconstitutionally Vague and Overbroad Definition of "Social Media Service" Risks Sweeping in Mission-Driven Entities**

### A.    The Court Should Hold that the Act is Unconstitutionally Vague

A statute is unconstitutionally vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023) (citing *Hill v. Colorado*, 530 U.S. 703 (2000)). The Act is written to apply only to companies that run a "social media service"—here defined as "a public website or application that," *inter alia*, "permits an individual to register as an account holder," "displays content that is primarily generated by account holders" which is "viewable by other users," and "allow[s] users to interact socially with each other."[15] But this

---

[13] Memorandum Decision and Order, *NetChoice, LLC v. Reyes*, No. 2:23-cv-00911-RJS-CMR, slip op. at 2 (D. Utah Sept. 10, 2024).
[14] *Id.*
[15] Utah Code Ann. § 13-71-101(14)(a).

definition leaves as many questions as it does answers, including what level or type of interaction between users qualifies as "social." The Act's definition can be distorted to fit platforms that are a far cry from being generally understood as social media services. Take Wikimedia, which allows individuals to register an account, even though in practice a minority of visitors will register, primarily displays content that is crowdsourced from a multitude of users, and allows users to communicate and connect with each other regarding the content of Wikipedia articles. Or take AO3, which allows users to comment on works posted by other users, but which does not have standard for-profit platform features like follower "social graphs," algorithmic recommendations, or private messaging. Or take ListedB, an innovative startup developing a specialized community platform marketplace that connects beauty industry professionals with local clients. These platforms, while enabling basic user interaction, bear little resemblance to the addictive, engagement-driven social media services that the Act purports to regulate.[16]

Vagueness concerns are heightened when a statute "interferes with the right of free speech or of association," in which a "more stringent vagueness test should apply." *Wyo. Gun Owners*, 83 F.4th at 1233 (quoting *Vill. of Hoffman Ests. v.*

---

[16] *See #StartupsEverywhere Profile: Roydon Jeffrey, Co-Founder & CEO, ListedB*, Engine, https://www.engine.is/news/startupseverywhere-brooklyn-ny-listedb (last visited June 2, 2025).

*Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982)). As discussed in Section II, the Act implicates and violates the right of covered entities to exercise editorial control over what content is displayed on their platforms and how that content is displayed. Any statute that significantly restricts the rights of free speech and association must, at minimum, have a clearly stated and well-defined set of covered entities. Here, the Act provides only a nebulous set of guidelines for which entities may be classified as a "social media service," which would fail even a basic vagueness test.

While the Act seems to be intended to target big tech social media services "like Facebook and YouTube" and "Instagram,"[17] which are repeatedly listed as examples of covered entities by the Utah government and described as "data mining enterprises"[18] by the Act's sponsor, it threatens to sweep in platforms like Wikipedia and AO3.[19] This leaves substantial discretion for the Utah Attorney General to potentially misapply the Act far beyond the legislature's intent. Due to the poor construction of the Act, many mission-driven platforms may fall into the

[17] Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, *NetChoice, LLC v. Reyes*, No. 2:23-cv-00911 (D. Utah 2024).

[18] SB194 Social Media Regulation Amendments, McKell: Utah Senate 2024 General Session - Day 36 (2024), https://le.utah.gov/av/floorArchive.jsp?markerID=126605.

[19] The legislative findings portion of the Act, Utah Code Ann. § 13-71-102, references "addictive design features of certain social media services," which "contribute to excessive use of a social media service by minors."

limbo of arbitrary enforcement where it is not immediately clear if the vague definition applies to them. These platforms remain vulnerable to the discretionary enforcement of the Act by the Attorney General. Additionally, this uncertainty creates a chilling effect where these services may be constrained in future feature development out of fear that any changes will draw attention from the Utah Attorney General and increase the risk that the platforms will allegedly fall under the Act's definition of "social media service."

### B.    The Court Should Find that the Act is Unconstitutionally Overbroad

The Act's definition of "social media service" is also overbroad and threatens to sweep in much more territory than was the stated intention. A statute is unconstitutionally overbroad if it "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'" *Virginia v. Hicks*, 539 U.S. 113, 118 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). The Act's framing of social media services as services that allow for user registration, account connections, and display content primarily generated by users sweeps in those that lack the supposedly addictive features that motivated the legislature, extending far beyond its intended targets like Facebook, YouTube, and Instagram. It is difficult to name well-trafficked websites that do *not* allow users to register an account. The prevalence of user-generated content extends well beyond social media platforms, appearing in countless forms across the Internet—from

product reviews to discussion forums to comment sections. Although the Act intends to improve online safety on certain social media sites, the breadth of its coverage definition clearly sweeps in much more content and more platforms than the Act's legitimate applications could conceivably justify. This extreme imbalance between the legitimate aims and the expansive consequences of the Act creates an offense to the Constitution's prohibition against laws that are substantially vague and overbroad. *See, e.g.*, *Moody*, 603 U.S. at 723 (requiring facial overbreadth analysis to determine if "a substantial number of [a law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep"); *U.S. v. Hansen*, 599 U.S. 762, 770 (2023) (holding that for facial invalidation, "a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep"); *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (explaining that vague laws offend due process because they can fail to provide fair notice and can "inhibit the exercise" of First Amendment freedoms by causing speakers to "steer far wider of the unlawful zone").

The Court should find that the Act's language is unconstitutionally overbroad and vague. While there may be legitimate aims and parties for whom the Act should apply, the Utah legislature did not intend for sites like Wikipedia or AO3 to be misconstrued as "social media services" with risks that necessitate strict

limitations on their freedom of speech. As it is written, the Act's vagueness and breadth create an incurable degree of arbitrariness and sweeping coverage that is far detached from the aims of the Utah legislature, and thus in violation of the Constitution's protections against ill-defined government restrictions on speech.

### C.    Upholding the Act Sets a Dangerous Precedent that Mission-Driven Platforms Will Struggle to Comply With

Setting a precedent by upholding this age assurance law will prove detrimental to a multitude of mission-driven platforms if other courts follow suit and uphold similar and likely broader laws in the future. Like Utah, other state legislatures across the country have been propagating broad age assurance and age verification laws that pose similar concerns.[20] If the Court reverses the district court's findings and chooses to uphold the Act in Utah—despite the First Amendment violations—it will set a dangerous precedent that will severely hamper the ability for mission-driven platforms to continue operating openly and freely. Legislatures will be empowered to pass sweeping age verification and assurance laws, requiring platforms to consistently challenge such laws or else give up their commitment to community-created knowledge. With not just one, but potentially many states passing variations of the Utah law with different

---

[20] *See Age Verification Bill Tracker*, FSC Action Center, https://action.freespeechcoalition.com/age-verification-bills (last visited Apr. 14, 2025).

requirements, the result will be a fragmented landscape for covered entities to navigate and a balkanized and disparate internet for users from different localities.

If the vague terms of the Utah Act or potential future laws are interpreted to their maximum breadth, numerous mission-driven platforms hosting a wide range of services will be heavily burdened with the requirements of the Act. From educational platforms like Scratch, a non-profit site designed at MIT which allows children to program their own video games and share it online with others,[21] to non-profit digital encyclopedias like Wikipedia, a multitude of platforms with mission-driven business models will need to invest in the unaffordable and complex age assurance systems required by the Act simply by nature of allowing users to create and share content with others. Compliance with the age assurance requirements in the Act, which must reach an "accuracy rate of at least 95%,"[22] can be incredibly costly for popular non-profit platforms AO3, who, according to internal data, receives around 3 billion page views a month. It would also be costly for the English Wikipedia, which received almost 980 million unique visitors in April 2025 alone.[23] Requiring platforms like these to conduct age assurance with near-perfect accuracy on millions or billions of unique visitors every month would be prohibitively expensive and would penalize them for remaining accessible and

[21] *About*, Scratch, https://scratch.mit.edu/about (last visited Apr. 20, 2025).
[22] Utah Code Ann. § 13-71-101(2) .
[23] Monthly Overview, *supra* note 6.

attracting a vast community. The costs to independently build and operationalize

an age-verification system can surpass $2 million—possibly exceeding what

platforms might have spent building their actual services.[24] Many common third-

party age assurance service providers charge anywhere from fifty cents to one

dollar for each successful age check.[25] At fifty cents each, age checks would

exhaust AO3's annual budget of under $500,000 in less than a day. The Act's age

assurance requirements would cripple platforms' operations and degrade valuable

resources for children and adults alike.

Even if these platforms were able to survive given the Act's requirements,

locking access to these services' benefits behind age assurance checks will

severely limit access to the knowledge and creativity that billions use and rely on.

Scratch relies on scale and ease of use to attract kids who have a fledgling interest

in computer coding. AO3 and Wikipedia also rely on their diverse and numerous

contributors of all ages and backgrounds to write and edit content. Placing barriers

on these sites would be detrimental. Older minors would lose access to AO3's rich

---

[24] *See More Than Just A Number: How Determining User Age Impacts Startups, Engine*, https://static1.squarespace.com/static/571681753c44d835a440c8b5/t/66ad1ff867b7 114cc6f16b00/1722621944736/More+Than+Just+A+Number+- +Updated+August+2024.pdf (Feb. 2024) at 2.

[25] *See, e.g.*, *Pricing*, IDWise, https://www.idwise.com/pricing (last visited Apr. 14, 2025); *Pricing*, AgeChecker, https://agechecker.net/pricing (last visited Apr. 14, 2025).

environment in which to practice and develop important literacy and language skills,[26] and the accuracy, depth, and coverage of the world's largest encyclopedia would be damaged.[27]

## II. The Court Should Hold That the Act Violates Covered Entities' First Amendment Right to Exercise Editorial Freedom

### A. The First Amendment Protects Online Platforms' Editorial Freedom

The First Amendment protects editorial decisions that serve an expressive purpose. *See Mia. Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo*, 418 U.S. 241 (1974); *Pac. Gas & Elec. Co. v. Pub. Utils. Com.*, 475 U.S. 1 (1986); *Turner Broad. Sys. v. FCC*, 509 U.S. 952 (1993); *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Bos.*, 515 U.S. 557 (1995). Editorial decisions serve an expressive purpose when an entity presents a "curated compilation of speech originally created by others." *Moody*, 603 U.S. at 728. Upholding the district court's decision would align this case with well-established precedent. For example, in *Hurley*, the Supreme Court held that Massachusetts could not compel parade organizers to include a gay and lesbian group in a parade, as "every

---

[26] *See generally* Betsy Rosenblatt & Rebecca Tushnet, *Transformative Works: Young Women's Voices on Fandom and Fair Use*, *in* eGirls, eCitizens: Putting Technology, Theory and Policy into Dialogue with Girls' and Young Women's Voices (Jane Bailey & Valerie Steeves eds., 2015).

[27] *Wikipedia: Largest Encyclopedia*, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:Largest_encyclopedia (last visited Apr. 14, 2025).

participating unit affects the message conveyed by the private organizers." 515

U.S. at 572. In *Tornillo*, the Supreme Court held that a law requiring newspapers to

print certain political messages violated the paper's First Amendment right to

exercise editorial control over the content included and omitted from the paper.

418 U.S. at 257.

In *Moody*, the Supreme Court affirmed that the First Amendment protects

social media companies' editorial freedom to select the content displayed on their

platforms. The Supreme Court evaluated the validity of Texas and Florida laws

that compelled social media companies to curate the content on their sites in a

particular manner outlined by the states' legislatures. The Supreme Court

explained that, in the virtual social media landscape, "government efforts to alter

an edited compilation of third-party expression are subject to judicial review for

compliance with the First Amendment." *Moody*, 603 U.S. at 717. The Supreme

Court emphasized that deciding what third-party speech will be "included in or

excluded from" a compilation and then "organizing and presenting the included

items" functions as protected speech. *Id.* at 731. When the government interferes

with social media companies' ability to exercise that editorial freedom, "the

government confronts the First Amendment." *Id.* at 732. Like the Texas and

Florida legislatures in *Moody*, the Utah legislature must confront the First

Amendment, which poses an insurmountable challenge to the Act.

### B.    The Act Infringes Upon Covered Entities' Editorial Freedom

The Act violates covered entities' editorial freedom to determine the blend of content displayed to users. Much like the parade in *Hurley*, "every participating unit" of content on an online platform counts. *Hurley*, 515 U.S. at 572. § 13-71-202(1)(a) of the Act restricts the visibility of Utah minors' accounts to only "connected accounts."[28] Similarly, § 13-71-202(1)(b) requires minors to exchange "content" only with "connected accounts."[29] To comply with the Act, platforms need to determine whether a user is a minor and whether that minor is an accountholder. Platforms would then need to ensure minor accountholders exchange content only with other connected accounts, forcing platforms to curate users' experiences based on their ages.

This hamstrings covered entities' ability to share new content with both minor and adult users, and it will prove especially difficult to implement for open-access platforms. Many public online platforms are not contact-based platforms, contain pages curated by the users themselves, and have centered their entire

---

[28] The Act defines a "connected account" as "an account on the social media service that is directly connected to: (a) the minor account holder's account; or (b) an account that is directly connected to an account directly connected to the minor account holder's account." *See* Utah Code Ann.§ 13-71-101(3).

[29] The Act defines "content" as "any information, visual depictions, tools, features, links, software, or other materials that appear on or are available or enabled through a social media service." *See* Utah Code Ann. § 13-71-101(4).

manner of presenting expression around public content availability. For example, online educational non-profits may allow individuals to share content or ask questions via public forums. Khan Academy, an educational non-profit, has question and answer pages for account-holders.[30] Scratch, a coding community for children, allows minors to create and share coding projects.[31] Decisions about what content to display gives these public platforms "a particular expressive quality" and "constitute[s] the exercise of protected editorial control." *Moody*, 603 U.S. at 711 (quoting *Tornillo*). The Act deprives covered entities of this editorial discretion by limiting their ability to display content to minors and share content created by minors. This erosion of online platforms' editorial rights violates the First Amendment.

If applied to Wikimedia, the Act will create an impediment to Wikipedia's community contribution model, a core aspect of its free-knowledge mission.[32] If a minor added to a Wikipedia page, that edit would likely qualify as "content," would trigger the restrictions imposed under the Act, and would be rendered invisible to the vast majority of users who are not "connected" with the minor. The Act's restrictions would also affect minors' access to content posted by adult

---

[30] *See What are Khan Academy's community guidelines?*, Khan Academy, https://support.khanacademy.org/hc/en-us/articles/115002941867-What-are-Khan-Academy-s-Community-Guidelines (last visited Apr. 20, 2025).

[31] *About*, Scratch, https://scratch.mit.edu/about (last visited Apr. 20, 2025).
[32] *Id.*

accountholders on Wikipedia's "talk pages," which are essential spaces for users to receive feedback on their edits, discuss the merits of adding or deleting pages, and verify facts.[33] Talk pages serve a critical expressive function, and embody the type of editorial discretion that courts have recognized as protected First Amendment activity. Likewise, for AO3 and other fan sites, participation in fan communities helps minors, particularly women, "find their own voices, explore and understand themselves, and gain skills that served them later in life": "[F]andom provides opportunities that other activities may not, because fandom encourages generative discourse—each fan builds on others' work while contributing her own insights. The discursive nature of fandom permits fans to connect with others like themselves despite geographic distance."[34] The Act's interference with these community contribution models exemplifies how the Act infringes on platforms' First Amendment rights to exercise editorial freedom.

Further, compliance with the Act may lead to the fractionation of the internet. Complying with the Act in Utah will place a significant burden on

[33] *Wikipedia:Talk Page Guidelines*, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:Talk_page_guidelines (last visited Apr. 20, 2025).

[34] Rosenblatt & Tushnet, *supra* note 23 at 387-88; *see generally* Rebecca W. Black, *Access and Affiliation: The Literacy and Composition Practices of English Language Learners in an Online Fanfiction Community*, 49 J. Adolescent & Adult Literacy 118-28 (2005); Rebecca W. Black, *Language, Culture, and Identity in Online Fanfiction*, 3 E-Learning and Digital Media 170-84 (2003).

covered entities and inhibit their editorial freedom. Thus, some covered entities may not want to alter their platforms to comply with the Utah model.[35] Rather, Utah will likely have distinct versions of services from the rest of the world. To accomplish this fractionation, platforms will need to identify the precise location of each user around the world and provide an entirely different user experience depending on whether the user is in Utah or in another location. By encouraging the fractionation of the internet and upending community editorial models, the Act poses a substantial threat to mission-driven platforms online.

## CONCLUSION

The Court should affirm the district court's judgment.

DATED: June 3, 2025

Respectfully submitted,

/s/ Wendy Chu
Wendy Chu
Harvard Cyberlaw Clinic
1557 Massachusetts Avenue, 4th Floor
Cambridge, MA 02138
(617) 495-0575
wchu@law.harvard.edu

*Counsel for Amici Curiae*[36]

---

[35] *See generally* World Econ. F., *Internet Fragmentation: An Overview*, 33-35, www3.weforum.org/docs/WEF_FII_Internet_Fragmentation_An_Overview_2016.pdf.
[36] *Amici* thank spring 2025 Harvard Cyberlaw Clinic students for their valuable contributions to this brief.

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of the Federal Rule of Appellate Procedure 29(a)(5), because, excluding the items listed under the Federal Rule of Appellate Procedure 32(f), it contains 4780 words according to the word-count function of Microsoft Office Word.

This document complies with the typeface requirements of the Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of the Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface in 14-point Times New Roman font using Microsoft Word.

Date: June 3, 2025                  <u>/s/ Wendy Chu</u>
                                            Wendy Chu

                                            *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing proposed brief was electronically filed with the Court using the ECF system. Service on counsel for all parties will be accomplished through the Court's electronic filing system.

Date: June 3, 2025                           /s/ Wendy Chu
                                             Wendy Chu

                                             *Counsel for Amici Curiae*

## STATEMENT OF COMPLIANCE WITH RULE 29

Pursuant to the Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief.

Pursuant to the Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief.

Date: June 3, 2025

/s/ Wendy Chu
Wendy Chu

*Counsel for Amici Curiae*