NO.  24-4100

===

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

NETCHOICE, LLC,

PLAINTIFF - APPELLEE,

V.

DEREK BROWN, in his official capacity as Attorney General of Utah, and
KATHERINE HASS, in her official capacity as Director of the Division of
Consumer Protection of the Utah Department of Commerce,

DEFENDANTS - APPELLANTS.

---

On Appeal from the United States District Court
for the District of Utah – Salt Lake City
(Case No. 2:23-CV-00911-RJS-CMR)
Honorable Robert J. Shelby, Chief United States District Judge

---

## BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION, AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF UTAH, FREEDOM TO READ FOUNDATION, LGBT TECHNOLOGY INSTITUTE, TECHFREEDOM, AND WOODHULL FREEDOM FOUNDATION IN SUPPORT PLAINTIFF- APPELLEE NETCHOICE, LLC AND REVERSAL

---

Jason Groth (Bar No. 16683)
ACLU OF UTAH
311 South State Street, Suite 310
Salt Lake City, UT 84111
Tel: (801) 521-9862
jgroth@acluutah.org

*Counsel for Amicus Curiae*
*American Civil Liberties Union of*
*Utah*

Aaron Mackey
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel: (415) 436-9333
amackey@eff.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amici Curiae* state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.


Dated: June 3, 2025                    By: s/ *Aaron Mackey*
                                            Aaron Mackey

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF INTEREST ................................................................. 1

INTRODUCTION ............................................................................... 4

I.   The Act blocks adults and minors from speaking to their intended audiences in the most important digital forums. ............................................. 6

    A.   Minors and adults use social media to disseminate their own speech and to read, watch, and listen to the speech of others on a wide array of topics. ...................................................................... 6

    B.   The vast majority of content on social media is constitutionally protected as to both adults and minors. ................................... 13

II.  The Act burdens minors and adults' First Amendment rights. ................... 15

    A.   The Act burdens minors' ability to speak on social media. ................. 16

        1.   The Act makes it impossible for minors to speak to users outside their friend group and for other users to hear from minors. .................................................................... 17

        2.   The First Amendment prohibits Utah from standing between minors and their audiences. .................................... 19

    B.   The Act also Burdens the First Amendment rights of adults and minors by requiring age verification that burdens expression, anonymity, and privacy. ................................................... 21

        1.   Age-assurance requirements will either chill or entirely block access to lawful speech. ........................................... 21

        2.   Online age-assurance schemes impermissibly burden the right to be anonymous online. ......................................... 24

3.     Online age verification puts internet users' sensitive personal
data at risk. .................................................................................. 25

CONCLUSION ........................................................................................ 28

CERTIFICATE OF COMPLIANCE ......................................................... 30

CERTIFICATE OF DIGITAL SUBMISSION ......................................... 31

CERTIFICATE OF SERVICE ................................................................. 32

## TABLE OF AUTHORITIES

**Cases**

*ACLU v. Gonzales*,
  478 F. Supp. 2d 775 (E.D. Pa. 2007) .................................................. 25

*ACLU v. Mukasey*,
  534 F.3d 181 (3d Cir. 2008) ............................................................... 25

*Am. Amusement Mach. Ass'n v. Kendrick*,
  244 F.3d 572 (7th Cir. 2001) .......................................................... 9, 15

*Am. Booksellers Found. v. Dean*,
  342 F.3d 96 (2d Cir. 2003) ........................................................... 22, 24

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ........................................................................... 21

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982) ........................................................................ 6, 15

*Brown v. Ent. Merch. Ass'ns*,
  564 U.S. 786 (2011) ...................................................................... 13, 14

*Carey v. Population Servs. Int'l*,
  431 U.S. 678 (1977) ........................................................................... 13

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975) ........................................................................... 14

*In re Anonymous Online Speakers*,
  661 F.3d 1168, 1173 (9th Cir. 2011) ................................................. 24

*Lamont v. Postmaster Gen. of U. S.*,
  381 U.S. 301 (1965) ...................................................................... 19, 20

*Mahanoy Area Sch. Dist. v. B.L. by & through Levy*,
  594 U.S. 180 (2021) ........................................................................... 14

*Martin v. City of Struthers, Ohio*,
  319 U.S. 141 (1943) ........................................................................ 6, 15

*McIntyre v. Ohio Elections Comm'n,*
514 U.S. 334 (1995)................................................................... 24

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024)................................................................... 15

*Packingham v. North Carolina,*
582 U.S. 98 (2017)................................................................... 6, 8

*PSINet, Inc. v. Chapman,*
362 F.3d 227 (4th Cir. 2004) ................................................ 21, 25

*Reno v. ACLU,*
521 U.S. 844 (1997)...........................................................*passim*

*Schneider v. State of New Jersey, Town of Irvington,*
308 U.S. 147 (1939)................................................................... 15

*Snyder v. Phelps,*
562 U.S. 443 (2011)................................................................... 13

*State v. Weidner,*
235 Wis. 2d 306 (2000) ............................................................. 25

*Vill. of Schaumburg v. Citizens for a Better Env't,*
444 U.S. 620 (1980)................................................................... 15

*W. Va. State Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943)................................................................... 14

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton,*
536 U.S. 150 (2002).................................................................. 15

**Statutes**

18 U.S.C. § 2721..................................................................... 26

Utah Code § 13-71-101 ........................................................... 5

Utah Code § 13-71-201 ....................................................... 21, 27

Utah Code § 13-71-202 ................................................... 5, 17, 19

Utah Code § 13-81-204 ........................................................... 17

**Other Authorities**

Amanda Lenhart, *Chapter 4: Social Media and Friendships*, Pew Res. Ctr.
  (Aug. 6, 2015) ............................................................................................ 9

Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'*
  BBC (Nov. 28, 2020) ................................................................................. 13

Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive
  Into the Technology of Corporate Surveillance*, EFF Deeplinks Blog
  (Dec. 2, 2019) ...................................................................................... 26, 27

Brooke Auxier, *Social Media Continue to Be Important Political Outlets for
  Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020) ............................................ 11

Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*,
  Travel & Leisure (Oct. 21, 2022) ....................................................................... 11

Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew Rsch. Ctr.
  (Sept. 17, 2024) ............................................................................................ 7

Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net
  Benefit*, N.Y. Times (May 24, 2023) ................................................................. 12

*Common Sense & Hopelab, A Double-Edged Sword: How Diverse Communities of
  Young People Think About the Multifaceted Relationship Between Social Media
  and Mental Health*, 17 (2024) ....................................................................... 7

Consumer Fin. Prot. Bureau, *Data Point: Credit Invisibles* (May 2015) ............... 23

*Digital Advertising in the United States – Statistics & Facts*, Statista (May 20,
  2025) ............................................................................................................ 27

Douglas A. Blackmon et al., *Birth of a Movement*, Wall St. J. (Oct. 29, 2010) ....... 7

Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times
  (Jul. 25, 2021) .............................................................................................. 11

Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings
  From Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023) ................ 9

Erica Chen et al., *Online Social Networking and Mental Health Among Older
  Adults: A Scoping Review*, Canadian J. on Aging, (2022) ................................. 12

Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022) ........................................................... 12

Gov. Spencer Cox (@GovCox), X ............................................................................. 8

Identity Theft Res. Ctr., *2023 Data Brach Report*, (Jan. 2024) ............................ 27

J Joely Johnson Mork, *Teen's Online Church Draws Young People From Around the World*, Faith & Leadership (Aug. 23, 2016) .................................................. 11

J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr., (Mar. 1, 2022) ............... 12

Jackie Snow, *Why Age Verification Is So Difficult for Websites*, Wall St. J. (Feb. 27, 2022) ............................................................................................................. 23

Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minors*, EFF Deeplinks Block, (Mar. 15, 2024) ................. 10

Jason Wise, *How Many Videos Are Uploaded to YouTube a Day in 2025?* Earthweb .................................................................................................................. 9

Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through the Lens of the COVID-19 Pandemic*, Persp. Psych. Sci. (May 9, 2022) ........................................................................... 8

Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Univ. Md. Ctr. for Democracy & Civic Engagement (Jan. 2024) ............................................................................. 22

Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021) ........................................................................................... 12

Keith N. Hampton et al., *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence From Access Inequalities and Restrictive Media Parenting in Rural America*, Soc. Sci. Comput. Rev. (Aug. 5, 2022) ...................................................................................................................... 12

Kim Ward, *How teachers can use social media to improve learning this fall*, Mich. State Univ. (June 23, 2020) ................................................................................... 9

Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013) ...................................................................................................... 24

Michael J. Hanmer & Samuel B. Novey, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies*, Univ. Md. Ctr. for Democracy & Civic Engagement, 5 (Mar. 2023) .............................................. 22

Number of internet and social media users worldwide as of February 2025, Statista (Feb. 2025) .................................................................................................... 7

*Official Social Media Accounts for Church Leaders and Groups*, The Church of Jesus Christ of Latter-Day Saints ....................................................... 10

*Position Paper: Online Age Verification and Children's Rights*, European Digital Rights (Oct. 4, 2023) ......................................................................... 23

*Press Release*, Identity Theft Res. Ctr., ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts (Aug. 23, 2023) ................................................................................................ 28

Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020) .................................................................................................. 8

Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo Movement": What Can We Learn From Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1 (May 2020) ................................................................................................................ 8

Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sept. 18, 2020) ................................................ 10

Richard Power, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers*, Carnegie Mellon CyLab, (2011) ................................................................................................... 28

Samuel Bestvater et al., *Americans' Views of and Experiences With Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023) .................................................. 8

Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, Health Expectations (Feb. 2017) .............................................................................................................. 25

Sen. Mike Lee (@SenMikeLee), X ...................................................................... 8

*Strive to Be (Official Facebook page for youth of The Church of Jesus Christ of Latter-day Saints)*, Facebook .......................................................... 10

Suzanne Smalley, *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself*, Record (June 12, 2024)............................. 23

*The Ninja Fam!*, YouTube.................................................................... 18

*The Robloxian Christians*, Exponential ................................................ 11

*The Tabernacle Choir at Temple Square*, YouTube ............................. 10

Tracy (Kitten) Goldberg, *Child Identity Fraud: A Web of Deception and Loss* 5, Javelin (Nov. 2, 2021) ......................................................... 28

Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy 44  (2018)...................................... 12

U.S. Census Bureau, CB 25-58, Quarterly Residential Vacancies and Homeownership, First Quarter 2024 (Apr. 28, 2025) ........................................ 23

United Nations, *E-Government Survey 2022: The Future of Digital Government*, 106 (2022)............................................................................................... 8

*Utah Islamic Center Youth Committee*, Instagram ................................ 10

Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens*, 41, Common Sense (2021) ....................................................... 10

*Young Jewish Professionals Utah*, Facebook........................................ 10

## STATEMENT OF INTEREST[1]

The Electronic Frontier Foundation (EFF) is a nonprofit civil liberties organization with more than 30,000 active donors that has worked since 1990 to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF is dedicated to protecting online users' free expression and privacy rights and has fought for both in courts and legislatures across the country. EFF has challenged laws that burden internet users' rights by requiring online services to verify users' ages. *See, e.g.*, *ACLU v. Reno*, 929 F. Supp. 824, 825-27 (E.D. Pa. 1996) (serving as a plaintiff challenging the Communications Decency Act); *ACLU v. Reno*, 31 F. Supp. 2d 473, 480 n.3 (E.D. Pa. 1999) (serving as a plaintiff challenging the Child Online Protection Act).

The American Civil Liberties Union (ACLU) is a nonprofit, nonpartisan membership organization devoted to protecting the civil rights and civil liberties of all Americans, including the First Amendment rights to free speech, anonymity, and access to information online. The American Civil Liberties Union of Utah is a state affiliate of the ACLU. The ACLU and ACLU of Utah have frequently appeared before courts to advocate for First Amendment rights online, *see, e.g.*, *Free Speech*

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amicus or their counsel has made any monetary contributions intended to fund the preparation or submission of this brief. The parties have consented to the filing of this brief.

*Coalition v. Paxton*, No. 23-1112 (U.S. 2025) (counsel); *Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); *Packingham v. North Carolina*, 582 U.S. 98 (2017) (amicus), and the free speech rights of young people, *see, e.g.*, *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038 (2021) (counsel); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (counsel). The ACLU and ACLU of Utah have also litigated many of the seminal cases striking down laws that prohibited the communication of certain materials online without age verification. *See, e.g.*, *Reno*, 521 U.S. 844; *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999).

The Freedom to Read Foundation (FTRF) is a nonprofit organization established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections and make available to the public any work they may legally acquire, including a broad array of authors and viewpoints; establish legal precedent for the freedom to read of all persons; and protect the public against efforts to suppress or censor speech.

The LGBT Technology Institute ("LGBT Tech") is a nonprofit organization dedicated to promoting technology adoption and advocacy within the lesbian, gay, bisexual, transgender, queer, and questioning (LGBTQ+) community. LGBT Tech encourages the continued early adoption and use of cutting-edge, new and emerging technologies by providing information, education, and strategic outreach. An important function of LGBT Tech is to advocate for policies that benefit the

LGBTQ+ community. To that end, LGBT Tech files amici curiae, singularly or jointly, in cases like this which raise issues of concern to the LGBTQ+ community.

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. It is dedicated to promoting technological progress that improves the human condition. TechFreedom opposes government efforts to control online speech. That is precisely why TechFreedom opposes laws that mandate online age verification. As TechFreedom's experts have explained in extensive expert commentary, online age-verification laws sacrifice privacy, free speech, and parental authority on the altar of good intentions. *See*, *e.g.*, Corbin K. Barthold, *Age-Verification Laws are a Verified Mistake*, Law & Liberty (Jan. 9, 2025), tinyurl.com/2avh8w48.

The Woodhull Freedom Foundation ("Woodhull") is a nonprofit organization that works to advance the recognition of sexual freedom, gender equality, and free expression. The organization works to improve the well-being, rights, and autonomy of every individual through advocacy, education, and action. Woodhull's mission is focused on affirming sexual freedom as a fundamental human right. Woodhull is particularly concerned with governmental attempts to censor or burden access to online speech, as sexual expression is often a target of such efforts. Woodhull believes that if this Court upholds the constitutionality of the challenged law, other jurisdictions will be incentivized to pass similar statutes threatening the ability of its

members to effectively advocate for sexual freedom and communicate about human sexuality online.

## INTRODUCTION

The Utah Minor Protection in Social Media Act ("the Act") violates the First Amendment by significantly limiting both the reach of minors' protected speech and their access to the speech of others. The Act's method of restricting minors' speech extends its First Amendment violations to all Utah internet users—adults and minors—by requiring invasive age verification checks that burden their rights to access lawful speech, compromise their anonymity, and jeopardize their privacy and security.

The Act burdens minors use of social media services—an essential expressive medium that enables users to create art, connect with loved ones, form political opinions, find community, and much more. Social media is a locus of expression for everyone precisely because it allows users to speak to others, friends and strangers alike. And users correspondingly seek out social media to engage with content from people they know and people they don't.

Several provisions of the Act violate the First Amendment rights of Utah minors to express themselves to broad audiences, to reach new communities, and to receive the protected expression of others. The Act prevents minors on social media from speaking to anyone more than one degree removed from "connected accounts"

unless a parent overrides this default setting. Utah Code §§ 13-71-101(3)(a)–(b), 204(1). This provision limits minors' speech from reaching beyond the users they know or who know their friends. *Id.* § 13-71-202(1)(b), (e). To share content with a wider audience—a core premise of social media—minor users would have to get their parents' permission or affirmatively friend or follow everyone on a service. Another provision of the Act prevents users who are more than one degree removed from a minor user from even seeing that minor's account if their parents have not approved. *Id.* §§ 13-71-202(1)(b), 204(1)). The Act essentially erases minor users' speech for everyone except the users' friends and their friends' friends.

The Act also burdens all internet users' First Amendment rights through its mandated age-verification scheme. *Id.* § 13-71-101(2). The Act requires social media websites to implement the age verification scheme for all users so that they know which ones are minors subject to the restrictions described above. The Act's age-verification requirement will block some adults and minors from accessing lawful speech in the first place, remove the possibility of speaking anonymously on these services, and increase users' risk of privacy invasions and data breaches.

## I.    THE ACT BLOCKS ADULTS AND MINORS FROM SPEAKING TO THEIR INTENDED AUDIENCES IN THE MOST IMPORTANT DIGITAL FORUMS.

### A.    Minors and adults use social media to disseminate their own speech and to read, watch, and listen to the speech of others on a wide array of topics.

The internet plays a dominant role in the exercise of First Amendment rights today, and social media services are "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). Internet users of all ages rely on social media "to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 105 (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997)).

The social nature of the medium furthers the "fundamental principle of the First Amendment" that "all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. The First Amendment protects the right to access others' speech, as the "right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality). Likewise, "Freedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that . . . it must be fully preserved." *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 146–47 (1943).

Social media has flourished into an important hub of diverse expression. An estimated 5.24 billion people use social media for everything from political expression, engaging with elected representatives, learning new dances, and finding community.[2] These billions of social media users routinely flock to online forums to express their political views or to get their news. For instance, 80 percent of Black young people, 69 percent of Latino young people, and 65 percent of white young people rely on social media to stay informed.[3] And 54 percent of American adults "at least sometimes" get their news from social media.[4]

Social media is also central to organizing, joining, and participating in social and political activities, from national campaigns like the Tea Party movement[5] to the #MeToo movement.[6] Nearly half of American social media users say they have been

---

[2] Number of internet and social media users worldwide as of February 2025, Statista (Feb. 2025), https://www.statista.com/statistics/617136/digital-population-worldwide/.

[3] *Common Sense & Hopelab, A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health*, 17 (2024), https://www.commonsensemedia.org/sites/default/files/research/report/2024-double-edged-sword-hopelab-report_final-release-for-web-v2.pdf.

[4] Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew Rsch. Ctr. (Sept. 17, 2024), https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/.

[5] Douglas A. Blackmon et al., *Birth of a Movement*, Wall St. J. (Oct. 29, 2010), http://on.wsj.com/2hZCWio.

[6] Ramona Alaggia & Susan Wang, "*I Never Told Anyone Until the #MeToo Movement": What Can We Learn From Sexual Abuse and Sexual Assault*

politically active on social media, whether by participating in a political group, encouraging others to take action, looking up information about rallies or protests, or using hashtags to show support for a cause.[7] And the interactive nature of many online services also enables direct interactions with elected officials. *Packingham*, 582 U.S. at 104–105.[8]

Minors' access to such information is essential to their growth into productive members of adult society because it helps them develop their own ideas, learn to express themselves, and engage productively with others in our democratic public sphere.[9] "[I]t is obvious that [minors] must be allowed the freedom to form their

---

*Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1, 4 (May 2020), https://pubmed.ncbi.nlm.nih.gov/32200194/.

[7] Samuel Bestvater et al., *Americans' Views of and Experiences With Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023), https://www.pewresearch.org/internet/2023/06/29/americans-views-of-and-experiences-with-activism-on-social-media/.

[8] *See*, *e.g.*, Gov. Spencer Cox (@GovCox), X, https://x.com/govcox (over 32,800 followers); Sen. Mike Lee (@SenMikeLee), X, https://x.com/senmikelee (over 797,400 followers); *see also* United Nations, *E-Government Survey 2022: The Future of Digital Government*, 106 (2022), https://publicadministration.un.org/egovkb/en-us/Reports/UN-E-Government-Survey-2022.

[9] *See* Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020), https://www.pbs.org/newshour/classroom/classroom-voices/student-voices/2020/11/student-voice-how-young-people-use-social-media-to-engage-civically; Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through the Lens of the COVID-19 Pandemic*, 662, Persp. Psych. Sci. (May 9, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9081105/ ("Social media provides

political views on the basis of uncensored speech *before* they turn eighteen, so that

their minds are not a blank when they first exercise the franchise." *Am. Amusement*

*Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001) (Posner, J). Social media

is a key venue for just that[10]

    Social media is also a forum for artistic creation. In one study, 71 percent of

teens reported that what they see on social media makes them feel "like they have a

place where they can show their creative side."[11] And thanks to abundant new online

resources,[12] children no longer need to enroll in expensive art classes or work with

private tutors to practice artistic skills; they can create and share for free on social

media. "In any given day, about one in 10 tweens and teens will use their digital

---

readily-accessible tools for teens to share developing thoughts and experiment with
new social identities, particularly without access to traditional methods.").

[10] *See*, e.g., Kim Ward, *How teachers can use social media to improve learning
this fall*, Mich. State Univ. (June 23, 2020),
https://msutoday.msu.edu/news/2020/how-teachers-can-use-social-media-to-
improve-learning-this-fall; Amanda Lenhart, *Chapter 4: Social Media and
Friendships*, Pew Res. Ctr. (Aug. 6, 2015),
https://www.pewresearch.org/internet/2015/08/06/chapter-4-social-media-and-
friendships/ ("68% [of teens] have received support on social media during
challenges or tough times.").

[11] Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings
From Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023),
https://www.pewresearch.org/short-reads/2023/04/24/teens-and-social-media-key-
findings-from-pew-research-center-surveys/.

[12] *See* Jason Wise, *How Many Videos Are Uploaded to YouTube a Day in 2025?*
Earthweb (last updated Sept. 30, 2024), https://earthweb.com/how-many-videos-
are-uploaded-to-youtube-a-day/.

devices to create some type of art or music."[13] In addition, minors and young adults report that the internet helps them learn about art and music history and affords them opportunities to distribute their creative works.[14]

Many people also take to social media to share religious beliefs, connect with others of the same faith, or explore their religious identity. Places of worship use social media to share information about upcoming events, livestream services, and foster community.[15] The Church of Jesus Christ of Latter-Day Saints, for example, has official accounts on several social media services, as do several of its leaders.[16]

---

[13] Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens*, 41, Common Sense (2021), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.

[14] Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minors*, EFF Deeplinks Block, (Mar. 15, 2024), https://www.eff.org/deeplinks/2024/03/thousands-young-people-told-us-why-kids-online-safety-act-will-be-harmful-minors#art.

[15] Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sept. 18, 2020), https://www.vox.com/recode/2020/9/18/21443661/religion-logging-off-online-engagement-content-creators; see also, e.g., *Strive to Be (Official Facebook page for youth of The Church of Jesus Christ of Latter-day Saints)*, Facebook, https://www.facebook.com/ldsyouth/; *Young Jewish Professionals Utah*, Facebook, https://www.facebook.com/yjputah/; *The Tabernacle Choir at Temple Square*, YouTube, https://www.youtube.com/channel/UCiAkukrUIRCwaLaFx_MJq7Q; *Utah Islamic Center Youth Committee*, Instagram, http://instagram.com/uicyouthcommittee/.

[16] *Official Social Media Accounts for Church Leaders and Groups*, The Church of Jesus Christ of Latter-Day Saints, https://www.churchofjesuschrist.org/learn/social-media-accounts?lang=eng.

Social media is also a vital source of religious and spiritual community and information for young people.[17] One young person even created an online church, "The Robloxian Christians," in 2011 as a place for kids on the Roblox gaming platform to pray for one another and talk about their faith.[18] Over the following decade, it expanded into a "youth-led virtual church ministry serving upwards of 40,000 young people from over 85 countries."[19]

Finally, social media enables individuals whose voices would otherwise not be heard to make vital and even lifesaving connections with one another, and to share their unique perspectives more widely.[20] For example, people with disabilities have used social media to build community, reduce isolation and stigma, and educate

---

[17] *See* Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times (Jul. 25, 2021), https://www.nytimes.com/2021/07/25/us/facebook-church.html.

[18] J Joely Johnson Mork, *Teen's Online Church Draws Young People From Around the World*, Faith & Leadership (Aug. 23, 2016), https://faithandleadership.com/teens-online-church-draws-young-people-around-the-world.

[19] *The Robloxian Christians*, Exponential, https://exponential.org/the-robloxian-christians.

[20] See, e.g., Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020), https://www.pewresearch.org/short-reads/2020/12/11/social-media-continue-to-be-important-political-outlets-for-black-americans; Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*, Travel & Leisure (Oct. 21, 2022), https://www.travelandleisure.com/culture-design/how-indigenous-creators-use-tiktok-to-share-their-cultures.

others.[21] Survivors of abuse, especially women and children who have survived domestic violence, rely on the accessibility and anonymity of online communities to seek advice and resources to help them cope.[22] Social media use has also been shown to reduce loneliness, social isolation, and depression in rural and elderly populations, both of whom face limited mobility and decreased ability to socialize in person.[23] And many young LGBTQ+ people who face discrimination and judgment offline turn to social media for community, exploration, and support.[24]

---

[21] Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022), https://www.teenvogue.com/story/chronic-illness-influencers-on-tiktok-are-showing-the-reality-of-being-sick; Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021), https://www.theverge.com/22583848/disabled-teen-cripple-punk-media-representation.

[22] Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy 44, 44–45 (2018), https://www.crimejusticejournal.com/article/view/893; *see also*, *e.g.*, J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr., (Mar. 1, 2022), https://www.nsvrc.org/blogs/online-communities-survivors-websites-and-resources-offering-support-and-help1.

[23] Keith N. Hampton et al., *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence From Access Inequalities and Restrictive Media Parenting in Rural America*, Soc. Sci. Comput. Rev. (Aug. 5, 2022), https://journals.sagepub.com/doi/full/10.1177/08944393221117466; Erica Chen et al., *Online Social Networking and Mental Health Among Older Adults: A Scoping Review*, Canadian J. on Aging, 26-27 (2022), https://psycnet.apa.org/record/2022-43114-005.

[24] See Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net Benefit*, N.Y. Times (May 24, 2023),

**B.**     **The vast majority of content on social media is constitutionally protected as to both adults and minors.**

Although Utah has a legitimate interest in protecting children from harm, "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merch. Ass'ns*, 564 U.S. 786, 794 (2011).

Minors enjoy the same First Amendment right as adults to access and engage in protected speech on social media. The speech occurring on social media is overwhelmingly, if not wholly, protected speech as to both minors and adults. As the foregoing examples demonstrate, socially valuable speech is abundant on social media. But online speech and access to it is protected even if its social value is not obvious. *Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *see Carey v. Population Servs. Int'l*, 431 U.S. 678, 701 (1977); *Reno*, 521 U.S. at 874–75. And First Amendment principles apply to new forms of communication regardless of their esthetic and moral value. *See Brown*, 564 U.S. at 790.

The Supreme Court has been explicit that, save for specific content and contexts not relevant to the Act, bedrock First Amendment principles apply to minors "[e]ven where the protection of children is the object." *Id.* at 804–05 (invalidating regulation of violent video games for minors); *Erznoznik v. City of*

---

https://www.nytimes.com/2023/05/24/upshot/social-media-lgbtq-benefits.html; Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'* BBC (Nov. 28, 2020), https://www.bbc.com/news/av/uk-55079954.

*Jacksonville*, 422 U.S. 205, 212–13 (1975) (invalidating restriction on drive-in movies designed to protect children from nudity); *Reno*, 521 U.S. at 874 (invalidating statute prohibiting indecent communications available to minors online). And they apply not only to what children can hear, but also to what they can say. *See Mahanoy Area Sch. Dist. v. B.L. by & through Levy*, 594 U.S. 180, 187 (2021). Although parents can restrict their children's access to lawful speech, and distributors can adopt policies that they will not provide certain speech to minors without parental consent, the First Amendment prevents the government from mandating such restrictive defaults. See *Brown*, 564 U.S. at 803–804.

The fact that speakers are young provides an insufficient basis for Utah to diminish their First Amendment rights in the way the Act attempts. Instead, minors' age augurs in favor of "scrupulous protection of [their] Constitutional freedoms . . . if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). Even when children are involved, "we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization." *Id.* at 641. This serves important democratic ends: "To shield children right up to the age of 18 from exposure to violent descriptions and images would not only be

quixotic, but deforming; it would leave them unequipped to cope with the world as we know it." *Kendrick*, 244 F.3d at 577.

## II. THE ACT BURDENS MINORS AND ADULTS' FIRST AMENDMENT RIGHTS.

The Act violates the First Amendment because it imposes a major obstacle to speech in two directions: minors cannot speak to unconnected users of any age and cannot see speech by other young people if they are not connected to those minor users. By impeding minors' ability to use the digital channels through which people speak and are spoken to on social media, Utah has impermissibly burdened their protected speech. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 768 (2024) ("Restricting access to social media can impair users' ability to speak to, learn from, and do business with others.").

The Supreme Court has long protected both the right to speak and to receive expression. *See Pico*, 457 U.S. at 867; *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 166 (2002) (acknowledging constitutional protection for the "desire to speak to her neighbors"); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 620-21 (1980); *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 163 (1939); *Martin*, 319 U.S. at 146–47. These fundamental First Amendment protections apply to both digital and physical spaces.

The Act also burdens adults' First Amendment rights. To create the default restrictions on minors' accounts described above, the Act requires platforms to implement age-verification schemes to determine who is a minor. Every user will therefore have to pass through an age gate, which poses additional burdens on their First Amendment rights.

### A.    The Act burdens minors' ability to speak on social media.

A primary reason that people use social media is that it enables any social media user to "become a town crier with a voice that resonates farther than it could from any soapbox." *Reno*, 521 U.S. at 870.  As Section I illustrates, the art creation, social and political organizing, religious exploration, and community outreach that occurs on social media necessarily depend on an interactive audience. Internet users rely on their ability to read, view, and/or hear the speech of others, including young people, and to ensure that their speech will be read, viewed, or heard by others, regardless of whether users are formally connected with one another on the platform.

But if the Act takes effect, minors' voices will only resonate as far as their friends and their friends' friends. As a result, Utah has effectively blocked minors from being able to speak to their communities and the larger world, frustrating the full exercise of their First Amendment rights.

### 1. The Act makes it impossible for minors to speak to users outside their friend group and for other users to hear from minors.

The Act burdens minors' ability to effectively speak by limiting the other users to whom they can disseminate speech and the ways in which they can grow an audience. The Act bars minors from communicating to the world without obtaining their parents' explicit permission. Utah Code §§ 13-71-202(1)(b), 204(1). This provision also prevents minors from messaging anyone more than two degrees removed from the minor. *Id.* § 13-71-202(1)(e). Therefore, to message another user or to share content with them, the minor would have already had to (1) request to connect with that user and have the user accept that request or (2) accept a request to connect from that user. At that point, the minor is limited to sharing content and/or messaging only with a connected user and that user's connections—a vastly smaller audience than currently available to them on social media.

The Act's other problematic provision has the inverse effect—it prevents minors from hearing from other minors with whom they are not connected and could also limit their ability to view adult users' content, depending on how the service disseminates user-generated content. The Act makes minor accounts invisible to users beyond second-degree connections unless parents allow minors to turn off this restriction. *Id.* §§ 13-71-202(1)(a); 204(1). Thus, after the Act takes effect, the ability for minors to accept requests to connect with other users will close when the

17

minors' account becomes invisible to anyone not within two degrees of connection of the minor.

In concert, these provisions prevent minor users from speaking to the majority of other social media users unless a minor affirmatively connects with every single one of them—a practical impossibility. For Utah minors, social media will become much less effective than the soapbox of old. At least from a soapbox in the town square, minors could speak to people beyond their friends' immediate circles. By contrast, the Act blunts minors' ability to speak, to organize politically, to raise funds for their school, to find pen pals from abroad to practice new language skills, or to create viral dance trends. The Act would frustrate aspiring creators like the Utah-based Ninja Fam, four siblings and martial arts enthusiasts who share "entertaining, wholesome videos that inspire people to shine bright, be healthy, and live strong" to their nearly 5.9 million followers, many of whom are other children around the world.[25] Under Utah's law, achieving an audience that large and diverse would be infeasible because the minors could not publish their videos to viewers more than two degrees removed. Conversely, interested new viewers wouldn't be able to see their profiles in the first instance.

---

[25] *See The Ninja Fam!*, YouTube,
https://www.youtube.com/channel/UCU3Q7YbKNK6yTsG-g7v-5Ug.

The Act could also limit minors' ability to hear from speakers outside of their immediate circle. Because the Act makes minors' accounts invisible to anyone who is not a friend or a friend of a friend, it is not clear whether minor users can access or otherwise interact with content posted by adults with whom they are not already connected. *Id.* § 13-71-202(1)(a). This may turn on the functions of particular services, which sometimes offer public streams of users' speech or require users to affirmatively connect with other users before being able to see their content. The latter would require that the minors know both what speech they wish to hear and which social media users are speaking.

As a result, the Act could prevent minors from receiving new and diverse content that social media platforms would otherwise serve based on their interests, whether from youth ministers sharing prayers or state politicians explaining policy.

It could also place an additional obstacle—friending other users—between minors and the speech they desire to see on social media. The First Amendment prevents Utah from requiring minors to jump through these technical hoops just to exercise their rights to speak and to hear the speech of others.

> **2.    The First Amendment prohibits Utah from standing between minors and their audiences.**

Laws that impose consent requirements before willing listeners can receive speech are unconstitutional. *Lamont v. Postmaster Gen. of U. S.*, 381 U.S. 301, 305 (1965). The federal law struck down in *Lamont* did not prohibit mailing "communist

political propaganda." *Id.* at 303 (internal quotation omitted). The Court nonetheless held that it impermissibly "sought to control the flow of ideas to the public" by requiring addressees to consent to the mail's delivery or else face its destruction. *Id.* at 306. Imposing such a consent regime—requiring addressees to request their mail in writing—"is at war with the uninhibited, robust, and wide-open debate and discussion that are contemplated by the First Amendment." *Id.* at 307 (internal quotation omitted).

The Act similarly intrudes on social media users' rights to receive information by putting the onus of finding and connecting with a desired listener entirely on the minor. While the burden in *Lamont* was directly imposed on those wishing to receive speech, the Supreme Court's concern was the government's interference with the normal exchange of speech between speakers and their audiences. The Act imposes a broader burden than the law at issue in *Lamont*. Before the Act, minors could speak to the entire universe of listeners on social media platforms. The Act now obstructs minors' ability to communicate as they did before—they must find and connect with every account that they hope to speak to or provide proof of their parents' consent for them to do so. Imposing this "affirmative obligation" burdens the delivery and reception of protected speech. *Id.*

**B.** **The Act also Burdens the First Amendment rights of adults and minors by requiring age verification that burdens expression, anonymity, and privacy.**

The Act also violates the First Amendment rights of all social media users—minors and adults alike—because it requires every user to prove their age, and compromise their anonymity and privacy, before using social media. The law does this by requiring the social media websites to impose "age assurance systems" on their services, *Id.* § 13-71-201, to verify which of their users are minors. The law thus compels social media services to create age-verification gates through which all users must pass.

Imposing age-verification mandates before accessing protected speech burdens the First Amendment rights of all internet users in several respects. *See Ashcroft v. ACLU*, 542 U.S. 656 (2004).

**1.** **Age-assurance requirements will either chill or entirely block access to lawful speech.**

The method of age-verification required by the Act is left to social media companies to decide, so long as it has an accuracy rate of at least 95% in determining whether a given user is minor.

Should social media companies implement verification via government-issued identification or similar means, it will "serve as a complete block to adults who wish to access adult material [online] but do not" have the necessary form of identification. *PSINet, Inc. v. Chapman*, 362 F.3d 227, 237 (4th Cir. 2004); *see also*

*Reno*, 521 U.S. at 856; *see also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99

(2d Cir. 2003) (invalidating age-assurance requirement that would make "adults who

do not have [the necessary form of identification] . . . unable to access those sites").

About 15 million adult U.S. citizens do not have a driver's license, while about 2.6

million do not have any form of government-issued photo ID.[26] Estimates show over

34.5 million adult citizens have neither a driver's license nor a state ID card with

their current name or address.[27]

Non-ID-based methods that have been suggested or implemented elsewhere

also burden the First Amendment rights of many internet users. Age assurance based

on public or private transactional data will exclude many adults. For example, a

service relying on mortgage documents would exclude the nearly 35 percent of

---

[26] Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Univ. Md. Ctr. for Democracy & Civic Engagement, 2 (Jan. 2024), https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%20Results%20Jan%202024%20%281%29.pdf.

[27] *Id*. at 2, 5; *see also* Michael J. Hanmer & Samuel B. Novey, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies*, Univ. Md. Ctr. for Democracy & Civic Engagement, 5 (Mar. 2023), https://www.voteriders.org/wp-content/uploads/2023/04/CDCE_VoteRiders_ANES2020Report_Spring2023.pdf ("Over 1.3 million voting-age citizens in [Georgia, Indiana, Kansas, Mississippi, Tennessee, and Wisconsin] likely did not have the identification needed to vote in 2020.").

Americans who do not own a home.[28] Should credit data be used, 26 million Americans—including over 80 percent of 18- and 19-year-olds—are "credit invisible," meaning they do not have a credit record for age-verifying vendors to check.[29]

Should social media services be permitted to use data brokers and commercial services to verify their users' ages, similar problems would arise. These entities purchase and collect massive amounts of private data.[30] But the data often contains inaccurate or outdated information, resulting in errors that could mistakenly block adults from accessing social media.[31]

---

[28] *See* U.S. Census Bureau, CB 25-58, Quarterly Residential Vacancies and Homeownership, First Quarter 2024, 5 (Apr. 28, 2025), https://www.census.gov/housing/hvs/files/currenthvspress.pdf.

[29] Consumer Fin. Prot. Bureau, *Data Point: Credit Invisibles*, 12 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.

[30] *See Position Paper: Online Age Verification and Children's Rights,* European Digital Rights, 16-17 (Oct. 4, 2023), https://edri.org/wp-content/uploads/2023/10/Online-age-verification-and-childrens-rights-EDRi-position-paper.pdf; Jackie Snow, *Why Age Verification Is So Difficult for Website*s, Wall St. J. (Feb. 27, 2022), https://www.wsj.com/articles/why-age-verification-is-difficult-for-websites-11645829728.

[31] Suzanne Smalley, *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself, Record* (June 12, 2024), https://therecord.media/junk-inferences-data-brokers.

**2.     Online age-assurance schemes impermissibly burden the right to be anonymous online.**

Regardless of the method used, the age assurance required by the Act would impermissibly deter users from accessing lawful content by undermining anonymity on social media. *See Am. Booksellers Found.*, 342 F.3d at 99 (age-verification schemes "require that website visitors forgo the anonymity otherwise available on the internet"). A reported 86 percent of internet users have taken steps online to minimize their digital footprints, and 55 percent have done so to "avoid observation by specific people, organizations, or the government."[32]

Anonymity is a respected, historic tradition that is "an aspect of the freedom of speech protected by the First Amendment"—no matter whether its use is "motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995). "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely[.]" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011).

---

[32] Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013), https://www.pewresearch.org/internet/2013/09/05/anonymity-privacy-and-security-online/.

Not surprisingly, without anonymity, "the stigma associated with the content of [certain] sites may deter adults from visiting them" at all. *PSINet, Inc.*, 362 F.3d at 236; *see also Reno*, 521 U.S. at 856. The absence of anonymity will chill users' ability to engage in dissent, discuss "sensitive, personal, controversial, or stigmatized content," or seek help from online support communities.[33] *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007); *see also State v. Weidner*, 235 Wis. 2d 306, 320 (2000) (age verification "constitutes an encroachment into the personal lives of those who use the internet precisely because it affords anonymity").

### 3.    Online age verification puts internet users' sensitive personal data at risk.

Even when users are comfortable with forgoing their anonymity, legitimate privacy and security concerns may dissuade them from accessing social media. "Requiring Internet users to provide . . . personally identifiable information to access a Web site would significantly deter many users from entering the site, because Internet users are concerned about security on the Internet and . . . afraid of fraud and identity theft[.]" *Gonzales*, 478 F. Supp. 2d at 806; *see also ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008); *PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878,

---

[33] *See, e.g.*, Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, Health Expectations (Feb. 2017), https://pubmed.ncbi.nlm.nih.gov/26725547/.

889 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access their [identifying information] . . . . may chill the willingness of some adults to participate in the 'marketplace of ideas' which adult Web site operators provide.").

The personal data that platforms may be required to collect to verify users' ages is extremely sensitive and often immutable.[34] Whereas usernames, passwords, and even credit card information can easily be changed in the event of identity theft or data breach, users' personal information contained in a government-issued ID (such as date of birth, name, and home address) are much more permanent.

Although Utah enacted the Act out of concern for children's wellbeing, the law's online age-verification regime will make children and adults less safe given the realities of the online advertising industry and data insecurity. All online data, including the sensitive personal data platforms would need to collect from all users to verify age under the Act, is transmitted through a host of intermediaries. This means that when a user shares identifying information with a website to verify their age, that data can be transmitted beyond the site, including to age-verification vendors and a series of additional parties.[35] Moreover, almost all websites and

---

[34] *See*, *e.g.*, Driver Privacy Protection Act, 18 U.S.C. §§ 2721 et seq.

[35] *See* Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, EFF Deeplinks Blog (Dec. 2, 2019), https://www.eff.org/wp/behind-the-one-way-mirror.

services host a network of dozens of private, third-party trackers managed by data brokers, advertisers, and other companies that are constantly collecting data about a user's browsing activity.[36] Personal information collected online sells astonishing profits.[37]

These privacy concerns are not adequately addressed by the Act's prohibition on the use of data collected in the age assurance process for anything other than website functions. *Id.* § 13-71-201(4). This provision bars the sale and sharing of that data only by the social media services subject to the law; it does not limit the third parties described above from collecting, selling, or otherwise disclosing the data should they acquire it. And once those entities collect users' personal information, they are likely to disclose it more broadly.

At minimum, the data will present a potential target for data thieves. Today, data breaches are an endemic and ever-increasing part of life. A record 3,205 data breaches occurred in 2023, up 78 percent from the year prior, and far exceeding the previous record of 1,860 breaches in 2021.[38] Over 350 million people—more than

---

[36] *Id.*

[37] *See Digital Advertising in the United States – Statistics & Facts*, Statista (May 20, 2025), https://www.statista.com/topics/1176/online-advertising/#topicOverview (the U.S. digital advertising market boasted "a revenue of over 317 billion dollars in 2024").

[38] Identity Theft Res. Ctr., *2023 Data Brach Report*, (Jan. 2024), https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.

the entire population of the United States—have been affected by these breaches, and 69 percent of general consumers have been victims of an identity crime more than once.[39]

Compounding this concern, children are attractive targets for identity theft due to their "uniquely valuable" unused Social Security numbers.[40] A 2021 study found that one in 50 U.S. children were victims of identity fraud, and one in 45 children had personal information exposed in a data breach.[41] The risk of data breach is likely to chill constitutionally protected expression.

## CONCLUSION

For the reasons stated above, this Court should affirm the lower court's decision.

---

[39] *Id.*; *see also Press Release*, Identity Theft Res. Ctr., ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts (Aug. 23, 2023), https://www.idtheftcenter.org/post/2023-consumer-impact-report-record-high-number-itrc-victims-suicidal-thoughts/.

[40] Richard Power, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers*, Carnegie Mellon CyLab, 3 (2011), https://www.akleg.gov/basis/get_documents.asp?session=29&docid=40175 ("A child's identity is a blank slate, and the probability of discovery is low, as the child will not be using it for a long period of time.").

[41] Tracy (Kitten) Goldberg, *Child Identity Fraud: A Web of Deception and Loss* 5, Javelin (Nov. 2, 2021), https://www.javelinstrategy.com/research/child-identity-fraud-web-deception-and-loss.

Dated: June 3, 2025                    Respectfully submitted,

                                       /s/ *Aaron Mackey*
                                            Aaron Mackey

                                       Electronic Frontier Foundation
                                       815 Eddy Street
                                       San Francisco, California 94109
                                       amackey@eff.org
                                       (415) 436-9333

                                       *Attorneys for Amici Curiae*


                                       Jason Groth (Bar No. 16683)
                                       ACLU OF UTAH
                                       311 South State Street, Suite 310
                                       Salt Lake City, UT 84111
                                       Tel: (801) 521-9862
                                       jgroth@acluutah.org

                                       *Counsel for Amicus Curiae*
                                       *American Civil Liberties Union of Utah*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1)I certify as follows:

1.     This Brief of Amici Curiae Electronic Frontier Foundation, American Civil Liberties Union, American Civil Liberties Union of Utah, Freedom to Read Foundation, LGBT Technology Institute, TechFreedom, and Woodhull Freedom Foundation, complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,416 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14-point font in Times New Roman font.

Dated:  June 3, 2025                         /s/ *Aaron Mackey*
                                            Aaron Mackey

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)    if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)    the digital submissions have been scanned for viruses with the most recent version of a commercial virus-scanning program, Virus Total, updated June 3, 2025, and according to the program are free of viruses.


Dated:  June 3, 2025                    /s/ *Aaron Mackey*
                                                    Aaron Mackey

## CERTIFICATE OF SERVICE

I certify that on June 3, 2025, I electronically filed the foregoing Brief of Amici Curiae Electronic Frontier Foundation, American Civil Liberties Union, American Civil Liberties Union of Utah, Freedom to Read Foundation, LGBT Technology Institute, TechFreedom, and Woodhull Freedom Foundation in Support of Plaintiff-Appellee Netchoice, LLC and Reversal using the Court's CM/ECF system which will send notification of such filing to all parties of record.

Dated:  June 3, 2025
                                          /s/ *Aaron Mackey*
                                          Aaron Mackey