No. 24-4100

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————————

NetChoice, LLC,

*Plaintiff-Appellee,*

v.

Derek Brown, Utah Attorney General, and Katherine Hass, Director,
Utah Division of Consumer Protection, Utah Department of Commerce,

*Defendants-Appellants.*

———————————————

On appeal from an order granting a preliminary injunction
United States District Court for the District of Utah
No. 2:23-cv-00911-RJS-CMR
Honorable Robert J. Shelby Presiding

BRIEF OF *AMICI CURIAE*
HANNAH ZOULEK, JESSICA CHRISTENSEN,
LU ANN COOPER, M.C., VAL SNOW, AND
UTAH YOUTH ENVIRONMENTAL SOLUTIONS
IN SUPPORT OF APPELLEE NETCHOICE, LLC

<div style="margin-left:40%">

Robert Corn-Revere
Arleigh P. Helfer
David Rubin
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Avenue, SE,
Suite 340
Washington, DC 20003
(215) 717-3473

</div>

Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici curiae* certifies that (1) *amici* do not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in any of the *amici*. *Amicus* Utah Youth Environmental Solutions is an organization exempt from income tax under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ................................................... iii

INTEREST OF *AMICI CURIAE* ................................................1

SUMMARY OF ARGUMENT ................................................4

ARGUMENT ......................................................................8

    I.    THE UTAH MINOR PROTECTION IN SOCIAL MEDIA ACT THREATENS TO SHARPLY CURTAIL BOTH MINORS' AND ADULTS' FIRST AMENDMENT RIGHTS. ................................................................8

    II.    THE STATE DOWNPLAYS THE ADVERSE EFFECTS OF LIMITING ACCESS TO SOCIAL MEDIA WHILE EXAGGERATING THE HARM TO MINORS .....................12

    III.    THE DISTRICT COURT CORRECTLY HELD THE UTAH MINOR PROTECTION IN SOCIAL MEDIA ACT LIKELY VIOLATES THE FIRST AMENDMENT. .....17

        A.    The District Court Correctly Held the Act is a Content-Based Speech Restriction That Fails Both Strict and Intermediate Scrutiny. ...............................17

        B.    The Act Imposes a Prior Restraint. .............................23

        C.    The Act is Unconstitutionally Overinclusive and Underinclusive. ..........................................................27

        D.    The Act is Unconstitutionally Vague...........................30

CONCLUSION ...................................................................34

# TABLE OF AUTHORITIES

## Cases

*Alexander v. United States,*
   509 U.S. 544 (1993) ................................................................24

*Am. C.L. Union v. Mukasey,*
   534 F.3d 181 (3d Cir. 2008) ....................................................9

*Ashcroft v. Free Speech Coal.,*
   535 U.S. 234 (2002) ................................................................27

*Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963) ..........................................................24, 26

*Brown v. Ent. Merchs. Ass'n,*
   564 U.S. 786 (2011) ....................................... 5, 7, 8, 9, 17, 30

*City of Ladue v. Gilleo,*
   512 U.S. 43 (1994) ..................................................................25

*Comput. & Commc'n Indus. Ass'n v. Paxton,*
   747 F. Supp. 3d 1011 (W.D. Tex. 2024) .................................. 19, 30, 33

*Counterman v. Colorado,*
   600 U.S. 66 (2023) ..................................................................34

*Doe v. City of Albuquerque,*
   667 F.3d 1111 (10th Cir. 2012) ..............................................8

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ................................................................34

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ....................................................................31

*Interstate Circuit, Inc. v. City of Dallas,*
   390 U.S. 676 (1968) ..........................................................24, 31

*NetChoice, LLC v. Bonta,*
   --- F. Supp. 3d ---, 2025 WL 807961 (N.D. Cal. Mar. 13, 2025) ...........26

*NetChoice, LLC v. Bonta,*
  No. 22-CV-08861, 2025 WL 807961 (N.D. Cal. Mar. 13, 2025) ........... 19

*NetChoice, LLC v. Fitch,*
  738 F. Supp. 3d 753 (S.D. Miss. 2024) ................................................. 20

*NetChoice, LLC v. Griffin,*
  No. 5:23-CV-5105, 2025 WL 978607 (W.D. Ark. Mar. 31,
  2025) ................................................................................. 19, 26, 30, 32

*NetChoice, LLC v. Reyes*,
  748 F. Supp. 3d 1105 (D. Utah 2024) ..................... 14, 15, 16, 18, 20, 21

*NetChoice, LLC v. Yost*,
  No. 2:24-cv-00047, --- F. Supp. 3d ---, 2025 WL 1137485
  (D. Ohio April 26, 2025) ................................................................ 19, 32

*Packingham v. North Carolina,*
  582 U.S. 98 (2017) ............................................................................ 8, 23

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ............................................................................... 18

*Reno v. ACLU,*
  521 U.S. 844 (1997) ......................................................................... 24, 30

*Richison v. Ernest Grp., Inc.,*
  634 F.3d 1123 (10th Cir. 2011) ............................................................ 23

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) ................................................................................. 8

*Speiser v. Randall,*
  357 U.S. 513 (1958) ............................................................................... 34

*Turner Broad. Sys., Inc. v. FCC,*
  512 U.S. 622 (1994) ......................................................................... 20, 23

*United States v. Stevens,*
  559 U.S. 460 (2010) ......................................................................... 8, 27

*Zoulek v. Hass*,
   No. 2:24-cv-00031 (D. Utah Jan. 12, 2024) ...........................................
   ..........................................................1, 2, 3, 4, 10, 11, 12, 15, 16, 22

**Statutes**

Utah Code § 13-71-101(2) .................................................................25, 32

Utah Code § 13-71-101(4) ......................................................................32

Utah Code § 13-71-101(5) ......................................................................33

Utah Code § 13-71-101(13) ....................................................................18

Utah Code § 13-71-101(14) ........................................................18, 29, 32

Utah Code § 13-71-101(18) ....................................................................33

Utah Code § 13-71-202(1) ............................................................25, 29, 33

Utah Code § 13-71-202(5) ..............................................................28, 29

Utah Code § 13-71-204(1) ......................................................................28

**Other Authorities**

Am. Psychological Ass'n,
   Health advisory on social media use in adolescence, May
   2023 .................................................................................................14

Emily A. Vogels & Risa Gelles-Watnick,
   *Teens and social media: Key findings from Pew Research
   Center surveys*, PEW RESEARCH CENTER (Apr. 24, 2023) ....................16

Eric Goldman,
   *The "Segregate and Suppress" Approach to Regulating
   Child Safety Online*, STANFORD TECH. L. REV. 32
   (forthcoming 2025) ..........................................................................26

Keith N. Hampton & Inyoung Shin,
   *Disconnection More Problematic for Adolescent Self-Esteem
   than Heavy Social Media Use: Evidence from Access
   Inequalities and Restrictive Media Parenting in Rural
   America*, 41 Soc. Sci. Comput. Rev. (2022) .........................................16

Office of the Surgeon General,
   Social Media and Youth Mental Health: The Surgeon
   General's Advisory 2023 ................................................................ 14, 15

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are Utah citizens who would suffer adverse effects from implementation of the Utah Minor Protection in Social Media Act. They are plaintiffs in a district court proceeding which is challenging the Act that is parallel to this one. The district court stayed that proceeding pending the outcome of this appeal. *See Zoulek v. Hass*, No. 2:24-cv-00031 (D. Utah Jan. 12, 2024).[2]

Hannah Paisley Zoulek is a college student from Utah who, as a high school student, testified before the Utah House Judiciary Committee to oppose predecessor legislation to the Utah Minor Protection in Social Media Act. Hannah cited concerns about the law's

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person, other than *amici*, their members, or their counsel contributed money intended to fund this brief's preparation or submission. All parties have consented to the filing of this brief.

[2] The district court assigned this case and *Zoulek v. Hass*, both of which raised facial First Amendment challenges to the Act and sought preliminary injunctive relief, to Judge Robert J. Shelby, who heard argument on both NetChoice's and *amici*'s preliminary injunction motions. *Zoulek*, ECF 47. The district court granted NetChoice's requested injunction but denied *amici*'s request, holding they lacked standing. *Id.*, ECF 74. *Amici* subsequently filed an amended complaint to perfect their standing, and the district court stayed that case pending this appeal.

infringement on teens' speech and their ability to discuss issues such as mental health. Hannah also uses social networks for educational purposes: learning and communicating with other students in a high school robotics club, connecting with friends and other communities they would not otherwise access, and expressing themselves through creative writing. *Zoulek v. Hass*, No. 2:24-cv-00031 (D. Utah) ("*Zoulek*"), ECF 40.

Jessica Christensen, LCSW, is a prominent advocate for former members of fundamentalist polygamous communities. Many teens and adults with ties to these communities contact her through social networks for support or other help. She has helped several minors escape abusive homes after they contacted her using social networks. *Zoulek*, ECF 38.

Lu Ann Cooper is the co-founder (with *amicus* Jessica Christensen) and president of the organization Hope After Polygamy, which helps individuals (including teens) who are in or have left polygamist communities by connecting them to resources, including educational scholarships. Hope After Polygamy maintains several social networking accounts that educate teens and adults about the resources it offers and notifies them of events such as free health screenings and financial

literacy classes. Teens and adults have contacted Hope After Polygamy and Cooper to seek help and support. Cooper and her husband are parents to eight children, including several teenagers who use social networks under their guidance. *Zoulek*, ECF 39.

M.C., the daughter of *amicus* Lu Ann Cooper, is a high school student who uses social networks to connect with her friends, explore her creative endeavors, and obtain news about current events, history, science, and popular culture. She also uses apps such as Instagram to build community with her dance and debate teams and to fundraise to support these groups. *Zoulek*, ECF 41.

Val Snow produces a YouTube channel that covers topics such as mental health, resilience, and LGBTQ perspectives. Both teens and adults watch Snow's YouTube channel and have contacted him to build community or seek support. Snow, who grew up without access to the Internet or social networks and experienced an assault at a young age, is passionate about protecting at-risk youths' access to information. *Zoulek*, ECF 42.

Utah Youth Environmental Solutions (UYES) is a youth-led nonpartisan nonprofit organization that seeks to educate young people in

Utah regarding climate change and environmental advocacy. Its mission is to normalize participation in the political process, as well as to pragmatically address local environmental issues. UYES operates a program for teens aged 14 to 17 every summer to educate teenagers about environmental justice and protecting Utah's natural resources while working alongside community partners such as indigenous leaders. It also educates teenagers about practical leadership skills and how to further protect the environment through legislative advocacy and other actions. UYES advertises these opportunities, as well as other resources and information, through social networks. The group also communicates with teenagers who are interested in the organization through these channels. *Zoulek*, ECF 40.

*Amici*'s participation illustrates that the State's claims exaggerate the hazards of social media for minors and ignore its benefits—all this while the State seriously downplays the adverse constitutional impact of the law.

## SUMMARY OF ARGUMENT

The Utah Minor Protection in Social Media Act, SB 194, is the State's latest effort to shield minors from the perceived ills of speech on

social media. It would force all Utahns to choose between giving up their anonymity and private information or accepting limits on speech the State deems appropriate for children—including limits parents themselves cannot override. Under this law, *amici* would be unable to express themselves in indisputably beneficial ways, such as to reach at-risk youth, advocate for political causes, and educate themselves; and those who are parents would be unable to make decisions suited to their own sensibilities about their children.

The State downplays these *concrete* adverse effects of barring teens from sharing this information while exaggerating the *imagined* harms social media might potentially inflict on others. "No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (citations omitted). As a threshold matter, the State has failed to support that the asserted harms of social media are real, or that the restrictions on speech would address them in a direct or material way.

In contrast, the adverse impact of the Act on speech is very real. The Act requires age verification for all social media users in Utah,

subjecting *all* of them—not just minors—to intrusive and imperfect age-verification mandates before they can use services that allow them to share expression and receive information, compromising their privacy and chilling speech. Burdening the speech of all based on what legislators fear some minors might see illegally infringes upon the speech rights of adults, requiring a sacrifice of anonymity, among other harms that violate the First Amendment. It also impermissibly lumps all minors together in a monolithic category, treating preschool-aged children the same as adolescents nearing the age of majority for no justifiable reason.

The Act limits how and with whom minors may communicate and receive content. Any user determined to be under the age of 18—or who declines to submit to age verification—is denied access to recommended content through platforms' autoplay and push notification features. These restrictions apply *even if* a parent lawfully consents to their child receiving push notifications and viewing autoplay content, usurping parental authority over decisions affecting their children. Under other provisions, the law restricts minors from communicating with all but a subset of persons already "connected" to them (or "connected" with their connections), cutting them off from information and communities not pre-

approved by their parents. While the Act purports to aid parental authority, it displaces parental prerogatives and unilaterally imposes "what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 804.

The district court properly held the Act is a content-based restriction on speech that cannot meet the rigorous demands of strict scrutiny. Additionally, the law imposes a prior restraint on access to social media platforms, rendering it subject to even more demanding review than strict scrutiny, and it regulates far more speech than the categories of content the Supreme Court has held unprotected, rendering it invalid under the overbreadth doctrine.

The State spends the bulk of its brief contending the district court should not have applied strict scrutiny, but that is wrong, as courts confronting nearly identical laws across the country have concluded. In any event, even if the State were correct, the Act cannot survive even intermediate scrutiny on the record the State assembled, which does not demonstrate the existence or magnitude of harms the Act purports to address. Moreover, the State fails to explain how the Act's speech restrictions relate to those alleged harms. Finally, the Act's speech

restrictions are not narrowly tailored and suppress far more speech than necessary to meet the State's claimed interest in protecting the young.

## ARGUMENT

### I. THE UTAH MINOR PROTECTION IN SOCIAL MEDIA ACT THREATENS TO SHARPLY CURTAIL BOTH MINORS' AND ADULTS' FIRST AMENDMENT RIGHTS.

Utah's Act implicates settled law that restricting access to social media must necessarily satisfy the First Amendment. *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017). The law both restricts access to speech and restrains the way information may be disseminated online for both minors and adults. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011); *see also Doe v. City of Albuquerque*, 667 F.3d 1111, 1118–19 (10th Cir. 2012) (First Amendment protects right to receive information as well as to speak) (collecting cases). And it does so in ways that violate well-settled constitutional limits.

Without even pretending to regulate speech only in the narrowly defined categories of unprotected speech, *see United States v. Stevens*, 559 U.S. 460, 468–69 (2010), the Act restricts access by all minors to a powerful medium of communication merely because (the State believes) access to some information by some minors may be detrimental. That is unconstitutional. *See Brown*, 564 U.S. at 812 (Alito, J., concurring)

(failure to draw "distinction between young children and adolescents who are nearing the age of majority" impermissibly "lump[s] all minors together"); *Am. C.L. Union v. Mukasey*, 534 F.3d 181, 206 (3d Cir. 2008) (same). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young," even if the government deems certain speakers and content "unsuitable for them." *Brown*, 564 U.S. at 795 (citation omitted).

The Act also restricts adults' speech, who must choose between engaging in protected speech or surrendering their anonymity and sensitive personal information—a choice that will deter many thousands of Utahns, including *amici*, from engaging in protected expression. Even adults and adult-run organizations willing to use social media despite the State's age-gate will have their protected speech restricted from reaching minors.

Some such speech may be legitimately regulable as to minors. But a substantial amount of it—such as Christensen's outreach to minors seeking asylum from unsafe communities, UYES's outreach to students interested in climate advocacy, Zoulek's planned outreach to students to support her campaigns, or outreach by a college recruit or coach to a high-

9

school athlete about a scholarship opportunity—is constitutionally protected and perfectly lawful. Yet it is still categorically barred by the Act.

The Act affects people who use social media networks for educational purposes, such as promoting learning and sharing knowledge, by restricting their access. *Amici* M.C. and Zoulek both used social networks to further their education. For example, M.C. used social networks such as Instagram to prepare and refine arguments for her high school debate class, and, like many minors, Zoulek used YouTube in high school to understand challenging math concepts and Discord to coordinate plans and assignments with their high school robotics team. First Am. Compl. ¶ 22, *Zoulek*, ECF 36 (the FAC).

In this regard, the Act will make it more difficult for youth to find opportunities like those provided by *amicus* UYES, which educates young people about climate change and environmental advocacy, topics of concern to today's children. UYES promotes its annual summer program for teens via social networks and communicates with teens interested in environmental reform and activism through social networks. FAC ¶¶ 12, 19, 23.

The Act would also stifle efforts to assist minors to escape abusive homes, such as those who have found and sought help from Jessica Christensen, a prominent advocate for those seeking to escape polygamous communities. Christensen's cousin and her half-sister both contacted her via direct-messaging features on Facebook to seek support when fleeing arranged underage marriages and abusive family members. FAC ¶ 32. Christensen also has used social networks to communicate with other teenagers who have reached out to her over social networks for support and guidance. *Id.* ¶ 33.

Like Christensen, *amicus* Lu Ann Cooper has counseled teens and adults seeking assistance, sometimes after they found Hope After Polygamy's social networking presence. *Id.* The Act's proof of age requirement would make it more difficult for people of all ages—by requiring submission of government IDs, birth certificates, or other documents their families have denied them—to communicate with Christensen and Cooper, or any number of others who are support resources for abused people in tight-knit communities or families. *Id.* ¶ 34.

11

The Act would also impede benefits to teens in the LGBTQ community. Val Snow grew up in a community that taught him being gay is "evil" and that denied him information about sexual orientation and safe sexual experiences. He did not have access to the Internet until he was eighteen. As a consequence, he did not know how to report a sexual assault he experienced at a young age. *Id.* ¶ 36. He developed a YouTube presence to provide teens and adults information and perspective his community denied him growing up. *Id.*

Further, the Act usurps the parental prerogative to decide what's best for one's own children when it comes to social network use. Cooper made decisions about what she allowed M.C. to do as a teen on Instagram, teaching her daughter to use it responsibly. *Id.* ¶ 40. And Christensen installed a curfew app on her children's phones that limits their time online. *Id.* The Act overrides these parents' choices and imposes a one-size-fits-all approach preferred by the Utah legislature.

## II.    THE STATE DOWNPLAYS THE ADVERSE EFFECTS OF LIMITING ACCESS TO SOCIAL MEDIA WHILE EXAGGERATING THE HARM TO MINORS.

The district court correctly held that Utah had failed to provide sufficient evidence to support the broad regulation of speech the Act

would impose. Specifically, the court found the State did not provide evidence establishing a clear, causal relationship between minors' social media use and negative mental health impacts. Nor was there any indication the Utah Legislature actually considered evidence as it deliberated whether to pass the Act, which prompted the district court to conclude that the Act would fail even intermediate scrutiny.

The district court observed that the principal reports on which the State relied fell short of its necessary proof. For example, a 2023 advisory by the United States Surgeon General identified some potential negative effects, but also found social media "provid[es] positive community and connection with others who share identities, abilities, and interests" and "can provide access to important information and create a space for self-expression."[3] It is impossible to generalize the effects, the advisory explained, due to major gaps in research, and because "different children and adolescents are affected by social media in different ways, based on

---

[3] Office of the Surgeon General, Social Media and Youth Mental Health: The Surgeon General's Advisory 2023, 6 (https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf) ("*Surgeon General's Advisory*").

their individual strengths and vulnerabilities, and based on cultural, historical, and socio-economic factors." *Surgeon General's Advisory* at 5.

In another report the State cited, the American Psychological Association observed that "[u]sing social media is not inherently beneficial or harmful to young people," finding that "youths' psychological development may benefit from this type of online social interaction, particularly during periods of social isolation, when experiencing stress, when seeking connection to peers with similar developmental and/or health conditions, and perhaps especially for youth who experience adversity or isolation in offline environments."[4]

The district court deconstructed the State's expert report submitted by Dr. Jean Twenge and found it does not support the law. The court noted a majority of the reports Twenge cited failed to show a causal relationship between social media use and negative mental health impacts. *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1125 (D. Utah 2024). Moreover, Dr. Twenge's report suggested any potential mental

---

[4] Am. Psychological Ass'n, Health advisory on social media use in adolescence, May 2023, 3–4 (https://www.apa.org/topics/social-media-internet/health-advisory-adolescent-social-media-use.pdf).

health impact was "limited to certain populations, such as teen girls, or certain mental health conditions, such as body image." *Id.* at 1125–26.

*Amici*, as plaintiffs in the parallel proceeding below, submitted a declaration from Clinical Psychologist and Professor Christopher Ferguson, Ph.D., in support of their application for a preliminary injunction. Decl. of Christopher Ferguson in Supp. of Pls.' Mot. for Prelim. Inj., *Zoulek* ECF 64. The Ferguson Declaration was thus before the court as it analyzed the State's arguments. Dr. Ferguson addressed Twenge's conclusions and found no clear evidence of an international trend in mental health impacting youth (whether due to access to social media or any other cause), no good evidence that restricting social media time is a panacea for mental health, and that time spent on social media does not appear to be a useful predictor of which youth are likely to develop mental health problems in the future. *Id.* at 28–29.

Ultimately, the district court found social media can help young people, and its benefits are especially prominent among minors "who are often marginalized, including racial, ethnic, and sexual and gender minorities." *Reyes*, 748 F. Supp. 3d at 1125 n.129. It noted, for example, that the Advisory cites evidence that "[s]even out of ten adolescent girls

of color report encountering positive or identity-affirming content related to race across social media platforms." *Id*. These are precisely the benefits to open communication that *amici* highlighted to the district court. *See, e.g.*, discussion, *supra*, at 10–12; FAC ¶¶ 25–40.

   *Amici*'s experiences are consistent with other research as well. One recent study found teenagers who use social media reported they feel more connected to their friends (80%); had somewhere to express their creativity (71%); had a support network in challenging times (67%); and were more accepted (58%).[5] Overall, American teenagers are more likely to report that social media has positive rather than negative effects on their lives. *Id*. In fact, some research suggests the isolation that results from disconnecting teens from social media may be more harmful to their self-esteem and wellbeing than is heavy use of the medium.[6]

---

   [5] Emily A. Vogels & Risa Gelles-Watnick, *Teens and social media: Key findings from Pew Research Center surveys*, PEW RESEARCH CENTER (Apr. 24, 2023), https://www.pewresearch.org/short-reads/2023/04/24/teens-and-social-media-key-findings-from-pew-research-center-surveys/.

   [6] Keith N. Hampton & Inyoung Shin, *Disconnection More Problematic for Adolescent Self-Esteem than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, 41 Soc. Sci. Comput. Rev., 626–47 (2022).

The notion that *some* types of social media used by *some* minors under certain conditions can adversely affect *some* segment of this population in *some* particular way is no basis for imposing state restrictions on all social media use by all minors—just as the State does not (and cannot) keep all books under lock and key because some are inappropriate for some children. Such overreach typifies how lawmakers historically have sought to regulate new media forms in the name of protecting the young. Whether dime novels or "penny dreadfuls" in the nineteenth century, moving pictures in the early twentieth century, comic books in the 1950s, or video games at the dawn of the twenty-first century, the response to these successive moral panics has been largely the same: legislatures pass vague and broadly worded speech restrictions that infringe basic First Amendment rights. *Brown*, 564 U.S. at 797–98 & n.5. History has repeated itself here.

## III.   THE DISTRICT COURT CORRECTLY HELD THE UTAH MINOR PROTECTION IN SOCIAL MEDIA ACT LIKELY VIOLATES THE FIRST AMENDMENT.

### A.   The District Court Correctly Held the Act is a Content-Based Speech Restriction That Fails Both Strict and Intermediate Scrutiny.

The district court correctly held the Act is a content-based regulation on its face that must satisfy the exacting requirements of strict

scrutiny. Among other things, the court held the Act's central coverage definition (which determines which online services are restricted) "draws distinctions between websites that allow users to interact socially and websites that serve another function or purpose, such as those that allow users to shop, read the news, access entertainment, educate themselves, or conduct business." *Reyes*, 748 F. Supp. 3d at 1121. And as the Supreme Court held in *Reed v. Town of Gilbert,* a regulation that divides speech into categories based on its communicative content and treats each category differently is facially content-based and subject to strict scrutiny. 576 U.S. 155, 163–64 (2015).

On appeal, the State devotes most of its brief rehashing its claim that the Act is not content-based—and therefore must satisfy only intermediate scrutiny—because, in the State's view, the central coverage definition concerns a social media service's structure, not subject matter. Apps.' Br. at 22–66. This is incorrect for the simple reason that the Act's central coverage definition specifically singles out speech and the exchange of information on social media platforms for different treatment because it "allow[s] users to interact socially with each other." Utah Code §§ 13-71-101(13)–(14). The Act thus divides the online world into a

category of social speech (which it restricts) and speech concerning other topics, such as sports, news, and commerce.

That is classic content-based regulation. As one district court analyzing a law similarly dividing the world into platforms offering social interaction versus websites that offer sports and news concluded, "favoring engagement with certain topics, to the exclusion of others … is plainly a content-based exception deserving of strict scrutiny." *NetChoice, LLC v. Yost*, No. 2:24-cv-00047, --- F. Supp. 3d ---, 2025 WL 1137485, at *20, 23–25 (D. Ohio April 26, 2025) (permanently enjoining law requiring platforms to obtain parental consent before permitting a minor to create an account).

A growing number of courts have reached the same conclusion. *See, e.g.*, *NetChoice, LLC v. Griffin*, No. 5:23-CV-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) (permanently enjoining age verification and parental-consent law); *NetChoice, LLC v. Bonta*, No. 22-CV-08861, 2025 WL 807961 (N.D. Cal. Mar. 13, 2025) (preliminarily enjoining regulation with age-estimation requirements); *Comput. & Commc'n Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) (preliminarily enjoining law requiring platforms to identify minors and monitor and filter out

certain content from minor users' accounts); *NetChoice, LLC v. Fitch*, 738 F. Supp. 3d 753, 770–71 (S.D. Miss. 2024) (distinguishing between "social interaction" and providing "news, sports, commerce [or] online video games" rendered social media age verification law content-based), *vacated on other grounds*, 134 F.4th 799 (5th Cir. 2025).

The Act cannot withstand constitutional review. For the reasons explained by the district court, it cannot survive strict scrutiny because the State did not establish that it is necessary to advance a compelling state interest nor that it is narrowly tailored to do so. *Reyes*, 748 F. Supp. 3d at 1123–30. Even were the Act somehow subject to only intermediate scrutiny, it still fails, because it does not serve a substantial government interest "unrelated to the suppression of free expression" by alleviating in "a direct and material way" harms that are "not merely conjectural," and it is not narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662, 664 (1994) (cleaned up). Under either standard, Utah has done nothing on the record in this case to demonstrate either the existence or magnitude of the harm purportedly caused by the

services it has chosen to regulate, nor to show how its chosen solution will help.

Regarding Utah's claimed interest in protecting children from adverse outcomes, the district court held the State's showing fell short of that necessity to survive even intermediate scrutiny. *Reyes*, 748 F. Supp. 3d at 1125 n.126. The State's reliance on the Surgeon General's Advisory failed to recognize its "nuanced" review of the research on the issue, the court explained, noting the Advisory found social media benefits minors by "providing positive community and connection with others who share identities, abilities, and interest." *Id*. at 1125. The State also lacked evidence below to prove its claimed interest rested on anything but conjecture, and it accordingly lacks that evidence here, too. Moreover, it made no serious effort to explain or substantiate how the Act's speech restrictions relate to the purported harms, or how the restrictions will have any measurable impact in reducing them.

The Ferguson Declaration further undermines any claim of a link between social media usage and mental health. Experimental studies of social media often exhibit poor methodologies, lack transparent research practices, and result in more complicated findings than their authors

suggest. Ferguson Decl. at 16–19, *Zoulek*, ECF No. 64. Correlational studies also support myriad conclusions—including positive mental health outcomes like decreased loneliness. *Id.* at 20–22. On the other hand, data recording suicide among youths reveal the strongest predictors of negative youth mental health outcomes are parental abuse and deficient family environment. *Id.* at 10. Other drivers of youth mental health suicide include fatherlessness, income inequality, and a decline in childhood independent activities. *Id.* at 12–13. Dr. Ferguson's analysis disproves any notion the Act's blanket approach will materially benefit youth mental health. Instead, a methodologically sound approach to solving systemic family issues and adult mental health is necessary.

Given the lack of record evidence to show the Act is needed to relieve non-speculative harms in a "direct and material way," it fails intermediate scrutiny at the first hurdle (and thus strict scrutiny, as well). Nothing in the State's brief changes this analysis or alters the contents of the record.

Even if the Act did directly and materially advance a substantial government interest, it is not narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner*

*Broad. Sys., Inc.*, 512 U.S. at 662. The Act's broad speech restrictions are the opposite of narrow tailoring—restricting and burdening enormous swathes of speech on social media on the theory that some speech for some people is potentially harmful. As discussed above at 5, 6, and 9, the age verification component burdens adults' privacy and First Amendment-protected anonymity. Burdening the First Amendment rights of adults cannot be "essential" to the State's asserted interest in protecting children's mental health.

## B. The Act Imposes a Prior Restraint.

This Court should also affirm because Utah's Act violates the First Amendment for reasons beyond those the district court cited in preliminarily enjoining it. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) ("[W]e may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal."). For one, the Act is a prior restraint.

Specifically, the Act imposes a series of statutory preconditions on access to social networks, limiting the ability of all Utahns to access important sources of information and social interaction. *Packingham*,

582 U.S. at 107. It thus "forbid[s] certain communications" before they occur, *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis omitted) (cleaned up), by restricting how services are designed and by imposing preconditions on accessing them.

Prior restraints include any government action that in substance prevents or deters publication of speech without a prior judicial determination "that such publications may lawfully be banned." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70–71 (1963); *see Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 678–79, 682–84 (1968) (requirement that exhibitors report whether a film was "suitable for young persons" created prior restraint).

It does not matter that the Act describes its requirement as "age assurance" not "age verification." All online age verification is effectively age assurance because there is no reliable way to ensure that whoever is providing the identity information is the person to whom it pertains, or is the ultimate user of the account. *See Reno v. ACLU*, 521 U.S. 844, 881–82 (1997) (noting that credit cards or adult identification passwords do not "actually preclude minors from posing as adults"). The bottom line is the same: In response to the Act's requirement of an "accuracy rate of at

24

least 95%," Utah Code § 13-71-101(2), many, if not most, covered websites will request users' proof of age.

The Act thus *de facto* obligates companies to age-verify all users, to presumptively bar persons under eighteen from using certain features, to restrict when and with whom minors may communicate, and to categorically prohibit minors from receiving information to which they are constitutionally entitled. It also presumptively bars minors from sharing content or direct messaging with anyone not already "connected" to them, *see* Utah Code §§ 13-71-202(1)(b), (e), effectively limiting them to communicating only with those in their immediate circle. *See id.* § 13-71-202(1) (restricting whether and how a minor account holder may search for and add connections).

Mandating age verification to access or engage in protected speech shuts the door to "an entire medium of expression," *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994), unless a speaker or listener—even an adult—is willing to forgo anonymity and supply sensitive identifying information such as a government-issued ID, credit card, or even biometric data. And many Utahns, including *amici*, would likely refrain from using social media at all rather than provide identification. *See* Eric

Goldman, *The "Segregate and Suppress" Approach to Regulating Child Safety Online*, STANFORD TECH. L. REV. 32 (forthcoming 2025) (manuscript at 32), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5208739 ("Rather than make unwanted disclosures, many readers confronted by a publisher's age authentication request will leave the publisher's service rather than complete the authentication process."). Others may lack identification.

Any law that imposes a prior restraint on expression, even if designed to promote "juvenile morality," carries "a heavy presumption against its constitutional validity," and the Act's "capacity for suppression" of protected speech "is far in excess of the typical licensing scheme held constitutionally invalid by this [c]ourt." *Bantam Books*, 372 U.S. at 70–71; *see also Griffin*, 2025 WL 978607, at *8, 13, 17 (permanently enjoining "maximally burdensome" social media age verification law); *NetChoice, LLC v. Bonta*, --- F. Supp. 3d ---, 2025 WL 807961, *21–22 (N.D. Cal. Mar. 13, 2025) (holding that age estimation requirement likely violates the First Amendment). In this case, the State has made no effort to justify the heavy burdens of a prior restraint.

## C.    The Act is Unconstitutionally Overinclusive and Underinclusive.

The Act's restrictions are also both over- and under-inclusive. As to the former, the Constitution "gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). A law is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (cleaned up). Yet without even pretending to regulate narrowly defined categories of unprotected speech, the Act limits access by all minors and non-age-verified Utahns to protected speech merely because the State believes access to some information by some minors may be detrimental.

This restricts speech in numerous ways. Begin with the fact that restricting adults' access to a communications medium as a means of protecting minors is inherently overbroad. Further, for example, a minor would not be able to comment on non-"connected" public officials' posts. And the Act imposes across-the-board restrictions on access to social networks for both adults and minors. Minors and non-age-verified persons alike will be barred from sharing any content—comments, posts,

27

videos, audio, "likes" or other reactions—beyond a narrow category of "connected" accounts without first obtaining "verifiable parental consent." Utah Code § 13-71-204(1). This means *amici* would be unable to direct-message Utah minors they are not connected to. And Cooper and Christensen—both mothers of Utah minors—are aware of and use parental controls. Yet the Act usurps their choices by dictating which features will be disabled for their children regardless of their preferences.

Many of the Act's specific restrictions are also individually overbroad. For example, the prohibitions against autoplay, scrolling features that display additional content, and push notifications, *see* Utah Code § 13-71-202(5), deprive individuals of their ability to choose how to engage in and display expression. Websites may use autoplay when expression lends itself to being viewed sequentially, such as episodes of a travel log or dance choreography. Seamless pagination is an effective way of displaying and viewing the enormous amounts of content on many social media websites. By prohibiting autoplay, infinite scroll, and push notifications, the Act effectively requires popular social platforms to either ban minor users or create an entirely new version of the

application for such users, stripped down to functionally prevent learning from or connecting with accounts outside their restricted communities.

Notifications inform users about things they may wish to know or opt into, such as announcements or suspicious login attempts. In these ways, the Act restricts without exception—including parental consent—the content teenagers may share, access, and receive through social networks, and with whom they may communicate. And blanket restrictions against communication, messaging, access, and discoverability beyond connected accounts, *id*. §§ 13-71-202(1)(b),(d),(e), likewise presumptively ban swaths of speech without regard to whether it is protected or subject to legitimate regulation. This regulates substantially more speech than the State may legitimately regulate.

The Act is underinclusive as well. It leaves unregulated myriad websites offering such features as autoplay, infinite scroll, and notifications, Utah Code Section 13-71-101(14)(a), (b); Section 13-71-202(5), and imposes no restrictions at all on minor's access to websites that do not meet the definition of a "social media company." Its coverage definition excludes news and entertainment websites commonly used by

teenagers, such as Buzzfeed or Netflix. *See* Buzzfeed, Videos, https://perma.cc/6JHM-H2M4.

These exclusions render the Act "wildly underinclusive when judged against its asserted justification, which … is alone enough to defeat it." *Brown*, 564 U.S. at 802; *see also Griffin*, 2025 WL 978607, at *11 (age verification law underinclusive relative to asserted government interest in protecting minors from predators because it regulated low-risk platforms but not platforms with high numbers of suspected child exploitation reports); *Paxton*, 747 F. Supp. 3d at 1037–38 (law that cut off minors from certain ideas on social media but nowhere else was fatally underinclusive). "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802. And this constitutional rule binds the State even when it is acting for the salutary purpose of protecting children. *Id.* at 794–96.

### D.    The Act is Unconstitutionally Vague.

The Act's vagueness "raise[s] special First Amendment concerns because of its obvious chilling effect on free speech," *Brown*, 564 U.S. at 807 (Alito, J., concurring in the judgment) (quoting *Reno*, 521 U.S. at

871–72), and thus requires a "more stringent" test that the Act cannot satisfy. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (citation omitted). Here, the Act fails to provide ordinary persons with fair notice of the proscribed conduct and is so dependent on inherently subjective, undefined standards that it all but mandates arbitrary or discriminatory enforcement against disfavored content, viewpoints, and speakers.

"It is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Circuit, Inc.*, 390 U.S. at 689 (cleaned up) (striking down city ordinance making it a misdemeanor to show films "unsuitable" for minors as impermissibly vague). But the Act fails to do so because it does not define key terms and phrases underpinning its core requirements, giving regulators unbridled discretion to impose massive penalties on a wide range of intermediaries that fail to censor users' speech.

The Act's scope and application, for example, turn on the definition of "social media service," which requires one to guess how essentially any kind of online service carrying any kind of "content" or "information" (i.e., every such service) is "primarily" used, as well as what it means to be "primarily" used in a particular way. Utah Code §§ 13-71-101(4), (14). And the Act regulates only where the primary use is to allow account holders "to interact socially with each other," *id*. § 13-71-101(14)(a)(iii), a term also left undefined. Courts examining similar laws have held them unconstitutionally vague for precisely this reason. *See Griffin*, 2025 WL 978607, at *15–16 (law's applicability to platforms based on their "primary purpose" without further definition rendered a social media law unconstitutionally vague); *see also Yost*, 2025 WL 1137485, at *3, 22–23 (the terms "target children," "reasonably anticipated to be accessed by children," and "established" or "widely recognized" media outlets were unconstitutionally vague).

The Act's age verification requirement—another essential requirement intertwined with its other mandates and prohibitions—does not define what counts as "measures reasonably calculated" to achieve an age assurance rate of at least 95%. *Id*. § 13-71-101(2). Nor does Section

32

13-71-101(18) explain what kind of "advance notice" and "confirmation" suffices to establish "verifiable parental consent." Can a minor self-report notice and confirmation? Must a parent submit some kind of identifying information? Is a service required to verify it? The meaning of a "directly connected" account is equally opaque, particularly as applied to social applications that permit users to "follow" another user without sending a request for permission. *Id.* § 13-71-101(5). Likewise, the Act fails to explain or define the ways in which covered companies are expected to "restrict the visibility of a Utah minor account holder's account." *Id.* § 13-71-202(1)(a).

Because no one can know with reasonable certainty what these terms mean, the law fails to provide constitutionally sufficient notice, and invites arbitrary and discriminatory enforcement against disfavored content, viewpoints, and speakers. *See Paxton*, 747 F. Supp. 3d at 1041–42 ("This vast indefinite scope of enforcement would effectively grant the State the discretion to assign liability selectively on the basis of the content of the speech. Such a sweeping grant of censorial power cannot pass First Amendment scrutiny." (cleaned up)). The "predictable tendency" given the ambiguity will be broad censorship of speech to "steer

wide of the unlawful zone." *Counterman v. Colorado*, 600 U.S. 66, 78 (2023) (cleaned up) (citing *Speiser v. Randall*, 357 U.S. 513, 526 (1958)); *see also Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). A preliminary injunction is thus justifiable based on the Act's vagueness alone.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order preliminarily enjoining the Act's enforcement.


Dated: June 3, 2025          /s/ *Robert Corn-Revere*
                             Robert Corn-Revere
                             Arleigh P. Helfer
                             David Rubin
                             FOUNDATION FOR INDIVIDUAL
                                RIGHTS AND EXPRESSION
                             700 Pennsylvania Avenue, SE,
                             Suite 340
                             Washington, DC 20003

                             Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1. All required privacy redactions have been made.

2. Any hard copies of the foregoing brief submitted to the clerk's office are exact copies of the brief as filed via ECF.

3. This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this document contains 6401 words.

4. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

5. This brief filed via ECF is free of viruses.

/s/ *Robert Corn-Revere*
Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 3, 2025, an electronic copy of the foregoing was filed with the Clerk of this Court using the CM/ECF system, and that all parties will be served through that system.

/s/ *Robert Corn-Revere*

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION