No. 24-4100
_____

**In the United States Court of Appeals for the Tenth Circuit**
_____

NetChoice, LLC,

*Plaintiff/Appellee,*

v.

Derek Brown, Utah Attorney General, and Katherine Hass, Director,
Utah Division of Consumer Protection, Utah Department of Commerce,

*Defendants/Appellants.*
_____

On appeal from an order granting a preliminary injunction
U.S. District Court, District of Utah, Honorable Robert J. Shelby,
No. 2:23-cv-00911-RJS-CMR
_____

**Reply Brief of Appellants**
_____

Stanford E. Purser
Utah Solicitor General

Erin T. Middleton
Deputy Solicitor General
David Wolf
Lance Sorenson
Assistant Attorneys General
Utah Attorney General's Office
P.O. Box 140858
Salt Lake City, UT 84114
(801) 366-0533

*Counsel for Derek Brown and
Katherine Hass*

# Table of Contents

Table of Contents ....................................................................ii

Table of Authorities.............................................................iv

Introduction..........................................................................1

Argument..............................................................................1

   I.     The definition is content-neutral..............................1

      A.  Each criteria is content-neutral. ..........................2

          i.   Whether users can "interact socially" is a content-neutral structural feature. ..............................2

         ii.  The list element is content-neutral. ...........................6

        iii. The user-generated speech element is not speaker-based................................................................6

      B.  The structural criteria are not a cover for content discrimination. ....................................................8

      C.  The Act is like a time, place, and manner regulation. .........9

   II.    The Act satisfies intermediate scrutiny. ...................12

      A.  The State has an important interest. ...................13

          i.   The State has an important interest in protecting children's mental health............................14

         ii.  The State has an important interest in protecting children's privacy.....................................17

      B.  The Act is appropriately tailored. ...................19

          i.   The Act is not overinclusive.........................................20

         ii.  The Act is not underinclusive. ....................................24

        iii. Least restrictive means are not required. ...................25

  III.   The Act's specific regulations are not at issue. ........................27

A. The addictive features regulation satisfies
   intermediate scrutiny. ..................................................28

B. The default privacy requirement is constitutional. ............30

C. Age assurance satisfies intermediate scrutiny. ..................33

Conclusion ........................................................................................35

Certificate of Compliance ................................................................36

CM/ECF Certification ......................................................................37

Certificate of Service .......................................................................38

# Table of Authorities

**Cases**

*Abilene Retail No. 33, Inc. v. Bd. of Comm'r's of Dickinson Cnty., Kan.*,
492 F.3d 1164 (10th Cir. 2007) ...................................................... 14, 16

*Aptive Env't, LLC v. Town of Castle Rock, Colo.*,
959 F.3d 961 (10th Cir. 2020) ............................................................. 16

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ............................................................................ 35

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) .......................................................... 13

*Brewer v. City of Albuquerque*,
18 F.4th 1205 (10th Cir. 2021) ..................................................... 20, 21

*Brown v. Ent. Merch. Ass'n*,
564 U.S. 786 (2011) ................................................................ 13, 31, 32

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022) .................................................... 2, 3, 4, 6, 7, 8, 10

*City of Los Angeles v. Alameda Books, Inc.*,
535 U.S. 425 (2002) ............................................................................ 14

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 4:24CV438-MW/MAF,
2025 WL 1570007 (N.D. Fla. June 3, 2025) ............................. 3, 4, 5, 9

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ............................................................................ 30

*Evans v. Sandy City*,
944 F.3d 847 (10th Cir. 2019) ............................................................ 30

*Free Speech Coalition, Inc. v. Paxton*,
606 U.S. ---, 145 S. Ct. 2291 (2025) ....... 11, 12, 20, 24, 25, 26, 27, 34, 35

*Golan v. Holder*,
609 F.3d 1076 (10th Cir. 2010) .......................................................... 20

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ....................................................................... 29, 30

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,*
  452 U.S. 647 (1981) ........................................................................ 10, 30

*Heideman v. S. Salt Lake City,*
  348 F.3d 1182 (10th 2003)................................................................... 16

*Hodgson v. Minnesota,*
  497 U.S. 417 (1990) ........................................................................... 19

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston,*
  515 U.S. 557 (1995) ........................................................................... 10

*Miami Herald Pub. Co. v. Tornillo,*
  418 U.S. 241 (1974) ........................................................................... 10

*Moody v. NetChoice,*
  603 U.S. 707 (2024) ................................................. 5, 10, 11, 22, 27, 28

*Packingham v. North Carolina*
  582 U.S. 98 (2017) ........................................................................... 5, 11

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary,*
  268 U.S. 510 (1925) ........................................................................... 30

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ...................................................................... 2, 3, 4

*Reno v. Am. Civ. Liberties Union,*
  521 U.S. 844 (1997) ........................................................................ 11, 34

*Rimbert v. Eli Lilly & Co.,*
  647 F.3d 1247 (10th 2011)................................................................... 27

*Sorrell v. IMS Health, Inc.,*
  564 U.S. 552 (2011) ........................................................................... 29

*TikTok, Inc. v. Garland,*
  145 S. Ct. 57 (2025) ............................................................. 4, 8, 23, 24

v

*Turner Broad. Sys., Inc. v. F.C.C. (Turner I),*
  512 U.S. 622 (1994) ...................................................... 4, 7, 8, 9, 12, 17

*Turner Broad. Sys., Inc. v. F.C.C. (Turner II),*
  520 U.S. 180 (1997) ......................................... 12, 14, 15, 17, 19, 20, 25

*United States v. Edge Broad. Co.,*
  509 U.S. 418 (1993) .............................................................................. 21

*VoteAmerica v. Schwab,*
  121 F.4th 822 (10th Cir. 2024) ........................................................... 13

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) .............................................................. 12, 20, 29

*Wyoming Farm Bureau Federation v. Babbitt,*
  199 F.3d 1224 (10th Cir. 2000) ........................................................... 27

**Statutes**

15 U.S.C. § 6501 ..................................................................................... 18

15 U.S.C. § 6506 ..................................................................................... 18

Utah Code § 13-61-302(3)(b) .................................................................. 18

Utah Code § 13-71-101(10)(b) ................................................................ 18

Utah Code § 13-71-101(11) ............................................................... 28, 29

Utah Code § 13-71-101(13) ....................................................................... 5

Utah Code § 13-71-101(14) ....................................................................... 5

Utah Code § 13-71-101(14)(a)(i) .............................................................. 1

Utah Code § 13-71-101(14)(a)(iii) ............................................................ 1

Utah Code § 13-71-101(14)(a)(iv) .......................................................... 1, 6

Utah Code § 13-71-101(14)(i) .................................................................... 6

Utah Code § 13-71-101(3) ....................................................................... 33

Utah Code § 13-71-101(5)....................................................................33

Utah Code § 13-71-102 .................................................. 5, 13, 14, 18, 20

Utah Code § 13-71-102(2)...............................................................17, 19

Utah Code § 13-71-102(4)....................................................................31

Utah Code § 13-71-102(8)...........................................................17, 26, 31

Utah Code § 13-71-202 ......................................................................18

Utah Code § 13-71-202(1)....................................................................30

Utah Code § 13-71-202(5)...............................................................28, 29

Utah Code § 13-71-302 ......................................................................33

Utah Code § 76-10-2201 ....................................................................19

Utah Code § 76-11-211 ......................................................................19

## Introduction

The district court's erroneous grant of a preliminary injunction hinges on a narrow issue: whether the Utah Minor Protection in Social Media Act's definition of a social media service (central coverage definition) is content-neutral. It is. The Act's definition is based on a website's structural features, not any topics discussed. NetChoice's contrary argument condemns the Act to strict scrutiny. That would insulate social media from any regulation, despite mounting evidence that minors pay for the hours-a-day they spend there with their mental health and privacy. This Court should reverse the district court's holding that the definition is content-based and remand for the court to apply intermediate scrutiny in the first instance.

## Argument

## I. The definition is content-neutral.

NetChoice incorrectly argues the central coverage definition is content-based because it covers sites that: (1) connect users to "interact socially with each other," (2) "make[] available" a list of connected users, and (3) display content "primarily generated by" users. Utah Code § 13-71-101(14)(a)(i),(iii),(iv); Resp.Br.18-22. None of those criteria

1

is content-based. Each merely identifies a content-neutral structural feature. The Act thus is like a content-neutral time, place, and manner regulation.

### A.    Each criteria is content-neutral.

#### i.    Whether users can "interact socially" is a content-neutral structural feature.

The "interact socially" provision is content-neutral because it does not apply based on "the topic discussed or the idea or message expressed." *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). It only identifies whether a platform structurally connects account holders to allow user-to-user interaction within the platform—about any topic and for any purpose. Aplt.Br.28-30.

This structural feature does not divide the internet between websites that permit social interactions and those that focus on news, professional, commercial, sports, or other content. The cases NetChoice cites in support of its contrary argument addressed laws that expressly exempted such specific topics. Resp.Br.19; Suppl.Auth.Letters (Dkt.62,63).

Utah's law includes no such topical exemptions. Aplt.Br.30. If a platform connects users so they can interact with each other within the platform, then it satisfies this element. That is so even if the site is about news, gaming, careers, or any other topical focus. It is also true regardless of the content of those interactions. The interact-socially criteria is thus content-neutral. *See Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 4:24CV438-MW/MAF, 2025 WL 1570007, at *1, 13-14 (N.D. Fla. June 3, 2025).

Despite that, NetChoice asserts the definition is content-based because it "subtl[y]" regulates subject matter. Resp.Br.20. Not so. This case is not like *Reed*, where the law "single[d] out specific subject matter[s]" by applying different restrictions to signs based on whether their subject matter was political, directional, or ideological. 576 U.S. at 156, 169. Here, the Act applies the same no matter what the interactions discuss.

NetChoice's argument also glosses over *Reagan's* retreat from *Reed's* broad holding. Although *Reagan* confirmed that laws cannot "swap[] an obvious subject-matter distinction for a 'function or purpose proxy' that achieves the same result," it disagreed that classifications

3

considering function or purpose are "*always* content based." *Reagan*, 596 U.S. at 74. It then upheld a regulation differentiating between on- and off- premises signs because the sign's message was irrelevant; it mattered only to inform how the law applied based on the sign's location. *Id.* at 71-72. *Reagan* therefore rejected "the view that *any* examination of speech or expression inherently triggers" strict scrutiny. *Id.* Only laws that discriminate based on "the topic discussed or the idea or message expressed" are content-based. *Id.*

Here, the "interact socially" criteria is not a proxy for a subject-based regulation like the topical categories in *Reed*, but is instead a content-neutral regulation like in *Reagan*. The interactions matter only to inform whether a site is structured to connect its users so they can interact with each other. The subject, message, or purpose of the interaction is irrelevant. *See id.*; *see also Uthmeier*, 2025 WL 1570007, at *14 (holding law regulating "social speech" was content-neutral). The fact that sites cannot "avoid or mitigate" the Act's coverage by altering what those interactions say proves the element's neutrality. *See TikTok, Inc. v. Garland*, 145 S. Ct. 57, 67 (2025) (per curiam) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 644 (1994) (*Turner I*)).

4

This reality does not render the term "socially" superfluous, as NetChoice asserts. Resp.Br.20-21. "Socially" means that the interactions take place between other account holders who are connected in an online community,[1] Aplt.Br.28, or in other words that it is "speech generated by users on social media platforms," *Uthmeier*, 2025 WL 1570007, at *14. This interpretation draws on the common understanding of social media and reflects the Act's express purpose to regulate those sites. Utah Code §§ 13-71-101(13),(14), -102; *see also Moody v. NetChoice*, 603 U.S. 707, 719 (2024) (explaining "the term 'social media platforms' typically refers" to platforms that "allow users to upload content . . . to share with others," so other users can "react to it, comment on it, or share it"). But the social media services that facilitate those interactions—and the interactions themselves—can be about anything. The provision is thus content-neutral.

---

[1] NetChoice argues this interpretation sweeps too broadly. Resp.Br.21. That's not only wrong, *see infra* at II.B.1, but also irrelevant to content-neutrality. *Packingham v. North Carolina*, which NetChoice cites, does not suggest otherwise. 582 U.S. 98, 105 (2017) (assuming without deciding that law was content-neutral).

### ii.    The list element is content-neutral.

NetChoice also argues that the law is content-based because it regulates services that "make[] available" a "list" of other users with whom the user shares a connection within the site. Utah Code § 13-71-101(14)(a)(iv). NetChoice did not argue that below. App.1:96-101;4:796-99. Even so, that element is content-neutral. If a platform provides that list, it matters not who is on it nor what subjects are implicated. Examining the list is only required to inform whether the website has that feature at all. *Reagan*, 596 U.S. at 71. That is no different than examining a sign to determine whether it is on- or off-site. *Id.*

### iii.    The user-generated speech element is not speaker-based.

NetChoice also argues the definition is content- and speaker-based because it differentiates between sites whose content is "primarily generated by account holders." Utah Code § 13-71-101(14)(i); Resp.Br.19, 21. This feature is content-neutral too because it does not differentiate between the "topic discussed or the idea or message expressed." *Reagan*, 596 U.S. at 69. For example, a speaker could post an identical message (about anything) on its own site where it is the

provider and another site where it is a user. Such posts may be relevant to determine whether a site primarily displays user- or provider-generated content, but that has nothing to do with what they say. As in *Reagan*, what matters is where the content is posted, not its message or speaker. The Act is thus not like a law that singles out the press, Resp.Br.21, because their content, and news content in general, is treated like everyone else's.

The user-generated speech element is thus not an impermissible speaker-based distinction. Resp.Br.21. Still, speaker-based distinctions don't automatically trigger strict scrutiny. *Turner I*, 512 U.S. at 658. They demand strict scrutiny only when the "speaker preference reflects a content preference." *Id.* The same is true when regulations apply to "one medium (or a subset thereof) but not others." *Id.* But speaker-based laws do not trigger strict scrutiny when "the differential treatment is 'justified by some special characteristic of' the particular" medium or speaker. *Id.* at 660-61 (internal quotation marks omitted).

The definition's reference to user- and provider-speech reflects a structural characteristic that is particular to social media sites and sets them apart from the rest of the internet. But this distinction does not

7

reflect a content preference, so it does not trigger strict scrutiny.

*TikTok*, 145 S. Ct. at 68.

### B.   The structural criteria are not a cover for content discrimination.

Despite that, NetChoice argues the definition is an attempt to use a content-neutral purpose to excuse a content-based law or regulate structure using content-based criteria. Resp.Br.22-23. Not so. Each of the above criteria is content-neutral on its own. *Supra* at I.A.,I.C. They are no different from the criteria about whether individuals can register as account holders, which NetChoice concedes is content-neutral. Resp.Br.23.

These structural criteria are like the content-neutral standards in *Turner I*, where the law applied based on the number of channels and how they were transmitted, but did not "depend upon the content" of the programming. 512 U.S. at 627, 644-45.  So too here. The Act regulates structure; the content matters only to inform that structure. *Reagan*, 596 U.S. at 71.

To be sure, the Act treats social media services, as defined, differently. They are unlike other sites. Their structure supplies users

with an endless feed of interactive content that has been linked to
excessive use, poor mental health, anxiety caused by fear of missing out,
and privacy concerns. App.2:310-315; 2:341-43. These "special
characteristics" may be different than the monopolistic nature of cable
cited in *Turner I*, but the result is the same, particularly where the Act
does not regulate what those social media services say. 512 U.S. at 659;
*see also Uthmeier*, 2025 WL 1570007, at *13.

**C.    The Act is like a time, place, and manner regulation.**

The cases about time, place, and manner regulations further
support the definition's content-neutrality. Aplt.Br.25. NetChoice
rejects that comparison, arguing time, place, and manner laws cannot
affect a speaker's editorial choices about how to organize and display
speech. Resp.Br.25. The central coverage definition doesn't do that. It
defines who is subject to the Act; it does not regulate what they display
or how they arrange it. Aplt.Br.33.

Even assuming the Act affects how some speech is displayed,
those regulations are similarly content-neutral. *See supra* at I; *see infra*
at III. Contrary to NetChoice's assertion, time, place, and manner
restrictions may limit a speaker's choices about how to present speech.

9

The First Amendment "does not guarantee the right to communicate . . . at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,* 452 U.S. 647, 653-54 (1981). For example, the content-neutral regulations in *Reagan* prohibited off-premises signs from digitizing—a limit on the speaker's editorial choices. 596 U.S. at 65-66.

*Moody* does not suggest otherwise. Resp.Br.25. It held that the government could not alter a social media site's "choices about the views they will, and will not, convey" by compelling them to publish posts against their content moderation policies. 603 U.S. at 737, 738-40. That holding followed earlier decisions that laws cannot compel newspapers to publish editorials or parades to include conflicting messages. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 243, 258 (1974); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 559-81 (1995).

Unlike those laws, the Act doesn't compel social media services to display any specific content. Its requirements are more like the ones limiting sign features or sound volume. Of course, determining a law is content-neutral does not mean the government is necessarily "allowed

10

to regulate" how private speakers publish speech. Resp.Br.25. But that is a question of whether the law satisfies intermediate scrutiny, not of content-neutrality.

NetChoice also argues this Court should not view the Act as a time, place, and manner regulation because those laws typically apply to speech in the public forum. Resp.Br.25. The internet—and specifically social media—is the new public forum. *Packingham*, 582 U.S. at 1041. Yet unlike the public square of old, this new public forum is "inescapable." *Moody*, 603 U.S. at 716. It can no longer be said that it does not "invade" our homes or appear on our screens "unbidden." *Cf. Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 869 (1997) (concluding internet communications are less invasive than television or radio); *Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291, 2313-14 (2025) (*FSC*) (describing exponential growth of internet since *Reno*). It too ought to be subject to time, place, and manner regulations.

The State is certainly not suggesting the First Amendment goes on leave for social media, as NetChoice alleges. Resp.Br.24. The definition is content-neutral under existing First Amendment precedent. *See supra* at I. But applying that precedent must adapt to

11

changes in how we communicate. *See FSC,* 145 S. Ct. at 2314 (observing older cases "do not cease to be precedential" when technology changes, but "respect for past judgments also means respecting their limits" (cleaned up)). Here, that means recognizing that time, place, and manner-like regulations are appropriate and not, as NetChoice suggests, holding that social media cannot be regulated because the very attempt to define it is content-based.

## II. The Act satisfies intermediate scrutiny.

The district court erred by applying strict scrutiny. Content-neutral laws are subject to intermediate scrutiny because they are less likely to "excis[e] certain ideas or viewpoints from the public dialogue." *FSC*, 145 S. Ct. at 2302 (quoting *Turner I*, 512 U.S. at 642 ). A law satisfies intermediate scrutiny if it advances important government interests and does not burden "substantially more speech than necessary." *Id.* at 2317 (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997) ("*Turner II*")); *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989).

This Court need not decide whether the Act passes intermediate scrutiny. The district court did not apply it, nor did it determine what

scrutiny applies to the other challenged provisions. The Court thus need only hold that the law is content-neutral and remand so the district court can apply intermediate scrutiny in the first instance. *See VoteAmerica v. Schwab*, 121 F.4th 822, 852 (10th Cir. 2024). The State addresses it here only to quickly reply to NetChoice's intermediate-scrutiny arguments and assure the Court that remand will not be futile because the State has valid arguments for the district court to consider.

### A.    The State has an important interest.

The State has an important interest in "safeguarding the well-being and privacy" of children from social media's harms. Utah Code § 13-71-102; Aplt.Br.42-53. NetChoice's argument that this interest is insufficient conflates strict scrutiny's compelling interest with intermediate scrutiny's important one. *See* Resp.Br.27-28 (citing *Brown v. Ent. Merch. Ass'n¸* 564 U.S. 786, 799 (2011) and *Awad v. Ziriax*, 670 F.3d 1111, 1130 (10th Cir. 2012)). Relying on strict scrutiny cases, NetChoice incorrectly asserts the State needs a "direct causal link" between that interest and the harms. *Id.*

Intermediate scrutiny does not require the State to prove the same causation as strict scrutiny. *Brown*, 564 U.S. at 799 (noting strict

13

scrutiny burden is "much higher"). It does not ask whether the legislature was correct, but rather whether it "drew reasonable inferences" supported by "substantial evidence." *Turner II,* 520 U.S. at 195, 211; *see also City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 437 (2002) (intermediate scrutiny doesn't require empirical proof). And while courts have "independent judgment," Resp.Br.28, they still cannot "replace" legislative factual predictions with judicial ones or "reweigh the evidence *de novo*." *Abilene Retail No. 33, Inc. v. Bd. of Comm'r's of Dickinson Cnty.*, *Kan.*, 492 F.3d 1164, 1174 (10th Cir. 2007).

### i.    The State has an important interest in protecting children's mental health.

The legislature's finding that social media threatens children's mental health is supported by substantial evidence. Utah Code § 13-71-102. The Surgeon General's Advisory and Dr. Twenge's declaration report, among other things, that excessive social media use is linked to poor sleep (and its attendant negative health outcomes), attention problems, and rising rates of depression. App.2:309-310,312-14,341-42; *see also* Aplt.Br.6-9. And the "social media-induced fear of missing

out . . . has been associated with depression, anxiety, and neuroticism." App.2:342.

Adolescents are particularly vulnerable because they are "susceptible to social pressures, peer opinions, and peer comparisons." App.2:337. That is concerning because "[n]early every" American teenager uses social media, with many of them "spend[ing] an average of 3.5 hours per day" on it. App.2:339,343. More troubling still, "social media platforms are often designed to maximize user engagement." App.2.341.

Yet NetChoice argues the State does not have substantial evidence because social media has some benefits and "more research is needed." Resp.Br.29.[2] These arguments "misapprehend[] the relevant inquiry." *Turner II*, 520 U.S. at 211. Some evidence supporting a "contrary conclusion" does not mean the State does not have substantial evidence of harm. *Id.* Nor need the State wait until every avenue of

---

[2] Zoulek amici cite a declaration from their case, which is not in the record and was not addressed by the district court. Dkt. 53, at 15. This Court should not consider it for the first time.

research is exhausted. *Cf. Aptive Env't, LLC v. Town of Castle Rock, Colo.*, 959 F.3d 961, 992-93 & n.11 (10th Cir. 2020) (noting there is no requirement for municipalities to "perform a double blind empirical study" before legislating (cleaned up)). Indeed, the Surgeon General's call for research came with a warning: children can't wait years because "[t]heir childhoods and development are happening now." App.2:336,345.

Granted, social media is not the only danger. Dr. Twenge's report acknowledges some risks of broader technology use. Resp.Br.29. But the bulk of her declaration—and the Surgeon General's Advisory—discuss "social media" specifically. *See, e.g.,* App.2:336,338-42,307-08,310-15. The legislative committee witnesses testified about social media too. Aplt.Br.49-50.

Dr. Twenge's anecdotal examples about specific social media sites also do not undermine the State's important interest. Anecdotal evidence is appropriate, *Abilene*, 492 F.3d at 1174, especially where this appeal arises from a preliminary injunction conducted under "pressured time constraints" and with limited evidence, *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

16

NetChoice asserts the State's interests are insufficient because the legislative findings were less detailed than those in *Turner I*. Resp.Br.30. But *Turner I* did not decide whether the law satisfied intermediate scrutiny. It remanded for that determination. 512 U.S. at 668 (plurality). And on remand, the lower court considered the legislative record plus other evidence developed on remand. *Turner II*, 520 U.S. at 187, 196, 204. Intermediate scrutiny is thus not limited to the legislative deliberations. The State did not err by using declarations to support its important interests below. Aplt.Br.47-50. NetChoice also attempts to undermine the State's interests by arguing the State cannot restrict children's exposure to ideas. Resp.Br.27. As already discussed, the Act does not restrict minors access to any topic or idea. *See supra* at I.

## ii. The State has an important interest in protecting children's privacy.

The State has an important interest in requiring a "higher standard" of privacy for children's data and personal information on social media. App.2:347; Utah Code § 13-71-102(2),-(8). Those terms are not euphemisms for speech. Personal information is a defined term,

17

which includes the minor's birthdate, home address, social security numbers, and geolocation information. Utah Code § 13-71-101(10)(b). User data is also broader than a post's message. It includes other information that may be derived from a child's social media presence, including location, age, and family information that minors might not even realize is there for the taking.

The State's interest in protecting children's privacy supports the Act's limited guardrails on account visibility. *Id.* § 13-71-102, -202. Children often do not appreciate the risks of providing information about themselves on social media, including that posts may spread everywhere and last forever.[3] Aplt.Br.12, 51.

Children's inability to fully comprehend consequences has long supported parental consent requirements, including in contexts that

---

[3] NetChoice challenges this interest because of the Utah Consumer Privacy Act. Resp.Br.34n.6. But that law provides only a minimum level of protection for certain data and provides no particularized protection of minors' data apart from incorporating federal law. See Utah Code §§ 13-61-302(3)(b) (incorporating the Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501 to -6506). It allows the legislature to enact additional protections for minors' data on social media services.

18

may implicate constitutional rights. *Hodgson v. Minnesota*, 497 U.S. 417, 444-45 (1990). Minors must, for example, obtain parental consent to get a tattoo or piercing—even though those are expressive—or to possess a firearm. Utah Code §§ 76-10-2201, 76-11-211. So too here. The Act serves the State's important interest by requiring social media services to use default settings to minimize the "widespread collection and utilization" of minor's data without parental consent before they are old enough to understand those risks. *Id.* § 13-71-102(2).

NetChoice complains the State's asserted interests make it too easy for governments to regulate speech. Resp.Br.30. Not so. Those interests are substantial and, in any case, government interests are only one part of the constitutional inquiry. But NetChoice's argument that the State's interests are insufficient because social media contains speech essentially asks this Court to immunize those sites from regulation, allowing them to profit from children's attention and data without any oversight.

**B.     The Act is appropriately tailored.**

Intermediate scrutiny allows the government to "employ the means of its choosing" to promote its interests, *Turner II*, 520 U.S. at

19

213, if those interests would be achieved less effectively without the law and the means do not "burden substantially more speech than is necessary to further" them, *FSC*, 145 S. Ct. at 2317. NetChoice's arguments that the Act is both overinclusive and underinclusive and does not use the least restrictive means misunderstand intermediate scrutiny.

### i.    The Act is not overinclusive.

A law is appropriately tailored when it "focuses on the source" of the harms the government wants to address without "significantly restricting a substantial quality of speech" that does not create the same harms. *Golan v. Holder*, 609 F.3d 1076, 1091 (10th Cir. 2010) (quoting *Ward*, 491 U.S. at 799). It must be "congruent to the benefits" the law affords. *Id.* (quoting *Turner II*, 520 U.S. at 215-16). That balance demands a "close fit," not a perfect one. *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1223-24 (10th Cir. 2021).

NetChoice argues the Act's social media definition is not a close fit because it covers platforms that don't use autoplay, infinite scroll, or push notifications. Resp.Br.31-32. Those features were not the State's only concern. Utah Code § 13-71-102. Even without them, social media

20

platforms risk exposing minors' data and personal information to the world before they fully understand those risks. *Supra* at II.A.ii. Limiting the Act to only services that use these addictive design features would not protect the State's interests as effectively.

NetChoice also asserts the Act regulates too much because the State doesn't have a study showing Dreamwidth harms minors. Resp.Br.32. A single site does not show the Act regulates *substantially* more speech than necessary. Intermediate scrutiny, after all, doesn't require a perfect fit. *Brewer*, 18 F.4th at 1225. And as NetChoice acknowledges, the law's validity depends on "the relation it bears to the overall problem," and not the "extent to which it furthers the government's interest in an individual case." *United States v. Edge Broad. Co.*, 509 U.S. 418, 430 (1993) (internal quotation marks omitted) (recognizing law was valid even if it "would no more than marginally" serve government interests as applied to plaintiff).

NetChoice tries to supplement that example by naming a college football forum and a recipe sharing app. Resp.Br.33. There is no record evidence about these platforms. Still NetChoice faults the State for "not offer[ing] any justification" for regulating them. *Id.* NetChoice

apparently wants this Court to conduct its own facial analysis, complete
with factual findings, to determine whether the Act applies to those
sites and, if so, whether any unconstitutional applications
"substantially outweigh[]" the constitutional ones, *Moody*, 603 U.S. at
718. The Court should not conduct that inquiry in the first instance.[4]
*See id.* at 726; *States' Am.Br.*11-15.

Even assuming those platforms are social media services under
the Act, regulating them would be congruent with the State's interests.
The Act does not carve out websites based on content. *Supra* at I.
Minors may still get caught in an endless, interactive feedback loop on
social media services with a specific topical focus, like sports or video
games. Those sites also may still compromise minors' privacy. Indeed,
the legislature heard testimony that small social media companies may
be more incentivized to monetize user information to compete with

_____

[4] Evidence about the specific platforms identified by the amici curiae is
also not in the record. Determinations about how those sites affect the
constitutional analysis of the Act should be reserved for remand.

larger platforms.[5] The fact that some regulated sites may be smaller, have fewer minor users, or have a topical focus, does not mean the Act is incongruent with the overall problems the State is trying to address.

To be sure, the Act regulates more than the law in *TikTok,* Resp.Br.33, which specifically applied to sites operated by TikTok or its owner. *TikTok*, 145 S. Ct. at 63-64. Regardless, *TikTok* supports the State's position. Although that case involved national security concerns, the Court applied its well-established intermediate scrutiny standard. *Id.* at 67-71. The application of that standard considered the unique facts of that case, as is true in any case. *Id.* at 70-71. Just as that law was appropriately tailored to address the government's interests in protecting data from TikTok's foreign owners, this law is appropriately tailored to protect minors and their data on social media. It is not some "covert" attempt to manipulate content. Resp.Br.34 (quoting *TikTok*, 145 S. Ct. at 73 (Gorsuch, J., concurring)).

---

[5] *See* Testimony of Serge Jorgenson*,* Feb. 14, 2024, at Min. 17:04, https://le.utah.gov/av/committeeArchive.jsp?timelineID=250130.

### ii.    The Act is not underinclusive.

NetChoice also argues the Act is not inclusive enough. Yet the Supreme Court twice recently reiterated that intermediate scrutiny "imposes no freestanding underinclusiveness limitation." *FSC*, 145 S. Ct. at 2318; *TikTok*, 145 S. Ct. at 70. *FSC* thus upheld a law requiring age verification on certain pornography sites "where children are likely to find sexually explicit content." 145 S. Ct. at 2318. The Court held the state had a "reasonable basis" for concluding the regulated sites were more inappropriate for children than other sites that were not subject to the law. *Id.*

While *FSC* did not address social media sites, its intermediate scrutiny analysis is instructive. There may be websites that are not covered by the Act even though they share some features with social media services, like allowing autoplay or push notifications. Resp.Br.35. There are also risks associated with other digital media. But the State need not craft a law to solve all the internet's perils "in one fell swoop." *FSC*, 145 S. Ct. at 2318 (internal quotation marks omitted).

The State had a reasonable basis to determine that sites satisfying the Act's definition of social media services most threaten

24

minors' privacy and mental health. That reasonable inference was supported by substantial evidence that "social media platforms are designed to maximize user engagement," which can "encourage excessive use and behavioral dysregulation," poor sleep, and "social-media induced fear of missing out" that has been tied to "depression, anxiety, and neuroticism," among other concerns. App.2:312-15,341-42; *see also States' Am.Br.*7-8,10-11.

### iii.    Least restrictive means are not required.

NetChoice argues the Act fails intermediate scrutiny because it isn't the "least restrictive means" of achieving the State's interest. Resp.Br.36. Intermediate scrutiny does not demand least restrictive means. *FSC,* 145 S. Ct. at 2317. Nor are regulations "invalid simply because there is some imaginable," less-burdensome alternative. *Turner II*, 520 U.S. at 217.

According to NetChoice, the Act is not narrowly tailored because the State could have promoted parental tools.[6] Resp.Br.37. *FSC* rejected

---

[6] NetChoice argues *Uthmeier* held a social media law failed intermediate scrutiny because Florida could have promoted parental tools. Supp.Auth.Let.(Dkt. 60), at 2. That case predates *FSC*. But it is

similar arguments. *FSC*, 145 S. Ct. at 2318. The Court upheld the age assurance law, concluding the government's interest in protecting children from obscenity would be "achieved less effectively" without it. *Id.* That was enough, "regardless of whether some other approach might be superior." *Id.* This was so even though it was unclear whether the law allowed websites to use newer methods of age verification that were less likely to raise privacy concerns. *Id.* at 2318 n.14.

NetChoice is not substantially likely to prevail for similar reasons. The State's interests would be less effectively served without the Act. The State found that the "existing measures employed by social media companies to protect minors have proven insufficient." Utah Code § 13-71-102(8). That finding is supported by evidence that teens easily circumnavigate those controls and that parents are struggling to keep up. App.2:326-27,345. Requiring the State to promote those same inadequate parental controls would achieve the State's interests less effectively than requiring social media companies to shoulder some of

_____

an example of a district court applying intermediate scrutiny in the first instance, as the district court should do here.

26

the responsibility by setting default privacy settings and disabling

addictive features on minors' accounts. NetChoice's or the district

court's preference for another approach is irrelevant. *FSC*, 145 S. Ct. at

2317.

## III. The Act's specific regulations are not at issue.

The district court did not reach NetChoice's facial challenges to

the Act's specific provisions about addictive features, privacy settings,

and age assurance.[7] App.1:37,46-50,54-56;5:941n.85. Those claims are

not part of this appeal. This Court should let the district court consider

them first so it can make necessary factual determinations about those

provisions and their applications. *Moody*, 603 U.S. at 723 (remanding

case for facial analysis); *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1256

(10th 2011) (affirming on alternative grounds is disfavored). Still, the

State briefly addresses those claims.

---

[7] The district court also did not reach NetChoice's vagueness claims. NetChoice does not raise vagueness on appeal, but some amici do. Dkt. 43, 53. This Court should not reach those issues. *See Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1231 n.2 (10th Cir. 2000) (stating court generally doesn't reach claims raised only by amicus curiae).

A. **The addictive features regulation satisfies intermediate scrutiny.**

NetChoice is not substantially likely to prevail on the merits of its challenge to the provision regulating push notifications, infinite scroll, and autoplay on minors' accounts. Utah Code § 13-71-202(5).

NetChoice complains that provision limits its editorial discretion, but it has not shown whether any of those features express human choices. *Moody*, 603 U.S. at 736 n.5. Even if humans initially adopted the algorithm, Resp.Br.45,45n.8, NetChoice has not shown whether the algorithm, once implemented, conveys a message beyond responding "solely to how users act online." *See Moody*, 603 U.S. at 736 n.5; *id.* at 746 (Barrett, J. concurring).

Setting that aside, NetChoice argues the State cannot regulate push notifications because they contain facts and opinions about whether users will find content useful. Resp.Br.46. Recall that a "push notification" is an "automatic electronic message" that appears when the social media service is not "actively open or visible on the device." Utah Code § 13-71-101(11).

28

The push notification regulation still allows social media services to alert minors about anything that could have been in a push notification. Platforms just must wait to notify minors until they open the application rather than interrupt them when they are away. *Id.* The provision also applies regardless of the notification's content. *Id.* § 13-71-202(5). The regulation is thus nothing like the unconstitutional law that banned pharmaceutical companies from using "facts" about prescribing doctors in advertising. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 570, 580 (2011).

Push notifications are more like a loudspeaker. Just as the law can require a speaker to reduce the volume, so too can it dampen noise from push notifications. *See Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) (upholding ordinance restricting noises that disturb schools); *Ward*, 491 U.S. at 802 (upholding law requiring use of city amplification equipment to avoid "excessive sound").

The same is true for infinite scroll and autoplay. Those content-neutral regulations don't stop social media services from communicating anything. Utah Code § 13-71-202(5). Both provisions merely prevent social media companies from displaying an endless

29

content feed, numbing children's ability to realize how long their attention has been captive. The provisions are as narrowly tailored as regulations that have been upheld despite some limits on editorial choices. *See Grayned*, 408 U.S. at 116; *see also Heffron*, 452 U.S. at 653-54 (upholding state fair regulation that anyone promoting anything must do so from a booth despite religious group's protest it couldn't communicate as effectively); *Evans v. Sandy City,* 944 F.3d 847, 860 (10th Cir. 2019) (upholding law restricting standing in certain medians despite plaintiff's desire to speak there).

### B.    The default privacy requirement is constitutional.

NetChoice is also not substantially likely to succeed on its challenge to the parental consent requirement for changing the default privacy settings, including settings that limit minor account visibility. Utah Code §§ 13-71-202(1),-204(1); Resp.Br.37.

Minors' First Amendment rights "are not co-extensive with" adults' rights because their brains are not fully developed and they lack maturity to understand consequences. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 214 n.11(1975) (cleaned up). This dovetails with parents' fundamental rights to direct their children's upbringing. *Pierce v. Soc'y*

*of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 535 (1925). The Act's parental consent requirement protects both these important interests. Utah Code § 13-71-102(4),-(8); *see supra* at II.A.

To be sure, these interests don't give states unlimited power to protect children from unsuitable "ideas." *Brown*, 564 U.S. at 795, 805. But the Act here is distinguishable from *Brown*'s content-based law banning the sale of violent video games. The State is not interested in shielding minors from "ideas." It wants to protect their mental health and privacy from the risks of worldwide exposure.

The Act also doesn't unconstitutionally prevent minors from speaking or listening. While children can "speak" and "be spoken to" without their parents, Resp.Br.38 (quoting *Brown*, 564 U.S. at 795 n.3), *Brown* did not hold that right was unlimited. That quote responded to the dissent's proposition that speaking to children without parental consent was a category, like obscenity for minors, outside of First Amendment protection. 564 U.S. at 835 (Thomas, J., dissenting). The Court rejected that theory, noting that a state cannot "prevent children from hearing or saying *anything*" at all without parental consent. *Id.* at 795 n.3 (emphasis added). A state could not, for example, require

31

parental consent before minors attend church. *Id.* But *Brown* left open the possibility that there are narrow circumstances when government could limit the dissemination of speech to minors. *Id.* at 794-95, 795 n.3 (surmising that state could require concert promoters to exclude minors whose parents had prohibited them from attending).

In any case, minors do not need parental consent to speak or be spoken to under the Act. They can accept a request from or initiate a request to anyone they want, including public officials or college recruiters, without parental consent. Aplt.Br.65-66. So while a minor may not be able to "leave a comment on an unconnected" account's page, Resp.Br.39, they can initiate the connection. Once connected, they can directly communicate with and their content would be visible to that user.[8] And even without a connection, minors can still see the content on any other publicly visible account.

---

[8] Amici argue that even a child on a soapbox can speak to those outside his inner circle. Dkt. 48, at 18. That argument disregards a minor's ability to expand his network. But there are different risks to a child on a soapbox and on social media. The child on a soapbox is exposed to those within the physical time and place limitations of the public

NetChoice complains that some sites do not use bilateral connections. Resp.Br.40-41; Utah Code § 13-71-101(3), (5). The district court did not address how the Act applies in those cases. But technology allows such bilateral connections. If some sites opt not to use it, the site, not the Act, is preventing children from speaking and being spoken to.

NetChoice also argues the parental verification requirements fail heightened scrutiny. Resp.Br.41. The district court did not address that either, but the alleged difficulty in verifying a parent-child relationship is neither new nor insurmountable, as it is required in other contexts. The Act also provides a safe-harbor for any mechanism that follows the Division's rules. Utah Code § 13-71-302.

## C.    Age assurance satisfies intermediate scrutiny.

The district court only mentioned age assurance in a footnote, noting it "appear[ed]" the Act was overinclusive because the age assurance provision burdened adult's access to social media services.

---

square. The child on social media, along with all his data, is exposed to the entire world forever.

App.5:956 n.169. It didn't resolve the parties' dispute about the level of scrutiny or otherwise address the provision.

The Supreme Court has since decided *FSC*. That case does not resolve what level of scrutiny applies to the Act's age assurance requirements. It addressed only the peculiar circumstances of obscenity which falls outside of First Amendment protection for minors, while still being protected for adults. *FSC,* 145 S. Ct. at 2309. The Court held that age assurance requirement was subject to intermediate scrutiny because it was "incidental to the statute's regulation of activity that is not protected by the First Amendment." *Id.*

That analysis is not helpful because the Act does not necessarily regulate sites that contain information protected for adults but not minors. The appropriate level of scrutiny is instead governed by *Reagan*, *Turner I*, and other precedent distinguishing between content-neutral and content-based laws. *See supra* at I.

The age assurance requirement is content-neutral under those cases. It does not distinguish between sites based on whether they have sexual content like the laws in *FSC* or the Court's prior internet age verification cases. *FSC,* 145 S. Ct. at 2311-12 (discussing *Reno*, 521 U.S.

34

844, and *Ashcroft v. ACLU*, 542 U.S. 656 (2004)). *FSC* thus does not support NetChoice's assertion that strict scrutiny applies to a content-neutral age assurance requirement. Suppl.Auth Let.(Dkt. 64), at 1. It is, at most, subject to intermediate scrutiny.

While *FSC* does not govern the level of scrutiny, its application of the well-established intermediate scrutiny test is helpful. *FSC,* 145 S. Ct. at 2317-19. *FSC* held the statute's age verification requirements were "plainly legitimate" because they advanced Texas's interest in protecting children from harm, relied on well-established verification models, and age verification services "have every incentive to assure" users' privacy. *Id.* So too here. App.2:319-30; Aplt.Br.59.

## Conclusion

For the foregoing reasons, this Court should reverse and remand.

Respectfully submitted,

/s/ Erin T. Middleton
Erin T. Middleton
Deputy Solicitor General
*Counsel for Derek Brown and
Katherine Hass*

35

## Certificate of Compliance

1.     This brief complies with the type volume limitation of Fed.

R. App. P. 32(a)(7)(B) and Local Rule 32(B) because it contains 6,399

words, excluding those parts of the brief exempted by the Rule.

2.     This brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been

prepared in a proportionally spaced typeface using Microsoft Word in

Century Schoolbook 14-point font.


<u>/s/ Erin T. Middleton</u>
Erin T. Middleton
Deputy Solicitor General
*Counsel for Derek Brown and*
*Katherine Hass*

## CM/ECF Certification

Pursuant to Section II(J) of the Court's CM/ECF User's Manual, the undersigned certifies that:

1.    All required privacy redactions have been made.

2.    Any hard copies of the foregoing brief required to be submitted to the clerk's office are exact copies of the brief as filed via ECF; and

3.    The brief filed via ECF was scanned for viruses with the most recent version of Microsoft Defender Antivirus, and according to the program, is free of viruses.

/s/ Erin T. Middleton
Erin T. Middleton
Deputy Solicitor General
*Counsel for Derek Brown and Katherine Hass*

37

## Certificate of Service

I hereby certify that on the 30th day of July, 2025, I electronically filed a copy of the foregoing brief using the Court's CM/ECF system, and all parties will be served through that system.

/s/ Erin T. Middleton
Erin T. Middleton
Deputy Solicitor General
*Counsel for Derek Brown and Katherine Hass*